UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

Government.

v.                                Case No. **01-80778**

**AHMED HANNAN,**
**KARIM KOUBRITI,**
**ABDEL ILAH EL MARDOUDI,**

Defendants.

_____/

**POST TRIAL EVIDENTIARY HEARING**

BEFORE THE HONORABLE **GERALD E. ROSEN**
United States District Judge
860 US Courthouse & Federal Building
231 Lafayette Boulevard West
Detroit, Michigan
**Friday, December 12, 2003**

**APPEARANCES:**

**JEFFREY COLLINS**
United States Attorney
Eastern District of Michigan

**JONATHAN TUKEL**
First Assistant United States Attorney

**ALAN GERSHEL**
Chief Assistant, Criminal Division
United States Attorneys Office

Stenographically reported by:  Carol S. Sapala, RMR-FCRR

**USA V Koubriti, et al 01-80778**

APPEARANCES:   (continuing)

**ERIC STRAUS**
**JOSEPH ALLEN**
**RICHARD CONVERTINO**
**KEITH CORBETT**
Assistant United States Attorneys


**JOSEPH CAPONE**
Department of Justice
Trial Attorney
Counter Terrorism Section


**RICHARD HELFRICK**
**LEROY SOLES**
**JAMES GEROMETTA**
Federal Defender Office
On behalf of Defendant Koubriti.

**JAMES C. THOMAS**
**JOSEPH NISKAR**
On behalf of Defendant Hannan.


**WILLIAM S. SWOR**
**MARGARET RABEN**
On behalf of Defendant El Mardoudi.

ALSO APPEARING:

**HAROLD GUREWITZ**
On behalf of Witness Milton Jones.


**STEVEN RABAUT**
On behalf of Witness Youssef Hmimssa.


ALSO PRESENT:

**ROBERT MORGAN**
Attorney at Law


THE INTERPRETERS:   David Habboo, El Sayed Mostafa

**USA V Koubriti, et al 01-80778**

# C O N T E N T S

IDENTIFICATION                                                          PAGE


WITNESSES

NINA TRUMP

Examination by the Court                                                10

Cross Examination by Mr. Helfrick                                       17

Cross Examination by Mr. Thomas                                         19

Cross Examination by Mr. Straus                                         21


MILTON BUTCH JONES

Examination by the Court                                                23

Cross Examination by Mr. Straus                                         26

Examination by the Court                                                26


YOUSSEF HMIMSSA

Examination by the Court                                                37

Cross Examination by Mr. Helfrick                                       44

Cross Examination by Mr. Thomas                                         48

# C O N T E N T S   (continuing)

**IDENTIFICATION**                                                    **PAGE**

Statement by Mr. Joseph Allen                                          58

Statement by Mr. Joseph Capone                                        76

Statement by Mr. Allen Gershel                                        81

Statement by Mr. Richard Convertino                                   87

Statement by Mr. Keith Corbett                                        114

Statement by Agent Michael Thomas                                     132

Statement by Agent James Brennan                                      132

Statement by Mr. Richard Helfrick                                     134

Statement by Mr. James Thomas                                         141

Statement by Ms. Margaret Raben                                       147

Statement by Mr. William Swor                                         153

Statement by Mr. Leroy Soles                                          157

Statement by Mr. Harold Gurewitz                                      159

Statement by Mr. Stephen Rabaut                                       165

Statement by Mr. Robert Morgan                                        165


Certification of Court Reporter                                       172

# E X H I B I T S

| IDENTIFICATION | MARKED | RECEIVED |
|---|---|---|
| **Court Exhibit 1A**<br>Wayne County Jail records<br>of Milton Jones | | 22 |
| **Court Exhibit 1B**<br>Wayne County Jail records<br>of Youssef Hmimssa | | 22 |
| **Court Exhibit 2**<br>Milton Jones letter | | NA |
| **Court Exhibit 3**<br>Fax cover sheet from<br>Richard Convertino to<br>Harold Gurewitz dated 2-22-02 | | 91 |

USA V Koubriti, et al 01-80778

Detroit, Michigan

Friday, December 12, 2003

12:01 p.m.

**THE LAW CLERK:**  Calling case number 01-08778, United States of America versus Karim Koubriti, Ahmed Hannan and Abdella Ilah-ElMardoudi.

**MR. CONVERTINO:**  Morning, Your Honor Eric Straus, Assistant United States Attorney, appearing on behalf of the United States.

I also have several Assistant U.S. Attorneys at counsel table, also.

**MR. HELFRICK:**  Richard Helfrick, Leroy Soles and James Gerometta, on behalf of Karim Koubriti, who's present.

**MR. THOMAS:**  Jim Thomas and Joseph Niskar, on behalf of Ahmed Hannan.

**MR. SWOR:**  William Swor, Margaret Raben, on behalf of Mr. El Mardoudi.

**THE COURT:**  Good afternoon.  It's nice to see all of you again.

As you all know, I have scheduled this emergency hearing to address issues raised by the disclosure of evidence, which is arguably evidence that should have been disclosed prior to the trial, or at the very latest, prior to the close of the trial.

The record should reflect that I have met in

chambers with all counsel, and I intend to address today, both evidentially and legally, the matters raised by the failure of the government to turn over this material.

In terms of the way we are going to proceed this morning or, I guess this afternoon, now, I am first going to call, as a witness, from the Wayne County Jail, Ms. Nina Trump, on the issue of whether Mr. Milton Jones was at any time housed with Youssef Hmimssa.

I must tell you that after discussing this with Nina Trump and all counsel. I don't think that there is a serious issue about that, but I want to establish an evidentiary record on it I want to give counsel an opportunity to question Ms. Trump if they wish to.

I next intend to call Milton Butch Jones. Mr. Jones' attorney is present, because Mr. Jones's testimony potentially implicates Mr. Jones' own interests in a case pending against him in this Court. And I believe Mr. Gurewitz is here somewhere.

**MR. GUREWITZ:** I am, Your Honor, seated in the back of the courtroom.

**THE COURT:** When Mr. Jones is called, I want you to come up as well.

Following Mr. Jones's testimony, I intend to call Youssef Hmimssa.

As I will with Mr. Jones, I will question.

**USA V Koubriti, et al 01-80778**

After conferring with counsel who indicated tome in chambers that they wished me to follow this process, I will question first, then I will give counsel an opportunity to question and we'll do that with all three witnesses.

With respect to the issues surrounding the failure of the Government to turn over this evidence, I have advised counsel in chambers that I am going to question them as to how this occurred.

Procedurally, I am not going to put them under oath. However, as I indicated to them in chambers, I view their statements that they make to the Court as tantamount to being under oath.

Specifically, I rely upon the American Bar Association Model Rules of Professional Conduct Rule 3.3 which says:

Attorneys are officers of the court and when they address the judge solemnly, upon a matter before the Court, their declarations are made under oath.

I'm sorry. Their declarations are virtually made under oath.

That is also a quote directly from *Holloway versus Arkansas*, United States Supreme Court decision 435 United States 475 at page 486.

The Sixth Circuit has essentially held the same

USA V Koubriti, et al 01-80778

thing, stating in *Smith versus Anderson*, 689 F2d. 59 at Page 64:

> That statements made by an attorney in his capacity as an officer of the court, are made as if upon oath.

So any representations made in this courtroom in response to questions that I ask, will be treated as statements made by an officer of the court.

And, by the way as I indicated to counsel in chambers, I may have questions for defense counsel as to their state of knowledge about these documents as well. Their statements will be treated the same way.

The only difference between, in my view, between administering the oath and the statements that are made is that there will be no cross examination.

If, after today's hearing, I deem it necessary to convene a further evidentiary hearing to take statements under oath by counsel and subject lawyers to cross examination, I will notice that hearing and proceed accordingly.

All right.  Is there anything else before we call the witness?

**MR. STRAUS:**  None from the government, Your Honor.

**MR. SWOR:**  No, Your Honor.

**MR. HELFRICK:**  No, Your Honor.

USA V Koubriti, et al 01-80778

Nina Trump-Examination/The Court

THE COURT:  All right.  Ms. Nina Trump.  Is she in court?  If you'd come up, please.

(Whereupon the witness was then sworn)

THE COURT:  Be seated.  Give and spell your full name.

THE WITNESS:  First name N-i-n-a, Lu l-u last Trump, t-r-u-m-p.

### EXAMINATION

Q    Ms. Trump, you are employed how?

A    Police Lieutenant with the Wayne County Sheriff's Department.

Q    In what capacity?  What is your role?

A    My current assignment is, I supervise the Special Services Section at the Sheriff's Department.

Q    When you say you supervise that section, what do you do?

A    They're three sergeants and seven officers assigned to the Special Services Section.

I supervise their various activities, investigations.  They report to me when it is their duty.

THE COURT:  Do you have knowledge of the Wayne County Jail and how the Wayne County Jail is set up and the different sections in the Wayne County Jail?

A    Yes.

Q    Okay.  Are you able to understand Wayne County Jail

Nina Trump-Examination/The Court

records?

A    Yes.

Q    Do you have records with you today from the period of October of 2001 through the period of March of 2001?

MS. RABEN:  2002.

THE COURT:  I'm sorry. 2002.

THE WITNESS:  The records that I have here cover various parts of that, yes.

BY THE COURT::

Q    Of prisoner movement?

A    Yes, sir.

Q    Okay.  Specifically, do you have records concerning the placement of two prisoners?

A    Yes, sir.

Q    Milton Jones and Youssef Hmimssa?

A    Yes.

Q    During that period?

A    Yes, sir.

Q    Okay.  Have you reviewed those records?

A    Yes, sir.  I have.

Q    Do you have them with you there?

A    Yes, sir.  I do.

Q    Can you look at those records and tell me, first, whether Butch Jones, Milton Butch Jones and Youssef Hmimssa, were at any time during that period, in proximity to each

## Nina Trump-Examination/The Court

other in the Wayne County Jail, such that they could converse?

A     Yes, sir.  They were.

Q     And what are those periods?

A     They're two periods of time.

The first beginning on December 20, 2001 at 1656 hours and ending on January 8, 2002.

Q     I'm sorry.  1656 hours.

A     Yes, sir.

Q     Okay.  And ending when?

A     Ending January 8, 2002 at 12:05 hours.

And the second period of time beginning on January 24, 2002 at 1134 hours and concluding on January 25 of 2002 at 1011 hours.

Q     December 20, 2001, beginning at 1656?

A     Yes.

Q     And concluding January 8, '02 at what time?

A     1205.

Q     Could you be -- in reviewing those records, can you tell exactly where they were in proximity to each other?

A     Mr. Hmimssa was housed in Jail Division II Wayne County Jail Ward 604, Cell 3.

Q     I'm sorry.  Ward 604.

A     604, Cell 3.

Q     We're talking about the December 20 period?

Nina Trump-Examination/The Court

A    Yes.

Q    Through January 8, correct?

A    Yes.

Q    All right.

A    During that time period, Mr. Jones was housed in Jail Division II, Wayne County Jail.

Q    I'm sorry.  Where?

A    Jail Division II, what we refer to as The Old Jail.

Ward 604, Cell 2.  So they were in adjacent cells.

Q    Right next to each other?

A    Yes, sir.

Q    Could you describe for me the physical structure of those two cells and whether or not Mr. Hmimssa and Mr. Jones would have been able to converse.

A    Ward 604 is a maximum security housing unit.

What that means is, is that inmates who are housed on that unit are in locked status 23 out of the 24 hours.

They are locked -- they are confined to their cells.

One hour a day, they are allowed out of the cell for showers, to walk the common area.

Q    Communally?

A    No.  Individually.

14

Nina Trump-Examination/The Court

Q      Individually?

A      Each, each inmate housed on the unit is given one hour out.

So --

Q      By himself?

A      Yes.

So, for example, Mr. Jones may be out from 1000 hours to 1100 hours and he would be placed in his cell.

Mr. Hmimssa would then be allowed out from 1100 hours to 1200 hours and placed back in his cell.

Q      During the time one of them is out, would that person have an opportunity to talk to the other person?

A      Yes, sir.  They are barred cells.

Q      They're barred cells?

A      Yes, sir.

Q      How would that happen?

A      I'm sorry?

Q      When you say "they're out of the cell"  Does that mean they get to walk around in the area immediately next to the cell?

A      In what we refer to the day area.  It's an open area that runs the length of the ward.

And then the cells are immediately adjacent to, but separated from, by the barred doors.

So they come directly out of their cell into

**Nina Trump-Examination/The Court**

the day area.  But all cells open onto that day area.

So as he -- it would almost be like as if that door there were a barred door.

And he would walk into court, he could stand and talk to the lady standing there in front of the door.

Q    How far away, if he was in the day area -- what ways the closet he could have come to Mr. Jones in having a discussion?

A    The diameter of the bars.

Q    He could have walked right up to his cell?

A    Yes.

Q    Would they have been able to have a confidential conversation then, such that they would not have been overheard by anybody?

A    It would probably depend on how quietly they talked.

Officers are on what they refer to as constant rounds, which means one officer constantly circulates around that side of the jail.

The Old Jail is divided into the old side, which is where 604 is and the annex side.

So an officer would constantly be monitoring 603, 604, 601, in a circular pattern, I guess, would be the best way to describe it.

Q    Are you able to say from your own knowledge, whether prisoners do talk to each other during this period?

Nina Trump-Examination/The Court

A    I've never been assigned to The Old Jail or to the maximum security.

So, in experience, inmates, in general, yes, they would speak to each other, given an opportunity.

Q    And you, obviously, have no personal knowledge as to whether Mr. Hmimssa and Mr. Jones talked to each other?

A    No, I wouldn't.

Q    And this contact continued from December 20, '01 to January 8, '02?

A    Yes.

Q    When they were both in their cells, would they have been able to talk to each other?

A    They would have had audible contact, but not visual contact.

There's a solid wall between the cells, but sound carries. Or one of them they could have spoken back and forth between the bars.

Q    How close would they have been to talk?

Is it the width of the wall?

A    Width of the wall, yes.

Q    Which is how thick, if you know? If you know.

A    I wouldn't know architecturally.

Q    Could they have spoken from their cells without going out to the bars and speaking over the walls?

In other words, does the wall go all the way up

USA V Koubriti, et al 01-80778

Nina Trump-Examination/The Court

to the ceiling?

A     Floor to ceiling.  There's a solid ceiling.

Q     The only way they could have talked is through the bars?

A     Yes.

THE COURT:  I've no further questions.

Any questions, Mr. Straus?

MR. STRAUS:  None from the United States.

THE COURT:  Mr. Helfrick, any questions?

MR. HELFRICK:  Yes, Your Honor.  Thank you.

CROSS EXAMINATION

BY MR. HELFRICK::

Q     Lieutenant?

A     Yes.

Q     Lieutenant Trump, this particular ward, 604, besides Cells 2 and 3, are there other cells?

A     I presume there is at least a Cell 1.

Q     Okay.  And do you know if there's a -- more cells then three?

A     I don't know exactly how many cells there are on 604, but I believe that there are more than three.

Q     Okay.  And during this time frame, the time frames that we are talking about, the two time frames that you listed, do your records show that there were other inmates in those cells during this same time frame?

USA V Koubriti, et al 01-80778

**Nina Trump-Cross Examination/Mr. Helfrick-Koubriti**

A     This exact -- these, these reports that I have here are specific to Mr. Jones' housing assignment and Mr. Hmimssa's housing assignment.

They're some other records that I browsed through this morning that would indicate that, yes, there were other people present at times during that time period from December 20 to January 8th.

Q     Okay. And when a person is taken out of a cell for their hour a day and, obviously, they can talk not only with Mr. Hmimssa, but had the opportunity to talk to Mr. Jones.

He, likewise, would have had the opportunity to talk to other people on the same ward, correct?

A     Yes.

Q     Okay. And you wouldn't know -- I guess this would be speculation.

If Mr. Hmimssa was talking to Mr. Jones, he could have been talking to other people as well, correct?

A     They're all in barred cells. He could have spoken to anyone on that ward.

Q     And, in your experience, these wards are not quite places, true?

A     Not generally, no.

Q     You wouldn't describe them as a quite place.

There's a lot of talking yelling and activity going on?

**Nina Trump-Cross Examination/Mr. Helfrick-Koubriti**

THE COURT: I don't think there's a lot of partying there, Mr. Helfrick.

MR. HELFRICK: Not parties. It isn't a church, either.

They're looked down 23 hours a day.

BY MR. HELFRICK::

Q   The only way they can communicate most of the time is by yelling to people in other cells. True?

A   Possibility exists, yes.

MR. HELFRICK: Okay. I don't have any further questions, Your Honor. Thank you.

THE COURT: Anything from any other defense counsel?

MR. THOMAS: Just a couple, judge.

**CROSS    EXAMINATION**

BY MR. THOMAS:

Q   Lieutenant Trump, the people who are in these wards, they're not prohibited from keeping papers or pencils, are they?

A   Pencils are not -- they're prohibited anywhere in The Old Jail.

Q   Writing instruments?

A   No, I didn't say writing instruments, I said pencils. You asked about pencils.

Q   Now I'm asking you about writing instruments. Can you

**Nina Trump-Cross Examination/Mr. Thomas-Hannan**

be specific about those?

A    They're permitted to have felt tip markers.

Q    Okay.

And is it possible for people to pass notes between cells?

A    As easy as is would be to speak, yes.

Q    When you were describing to the judge where the lady was sitting over by the door, it would be easy to speak to somebody since you could go up the diameter on the bars on the cell.

The cell door is, obviously, bars.

Is the whole area along the front of the pie, is that barred or is that concrete?

A    Are you talking about the cells or?

Q    The cells.

A    Yes.  The front of the cells are barred.

Q    Barred.

So that you could have your conversation with the person not only at the door to the cell, but, also, at any point within the one area facing the walkway.

Would you agree?

A    There are bars, wall, bars, wall, bars and so on.

Q    Okay.  Now you talked about the fact that there might have been persons who were there and would have been able to observe what was going on at the cells.

### Nina Trump-Cross Examination/Mr. Thomas-Hannan

If I were an inmate and I were walking in that common area, I'm able to walk outside of my cell during that one hour a day?

I'm not prohibited from having a conversation with people as I walk up and down, am I?

A    Not to the best of my knowledge, no.

Q    There is no jail rule that said you can't talk to the people during that period of time?

A    Not to the best of my knowledge, no.

Q    So if I were having a conversation with somebody and that conversation was observed by a deputy, that conversation wouldn't be interrupted?

A    Probably not, no.

MR. THOMAS:  Nothing further.

THE COURT:  Mr. Swor, anything?

MR. SWOR:  Nothing, Your Honor.  Thank you.

THE COURT:  Any follow up, Mr. Straus?

MR. STRAUS:  Let me ask one question.

### CROSS EXAMINATION

BY MR. STRAUS:

Q    Is it true that the inmates are talking -- are seen talking, is it true that the guards will sometimes move them along?  Limit them to a certain period of time when they're together talking?

A    Not to the best of my knowledge.  The officers don't

Nina Trump-Cross Examination/Mr. Straus-Govt.

separate them, no.

MR. STRAUS:  Thank you.  I have nothing further, Your Honor.

THE COURT:  Thank you.  Thank you for coming in.

I'd like you if you would -- you've authenticated these records.

Does anybody have any objection to making these records a part of this hearing?

Any objection from the Government?

MR. STRAUS:  No, Your Honor.

MR. HELFRICK:  I don't think they've been assigned a letter or number.

THE COURT:  Court Exhibit 1A and 1B.  1A will be Milton Jones.  1B Joseph Hmimssa.

(Whereupon the witness was then

excused 12:33 p.m.)

THE COURT:  All right.  Mr. Jones will be in court momentarily.

Mr. Gurewitz, where would you like to sit, next to Mr. Jones up here?

MR. GUREWITZ:  I can sit up here.  That would be fine.

THE COURT:  You've had an opportunity to confer with Mr. Jones prior to this hearing; is that correct?

MR. GUREWITZ:  My name is Harold Gurewitz.  I

USA V Koubriti, et al 01-80778

represent Mr. Jones in a case which is now pending before Judge O'Meara.

And that case has been pending before Judge O'Meara was pending at the time period you just referred to before.

December of 2001. I have had an opportunity to confer with Mr. Jones. And I have some ideas of the nature of questions which the Court might put to Mr. Jones.

And based upon the existence of the other case which Mr. Jones is a defendant, I have advised him to not answer any questions concerning subject matters that I believe will be the Court's inquiry. And to assert his Fifth Amendment privilege.

**THE COURT:** Thank you.

Do you want to then have a continuing objection on Fifth Amendment grounds either questions I or any counsel direct to Mr. Jones?

**MR. GUREWITZ:** Yes, I do.

**THE COURT:** Mr. Jones raise your right hand, sir.

(Whereupon the witness was then sworn)

**THE WITNESS:** Milton Butch Jones. M-i-l-t-o-n Jones, J-o-n-e-s.

**EXAMINATION**

BY THE COURT:

Q    How old are you, sir?

A    48.

USA V Koubriti, et al 01-80778

## Milton Jones-Examination/The Court

Q    All right.  Let me get right to it.

First of all, have you had an opportunity discuss your testimony with Mr. Gurewitz here today?

A    Yes, I have.

Q    Mr. Gurewitz has just indicated that he has advised you not answer any questions and to exercise your Fifth Amendment right to remain silent.

Is that correct, sir?

A    Yes, it is.

Q    Do you intend to follow his advice?

A    Yes, sir.

Q    So if I were to ask you, sir, if you were housed with Youssef Hmimssa in the Wayne County Jail in a cell next to him between December 20 -- December 20, 2001 and January 8 of 2002, would you answer that question, sir?

A    No, sir.

Q    If I were to ask you, sir --

MR. HELFRICK:  Your Honor, we all have the same objection, and that is, that our belief that Mr. Jones does not have a Fifth Amendment protection, that the answer to that question would not incriminate Mr. Jones in anyway.

MR. THOMAS:  Motion to Compel.

MR. SWOR:  Yes.

THE COURT:  All right. I understand that and we will have argument from Mr. Gurewitz on that point.

## Milton Jones-Examination/The Court

First, I want to establish whether or not he will answer the questions.

If I were to ask you, sir, whether or not you directed a letter in December of 2001 to Mr. Allen, the prosecutor I believe in your case concerning Mr. Hmimssa, would you answer that question?

THE WITNESS: No, sir.

BY THE COURT:

Q    If I were to ask you, sir, whether or not you had any conversations at all with Mr. Hmimssa during that period, would you answer that question?

A    No, sir.

THE COURT: I can continue but, at this point, I'm prepared to make a fruitlessness finding.

In other words, that it would be fruitless to inquire further of Mr. Jones on anything concerning the subject matter of this case -- of this hearing, absent a Compulsion Order.

Does any counsel wish me to inquire further or any counsel wish to question Mr. Jones, himself, in furtherance of a fruitlessness finding?  Mr. Straus?

MR. STRAUS: Judge, I guess at the risk of beating a dead horse, if I may from here?

**Milton Jones-Cross Exam/Mr. Straus-Govt.**

## CROSS EXAMINATION

BY MR. STRAUS:

Q    Mr. Jones, good afternoon.

My name is Eric Straus.  It's my understanding that in addition to refusing to answer any questions from the Court, would it also be your desire not to answer any questions by government counsel in this case?

A    That's true.  I ain't answering no questions.

**MR. STRAUS:**  No further questions.

**THE COURT:**  Mr. Helfrick?

**MR. HELFRICK:**  No, Your Honor.  I think it depends on -- the Court has to make a ruling whether it applies or not.

**MR. THOMAS:**  Judge, I -- I'm not anticipating what you're going to do, but I would ask you to ask him questions regarding the authorship of the letter and whether or not that is his letter.

**THE COURT:**  I thought I covered that.

## EXAMINATION

THE COURT:

Q    I'm going to show you what purports to be a letter dated 12-30-01.

Remember, you can refuse to answer this question.

But would you answer whether or not that is your

**USA V Koubriti, et al 01-80778**

## Milton Jones-Examination/The Court

letter?

A    No, sir.

Q    No, sir you will not answer the question?

A    I will not answer the question.

Q    You would not authenticate this letter as being from you, sir?

You would not say that this is your letter?

You would not answer that question?

A    No, sir.

**THE COURT:**  Mr. Gurewitz, defense counsel here have challenged the legal basis for your assertion of the Fifth Amendment privilege for Mr. Jones.

Would you state that privilege in open court, sir.

**MR. GUREWITZ:**  Your Honor, as I indicated in the statement I made to the Court initially before you asked any questions of Mr. Jones, he is a defendant in a pending case before Judge O'Meara in which the United States has filed a notice asking for the imposition of the dealt penalty.

The subject matter of the inquiry relates, first of all, to a letter which has been disclosed to defense counsel.

And the inquiries concern whether or not Mr. Jones wrote that letter.

To the extent that there is any challenge as to the content of that letter, I think that answer may subject Mr. Jones to -- his answers to scrutiny as to whether or not his

testimony conflicts with any other information presented to the Court and, therefore, exposes him to possible prosecution.

In addition, Your Honor, I think that any extended cross examination here would impact upon issues which are related to Mr. Jones case before O'Meara.

And I would like to have the opportunity, if the Court desires me, to put forth my reasons on the record separately.

THE COURT:  Let me ask you several questions, Mr. Gurewitz.

Number one, if I were to conduct a sealed hearing, separate record, would your instruction to Mr. Jones be the same?

MR. GUREWITZ:  Yes.

THE COURT:  If I were to compel Mr. Jones to testify, would your instructions be the same?

MR. GUREWITZ:  Well, if what you mean then is that you were to grant him immunity pursuant to --

THE COURT:  I don't think I can grant him immunity.

However, if the government were to grant him immunity, if the government were to move for a grant of immunity I would grant that motion, I should say.

MR. GUREWITZ:  At that point, I believe that Mr.

Jones would not have a Fifth Amendment privilege, if that kind of a motion were brought and granted.

THE COURT: If there were a Compulsion Order, you believe that the Fifth Amendment privilege would evaporate?

MR. GUREWITZ: As I stand here at the present time here, I do.

Going back --

THE COURT: Going back to January of 2002, February of 2002, December of 2001, if you can answer this.

Would you have permitted Mr. Jones to have discussed with defense counsel in this case, or at any time after that, the issues raised in this letter?

MR. GUREWITZ: My answer is no.

THE COURT: Would you have permitted Mr. Jones to have testified in the trial in this matter, without recommending to him the assertion of the Fifth Amendment privilege?

MR. GUREWITZ: I would have given him the same advice I did today, which I set forth on the record; that is, to advise him to assert his Fifth Amendment privilege.

THE COURT: Mr. Jones, you heard your attorney say that he would have recommended to you not to have discussed anything with the defense lawyers in this case.

Would you follow that instruction, sir?

THE WITNESS: Yes, I would.

USA V Koubriti, et al 01-80778

**THE COURT:** You have heard your attorney say he would have instructed you not to testify in this case or, rather, to assert a Fifth Amendment privilege. if you were called to testify in the case.

Would you have followed that instruction?

**THE WITNESS:** Yes.

**THE COURT:** Mr. Helfrick?

**MR. HELFRICK:** Mr. Jones now seems to be answering the questions.

I think now by answering questions, he should be compelled to answer all of the other questions.

**THE COURT:** He's asking questions that I have put to him regarding whether or not he would testify and whether or not he would -- that does not go to the substance, does not waive his Fifth Amendment privilege.

**MR. THOMAS:** Judge, in a follow up question why did he send the letter if he wouldn't have testified.

**THE COURT:** I'll ask him.

He can continue to assert his privilege.

Mr. Jones -- first of all, he hadn't indicated, Mr. Thomas, he has sent the letter, but --

**MR. THOMAS:** I think anybody's going to argue about that, judge.

**THE COURT:** He hadn't indicated that, but, if you did send the letter, Mr. Jones, why would you then refuse to

talk to defense counsel and refuse to testify?

THE WITNESS: I would like to assert my Fifth Amendment rights again.

THE COURT: All right.

MR. THOMAS: Judge, I'd ask you to make a finding now, at this point, whether or not there is a sufficient basis that's been alleged as to raising a Fifth Amendment privilege.

I don't believe that there has. I'd ask the Court to allow us to argue.

MR. SWOR: In addition, Your Honor, the document refers to other written materials.

Those written materials are not the subject of any Fifth Amendment privilege.

THE COURT: Well, let me ask Mr. Gurewitz.

Mr. Gurewitz, the document does refer to other written materials.

Are you asserting the privilege as to those written materials?

MR. GUREWITZ: That's a more difficult question.

And at the present time, my response is that I think that the process of production raises Fifth Amendment issues as to that particular document.

And I would give him the same advice about that as of right now.

**THE COURT:**  With respect -- you've indicated that you are premising your advice to him to assert the Fifth Amendment based on his exposure in the pending case before Judge O'Meara.

**MR. GUREWITZ:**  Not only that.

**THE COURT:**  Not only that.

What other basis?

**MR. GUREWITZ:**  As I indicated, I think that testimony in this case could subject him to possible scrutiny, based upon the information which is in the letter at issue.

If there was a claim that that information is not factual or accurate, that it may well subject him to consideration by prosecutors --

**THE COURT:**  Are you talking --

**MR. GUREWITZ:**  -- in violation of a separate statute that's not pending.

**THE COURT:**  Possible 1001?

**MR. GUREWITZ:**  That's correct, Your Honor.

**THE COURT:**  All right.

In addition to that, with respect to any possible exposure in the case pending before Judge O'Meara, do you have any other legal theory as to whether or not the statements made in this letter could subject him to an increased chance of incarceration or criminal prosecution or

enhance his exposure in that case, sir?

MR. GUREWITZ: First, for the same reasons that I've given in support of the assertion by Mr. Jones of his Fifth Amendment privilege with regard to his testimony here today, and certainly applies.

And I think, though, that the issues about a document that's already in existence are not quite the same for purposes of Fifth Amendment analysis.

But I do believe that the subject matter certainly exposes him to the same kinds of problems that I've outlined in his pending case or in the event that there's any possible scrutiny given to the letter itself.

The Fifth Amendment issue, however, deals with whether or not that document that's in existence right now, provides him a basis to assert a privilege. And I'm taking the position right now that it does.

Not only is the document in existence, but in any way tendering it to anyone, I think, implicates some Fifth Amendment questions.

THE COURT: Well, let me inquire further.

Are you concerned, then, reading between the lines, that the prosecution could use this letter, itself, to show in his case before Judge O'Meara, some consciousness of guilt in that case?

MR. GUREWITZ: I think it could fall into the

category of that type of argument, that might well be raised.

In a death penalty case, of course, there are two portions of a case that potentially may play out in the course of a litigation; one for the finding of guilt and the other one of the determination of the penalty.

In the penalty phase of the death penalty case, the Rules of Evidence are much more relaxed, so there may well be instances in which evidence can be used to Mr. Jones' detriment in that circumstance that might not be part of a guilt determination.

**THE COURT:** Thank you, Mr. Gurewitz.

Mr. Swor?

**MR. SWOR:** Your Honor, with regard to the last suggestion by Mr. Gurewitz, I think that the court -- in considering that, should take in mind the timing and the circumstances regarding this document and the circumstances on which it was offered.

It was offered, we would argue, as an intention to assist the government.

And I think the Court should view with a healthy dose of skepticism, an honestly made statement -- assuming it was made honestly, that was intended to be used by the government would then, in a later prosecution, if he said the same things in a later prosecution, be somehow used by the

government to injure him.

**THE COURT:** Thank you, Mr. Swor. Thank you Mr. Gurewitz.

What I'm going to do now is, I'm not going to rule on the Fifth Amendment assertion issue.

I'm going to invite briefs from Mr. Gurewitz, defense counsel and the government on this issue.

We're not going to inquire any further. It would be fruitless to inquire any further today of Mr. Jones.

However, there are a number of different options.

One, I would like the government -- excuse me.

I would like the government to explore whether or not the government would request a Compulsion Order granting Mr. Jones immunity.

Number two, if necessary, I may require a further hearing on the privilege issues, because I know that they're additional issues out there of concern to both the government and to Mr. Gurewitz, that they may not wish to address in open court here.

And I may require a sealed hearing on that as well. I may; haven't decided that yet.

**MS. RABEN:** Your Honor, may I request all of these submissions be placed under seal?

**THE COURT:** Oh, the briefs?

**MS. RABEN:** Yes.

USA V Koubriti, et al 01-80778

**THE COURT:** I'm sorry. I was going to say -- I'm not sure sealing this record would be --

**MS. RABEN:** I meant the briefs.

**THE COURT:** I think that's appropriate.

And since all of these submissions will be under seal, counsel should be -- feel free to address all issues.

If, after I receive the briefs on this, I determine that there is not a basis for a Fifth Amendment assertion, I will advise counsel and we will proceed from there.

In the meantime, I am requesting the government to seek a Compulsion Order.

I understand this puts the government in a conflicted position, but in the interests of justice here in getting the full scope of the testimony on the materiality issue in the Koubriti case, I want to pursue that.

Anything else for Mr. Jones?

**MR. THOMAS:** Judge, we should have the letter at least listed as Exhibit C.

**THE COURT:** Well, we'll make this Exhibit 2. But, unfortunately, there isn't a foundation for it.

**MR. THOMAS:** It's not admitted.

**THE COURT:** It's not an admitted exhibit. We'll make it Proposed Court Exhibit 2.

All right. You may return Mr. Jones, marshal. Thank you.

## Youssef Hmimssa-Examination/The Court

(Whereupon the witness was excused at 12:55 p.m.)

THE COURT:  Let's have Mr. Hmimssa.

Anything else before we bring Mr. Hmimssa in?

MR. STRAUS:  Nothing further from the government, Your Honor.

THE COURT:  All right.

(Whereupon the witness was then sworn)

THE COURT:  Be seated.

Give and spell your full name for the court, please.

THE WITNESS:  Youssef Hmimssa.

Y-o-u-s-s-e-f, h-m-i-m-s-s-a.

### EXAMINATION

BY THE COURT:

Q    Mr. Hmimssa, you testified for some five days in this case.

Do you recall that?

A    Yes, Your Honor.

Q    After you were arrested, were you housed in the Wayne County Jail for some period of time between December 20 of 2001 and January 8 of 2002?

A    Yes, Your Honor.

Q    And, in fact, you were their well through later in the year in 2002, correct?

USA V Koubriti, et al 01-80778

## Youssef Hmimssa-Examination/The Court

A     In the beginning of 2002 and through March.

Q     I'm sorry?

A     I was housed in at Wayne County Jail until March 2002.

Q     While you were in the Wayne County Jail, were you housed in proximity to another prisoner by the name of Butch Jones or Milton Jones?

A     Yes, Your Honor.

Q     When do you recall that was?

A     It was in December, few weeks before Christmas.

Q     Did you talk to him?

A     Yes, Your Honor.

Q     What did you talk about?

A     We played chest, we exchanged books.

      He tried to talk about my case.

Q     About whose case?

A     My case.

Q     Your case.

A     I told him I was told by my lawyer not to talk about my case.

Q     And just for the record, your lawyer is in court, I believe, Mr. Rabaut?

A     Yes.

Q     Mr. Rabaut, if you would come up here.

      If, at any point, you wish to confer with Mr. Rabaut, Mr. Hmimssa, or, Mr. Rabaut, if any point before he

## Youssef Hmimssa-Examination/The Court

answers questions, you wish to confer with Mr. Hmimssa, please indicate that, okay?

MR. RABAUT: Yes, sir.

BY THE COURT:

Q    You had discussions with Mr. Jones about what, sir? I'm sorry.

A    We played chess and exchanged books.

And he tried to talk about my case, asking about my case.

As I told him, I'm not supposed to talk about my case.

I was told by my lawyer not to talk about my case many times by Mr. Rabaut and by Jean Kelly, in Iowa.

And Mr. Rabaut, he explained to me for why I'm not supposed to talk about my case.

Because he told me inmate, they will try to -- you're high profile.

They will get close to you, get information from you and use it to get out from prison.

Q    I have in front of me a letter that purports to be from Mr. Jones in which he relates conversations that he had with you concerning your case.

And I want to read the letter to you and I then am going to go through it.

This letter is directed to Mr. Allen, who's a

### Youssef Hmimssa-Examination/The Court

prosecutor in Mr. Jones' case.

I'm writing you and the government today because, 10 days ago, December 20, 2001, they moved me from Ward 413 to Ward 604 the max security ward for no reason.

But they put me in a cell right next to Youssef Hmimssa.

So the next day, Youssef get to talking to me about his case, says "him case" but I think he means his case.

And asked me things about my case.

So after a few days, Youssef get to telling me things about the United States Attorney General, Mr. John D. Ashcroft.

Then Youssef started calling the Bush family drug dealers.  So now I'm taking notes.

I'm writing you -- I'm writing everything down he tell me.

He get to telling me how he lied to the FBI, how he fool the Secret Service Agent on his case.

Youssef get to telling me the role he played with the terrorists of September 11th and how he made the I.D. and

## Youssef Hmimssa-Examination/The Court

documents for them to get around anywhere in the world.

How he was going to help bring the United States down electorally. When he went to talking about my President, I knew I better write you and tell you.

You can ask my lawyer and he will tell you.

I like President Bush.

I'm sure the President will be happy to hear that.

I tell him all the time.

Anyway, when you Youssef talk about terrorists things, I know that's a matter of national security of the highest priority.

So could you please let the Assistant United States Attorney who is the prosecuting attorney for Youssef Hmimssa know that I have notes, quote, verbatim, unquote, as it was told to me and I'm willing to take a polygraph test about my notes and my information.

Thank you very much.

## Youssef Hmimssa-Examination/The Court

First, did you talk to Mr. Jones about Attorney General Ashcroft?

A   No, Your Honor.

At that time, I didn't even know who John Ashcroft is.

Q   Did you refer to the Bush family as drug dealers?

A   No, Your Honor.

Q   Did you ever observe Mr. Jones taking notes about everything -- about anything you were telling him?

A   No, Your Honor.

Q   Did you tell Mr. Jones that you lied to the FBI?

A   No, Your Honor.

Q   Did you tell him that you had fooled the Secret Service agents on his case?

A   No, Your Honor.

Q   Did you tell him anything about any relationships that you had with terrorists?

A   No, Your Honor.

Q   Specifically, as to September 11th?

A   No, Your Honor.

Q   Did you tell him you had made identification and documents for them to get around?

A   No, Your Honor.

Q   Did you tell them anything about bringing the United States down?

## Youssef Hmimssa-Examination/The Court

A    No, Your Honor.

Q    Did you talk to him about President Bush?

A    No, Your Honor.

Q    During this period of time from December 20, 2001 to January 8 of 2002, were you cooperating with the government at that time?

A    I started in November and had a break down.

Q    I'm sorry.  You started when?

A    In November.  And I had a break down in the cooperation.

Q    November of 2001?

A    Yes.

Q    How many times had you met with them?

A    Just one time.  And here in Michigan.

Q    At that time, had you talked them anything about the defendants in this case, Mr. El Mardoudi, Mr. Koubriti, Mr. Hannan or Mr. Ali-Haimoud?

A    No, Your Honor.

I had a break down in the interview and we stopped.

Q    Were you cooperating with the government at that time about any other case that you were involved in?

A    No, Your Honor.

THE COURT:  Mr. Straus, any questions for Mr. Hmimssa?

## Youssef Hmimssa-Examination/The Court

MR. STRAUS:  One moment, judge.

(A discussion was held off the record)

MR. STRAUS:  No questions from the United States, Your Honor.

THE COURT:  Mr. Helfrick?

### CROSS    EXAMINATION

BY MR. HELFRICK

Q    Good afternoon, Mr. Hmimssa.

A    Good afternoon.

Q    Initially, you were arrested in Iowa, correct?

A    That's right.

Q    And when you by arrested in Iowa, you had conversations with the FBI there, correct?

A    Yes.

Q    Okay.  And when you were in Iowa, you were detained without bond, correct?

A    I'm sorry?

Q    You were held without bond?

A    Yes.

Q    You were incarcerated?

A    Yes.  That's right.

Q    You were incarcerated in a local county jail?

A    That's right.

Q    And while you were incarcerated in the county jail, you were housed with an individual by the name of Flowers,

**Youssef Hmimssa-Cross Exam/Mr. Helfrick-Koubriti**

correct?

A     I believe so.

Q     Okay.

Do you remember having any conversations with Mr. Flowers about your situation?

A     He wasn't my cell mate.  He was next to me.

Q     Right.

Well, you were able to talk to -- you were able to talk to individuals next door?

A     Hardly.  Hardly.

Q     But you were able to do that, correct?

A     Yes.

Q     You were able to do that at the Wayne County Jail as well?

A     Yes, I could talk to them.

Q     Again, did you have conversations with Mr. Flowers about your situation?

A     No.

I was advised by Ms. Jean Kelly not to talk to Anton Flowers.

And she told me many, many times not to trust any inmate in system.

Q     Okay.

After you went to Iowa -- after you were arrested in Iowa, you then were transferred to Detroit.

**Youssef Hnimssa-Cross Exam/Mr. Helfrick-Koubriti**

That's when you were at Wayne County Jail, correct?

A    I went to FDC for about a week, then I came to Wayne County Jail.

Q    Okay.  And just back up again.

When you had your case in Chicago, you had been arrested on that case was with the Secret Service, correct?

A    That's right.

Q    Okay.  And you were a fugitive on that case when you were arrested in Iowa, correct?

A    That's right.

Q    When you were housed in the Wayne County Jail where Milton Jones was and he was in the cell next to you, correct?

A    That's right.

Q    Okay.  Now on that particular ward or rock when you were housed there, were there other prisoners in the other cells?

A    At -- sometimes.  It was just Butch Jones and I.

Then they moved in other inmates, you know.

Q    Who was that?

A    The man's name is Murray.  They moved another inmate after that.  His name is Steve.

Q    That's his first name, Steve?

A    Yes.

**Youssef Hmimssa-Cross Exam/Mr. Helfrick-Koubriti**

Q      The other one who you called Murray, first name or last name?

A      I don't know.  I'm not sure.

Q      Did you have conversations with them as well?

A      I talk to them, but I do not talk about my case.

Q      Okay.  And when you had conversations with them, sometimes, they were in their cells, correct?

A      Yeah.  We, you know, we, you know, we had --

Q      You can yell at each other, have conversations?

A      Yes.

Q      At other times, you were let out of your cell for an hour a day?

A      That's right, sir.

Q      That's how you played chess?

A      That's how we played chess.

Q      You can walk around talk with the other prisoners in their cells, too, right?

A      That's right.

Q      And it's true, is it not, that at that particular time in time, when -- in December, when you were at the Wayne County Jail, isn't it true that at that point in time, you had lied to the FBI and you had lied to the Secret Service?

A      I did not lie to the United States Secret Service.

I fully cooperated with Secret Service in Chicago.  I did not lie to the FBI.  I did not lie to them.

**Youssef Hmimssa-Cross Exam/Mr. Helfrick-Koubriti**

We had a break down in the interview.

Q    Okay.  So prior to your being housed in the Wayne County Jail, you had not lied to the FBI?

A    We had a break down in the interview, that's how I can explain it to you.

Q    You were interviewed by the FBI in Iowa as well?

A    That's right.

Q    Prior to this time, you had not ever lied to the FBI and you had not lied to the Secret Service, right?

A    I did not lie to United States Secret Service.

MR. HELFRICK:  Okay.  No further questions, Your Honor.

THE COURT:  Mr. Thomas?

CROSS  EXAMINATION

BY MR. THOMAS:

Q    Mr. Hmimssa, it's not clear to me were you and Mr. Jones able to walk around outside your cells at the same time?

A    No.

Q    It was one person at a time?

A    One person at a time.

Q    But you were not resisted in any way having conversations with anybody that's walking around on the walkway outside of the cells; is that right?

A    That's right.

**Youssef Hmimssa-Cross Exam/Mr. Thomas-Hannan**

Q     All right.

I just want to see if I could talk about people in your cells had their papers with them, did they not?

A     That's right.

Q     And you had your papers from court with you in your cell at that time?

A     I believe so.

Q     Some of the discovery matters that had been given to Mr. Rabaut were given to you.

You had those, right?

A     I believe so.

Q     Do you have pencils or pens in there to write down on paper?

A     Yes.  Yes.

Q     And do you know whether or not Mr. Jones had any pencils or papers in his --

A     Sure, he had.

Q     Now you said that you didn't talk to them about the case; is that right?

A     That's right.

Q     But prior to December 30th when you were with him, you said that you were not aware of who John Ashcroft was?

A     I didn't know exactly John Ashcroft is.

Q     Did you know whether or not there was a gag order in this case?

**Youssef Hmimssa-Cross Exam/Mr. Thomas-Hannan**

A    I don't know.

Q    Did you know whether or not people were prohibited from speaking publicly about the case?

A    I was advised by my lawyer not to speak to anybody about the case many, many times.

Q    No, no.  Maybe you don't understand.

The lawyers were prohibited from speaking publicly about the case.

Do you remember that being an issue?

A    I don't know what it means, sir, gag order.

Q    Do you remember whether or not an issue arose while you were a defendant in this case, about Mr. Ashcroft making a statement about your case on television?

THE COURT:  Just a moment.  Yes?

MR. STRAUS:  I've an objection.

Judge, it seems to me the question has been asked and answered and the premise of this question is the no to the previous answer.

THE COURT:  Overruled.

BY MR. THOMAS:

Q    Do you remember that issue coming up before December?

THE COURT:  Let me ask a question, if you would, Mr. Thomas.

MR. THOMAS:  Whatever way you want to do it.

THE COURT:  Mr. Hmimssa?

**USA V Koubriti, et al 01-80778**