**Youssef Hmimssa-Cross Exam/Mr. Thomas-Hannan**

THE WITNESS: Yes, Your Honor.

THE COURT: The Attorney General, on October 31st of 2001, made a statement concerning defendants in this case.

Were you aware of that statement?

THE WITNESS: No, Your Honor. I knew it after, but I don't know who John Ashcroft -- I didn't know what it means at a later time.

THE COURT: In December.

THE WITNESS: No, Your Honor. I didn't know.

THE COURT: Did you at that time know that the Attorney General had made a statement indicating that the defendants in this case, of which you were one at the time, had prior knowledge or had some -- may have potentially had knowledge about the events of September 11st.

Do you ever hear about that?

THE WITNESS: No, Your Honor.

THE COURT: Nobody ever discussed that with you?

THE WITNESS: I didn't know who John Ashcroft is.

Christmas Day my girl friend, she came to see me and she told me she was saying something. I didn't even understand what she was talking about.

This guy called her. But at a later time, few months later, after I started cooperating, I did understand.

THE COURT: Just to clear up the record.

**USA V Koubriti, et al 01-80778**

**Youssef Hmimssa-Cross Exam/Mr. Thomas-Hannan**

You understand -- I think we all know now that that statement was later retracted. In fact, it was retracted.

MR. THOMAS: Almost the next day.

THE COURT: Almost the next day. All right.

But your question's going to the statements as to his knowledge of the Attorney General.

MR. THOMAS: That's what I'm trying to get to.

BY MR. THOMAS:

Q    Do you remember being cross examined regarding Marie Jakum, her visiting you at Christmastime in the year 2001?

A    You never asked me about it.

Q    Do you remember being asked any questions regarding a phone call you had with her, where you were confronted about the fact that you were in trouble and that you were alleged to have been a terrorist.

Do you remember that?

A    I never said that on the phone.

Q    You never remember having any conversation with her where you had to make her feel better about the fact you were charged with these allegations and that you told her there was nothing to them.

Do you remember that?

A    I wrote her a letter.

Q    And what was --

A    I don't remember what I wrote.

**Youssef Hnimssa-Cross Exam/Mr. Thomas-Hannan**

I made her aware that I have nothing to do with anything what's going on.

Q    How was it she became aware of the fact that you were being charged with crimes that might relate to terrorism?

A    Well, I wrote her a letter.

I made a phone call, but I did not talk to her.  I did not find her at home.

I talked to her brother and I wrote her a letter from Iowa.

When I came over here to Michigan, I wrote her a letter from here.

Q    What did you discuss with her brother?  What did you tell him to tell her?

A    I did not say anything about the case or I told her I'm just I'm in trouble.  And I said it.

Q    You were not confronted by Mary or her family about the fact they had seen something on the news media relating to you being linked to terrorism?

A    I did not talk to her on the phone when I was in Iowa.

Q    Did you talk to her family?

A    I talked to her brother.

Q    And did it have anything to do with the news media account that you were linked to terrorism?

A    I don't recall.

I just told him that -- to say hi to Mary and

**Youssef Hmimssa-Cross Exam/Mr. Thomas-Hannan**

to let her know I'm in trouble.

Q     Did you say you did not have a discussion then or you just don't recall and it's possible you did have a discussion with him?

A     I did not have a discussion with him about my linked to any crime.

THE COURT:  Mr. Thomas, I'm getting a little sense of *Deja Vu* here.

MR. THOMAS:  What is that about the credibility of the judge and my questioning?

THE COURT:  About the extensive cross examination. This is a fairly limited scope that we're involved in here.

MR. THOMAS:  I've locked him into what I need to lock him into, judge.

BY MR. THOMAS:

Q     Now you said to Mr. Helfrick you didn't lie to the FBI; is that right?

A     I did not lie --

Q     Okay.

A     -- to the FBI.

We had a break down in the interview.

Q     Now before the interview, okay, you had been questioned by the FBI in Iowa, were you not?

A     Yes.

Q     Okay.  Didn't you lie to them in Iowa?

**Youssef Hmimssa-Cross Exam/Mr. Thomas-Hannan**

A    No I did not lie to them.

Q    What name did you use when you were in Iowa?

A    Youssef.  I get arrested under the name of Youssef Hmimssa.

Q    What about the Secret Service in Chicago?

You didn't lie to the Secret Service in Chicago?

A    I did not lie to them.

Q    Okay.  What name did you use in Chicago?

A    Patrick Vuillaume.  That's the name -- that's the name I was using and being under.

Q    That's not your true name, is it?

A    It's my name, you know, I was using it.

THE COURT:  What name were you born under, Mr. Hmimssa?

THE WITNESS:  Youssef Hmimssa.

BY MR. THOMAS:

Q    How many names can a person have?

In your case, 17, right?

A    (No response)

Q    Did Mr. Jones tell you he was writing notes?

A    No.

Q    Did Mr. Jones have any conversations with you about his case?

A    No, sir.

Q    So that he wasn't talking to you about his case?

**Youssef Hmimssa-Cross Exam/Mr. Thomas-Hannan**

A    He wasn't talking to me about his case.

Q    Did he attempt to try to talk to you about your case?

A    Yes.

Q    All right.

How many times did he try to talk to you about your case?

A    I don't recall, but I told him I was told by my lawyer not to talk about my case.

MR. THOMAS:  Nothing further.

THE COURT:  Mr. Swor?

MR. SWOR:  No, sir.

THE COURT:  Mr. Straus, any follow up?

MR. STRAUS:  None, Your Honor.

THE COURT:  Normally, I would ask if they're any questions from our jurors.  But these folks have not been properly empaneled.

MR. THOMAS:  Judge, we wouldn't object this time.

THE COURT:  We're not going to have that. Although, I'm sure they would like to ask some questions.

All right.  You can return Mr. Hmimssa.  Thank you.

(The witness was excused at 1:20 p.m.)

THE COURT:  All right.

The way I want to proceed now, is to ask the United States Attorney's Office to document for the Court, the entire state of knowledge of the lawyers in that office

concerning two documents.

Obviously, one is the letter to Mr. Allen from Butch Jones.

And the second is the FBI 302 concerning Mr. Roussi. May I have that, please.

In terms of the way we proceed here, I'd like to do it as best as possible chronologically.

As I understand it, the chronology goes from Mr. Allen. Let's start first with the Butch Jones letter.

Knowledge goes from Mr. Allen to Gurewitz.

MR. GUREWITZ: Your Honor, I have a point I'd like to raise at side bar, very briefly.

THE COURT: Do you want this on the record?

MR. GUREWITZ: No. I don't think it needs be on the record.

(A discussion was held off the record)

THE COURT: At any rate, thank you, Mr. Gurewitz.

I'd appreciate, Mr. Gurewitz, if you would remain here.

And if we're treading on any issues that you're concerned about we discussed at side bar, flag us.

The way I want to proceed, Mr. Allen, is to get the full story from you as far as you know it concerning the letter from Mr. Jones.

I believe chronologically next, is Mr. Gershel,

then Mr. Convertino, Mr. Corbett, then Mr. Gershel, again. Then Mr. Capone from the Justice Department.

Is that --

MR. ALLEN:  That is pretty close, Your Honor.

THE COURT:  My point is, I don't want any gaps left here.

MR. ALLEN:  I understand, other than the issue we just discussed.

THE COURT:  Other than the issue we just discussed, correct.

MR. ALLEN:  Your Honor, I am the prosecutor on the case of *United States versus Milton Butch Jones, et al*. It's a 14 defendant case.  Mr. Jones is one of the defendants.

THE COURT:  Try it now.

MR. ALLEN:  Mr. Jones is one of the defendants.

THE COURT:  My son was in here playing with it, so.

MR. ALLEN:  Some experience with that as well, Your Honor.

Mr. Jones is one of the defendants in the case and the case involves the potential for the death penalty.

I, I received in February of 2002, a letter dated 12-30-01, purporting to be from Mr. Jones' handwriting print that I recognize generally to be Mr. Jones'.

USA V Koubriti, et al 01-80778

## Mr. Joseph Allen

It was time stamped received in my office on February 7 at 11:18 a.m. on 2002.

I've gone back, looked at my records. I know I believe that week I was in Fort Worth, Texas for the entire week.

I returned to the office, I believe, on February 11th. I'd have to locate a 2002 calendar.

In any event, sometime during the week of February 11th, I personally received the letter in my mailbox.

I reviewed it, then advised the Chief Assistant, Chief Assistant and Criminal Chief, Alan Gershel, about it.

At some point, discussed it with the case agents on my case, discussed it with other attorneys assigned to the case, paralegals assigned to the case.

Within a few days or a day, I would think, I brought it down to Mr. Convertino who was the assigned prosecutor on Youssef Hmimssa.

I gave the letter to Mr. Convertino. I explained a little bit about the background of Butch Jones and the cases.

There is significant background to Mr. Jones beyond the instant case.

We had been previously prosecuted by our office, he had written a book. They're a number of issues out there.

After I described that to Mr. Convertino, I gave him a copy of the letter. It appeared to me at the time that

## Mr. Joseph Allen

he was interested in pursuing the items in the letter with Mr. Jones.

Mr. Jones was, of course, a defendant.  He was represented by counsel.

I left Mr. Convertino with the understanding the letter would be forwarded to Harold Gurewitz representing Mr. Jones in our case, for discussion as to whether there could be follow up.

THE COURT:  Can you give me time frame here?

MR. ALLEN:  We're talking the week of February 11, 2002.

THE COURT:  Did Mr. Convertino indicate to you whether he would also turn over the letter or did you even have any conversations with him as to whether he would also turn over the letter to defense counsel in this case?

MR. ALLEN:  None, Your Honor.

At that point in time, I was completely unaware that Mr. Hmimssa was cooperating.  I was only aware of what the public, general knowledge was.  I had no participation in the case.

THE COURT:  What about with Mr. Corbett?

MR. ALLEN:  I, eventually, talked to Mr. Corbett Your Honor.

THE COURT:  What time frame?

MR. ALLEN:  Same day, within five minutes or so of

USA V Koubriti, et al 01-80778

## Mr. Joseph Allen

leaving Mr. Convertino.

It was a fairly brief conversation with Mr. Convertino.

He indicated he was going to contact Mr. Gurewitz. He was going to follow up. It seemed like to me he was contemplating using Mr. Jones as a witness. That's why I filled him in on what I would call, baggage, associated with Mr. Jones as far as being used as a witness.

It was also clear between us that Mr. Jones was a potential capital defendant and if Mr. Convertino pursued it, eventually, Mr. Gurewitz would have to be in touch with me though there are supposed ways that could have been worked around.

From there, after my conversation with Mr. Convertino, I walked down to Mr. Corbett's office. Mr. Corbett is the supervisor of the Strike Force Unit where Mr. Convertino was assigned.

At that time, Mr. Corbett was not assigned to the case, as I understand it. But he is Mr. Convertino's supervisor and he is, also, Mr. Convertino's confident in the office.

THE COURT: So Mr. Corbett was not yet a working lawyer on this case?

MR. ALLEN: Yes, that is correct. I went to advise one, Mr. Corbett, about the letter. I thought I'd

**Mr. Joseph Allen**

left a copy with him.  I may not have.  I described the substance.  I had my own copy.

And I asked him, also, to talk to Mr. Convertino, because Mr. Corbett was more familiar with Butch Jones, particularly from his tenure in the office.

And Mr. Corbett expressed his opinion on the likelihood that anyone would use Mr. Jones as a witness in any case.

He was pretty graphic about it.  He didn't think it was a good idea.

**THE COURT:**  We all know how Mr. Corbett can be graphic.

**MR. ALLEN:**  He also indicated he thought that any -- not just Mr. Convertino, anybody who at that point in time under the circumstances that we knew basically would be, for lack of a better term, a little bit crazy to try to use Mr. Jones.

With that, I left the matter in Mr. Convertino's hands.  He was the prosecutor on the case.  I did as requested by Mr. Jones in the letter.

Generally, at some point, advised my superiors, both in my unit and Mr. Gershel, and went back to my work on the Jones case and other cases which, at that time, involved motions to dismiss that had been filed by Mr. Gurewitz and a number of the other lawyers.

## Mr. Joseph Allen

**THE COURT:**  When was your next contact with this letter at all?

**MR. ALLEN:**  Later, I would say within, about, within 30 days.  Certainly, at some point in the Spring, I was talking to Mr. Gurewitz about other matters in the case.

He indicated that he had received the letter from Mr. Convertino and had some conversation with him, but he also expressed some frustration because he had not gotten -- he thought he didn't get enough follow up from Mr. Convertino, for lack of a better way to describe it.

And we proceeded with our case, with the Jones case, through motions and a number of other things.

At some point in time I, again, discussed the issue of the letter with Mr. Gurewitz and his interaction with Mr. Convertino and what that meant to us in our case.

I don't think I can go any further detail at this point, unless the Court directs me.

That would have taken us through, roughly, the Summer of 2002 -- into the Summer, excuse me, of 2002.

At which point, there were a number of developments in my case with Mr. Jones that lasted up through, roughly, the end of September 2002.

Right.  Those issues took us up until January of 2003.

There was continued back and forth between

64

## Mr. Joseph Allen

Mr. Gurewitz and myself, of course, other activities on the case.

But in January of 2003, the Attorney General of the United States authorized the United States to seek a death penalty against Mr. Jones.

And, basically, all of our conversations in the case since that time have centered on the issue of the death penalty  And getting the case to trial.  I'm talking about myself and Mr. Gurewitz.

I did not have any substantial follow up other than those matters were mentioned in chambers with respect to the letter.

I was pursuing the case.

**THE COURT:**  Those matters we mentioned in chambers I want included as part of the separate record.

You can do it by affidavit, if you wish.

**MR. ALLEN:**  Yes, Your Honor.

So as of January of 2003, the posture of the case with Mr. Jones had changed.

The issue as to the follow up on the letter in my mind was with the prosecutors on the Hmimssa case, which, at that time, was Mr. Convertino.  By that time, also, Mr. Corbett.

My next contact with the issue of the letter came about as a result of the trial initiating.

## Mr. Joseph Allen

THE COURT: How so?

MR. ALLEN: There was a Department of Justice attorney who was here assisting Mr. Convertino and Mr. Corbett. He's essentially monitoring the trial. He is someone I've known for a number of years.

And from time to time, he would ask me some questions, not specifically about the case, because I didn't have any independent knowledge.

THE COURT: Let's be clear. This is Mr. Capone who's with us today.

MR. ALLEN: Joseph Capone. He would tell me, sometimes, some things that happened in court. He would ask me some questions about the methods employed in this district, in general by the court itself, and by the prosecutors in the case.

And in the course of that, at some point, it's going to be after the trial began, some issues were coming up about Mr. Hmimssa.

I mentioned to Mr. Capone the fact of the Butch Jones letter -- what I call the Butch Jones letter.

And I was --

THE COURT: Prior to this point, had you ever discussed this letter with Mr. Capone?

MR. ALLEN: I had no reason to.

It was some point, Your Honor, I can't put a

## Mr. Joseph Allen

specific date on it.  It was after the trial had begun and the context of the conversation as best I can remember is, I was wondering when if or when the issue would arise.

If or when the letter would be used, if or when there would be any contact to Mr. Gurewitz.

**THE COURT:**  What was the state of your mind at that time as to whether the letter had been turned over to defense lawyers?

**MR. ALLEN:**  Your Honor, in that time frame, I had contact with all the counsel in this case, from time to time.

**THE COURT:**  By "counsel" you mean defense counsel?

**MR. ALLEN:**  Defense counsel.  Yes, sir.

At some point in some conversation with one or more of the counsel, I remembered that Mr. Jones name was mentioned in conjunction with Mr. Hmimssa's testimony.

I took that to mean that the letter that was -- basically, my understanding, I thought defense counsel, in general, was aware of it.

I was also very aware Ms. Raben is Mr. Gurewitz's partner.  And that she, from time to time, had some role.  I wasn't sure what, with respect to Mr. Jones.

I may be wrong, but I assumed she was working on some of the briefing matters at the time.

So my general belief in the time frame that the

## Mr. Joseph Allen

trial began in 2003, was that the defense counsel in this case were aware of either, specifically the letter, or the facts underlying the letter that Mr. Jones alleged.

As the trial proceeded and I discussed further with Mr. Capone some of the issues that were coming up, it became clear to me, particularly after Mr. Hmimssa had testified and the issue had not arisen in any form, I became concerned that the letter had not been disclosed.

THE COURT: Why were you concerned?

MR. ALLEN: If I were counsel, I would have used the letter in cross examination of him.

THE COURT: Defense counsel?

MR. ALLEN: Yes.

They're reasons -- I thought at the time they're reasons they may not have, all kinds of reasons. It was perplexing to me, in some sense.

I was then out of town in April --

THE COURT: Well, let's stop for a moment there.

If you were defense counsel, you would have, at the very least, used the letter to cross examine Mr. Hmimssa, or at least have wanted the opportunity to do that?

MR. ALLEN: I would have at least tried.

I could have think of reasons the Court would preclude them, strategy reasons, they elected not to do that. It was puzzling to me, I guess is the way to word it.

USA V Koubriti, et al 01-80778

## Mr. Joseph Allen

**THE COURT:**  Puzzling the letter had not come up in the course of examination of Mr. Hmimssa?

**MR. ALLEN:**  Yes.

In April, I -- I believe that I discussed that with Mr. Capone and some other people in the office, just in general.

I never sat in the trial.  I was never here.  All of my information as to what was happening in the trial was either media accounts, from Mr. Capone, or other assistants in the office who stopped in.

In April of 2003 while the trial was proceeding, I was on a family vacation in Florida.  And was just generally following media accounts of the trial, which weren't very detailed, when I received a call from Mr. Capone.

I was actually out on the beach and they came down and got me and said it was an important phone call.

I discussed at length with Mr. Capone the fact that a witness, materialized, I guess is the word I'd used.

Mr. Shishani, also being prosecuted by our office.  And allegations -- Mr. Shishani was making allegations Mr. Hmimssa allegedly told him in the jail.

**THE COURT:**  The same nature, generally, as are reflected in the letter to you?

**MR. ALLEN:**  That was my understanding.  Yes, sir.  Again, some passing familiarity with the Shishani matter.

## Mr. Joseph Allen

When I returned -- first thing I did when I returned, I believe it was later in the week when I got back and I returned, I got Mr. Capone a copy of the letter.

I believe that was April 28, 2003, to make sure he was aware of all the details in the letter, because I don't think he had had access to the government's exhibits and witnesses. I know that for a fact.

THE COURT: That Mr. Capone did not have access to the exhibits?

MR. ALLEN: I do not believe he had access to the case file on a daily basis, Your Honor. He his role was not that role.

As I understood it, I should maybe -- when I say no for a fact, it was my understanding.

THE COURT: We'll hear from Mr. Capone.

MR. ALLEN: It was my understanding he had not reviewed the entire file. It was to make sure we all were talking about the same thing.

After I gave Mr. Capone the letter, I immediately went to see Mr. Gershel. I wanted to discuss the matter with him. He was the supervisor of the Criminal Division in the office.

The United States Attorney was recused from the Jones matter, I could not discuss it with him.

THE COURT: Mr. Collins.

USA V Koubriti, et al 01-80778

70

## Mr. Joseph Allen

MR. ALLEN:  Mr. Collins, Jeffrey Collins.

THE COURT:  Was recused from the Jones matter.

MR. ALLEN:  Yes, sir.

I explained my concerns to Mr. Gershel.  The trial prosecutors were, at that point in your courtroom, I believe.

I explained the background, generally, that I've explained to the Court.

I said it appears to me that --

THE COURT:  Where did this conversation take place?  In Mr. Gershel's office?

MR. ALLEN:  Yes, sir.

THE COURT:  Anybody else in the room?

MR. ALLEN:  Not at that point, Your Honor.  I don't believe so.

THE COURT:  Go ahead.

MR. ALLEN:  It was not a matter that would be generally discussed.

I explained -- reminded Mr. Gershel about the letter, because it had been some time since it had come in.

Explained my conversations with Mr. Capone, explained my own concerns and reasons that I had for thinking there has been a miscommunication or mistake here.

And wanted to be sure that the letter was, indeed, in the hands of all defense counsel for that trial.

THE COURT:  You wanted it to be?

**Mr. Joseph Allen**

**MR. ALLEN:** Yes, sir.

**THE COURT:** What did Mr. Gershel say to you?

**MR. ALLEN:** He agreed. Our assessment of the letter was the same.

I can quote him. He said this is a no brainer. We have to make sure that we get this out.

He then told me that I should not do anything independently, that he would talk to Mr. Corbett and/or Mr. Convertino and make sure that the letter is disclosed. And that was -- by that point, it was probably mid-morning.

Later that afternoon, much later, maybe even early evening, I received a call from Mr. Gershel.

He said he had discussed the matter -- I'm certain he said with Mr. Corbett, and I thought maybe, also, with Mr. Convertino.

That he had directed the prosecution to disclose the letter and that should be the end of the issue. And we'll see where everything goes from there.

**THE COURT:** Did you have any further contact with the letter or Mr. Convertino or Mr. Corbett or Mr. Gershel or Mr. Capone or anybody else about the letter before the end of the trial?

**MR. ALLEN:** Before the end of the trial? No, Your Honor.

It was my belief from what Mr. Gershel told me,

**Mr. Joseph Allen**

that the matter had been taken care of.

THE COURT: Obviously, after the trial, what happened?

MR. ALLEN: After the trial, Mr. Straus was assigned to the case. He was consulting with Mr. Capone about the issues in the case.

The issue of the letter, again, came up in response to a letter from Mr. Swor and some allegations generally made by the defense.

And I -- Mr. Capone advised Mr. Straus to come see me. I gave him a copy of the letter.

I, again, explained I thought that the letter was known or at least the information in the letter was known, at least it was still my belief, to Ms. Raben.

And that I recounted for him the issue of going to see Mr. Gershel. And Mr. Corbett and/or Mr. Convertino being directed to turn it over.

At that point, Mr. Swor and I discussed, in abundance of caution, no matter what else, we'll redisclose the letter and make sure that it's done.

Some point in -- right in that period, I know I had another conversation with Mr. Helfrick, in general terms, about this issue.

THE COURT: And your recollection of that conversation is?

USA V Koubriti, et al 01-80778

## Mr. Joseph Allen

MR. ALLEN:  Essentially, that the Butch Jones role in this case and whatever happened with it.

And we were, I think, at that point discussing apples and oranges.  It was a general conversation.

THE COURT:  Did Mr. Helfrick indicate to you whether he had known about Mr. Jones previously?

MR. ALLEN:  Mr. Helfrick's indication to me -- I think this is after the letter had been disclosed, again, was that at some point he was aware.

I think these were his words, there was something out there involving Butch Jones and that he was generally aware of that.

We did not discuss the specifics of the letter.

THE COURT:  Did you discuss the letter at all?

MR. ALLEN:  Yes.

THE COURT:  What did Mr. Helfrick say about the letter?

MR. ALLEN:  He acknowledged it.  He received it, acknowledged it.  Mr. Swor would be filing something with respect to that.

MR. THOMAS:  Time, judge?

MR. HELFRICK:  The day of DeBold's going away party.

THE COURT:  I'm sorry I didn't attend.

MR. THOMAS:  It was a good party, judge.

USA V Koubriti, et al 01-80778

## Mr. Joseph Allen

THE COURT:  I'm sure it was.

MR. ALLEN:  I believe that's -- other than the other matters we discussed, about the entirety of the involvement I had.  I think that's it, Your Honor.

I may have mentioned another thing or two in chambers, but the details of my conversations with Mr. Gershel I've given --

THE COURT:  Did you ever talk directly with Mr. Convertino or Corbett as to whether or not they turned over the letter during the trial?

MR. ALLEN:  I did not see other prosecutors during the course of that trial.

THE COURT:  Mr. Corbett was still your supervisor, wasn't he?

MR. ALLEN:  Mr. Corbett's not my supervisor.  He's on a different floor.  They were in trial mode, Your Honor. I was had my own matters.

I did not go down to the floor.

THE COURT:  You, yourself, did not have a direct conversation with Mr. Corbett or Mr. Convertino about turning the letter over during the trial?

MR. ALLEN:  During the course of the trial, no, I did not.

THE COURT:  What about before the trial to defense counsel?  I know you talked to about turning it over to

USA V Koubriti, et al 01-80778

## Mr. Joseph Allen

Mr. Gurewitz.

What about to defense counsel?

**MR. ALLEN:**  There was a point in time when I made inquiry to Mr. Convertino about the results of his contact with Mr. Gurewitz.

And I tried to follow up that on that once or twice and was unsuccessful.

There were -- there were some issues within the office about the case -- the case, meaning this case, had some significant issues that we discussed this morning.  And I was not involved in those.

More frankly, did I have the time or inclination to get involved in those.

But I did make some follow up inquiries to Mr. Convertino.  Best way I can describe it, they were not successful.

I relied, in part, on what Mr. Gurewitz related to me.  And we're, again, into chambers -- issues in chambers.

**THE COURT:**  I want those issues discussed in chambers relating to Mr. Jones to be the subject of an affidavit under seal.

**MR. ALLEN:**  Yes, sir.

**THE COURT:**  Mr. Gershel, I think that brings us to you at this point, then Mr. Convertino.

Where is Mr. Convertino?

USA V Koubriti, et al 01-80778

76

## Joseph Capone

**MR. STRAUS:** Judge, I think maybe -- I was thinking maybe, logically, Mr. Capone.

**THE COURT:** Well, I don't have a preference.

Mr. Capone, if you want to go next, that's fine.

**MR. CAPONE:** At some point during the course of the trial, it became obvious to me that defense counsel weren't using this material that Mr. Allen had told me about.

**THE COURT:** Before we get to that, let's take it step by step.

When was your first knowledge about the fact that Butch Jones may even have had any information about Mr. Hmimssa?

**MR. CAPONE:** Some point during the trial, Mr. Allen told me about the substance of the letter.

**THE COURT:** You had no knowledge of Mr. Jones' possible relationship with Mr. Hmimssa or his letter to Mr. Hmimssa or anything about Mr. Jones prior to the trial?

**MR. CAPONE:** That's correct.

My best memory of this is that it came up sometime during Hmimssa's testimony.

And that Mr. Allen told me of the substance of the letter. I didn't see the letter at that time, but he told me about the substance of it.

As the trial progressed, it became apparent to me

USA V Koubriti, et al 01-80778

## Mr. Joseph Capone

that defense counsel weren't using any of that.  I became a little concerned.

I called Mr. Gershel.  At some point, I discussed the issue with him.

I asked him if he was aware of it.

He said yes, he was.

He said that he had spoken with either Keith or Rick or both about the letter.  He had told them to disclose the letter.

And there was some discussion about whether defense counsel may have already known about the topic.

At that point, I basically was out of it.

**THE COURT:**  Was there any question in your mind that the letter, at some point, should have been turned over?

**MR. CAPONE:**  The way I read the letter from my knowledge of the case and watching the evidence unfold in court --

**THE COURT:**  You were here every day.

**MR. CAPONE:**  -- it should have been turned over. The letter should have been turned over.

After speaking to Mr. Gershel, my assumption was that it was being taken care of.

**THE COURT:**  Did you ever have any conversation with Mr. Corbett or Mr. Convertino as to whether or not they

78

**Mr. Joseph Capone**

had, in fact, turned the letter over?

MR. CAPONE:  No, I didn't, Your Honor.

THE COURT:  Why did you not?  You were here every day with them.

Why did you not ask them what about this letter? Did you turn it over?  Particularly after -- I've got to ask.

These questions are awfully obvious, particularly after you had been told by Mr. Gershel they had been told to turn it over.

MR. CAPONE:  I guess I assumed at that point that the instructions had been followed.

Mr. Gershel is a high level manager in the office. I assumed the instructions had been followed.

I suppose part of me was thinking that maybe they got it, and for strategic reasons, chose not to do anything about it; although I kind of doubted that, given the case the case was aggressively defended.

THE COURT:  You certainly understood Mr. Hmimssa's credibility was central to the defense case.

MR. CAPONE:  I did, Your Honor.

And I guess the second part of my answer to your question is, my role in the case was basically to come out as a monitor to report to my superiors in Washington, the progress of the case and to assist, if asked.

That's kind of the way I viewed my role.

## Mr. Joseph Capone

I think in the beginning of the case, there was a lot of resistance to the Department of Justice oversight and so there was not a lot of free flowing communication between me and counsel.

And so I basically fell into the role of monitoring the progress of the case, reporting to my supervisors.

And until the time came when one of the trial attorneys asked me to help them with something, that's basically what my role was.

THE COURT:  I'm sorry.  Go ahead.

MR. CAPONE:  This one issue caused me enough concern I wanted to speak to Mr. Gershel about it.

I suppose I felt more comfortable at that point talking to a superior in the office.  And asking him if he was aware of it and had taken steps to make sure it was carried out.

THE COURT:  I have to ask you this question, sir.

To your knowledge, did you or anyone else in the Justice Department, outside -- to anyone else in the Justice Department, instruct either Mr. Convertino or Mr. Corbett not to turn the letter over?

MR. CAPONE:  Absolutely not.  I know that for a fact that did not happen.

THE COURT:  Anything else you want to add to this?

MR. CAPONE:  After the case was over, I went back

## Mr. Joseph Capone

to Washington.  I know that a post-trial motion was filed.

Mr. Straus called me, said he had been assigned to work on the case, asked for my help.

And told me that there was a letter from Mr. Swor asking the government to go back, review its files to see if there had been any *Brady* or *Giglio* information missed.

I thought of this letter.  I told Mr. Straus there was a letter out there from this person and that he should get a copy of it.  We should talk about it, decide whether it should be disclosed.

I came out.  I met with Mr. Straus.  We discussed the post-trial motion, the government's response.  We went over the letter.

The 302 -- the FBI 302 reports had been mentioned. I saw at that point for the first time --

**THE COURT:**  Roussi 302.

**MR. CAPONE:**  We met with Mr. Tukel, decided we should turn them over.

So Mr. Straus prepared a letter and disclosed the letter and the 302's.

**THE COURT:**  Thank you.

**MR. ALLEN:**  If I may?  I think one thing I did not cover with the Court; I assume the Court is aware of but, may not be.

In our offices, as in most offices --

## Mr. Joseph Allen

THE COURT:  Apparently, I'm not aware of, so don't assume anything.

MR. ALLEN:  In the United States Attorney's Office in the Eastern District of Michigan, there is a policy that the prosecutors assigned to the case control the discovery.

I don't have other prosecutors who are not assigned to my case giving things to the defense.  They go through the prosecutor who is assigned to the case.

That was discussed with Mr. Gershel in the context of my meeting.  And the way that this was handled from my prospective was through the superiors in the office, as Mr. Capone just described.

THE COURT:  In other words, you're telling me it was not your place to turn the letter over to defense counsel in this case.

MR. ALLEN:  I could not do that without their express permission or express permission of supervisors.

THE COURT:  Mr. Gershel.

MR. ALLEN:  Especially in this case.  Discovery had to be controlled.  Most of -- many items were classified.  It's a need-to-know, need-to-see, especially in this case; that was strictly adhered to.

THE COURT:  Thank you.

MR. GERSHEL:  I'm going to respond to the meetings referred to first.

82

## Mr. Alan Gershel

For the record, I should indicate, it may have been brought out.

Mr. Collins, the United States Attorney, had been recused from the Butch Jones matter.  For purposes of that case, the Butch Jones matter, I'm also the acting United States Attorney.

Mr. Allen referred to a conversation with me shortly after the letter came in, which would have been late 2001.

Your Honor, I've searched my memory.  Frankly, I only have the vaguest recollection of that.  I have some sense Mr. Allen spoke with me.

It would have been appropriate, given my connection with the Butch Jones matter, but I can't -- I can't give you details about that, that particular meeting.

I do now fast forward to the matter at hand.

At some point during the trial, Mr. Allen had called me.  He actually came to see me.

He was concerned, I would say almost upset, that the letter had not been disclosed in connection with the prosecution of these defendants.

Mr. Allen had the letter with him.  I looked at it. Frankly, Your Honor, there were references to Mr. Hmimssa allegedly lying to the FBI, fooling the Secret Service. Perhaps, having some connection to the events of 9/11.

**USA V Koubriti, et al 01-80778**

**Mr. Alan Gershel**

And I knew that Mr. Hmimssa was a key witness for the government in connection with this case.

And, frankly, it was -- I probably did use the expression no brainer, because it was and it is, that this should be turned over.

I did tell Mr. Allen --

THE COURT:  Let me stop you for a moment, Mr. Gershel.

Do you have any question in your mind but that this letter should have been turned over?

MR. GERSHEL:  No.  I then told Mr. Allen I would take care of it.

And I believe that day, in fact, that I reached out to Mr. Corbett and had him come see me.  I believe the meeting took place in my office.  It was a brief meeting.

THE COURT:  With Mr. Corbett?

MR. GERSHEL:  Yes.  I don't believe Mr. Convertino was present.  I believe my meeting was with Mr. Corbett.

I had the letter in front of me.  I said something to the effect, this letter needs to be turned over.

It seemed to me that it was really an easy decision.  It was unlikely that Mr. Jones would be called as a witness, but, irrespective of that.

THE COURT:  It's not your call.  That wasn't your call to make, whether or not the defense was going to call

## Mr. Alan Gershel

them.

**MR. GERSHEL:**  I understand that.

**THE COURT:**  I'm putting words in your mouth.

**MR. GERSHEL:**  As far as I'm concerned, the letter, on its face, required disclosure.  And I said, turn it over.

I believe the meeting with Mr. Corbett probably lasted just four, five minutes.  It -- there was no debate, no discussion.

**THE COURT:**  What was his reaction?

**MR. GERSHEL:**  Okay.  I mean, I think they both recognized that it was likely it was going to hurt the government, that Mr. Jones was not likely to be called.

As I said, there was no disagreement as to whether or not the letter constituted impeachment information or, perhaps, even potentially *Brady* information.

I wanted the letter turned over, be done with this issue and move on.  That was it.

And it was -- Mr. Corbett left my office.  I believe at some point that day, I called Mr. Allen who was concerned about that.

I told him that I, in fact, had taken care of it.  As far as I was concerned, end of story.

**THE COURT:**  When was your next contact with any issues surrounding the letter and the prosecutors on the case?

## Mr. Alan Gershel

MR. GERSHEL:  Recently, in connection with the letter being disclosed to defense counsel.

THE COURT:  Which was November?  Before then?

MR. GERSHEL:  Approximately that time, yes.

THE COURT:  You had a conversation with Mr. Capone about that?

MR. GERSHEL:  Mr. Capone referred to a conversation.  I don't doubt that.  I don't remember the conversation.

I do remember --

THE COURT:  When you found out that the letter was not turned over, what was your reaction?

MR. GERSHEL:  Well, as I indicated, I only recently found out it wasn't turned over.

And my position was and is, that it should have been turned over.

I did not follow up, Your Honor, after I had given instructions.

Frankly, when I give instructions, I expect them to be carried out.

THE COURT:  You were surprised to learn the letter was not turned over?

MR. GERSHEL:  Yes.

THE COURT:  Did you have anything else you want to add?

## Mr. Alan Gershel

MR. GERSHEL:  No, I don't.

THE COURT:  Mr. Convertino.

Mr. Gershel, beyond the attorneys that we've talked about, does any government agent have any information bearing upon this, either the FBI agents who are here today or any other FBI agents?

MR. GERSHEL:  About the disclosure/nondisclosure?

THE COURT:  Yes.

MR. GERSHEL:  I have no information.

I've never had any conversation with any agents about this particular letter, ever.

THE COURT:  Okay.  I should ask Mr. Allen the same thing.

MR. ALLEN:  Your Honor, as I related to the Court, I had a conversation with my case agents on the Butch Jones case.

THE COURT:  On the Butch Jones case.

Any conversation with any agents on this case?

MR. ALLEN:  No, Your Honor, not directly.

I told the agents on my case at the time we got the letter, that this is will be disclosed.  And that involved --

THE COURT:  By that you meant disclosed to Mr. Gurewitz?

MR. ALLEN:  The letter would be disclosed, period.

THE COURT:  All right.

USA V Koubriti, et al 01-80778

87

**Mr. Alan Gershel**

**MR. ALLEN:** It was going to be disclosed where it ever it need be disclosed.

I told them all that because of some of the allegations in the letters, I wanted them to let their supervisors know in case there was ever media attention or otherwise.

**THE COURT:** Mr. Capone, what about you.

Did you ever have any conversations with any case agents concerning the state of the letter?

**MR. CAPONE:** No, Your Honor. No.

**MR. THOMAS:** Can we know who the agents are, please?

**THE COURT:** On which case?

**MR. THOMAS:** On Mr. Allen's case, because they may be from the same units as the agents in this case.

**THE COURT:** We don't need to do that publicly, Mr. Thomas. I'll direct Mr. Allen to give you that information, okay?

Mr. Convertino, what do you know about the letter, sir?

**MR. CONVERTINO:** The letter first came to my attention sometime in mid to late February. I can't tell you exactly when.

Nor can I tell you exactly how it came to my attention, either by Mr. Allen himself or through interoffice

88

## Mr. Richard Convertino

mail.

At some point in time, I did have a conversation about Butch Jones with Mr. Allen regarding the letter that was written and submitted to me.

The letter, itself, I did not have anything more than a general familiarity with Mr. Jones or who he was and his background; I don't even think at the time prior to seeing the letter and talking to Mr. Allen.  I knew he was indicted and a defendant.

**THE COURT:**  So we have some context here.

Where was the governments in relation to its discussions with Mr. Hmimssa at the point; that is, both covered in the letter up to December 30 and then at the time in February when you saw the letter?

**MR. CONVERTINO:**  Mr. Hmimssa was brought in for an initial debriefing sometime in November.  I believe first week in November, if I'm not mistaken.

**THE COURT:**  This is what we covered at trial, I believe.

**MR. CONVERTINO:**  I'm sure we did, yes.  He was here in the courthouse on the tenth floor.

There were agents from headquarters, pardon me, from Detroit here, two agents took part in that interview alone with Mr. Rabaut, Mr. Hmimssa, myself.

That interview lasted, I'm guessing, maybe a half

89

## Mr. Richard Convertino

an hour, 45 minutes.  And then it ended.

At the time between that period of November and March, again, began to debrief Mr. Hmimssa.  There was no contact with Mr. Hmimssa.

**THE COURT:**  You began to debrief him again when?

**MR. CONVERTINO:**  I believe it was March.  The dates I don't have right now.

**THE COURT:**  Tell me what happened when Mr. Allen gave you this letter.

**MR. CONVERTINO:**  He gave me the letter.  As I said, I didn't have familiarity with Mr. Jones.

He told me who Mr. Jones was in a general sense and that notoriety that went with Mr. Jones.

He told me that he had a lot of baggage and would be useless as a witness.

At that point in time, I then at some point soon thereafter, made the letter known to people in the Strike Force.

I think I mentioned it to Mr. Kozar, I think I mentioned it in some way to Mr. Corbett.

Mr. Corbett was not working the case at the time. I was working the case at that point in time with Mr. Kozar (Mark).

At some time -- the letter struck me as absurd on its face.  I knew the first allegation that Mr. Hmimssa was

**USA V Koubriti, et al 01-80778**

## Mr. Richard Convertino

involved in providing false documentation to the 9/11 hijackers was not accurate, since I knew that the 9/11 hijackers didn't use false identification.

That Mr. Hmimssa was going to take over the country electorally, whatever that meant, was, obviously, absurd.

And that the Bush family were narcotics traffickers as well.

The other two items in the letter of note were that Hmimssa lied to the FBI and Hmimssa lied to or fooled, I think was the term, the Secret Service.

Those were, in sum, the five allegations in the letter that Mr. Hmimssa gave to Mr. Jones.

I did not at first blush, know the veracity of what was contained within the letter.

At some point after that, I made a call to Mr. Gurewitz, who I understood more likely then not from Mr. Allen, was representing Mr. Jones.

I had no way of knowing who his lawyer was. I'm assuming Mr. Allen told me.

Called Mr. Gurewitz, had a brief discussion about Mr. Jones.

And then I received this letter and I faxed it to Mr. Gurewitz on February 22 of 2002.

THE COURT: What did you say in the fax sheet, if anything?

## Mr. Richard Convertino

MR. STRAUS:  I have the attached fax in the letter, if the Court wants to mark it as an exhibit.

THE COURT:  I think we should.

Any objection to anybody marking it as an exhibit?

MR. THOMAS:  No.

THE COURT:  Court will.  It is admitted.

MR. CONVERTINO:  Dated February 22, 2002 to Mr. Gurewitz with his fax number attached.

From me with my phone number attached and the remarks read as follows:

Please let me here from you ASAP regarding this matter.  As you know, time is of the essence Rick Convertino that would have been completed by my secretary at the time.

The second page --

THE COURT:  What was the date of the fax, again, please Mr. Convertino.

MR. CONVERTINO:  February 22, 2002.  The second page is a, for lack of a better term, receipt off of the fax machine in the office that's dated February 22, 2002.

THE COURT:  Indicating that the transmission was completed.

MR. CONVERTINO:  Yes.  I can't tell you how you can figure that out from this, but that's what it appears to

**Mr. Richard Convertino**

be, with the time 12:14 p.m.

Then the latter three pages are the document itself.

THE COURT: Did you talk to Mr. Gurewitz after that?

MR. CONVERTINO: I can't recall. I know when I spoke to Mr. Gurewitz.

At that time, I knew Mr. Allen had the case. I knew more about the case.

I knew it was a death penalty eligible case. It was a very serious matter. I knew more about Mr. Jones at that period or time.

And the likelihood -- I told Mr. Gurewitz whatever deal ha had to be work out had to be worked out between Mr. Gurewitz and Mr. Allen.

And that is my recollection of my conversation with Mr. Gurewitz. It must have been before the call, I mean, before the fax it may have been after.

THE COURT: Do you recall any conversations with Mr. Gurewitz after the fax of the letter?

MR. CONVERTINO: No, I don't recall any specific conversations with Mr. Gurewitz.

THE COURT: Why did you not turn the letter over at that time to defense counsel?

MR. CONVERTINO: I don't believe at that time --

93

## Mr. Richard Convertino

at that time, February 22, I believe, was -- the Indictment -- we would have been operating under the first Indictment, which would have been the passport case.  And I can't tell you right now what the trial date was on the first Indictment.

I can tell you that my analysis of this was that it was not *Brady*, it was not *Giglio* material.

And I did not think that the references included in the letter was specific references to the things that I just mentioned were of any value or importance.  That was -- I'm telling you, judge, this was my assessment.

THE COURT:  What about turning it over to Mr. Rabaut, Mr. Hmimssa's lawyer?

MR. CONVERTINO:  I can't recall if that was done or not.  I don't know.

I would be surprised if I didn't mention at some point in time down the road, Butch Jones to Youssef Hmimssa. That may have happened.

So --

THE COURT:  Do you remember when that would have been?  In one of your debriefings when he was cooperating?

MR. CONVERTINO:  I don't remember doing it.

THE COURT:  You don't remember doing it.

MR. CONVERTINO:  In my own mind, it's something I would have done.  Hey, do you know who this guy is, did you

USA V Koubriti, et al 01-80778

94

## Mr. Richard Convertino

talk to him.

THE COURT:  Did you prepare -- in preparing with Hmimssa for his testimony, did you review with Mr. Hmimssa that letter?

MR. CONVERTINO:  No.

THE COURT:  Or the contents in that letter?

MR. CONVERTINO:  No, I did not.

I did not deem this letter and still do not deem this letter the same way the gentlemen who testified here or spoke before me.  I do not and did not.

THE COURT:  You don't agree with Mr. Allen, Mr. Gershel and Mr. Capone, that it should have been turned over?

MR. CONVERTINO:  That's a different question.

Whether it should have been turned over, there's no question in my mind whatever that this letter, this document, would have been no down side to the government in turning this over, so why it wasn't turned over, I don't know.  I can't explain.  It wasn't.

THE COURT:  Why didn't you turn it over?

MR. CONVERTINO:  I'm assuming what happened, and I think what happened was, the discovery in this case, judge, was overwhelming.

THE COURT:  You don't have to tell me that.  I understand.

## Mr. Richard Convertino

MR. CONVERTINO: I was attempting to juggle discovery coming in from three districts around the United States, documents from everywhere.

We were doing the very best we could. This document, I'm sure, because of its significance to me, which was almost none, got put aside until a later point in time when it came up again.

THE COURT: At the later point in time when it came up again, was that during trial?

MR. CONVERTINO: My recollection was and is, that it was before trial at some point in time.

THE COURT: What happened then?

MR. CONVERTINO: The letter came back around and I reviewed it again.

THE COURT: Who'd you get you it from?

MR. CONVERTINO: I can't recall, judge. I can't.

THE COURT: A lawyer in your office? Defense counsel?

MR. CONVERTINO: I can't -- I cannot tell you. It certainly would have not been defense counsel.

THE COURT: It flashed on your radar screen --

MR. CONVERTINO: Yes.

THE COURT: -- as you were preparing for trial?

MR. CONVERTINO: Yes.

THE COURT: What did you do then?

**Mr. Richard Convertino**

MR. CONVERTINO:  I reviewed it.

My recollection is, I showed it to Keith to -- for his review.  He reviewed it.  His assessment was the same as mine.  And that was the end of it.

That's my recollection of how that was handled.

THE COURT:  What about during trial?

MR. CONVERTINO:  I don't recall this coming up during trial, which is -- which is why this may have happened during trial.

I recall it before trial.

THE COURT:  During trial?

MR. CONVERTINO:  Yes, sir.

THE COURT:  Did you have any discussions with Mr. Allen, Mr. Gershel or Mr. Capone, concerning that letter and whether it should be turned over?

MR. CONVERTINO:  No.  No one instructed me directly or indirectly to turn this letter over.

No one, either Mr. Allen, nor Mr. Capone who was here every day, nor Mr. Gershel ever, ever raised this letter with me.

THE COURT:  They never mentioned it to you?

MR. CONVERTINO:  No, not after February of 2002. I heard them stress the importance of this and that it was a no brainer.

And I sat here and wondered to myself if I missed

97

## Mr. Richard Convertino

it, my analysis, which certainly is not infallible by any means, if I missed it.

Then it was ample opportunity for this to be directed to me, directed to Keith, and insured that it was turned over.

I cannot imagine in my wildest dreams, Keith Corbett receiving a direct order from Alan Gershel to turn something over and he not doing it immediately.

To me, that is unfathomable.

THE COURT:  Tell me why you didn't turn it over? Is it simply because you made the judgment that it was neither *Brady* nor Giglio material?

MR. CONVERTINO:  Yes, I made that analysis. Incidentally, that was given to Mr. Corbett for his analysis.  That's how we typically do it on the trial team.

Mr. Corbett's analysis was the same as mine.  I believe his analysis and belief is still the same.

MR. THOMAS:  Let him say it, Your Honor.

MR. CONVERTINO:  Judge, I will tell you this.

If this document was not important to me after it was determined that -- who Butch Jones was and what his credibility was and the likelihood, which was zero, that he would, in my mind, judge -- that he would testify, there was no down side in holding this document.

There was neither a legal down side or strategical

## Mr. Richard Convertino

down side in holding this document and not turning it over.

THE COURT:  Why didn't you, though?

MR. CONVERTINO:  The only thing I can tell you, judge, is, it slipped through the cracks.

THE COURT:  Mr. Convertino, look.

Without getting into specifics, we had numerous issues come up both before trial and during trial in which documents and material had not been turned over, that you discovered, one of which you initiated on your own and came to me.  That's the Brahim Sidi 302.

MR. CONVERTINO:  Yes, sir.

THE COURT:  Why did you not come to me with that document and say, judge, I don't think this is worth anything, but you decide?

MR. CONVERTINO:  Well, judge, if I -- if I had this document in front of me and the issue is whether or not to turn it over, I would not come to you.  I would turn it over.  There's no down side in not turning this document over.

So I've asked Mr. Corbett why didn't we turn this over.  His reaction was the same as mine, I'm not sure.

THE COURT:  How can prosecutors make that decision unilaterally when it's got, on the face of it -- I'm not making a credibility determination, but on the face of it clearly, *Brady* and *Giglio* implications for the key witness

USA V Koubriti, et al 01-80778

## Mr. Richard Convertino

in the government's case?

**MR. CONVERTINO:**  Well, at the time that the gentlemen are talking about, the rediscovery of this document, Mr. Hmimssa had already testified.

**THE COURT:**  He can certainly have been recalled and they could certainly have explored this.

Potentially; it might have been fruitless, as Mr. Gurewitz seems to indicate.

They could have potentially explored this with Mr. Jones and, perhaps, others that were on the cell block with Mr. Hmimssa at the time.

**MR. CONVERTINO:**  Yes.

The two points that seems to be the most important in the letter, was that Mr. Hmimssa fooled the Secret Service is not a point of contention.

The point that Hmimssa lied to the FBI is not a point of contention.  So neither of those matters would be cumulative.

**MR. THOMAS:**  Judge -- Judge, are we going to get a chance to ask questions?

**THE COURT:**  No.

**MR. THOMAS:**  May I ask you to ask questions?

**THE COURT:**  No.  Sit down.

**MR. THOMAS:**  The letter refers to a note.  Ask him a question on notes.

## Mr. Richard Convertino

THE COURT:  Mr. Thomas, let me conduct the examination questions here.  I'm not done with this.

On its face, the letter contains exculpatory information on its face.

It may be wildly incredible, but that's not a decision that a prosecutor can make unilaterally.  It's a decision that the defense, first, in the first instance, gets to make.

And if there's a question in your mind, it comes to the Court.

MR. CONVERTINO:  I, I understand.  I don't disagree with that one bit.

THE COURT:  You came to me with the Brahim Sidi letter, with the 302.

MR. CONVERTINO:  I'm saying there would have been no question about this letter.

If somebody said to me turn it over, I would not have even attempted to argue it.  It would have been turned over, because it is of no value to the defense, from my estimation, my analysis, both trial strategy and --

THE COURT:  Wouldn't the safest thing to do would have to been to come to me to make that determination?  Let me say the most prudent?

MR. CONVERTINO:  There's no question about that. And I regret that wasn't done.