## Mr. Richard Convertino

And in this particular case, there was no reason not to turn it over.

THE COURT: Let me ask you this.

Mr. Thomas was all exercised about this. I was getting to this.

In the letter Mr. Jones says he was taking contemporaneous notes.

Did you ever ask Mr. Gurewitz whether he had those notes?

MR. CONVERTINO: No.

THE COURT: Were you not interested whether or not he had the notes?

MR. CONVERTINO: Yes. I was interested, as you can see by my fax of the 22nd of February, in having at least agents reach out and see if they can make contact with Mr. Jones.

THE COURT: Did they do that?

MR. CONVERTINO: No, no.

THE COURT: Why not?

Why didn't you follow up to see, at least if he had the notes.

If he had the notes, arguably, that could have been which he says are contemporaneous, arguably, that could have given some corroboration to some of the allegations concerning Mr. Hmimssa that Mr. Jones makes in the note -- in

## Mr. Richard Convertino

the letter.

MR. CONVERTINO:  Judge, my position at this point in time or soon thereafter was, that Mr. Gurewitz -- Mr. Gurewitz was not going to allow us to have contact with Mr. Jones unless there could be some benefit to Mr. Jones.

My analysis and assumption after February, after speaking to people who were aware of Mr. Jones, after gaining and gathering information on Mr. Jones, was that it was not worth the effort and time at that point in time.

I didn't hear back.  I don't recall certainly hearing back from Mr. Gurewitz.  If he wanted to pursue this matter, I assure you, we would have.  I would have.

I would have asked Mr. Allen or Mr. Gershel whatever we could have done, reasonably, to get access to Mr. Jones.

But my overall belief was that he was not worthwhile as a potential witness for --

THE COURT:  Did you ever pursue this with Mr. Jones?  Did you ever go talk with Mr. Jones?

MR. CONVERTINO:  Did I personally?

THE COURT:  Yes.

MR. CONVERTINO:  No, sir.

THE COURT:  Did you ever send an agent to talk to Mr. Jones about this?

MR. CONVERTINO:  We wouldn't be allowed to do that

## Mr. Richard Convertino

without going through Mr. Gurewitz.

THE COURT:  Did you ever broach the topic with Mr. Gurewitz about interviewing Mr. Jones?

MR. CONVERTINO:  I believe that was the purpose of sending him this letter.

THE COURT:  Why didn't you pursue it then?  You should have contacted me ASAP.

Why didn't you pursue that?

MR. CONVERTINO:  Well, judge, you know, I -- the responsibility for the case at that point was almost exclusively mine.

I had a million things I was doing.  In the scheme of things on the ladderer of importance, this was on the bottom.

Now at one point in time, judge, we came across the Butch Jones letter -- this may have been the time during trial.  It had a handwritten notation from my secretary.

MR. GUREWITZ:  Excuse me.

MR. CONVERTINO:  That's all I'm going to say about that.

THE COURT:  Well, wait a minute.

What issue does that bear on you're concerned about?

MR. GUREWITZ:  Something we talked about at side bar.

## Mr. Richard Convertino

THE COURT: I see. I know. I got it. All right. I want that to be part of the sealed record.

MR. CONVERTINO: The handwritten notation?

THE COURT: Yes. Mr. Jones also volunteers in the letter to take a polygraph.

MR. CONVERTINO: Yes, sir.

THE COURT: Did you attempt ever to polygraph him on this -- the issues raised in this letter?

MR. CONVERTINO: I did not.

Again, those decisions, whether or not to proceed on those matters, would have to be in conjunction with Mr. Gurewitz and Mr. Allen. And that didn't -- we didn't get that far.

THE COURT: Mr. Allen, was Mr. Jones ever polygraphed on the issues raised in this letter?

MR. ALLEN: No, sir.

THE COURT: Did Mr. Corbett ever tell you that Mr. Gershel told him to turn this letter over?

MR. CONVERTINO: Absolutely not.

I believe that if Mr. Corbett was instructed to do that, he would do it without hesitation.

If he told me -- if Mr. Corbett made me aware of that conversation with Mr. Gershel that he was instructed directly to do that, there would be no doubt in my mind whatever that Mr. Corbett would do that.

USA V Koubriti, et al 01-80778

### Mr. Richard Convertino

THE COURT: When was the next you heard about the letter?

MR. CONVERTINO: Recently. Can't remember exactly, judge. Within the last -- well --

THE COURT: After it was turned over?

MR. CONVERTINO: Yes.

THE COURT: Or before it was turned over?

MR. CONVERTINO: After it was turned over.

It was turned over -- my understanding I learned today, turned over on November 18th.

I learned about this letter through my conversation with Special Agent Mike Thomas who told me he was shown the letter, asked, you never saw this. He said, no. I didn't. I didn't see this.

Mike Thomas asked me who Butch Jones was.

THE COURT: To your knowledge, did Mr. Thomas, Mr. Brennan or any of the other FBI agents, Mr. George, ever see the letter?

MR. CONVERTINO: No, sir.

THE COURT: You never showed it to them?

MR. CONVERTINO: I do not -- no, I don't believe I did.

I can't be a hundred percent sure, but I do not believe I showed the letter.

I believe we discussed --

USA V Koubriti, et al 01-80778

## Mr. Richard Convertino

**THE COURT:** Mr. Thomas and Brennan are here. I'm going to ask them, briefly, what they know about the letter. All right.

**MR. CONVERTINO:** The letter was sent out on November 18th. It's within the last couple of days Mr. Thomas asked me -- told me he was shown a copy of this letter, asked me if I was aware of it.

At first, I wasn't. I didn't recall it right away. I didn't know what he was speaking about.

And then I remembered there was something with Butch Jones, yeah.

So that was the extent of my recollection. Even at this late period of time, I didn't put much weight or substance into that letter.

**THE COURT:** What about the Roussi 302?

**MR. CONVERTINO:** The Roussi 302. When that came to my attention, I reviewed that 302.

I determined that it was Mr. Roussi would not be a witness, that it was neither *Brady* or *Giglio*. And that 302, I don't believe, was turned over.

**THE COURT:** There is a passage in the -- I have it in front of me.

May I have the Roussi 302? Do I have it?

There's a passage in the Roussi 302

indicating that Mr. Ahmed, that would

**USA V Koubriti, et al 01-80778**

## Mr. Richard Convertino

be -- Mr. Hannan, I believe, and Mr. Koubriti, had lived with Mr. Roussi. That Mr. Koubriti arrived in the United States approximately one year ago. And Mr. Hannan arrived sometime prior to that. Mr. Koubriti and Mr. Hannan were Muslims, but they did not adhere to strict standards of their religion.

Both recently drank alcohol excessively, smoked marijuana, and had sexual intercourse with many women.

Mr. Hannan and Mr. Koubriti never discussed their political beliefs with Mr. Roussi concerning either American politics or those concerning their feelings for Osama bin Laden.

Roussi has known both Hannan and Koubriti to telephone their relatives overseas once per week.

Once, back in Canton, Roussi would maintain contact with Hannan and Koubriti by talking to them once a week on the telephone.

Roussi could only recall -- then there's a partial number there, has a partial

## Mr. Richard Convertino

telephone number for them, in the aforementioned Dearborn basement apartment.

Koubriti had a telephone call. Advised Roussi that he and Hannan had secured a few jobs since arriving in Detroit to include a Big Boy Restaurant in the Detroit International Airport one month only in Detroit -- I'm sorry, as dishwashers.

Roussi advised that both men had sincere desires to obtain their commercial driver's license, the CDL, and that they believed they could earn a lot of money with such credentials.

Mr. Hannan and Mr. Koubriti reside at the Dearborn, Michigan apartment with Kalid, who is originally from Algeria.

Roussi described Kalid as, approximately, 197 meters tall.

That's from the September 27th 302.

On the October 18th 302, there is a notation that: Roussi was questioned regarding his contacts with Hannan and Koubriti and observations made of their possession of

## Mr. Richard Convertino

false documents.

Roussi indicated that on the second visit to Detroit, Hannan told him that he took several pieces of identification to include passports, visas and what he called I.D.'s, from his roommate who was originally from Morocco.

Mr. Hannan told Roussi that this Moroccan was able to make false identifications through the use of computers.

He described him as very experienced in falsifying documents.

Not that's anything knew about Mr. Hmimssa.

But at any rate --

MR. CONVERTINO: Pardon me?

THE COURT: Yes.

The passages concerning Mr. Hannan's lack of religious and Mr. Koubriti lack of religious following and their lack of political inclination and there, shall we say non Islamic fundamental behavior concerning alcohol and smoking and women, drugs, you didn't think that was exculpatory?

MR. CONVERTINO: No, that was perfectly consistent with the evidence adduced at trial.

USA V Koubriti, et al 01-80778

## Mr. Richard Convertino

**THE COURT:** Sure it was which was a big part of their defense.

**MR. CONVERTINO:** Those, those matters that you just read from, judge, were never contested at trial.

They were Taqiya. That was our theory, Mr. Hmimssa talked about them doing some the same things that are in that 302.

**THE COURT:** I understand there was other testimony about it, Mr. Koubriti and others. I understand that. But that doesn't mean this is also not exculpatory.

**MR. CONVERTINO:** Judge, I can tell you this. I reviewed that 302, Mr. Corbett reviewed the 302.

And I'm told, recently, Mr. Straus reviewed that 302, all having the same conclusion. And that's the best I can give you on that, judge.

**THE COURT:** I guess the question is the same. Why do the prosecutors unilaterally get to make this determination?

Shouldn't the Court make it, at the very least, if not turning it over?

I agree with you, there's really nothing new here on this issue.

I've got a question about the other issue, but there's nothing new here. But it's up to the defense to decide whether they want to use it.

USA V Koubriti, et al 01-80778

## Mr. Richard Convertino

**MR. CONVERTINO:** Well, I agree wholeheartedly. If it's a close call or remotely close call, it should be turned over to you for at least your review on these two.

My estimation, my initial review was it was not. That was a reviewed by others, both documents were reviewed by others. They were determined not to be.

**THE COURT:** Who else?

**MR. CONVERTINO:** Mr. Corbett, on both the 302 and the letter of Mr. Jones.

**THE COURT:** What about the issue of the commercial driver's license? That is fairly significant.

You introduced evidence they had been trying to obtain commercial driver's licenses.

Obviously, in addition if they had a commercial driver's license, they would have been able to haul hazardous materials; that was the context in which it was introduced.

Here, you have Mr. Roussi saying that they wanted the commercial driver's license to earn a lot of money.

Would that not have been exculpatory, at least explanatory?

**MR. CONVERTINO:** May have been explanatory, I don't believe it's exculpatory.

**THE COURT:** Well, it's one thing to say terrorists are attempting to obtain commercial driver's licenses so that they can haul hazardous materials and then have

## Mr. Richard Convertino

evidence that, at least partially refutes that motive by saying they could earn a lot of money.

**MR. CONVERTINO:** I understand the Court's analysis.

And I'm not saying my analysis on any document I reviewed is fool proof. I'm saying that I reviewed those.

I came to my conclusion and then others reviewed them and came to the same conclusion.

Mr. Corbett's review, in particular, he's someone who's been an Assistant United States Attorney for 24 years, supervisor for 15.

I have the utmost confidence and faith in his ability whether something is or is not *Brady* or *Giglio*.

He is of the same --

**THE COURT:** As you know, Mr. Corbett and I have had a number of discussions about what constitutes material that should be turned over. I didn't always agree with him.

I have respect for his talents as a lawyer, but I disagree with you about him or you for that matter.

**MR. CONVERTINO:** I agree with that. Again, I'll tell you that I'm sure Mr. Corbett will say the same thing.

It was -- there was no intentional withholding of the Jones document.

That document, we would have both turned over, not to the Court, but to the defendants, because it's so

## Mr. Richard Convertino

worthless, in my estimation.  That's my opinion; it was then and it is now.

Now if Mr. Capone, Mr. Gershel, Mr. Allen had these concerns and, in particular, Mr. Capone, during the course of the trial after he received notification from Mr. Gershel that he was -- that Mr. Gershel instructed Mr. Corbett to turn it over and it was not, then, certainly, Mr. Capone would have known about that.

But I don't --

THE COURT:  Would have known about what, it wasn't turned over?

MR. CONVERTINO:  It seems to me Mr. Capone is saying he was made aware at some point in time Mr. Gershel directed Mr. Corbett to turn it over.

THE COURT:  How would he have known it wasn't turned over?

MR. CONVERTINO:  He was here every day in court.

THE COURT:  You're saying he should have brought it to your attention?

MR. CONVERTINO:  I'm saying if it was important by this many people, somebody should have insured it was turned over.

THE COURT:  Well, that probably is the understatement of the day.

## Mr. Richard Convertino

MR. CONVERTINO:  Which is why it was not significant to me, because I didn't view it that way.

THE COURT:  All right, Mr. Convertino.  Thank you.  Mr. Corbett.

MR. STRAUS:  One moment to advise Mr. Corbett?

THE COURT:  Yeah.

You're advising of the matter we discussed with Mr. Gurewitz and in chambers, correct?

MR. STRAUS:  Yes, Your Honor.

MR. CORBETT:  I was going to raise that with the Court before I started.

THE COURT:  I don't want you to get into any --

MR. CORBETT:  I understand.

Do you want me to start?

THE COURT:  I want you to start with everything you knew and when you knew it.  As Howard Baker does or used to say, when did the President know and when did he know it.

MR. CORBETT:  I was in the courtroom when Mr. Allen indicated to me he showed me a copy of the letter in, approximately, February of 2002.

THE COURT:  You were in what courtroom?

MR. CORBETT:  This courtroom.

THE COURT:  You mean when he said he said that?

MR. CORBETT:  Probably 50 minutes ago when he said it?

## Mr. Keith Corbett

As I indicated earlier, during the chambers meeting as I would indicate now, I have no recollection of that.

At the time that that letter was forthcoming, I had no involvement in the case.  In fact, I didn't want it in my unit, was trying to get rid of it.

THE COURT:  Weren't you supervising it, though?

MR. CORBETT:  I didn't feel it was an organized crime case, I thought it was more appropriate somewhere else.  I didn't want the case.

At that time, too, we're talking about February of 2002, the charge was possession of a false passport only. There were no terrorism charges.

And I don't even believe Mr. Hmimssa was named as Youssef Hmimssa.  I think he was Jalali in the charges.

I was not even aware at that time that Youssef Hmimssa and Jilali were one in the same person.

If Mr. Allen had shown me a letter from Mr. Jones having information about a government witness involved in terrorism, suggested to me Mr. Convertino was serious about it, I'm sure my reaction is this is a joke.  Nobody can trust Butch Jones and move on.

So I am not suggesting to the Court that that conversation didn't take place, it's just that given the relative situation regarding the case and my involvement over it at that time, I have no recollection of having seen the

USA V Koubriti, et al 01-80778

## Mr. Keith Corbett

letter and no recollection of even necessarily at that time saying Youssef Hmimssa is a defendant in the passport case, because I didn't know his name to be Youssef Hmimssa.

Jump ahead to, I would say, September, October, November of 2002, sometime in that time frame, I agreed to assist Mr. Convertino in this case and became -- began to immerse myself in the terrorism case.  And began to work on the case and learn information about the case.

The first time I recall seeing the letter and anchoring it to anything, I was aware of would have been during the course of the trial.

And as I recall and I understand that Mr. Gershel has testified.  But as I recall Mr. Convertino brought the letter to me, showed it to me.

I called Mr. Gershel in an effort to find out what was happening with Butch Jones was told, you know, his death penalty case had been recommended and that the government was proceeding.

At that time -- I'm not going to go any further. There was a note in the corner of the letter I had, that impacted on my decision making process.  But the Court's already aware of that.  I'm not going to discus that.

THE COURT:  I need to have that in an affidavit, sealed affidavit from you.

MR. CORBETT:  Certainly.

USA V Koubriti, et al 01-80778

## Mr. Keith Corbett

Much like Mr. Convertino's analysis now, I had -- I believe, and this is why I'm saying this.

I believe it came to me at a point in time at which Mr. Hmimssa had already testified or was in the process of testifying.

Because as I read the letter, I said to myself, well, Hmimssa has already admitted that he told the police the FBI in Cedar Rapids Iowa --

THE COURT: Mr. Morgan --

MR. MORGAN: Yes, sir?

THE COURT: -- you're leaving us?

MR. MORGAN: No. I'm going out in the hall.

THE COURT: I may want to ask you one or two questions.

MR. MORGAN: Okay.

MR. CORBETT: That Hmimssa had already testified -- and this is to the best of my recollection.

I was thinking to myself as I read the letter when he was first asked about terrorism in Cedar Rapids, Iowa, he wasn't forth coming.

He admitted he walked away from his cooperation agreement with the Secret Service by refusing to make the recording and beginning the flight that, ultimately, led him to Detroit.

So I didn't view those two issues as serious. I

USA V Koubriti, et al 01-80778

118

## Mr. Keith Corbett

didn't view his charge at the present as a drug dealer was serious.

I didn't view his charge Mr. Hmimssa intended to take this country electronically or electorally, giving him the benefit of a spelling mistake.

Therefore, the only issue on that was the reference to that, I thought might be germane in any way, the only issue there was a reference to his complicity in the September 11 bombing.

Which brought --

**THE COURT:** What about lying to the FBI?

**MR. CORBETT:** I believed he already admitted that on the witness stand.

**THE COURT:** Well, but --

**MR. CORBETT:** Mr. Hmimssa, isn't it true you said you lied to the FBI? Yes. He already said he lied to the FBI.

What do you use that for?

**THE COURT:** The answer is yes.

**MR. CORBETT:** If somebody says I robbed the bank on June 1st, you asked him did you rob the bank on June 1st for impeachment? I don't understand that.

**THE COURT:** Well, if he's already admitted it, he now admitting it again.

**MR. CORBETT:** This is my analysis, anyway, for

## Mr. Keith Corbett

the -- and so the only issue was the September 25th incident, coupled with the note, which I misunderstood but --

THE COURT: The September --

MR. CORBETT: His alleged complicity in September 11th, coupled with the notes in the upper corner of the letter, which I misread as being -- referring to a different matter, I made the decision that it was *de minimus* and there was no need to produce it.

Obviously, with the benefit of hindsight, that was a mistake.

And I would concede to the Court I had to do all over again, I would certainly have given it to the judge, at the very least.

THE COURT: Putting it aside for the moment, Mr. Gershel's statement here, wouldn't the best thing to do, since it was *de minimus*, have simply to give it to the -- look.

You have a relationship of long standing with virtually all of these folks.

Wouldn't the easiest thing to do would be to say, here, guys, have fun with this?

MR. CORBETT: Your Honor, the answer to that is 100 percent correct. Just as it is if Mr. Gershel would told me to turn it over.

## Mr. Keith Corbett

I'm not going to jeopardize a career with 25 years ignoring a direct command from my supervisor to turn the document over, especially this document.

And let's anchor a couple of things in time. Because the Court will recall these when the issue of production of the Brahim Sidi 302, which was post Mr. Hmimssa's testimony came up, there was a fairly significant brou ha ha in the press about the impact of this, what the government had done.

And had the purported letter from Mr. Jones been of similar, one would have expected reporting along the same lines.

One would have expected people were watching for that. Where's the story about Butch Jones. I remember having meetings with Mr. Gershel, discussing what had happened, trying to explain how he had failed to identify the Sidi 302's, and what our anticipated plan of attack was in terms of producing them, what we anticipated the Court might do. And even asking the FBI to take charge of an effort to locate Mr. Sidi.

So I'm only suggesting to the Court I'm, frankly, to be completely honest, at a loss to understand, one, why we didn't turn it over.

Or, two, why somebody would think that they had told me to turn it over and I failed to do so.

121

## Mr. Keith Corbett

**THE COURT:** Do you have a recollection of a meeting with Mr. Gershel concerning this letter?

**MR. CORBETT:** I have a recollection of a phone conversation with Mr. Gershel referenced that letter in my effort to ascertain what was going on with Butch Jones.

**THE COURT:** That was earlier.

**MR. CORBETT:** That was at the time I got it. I got that letter during the trial. That's the very first time I saw it.

I don't mean back in -- when Mr. Allen would have given to me. I have no recollection of that.

The first time I recall seeing this letter was during the Karim Koubriti trial. And I'm thinking it's even after Mr. Hmimssa.

**THE COURT:** You do not have a specific recollection of you and Mr. Gershel having this discussion in which he at the very least told you about this letter and showed it to you?

**MR. CORBETT:** No.

As I indicated earlier, I believe I was shown the letter by Mr. Convertino.

And what I'm suggesting to the Court, I understand people's recollections are different.

But if Mr. Gershel had told me to do that, I just would have done it. It wouldn't even have been worth

USA V Koubriti, et al 01-80778

## Mr. Keith Corbett

discussing.

I might have argued with him, as I would argue with the Court, about whether or not I felt it was discoverable or whether or not I felt it fell within the parameters of *Brady* or *Giglio*.

But if I was told by the Chief Assistant United States Attorney to turn the document over, I would have turned it over. And I have no recollection of that conversation.

**THE COURT:** Don't you think it's significant Mr. Jones says in the letter that he had contemporaneous notes?

**MR. CORBETT:** The answer to that, Your Honor, is now today, yes. At that time, no.

I mean, it is something I mixed in my perusal of the letter. But as I now look at it, yeah, that is something that, now, whether or not he had those notes a year and-a-half later, is no way of knowing.

But I do think we could have undertaken some effort. I don't know if Mr. Gurewitz would have allowed anyone from the government to have talked to him or seek to retrieve those documents if they existed, but should have been made available.

**THE COURT:** You agree it would have prudent to come to me, at least, with this letter?

**MR. CORBETT:** Absolutely, Your Honor.

## Mr. Keith Corbett

As I said, hindsight's 2020.  I certainly wish, hindsight, I would have, I would have given it to defense attorneys, because I don't think they would have used it and we wouldn't be here today.

The answer to that question is, yes, I wish I would have given it to you.

THE COURT:  What about the Roussi 302?

MR. CORBETT:  Again, in my mind, I believe that I saw that -- I know I saw it after the trial, but I believe I may have seen it, again, after the witnesses that testified.

As I indicated, as Mr. Convertino said, I heard that portion of his description, I agree with him, even on the commercial driver's license.

If the Court will recall, the defendants, themselves, proffered testimony from the people at ACCESS. They had signed up these guys to become commercial drivers. They were reluctant to even get involved, had to jack them up to get them involved.

THE COURT:  I remember that.  But this comment goes specifically to their motive in doing it, which I don't believe was the subject of any specific testimony.

MR. CORBETT:  Why isn't it hearsay anyway?

THE COURT:  If you put Mr. Roussi on?

MR. CORBETT:  Yes.  It's an out of court statement by somebody not subject to cross examination.

USA V Koubriti, et al 01-80778

## Mr. Keith Corbett

Why isn't it hearsay?

THE COURT: Well, ruling on it, I can see a number of different exceptions.

But at any rate, they should have at least had an opportunity to develop it.

MR. CORBETT: Your Honor, they also knew Mr. Roussi.

The question --

THE COURT: How did they know Mr. Roussi?

MR. CORBETT: He was there. It's evidence uniquely in the government's possession.

They didn't know who their roommates were, they couldn't identify people in the community who my have had access to this kind of information?

It's not as black and white as the government knows it. They don't -- they live with this guy.

THE COURT: Were there any 302's that mention Mr. Roussi as a roommate that were turned over to the defense, as far as you know?

MR. CORBETT: Not that I know of.

THE COURT: I seem to recall that there was one.

MR. CORBETT: There may have been, not that I recall.

THE COURT: Is Mr. Convertino still here?

MR. CORBETT: They know who they lived with in

## Mr. Keith Corbett

Ohio.

THE COURT: Mr. Convertino, I seem to recall -- I don't have it here. I seem to recall that there was a 302 somewhere that mentioned Mr. Roussi as a roommate of Mr. Hannan and Mr. Koubriti.

MR. CONVERTINO: I can't recall right now, judge.

THE COURT: I want defense counsel and the government to research that issue and brief it.

As Mr. Corbett indicates, that does go to access.

MR. HELFRICK: The one point you may want to be aware of as well is, the government deported Mr. Roussi in April of '02, so which, again, is prior to the terrorism charges, as they have pointed out.

THE COURT: Well, we may have been able to solve that problem, at least partially, like we solved the Brahim Sidi problem.

MR. HELFRICK: I don't consider that solved.

MR. THOMAS: That wasn't solved.

MR. CORBETT: Court have any other questions?

THE COURT: I have just one.

MR. CORBETT: Sure.

THE COURT: You've made at least two determinations here.

MR. CORBETT: Both of which were wrong, apparently.

## Mr. Keith Corbett

**THE COURT:**  In my view, they were wrong.

**MR. CORBETT:**  I understand.

**THE COURT:**  Why would you have unilaterally done this?

Wouldn't the most prudent thing to do with respect to each of these documents, simply either given it to the defendants or come to me, as the government did with numerous other documents?

Said, judge, we don't know if this is *Brady*.  We don't know if this is *Giglio*.

You make the call on this.

**MR. CORBETT:**  The answer to that is -- the answer to that is, yes, it would have been the most prudent course of events.

You have to understand, sometimes, these materials don't even get to a situation where you can tell whether they're *Brady, Giglio*, until there's been testimony at trial, until they served to impeach someone else, until they serve to form the basis of exculpatory evidence.

In hindsight, yes, the answer to that question is, I wish I would have given the Court both those documents to review those things.

I will stand here now and say I understand the Court has a a radically different view.

But, in being as honest and frank with the Court as

**USA V Koubriti, et al 01-80778**

## Mr. Keith Corbett

I can, and, again, it is not my determination that, ultimately, settles these things.

But I did not think there was any effective use of the defendants to make of the Butch Jones letter, albeit, that was wrong.

THE COURT: All right.

The problem I have with that, Mr. Corbett, the problem I have with that is, with respect to both of these documents in varying degrees that decision rests, at least to some agree, more with the Jones letter then with the Roussi letter on a credibility evaluation, unilaterally made by the prosecutors, the source of this information.

You don't get to make that. We've had discussion before. You don't get to make that unilateral --

MR. CORBETT: I understand that.

THE COURT: That's what I get the big bucks for.

MR. CORBETT: I know that the alternative is then to give the Court virtually the entire file and ask it to peruse it.

THE COURT: Not true, Mr. Corbett.

MR. CORBETT: And then the judge will turn everything over.

THE COURT: Number one, that may be with some judges. It's not with me. But beyond that, that's not true.

## Mr. Keith Corbett

There is some documents many, many, many documents which simply have nothing whatsoever with anything to do with a witness in the case or any issue in the case.

This document, the Jones letter, has to do directly with the key witness of the government and the Roussi document, at least tangentially, has to do with a defense raised by the defendants.

**MR. CORBETT:** But a defense that the government never contradicted.

There was never a challenge, there was never a single question asked of a witness they didn't drink. We acknowledged that.

So what's the issue in dispute, if all those things about they're acting in a non Muslim style --

**THE COURT:** It may have been somewhat cumulative. Let's just take the Jones letter.

**MR. CORBETT:** The Jones letter is a different element, I concede that.

**THE COURT:** The Jones letter. Quite specifically, Mr. Hmimssa was impeached for three days. Well, actually, four days, if you include Mr. Convertino's impeachment of him as to general matters concerning his character, concerning his background, concerning his criminal history, concerning his use of aliases, concerning his expertise and I.D. theft.

## Mr. Keith Corbett

All of these general matters he was --

**MR. CORBETT:** Right.

**THE COURT:** -- impeached on.

That is general impeachment.

However, there is a different kind of impeachment, often much more probative and that is specific impeachment about a specific story that a specific witness is telling.

**MR. CORBETT:** Right.

**THE COURT:** Arguably, I'm not saying directly, but, arguably, the Jones letter goes to specific impeachment.

Now Mr. Shishani was offered in evidence as a witness for the defense. He testified Mr. Hmimssa had told him that he was lying.

Had the defense been able to put on another witness, albeit compromised and, perhaps, incredible, to say Mr. Hmimssa also told him he was lying, would that not have been potentially of assistance to the defense?

**MR. CORBETT:** Your Honor, I think -- and I could be wrong.

But I think if the Court will go back and review Mr. Shishani's testimony, he never said Hmimssa was lying about the stuff he said in court.

I think that was one of the problems with Mr. Shishani as a witness. Because he said, you know, he

**USA V Koubriti, et al 01-80778**

## Mr. Keith Corbett

misrepresented things to the FBI, but he never told him about making up the story.

And I think a review of Mr. Shishani's testimony on that point might be relevant for two points.

**THE COURT:**  Then maybe this would be more probative --

**MR. CORBETT:**  He was much less forthcoming with Mr. Shishani then he was with Mr. -- I understand what the Court's saying.

There's no sense arguing it, because the Court has to make this call.

But as I stand here now, I'm completely convinced specific instances of misconduct, fooled the Secret Service Agent.  He said he fooled the Secret Service Agent.

He described how he was going to record a conversation and he took off and left the Secret Service high and dry.

He was cross examined on that, that specific incident at great length by all the defense attorneys.

You didn't do things.  You did that.  You left the car.  Did he have a gun, didn't he have a gun.  All these documents.

A general, vague allegation that I lied to the FBI as I indicated, in my judgment, he lied to the FBI in the beginning and you couldn't impeach him on that.

**USA V Koubriti, et al 01-80778**

## Mr. Keith Corbett

I do concede, if the defendants elected to make use of it, there may be some value to questioning him about the alleged complicity in the 9/11 bombers.

But, on the other hand, they have suggested that this Court's questioning of Mr. George raised the issue of whether or not Mr. Hmimssa was a terrorist.

The defendants object to that.  It ties their clients to terrorism.  There's a serious question.

**THE COURT**:  There's no question, as I told counsel in chambers, it may have cut both ways.

In that if he was a terrorist, Hmimssa, he was living with these folks for two weeks, three weeks, a month, whatever it was.  No question.

So it might have cut -- they may ultimately decided not to use Butch Jones.

Very well.  The point is, you don't get to make that decision.

**MR. CORBETT**:  The Court's asking me if I made a mistake.  I'm going to stand on the record.

If you want to, at another time, put me under oath, yes, we should have given that document to the Court.

But the reasons why we're -- it's just a mistake in judgment on our part and not any kind of intentional plan to conceal what we viewed to be some sort of significant piece

USA V Koubriti, et al 01-80778

**Agent Michael Thomas**
**Agent James Brennan**

of evidence from the defendants.

Maybe it was an obvious misreading of the situation.  That's all it was, Your Honor.

THE COURT:  Thank you, Mr. Corbett.

Mr. Thomas, do you have any personal knowledge concerning the letter or Mr. Roussi?

AGENT THOMAS:  First time I saw the letter is when Mr. Straus showed it to me on Monday.

THE COURT:  You never discussed it with Mr. Convertino?

AGENT THOMAS:  Subsequent to my meeting with Eric Straus, I did contact --

THE COURT:  No.  No.  I'm talking about back during the trial or beforehand.

AGENT THOMAS:  Not to my recollection.

It's possible a conversation came up with Mr. Convertino that we received a letter, something.  But I never saw the letter.

THE COURT:  Do you know if any agent working with you on the case, ever discussed it with either Mr. Convertino or Corbett?

AGENT THOMAS:  Myself, Jim Brennan and Matt Meyer. No, sir.

THE COURT:  Mr. Brennan, to the same effect.

AGENT BRENNAN:  I'm sorry?

133

**Agent Michael Thomas**
**Agent James Brennan**

THE COURT: To the same effect.

AGENT BRENNAN: First occasion I was made aware of the letter was this week from Mr. Straus. I was not aware of the letter up until that point in time.

I was not -- I did not discuss the letter at any point in time with anybody until Monday of this week.

THE COURT: Let me ask defense counsel this.

I've indicated that I was going to treat the statements of the lawyers as commensurate with testimony under oath because they're officers of the Court. That goes to both defense counsel and the government lawyers.

However, the agents are not officers of the court, strictly speaking.

Do you wish me to put Mr. Thomas or Brennan under oath and to get this testimony?

MR. SWOR: No, sir.

MR. THOMAS: There's no need, judge.

MR. SWOR: I don't, Your Honor.

MR. HELFRICK: No, Your Honor.

I think I would like you to ask a further question of the agents in reference the Brahim Sidi 302, if there was any discussions or arguments about who was going to take the blame for that not being turned over.

THE COURT: I'm not going to get into that today.

All right. I think my discussions with defense

USA V Koubriti, et al 01-80778

## Mr. Richard Helfrick

counsel will be brief and maybe we can finish up.

If not, I think we're all getting to the point where we can take a break.

Mr. Helfrick.

**MR. HELFRICK:** I know my name has been mentioned. Let me --

**THE COURT:** Obviously, let me frame this issue so you understand it, at least as to how I'm looking at it.

One of the exceptions to *Brady* and *Giglio* is whether or not you or any of the defense lawyers had access to this information.

**MR. HELFRICK:** Right.

**THE COURT:** It's been indicated by Mr. Allen that you, apparently at some point, indicated that you knew about Butch Jones or knew something about him.

**MR. HELFRICK:** Right.

And there is, at some point during the time, it may be because Mr. Allen was concerned as to whether or not the letter had been turned over.

Let me say for the record, the letter had not ever been turned over until we received it from Mr. Straus. And that's, likewise, true of the Roussi 302.

**THE COURT:** That doesn't seem to be in dispute.

**MR. THOMAS:** We never had that stuff. I knew -- never knew of that stuff.

## Mr. Richard Helfrick

THE COURT: That's the other question.

Did you even know there was a letter?

MR. HELFRICK: I had no, no idea there was a letter out there.

THE COURT: Anybody in your office.

MR. HELFRICK: Nobody knew about the letter. They can get up, say it themselves. Nobody knew about the letter or this Roussi 302 or information contained in it.

There was as we indicated in chambers at some point when I was at Dave Debold's party, we had a discussion about this.

What I was saying to both Eric and Joe was that, you know, it seems I have something in the back of my mind about Milton Jones having come up, just like the Court had something came up about that.

And I knew something had come up. I couldn't remember what it was. I didn't want to commit to them whatever it was.

Subsequently, we all had a meeting and as it turns out, what I think it is, is, is this business with Dick Amberg had a client, Robertson, who was saying a lot of these same things about you know Hmimssa and that Butch Jones knows this, too, was something that Mr. Amberg said.

However, I guess from other people who knew about.

THE COURT: When would that have been?

136

## Mr. Richard Helfrick

**MR. HELFRICK:**  Sometime during the trial.  It was on one of these Saturday morning meetings we were having on the weekends, getting prepared for trial and preparing for the week coming.

**THE COURT:**  The reaction was what?

**MR. HELFRICK:**  Well, our reaction -- our discussion was about Amberg's client really.

It was that as I recall it, it was that this particular defendant was, you know, mentally unstable or he was not.

**THE COURT:**  For the record, all of you I'm sure know that Mr. Robertson was a defendant in my -- in this court before me who went to trial, who I sentenced.

**MR. HELFRICK:**  That, I think, was part of our discussions.

Dick Amberg told us that we collectively decided we were not going to talk to that individual.

And that, you know, information, we didn't deem it at that point in time to be --

**THE COURT:**  What about follow up on Butch Jones?

**MR. HELFRICK:**  No one followed up on it.

**THE COURT:**  Why not, if you thought maybe he had information about Hmimssa?  You guys went after Hmimssa hammer and tongs.

Why didn't you follow up?

## Mr. Richard Helfrick

MR. HELFRICK:  I don't think we had that specific -- when we had that specific information, for instance, with Omar Shishani and the information was brought to our attention as to what he might want to say, we got in touch with his attorney, Corbett O'Meara, got permission to talk to Mr. Shishani, talked to him, found out the information, and tried to, you know, to protect him and his Rule 11 as best we could, which, obviously, did not work out.

But that was the extent of what we knew about -- at least what I knew about Butch Jones.

THE COURT:  I want to know, as an officer of this Court, Mr. Helfrick, what you would have done had you been given this letter either before the trial or during the trial.

MR. HELFRICK:  I think, obviously, the next step would have been to contact Harold.

Again, if this letter -- if we had known about this letter Ms. Raben probably would have had to have withdrawn at that point in time, which is another indication we didn't know.

THE COURT:  I think Miss Raben's position would have been seriously jeopardized.

MR. HELFRICK:  I think there's to be any question we didn't know.

USA V Koubriti, et al 01-80778

## Mr. Richard Helfrick

But, obviously, the first step would have been get in touch with Harold Gurewitz.

If we would have had, likewise, the idea Hmimssa had been at the Wayne County Jail yakking away as the Court sees where we're going with that, maybe we could have found out who else was up on that floor, started getting in touch with their lawyers, find out if anything like that had been said.

You know, even like with the Shishani information. You know, that information did not come to light until after the trial started.  You know, those meetings, you know, can be documented.

**THE COURT:**  In fairness to him, he wasn't incarcerated until -- Mr. Shishani, until after the trial started.  It wasn't like the government knew about this or had that prior to trial.

I mean, it seems to me you knew about Mr. Shishani just about when everybody knew about him.

**MR. HELFRICK:**  They were housed together at Milan.

You know, just to make one other thing clear because you talk about how the government came to you with the Brahim Sidi information.

That was in response to Mr. Swor sending them letters, after we received information about this individual, and started writing, saying, what's the deal with Brahim

139

## Mr. Richard Helfrick

Sidi. Then they came to Your Honor.

THE COURT: All of that is true.

MR. HELFRICK: They went --

THE COURT: If they were up to something nefarious, they wouldn't have seen the light of day.

MR. HELFRICK: Not when they know we talked to Brahim Sidi's lawyer in Iowa.

We knew they'd been interviewed by the FBI at that point. They're kind of caught.

THE COURT: Same is true of the Butch Jones letter and the Roussi letter.

If they were up to something nefarious as opposed to simply making assumptions on their own without conferring with defense counsel or the Court, if they were up to something truly the nefarious or egregious, these documents would never have seen the light of day.

MR. HELFRICK: They went to Mr. Allen, not to -- you know, initially, they went to Mr. Allen. That's why they see the light of day.

But the other thing about the Roussi 302, is that I think you're saying its people are saying this cumulative, or this came out at trial, you know, Hmimssa testified, you know.

Within five minutes of meeting these guys, they were recruiting him. You know, they were talking about

## Mr. Richard Helfrick

political things, pointed at the t.v. and their Muslim beliefs.

And this person, not only does he help in our defense, he directly contradicts Hmimssa.  This guy knew them and lived with them.  And he says they never talked about it.

THE COURT:  I would submit Mr. Hmimssa had a certain talent that would have made these defendants potentially more interested in Mr. Hmimssa then Mr. Roussi.

Namely, Mr. Hmimssa had the ability to forge documents and obtain documents and identity theft.

And I will say this.  I mean, I'm not evaluating the credibility here.  But, indeed, as I read, they also corroborate -- Mr. Roussi also corroborates Mr. Hmimssa in that Mr. Roussi indicates that your client, Mr. Koubriti, wanted -- and Mr. Hannan, wanted to get him identification passports, visas, *et cetera*, *et cetera*, and that he didn't want any part of that.  So it also corroborates Hmimssa.

And to the extent that you are raising this as an issue, you know, Hmimssa could have supplied the documents.

Mr. Koubriti was asking Mr. Roussi, apparently, if you believe Mr. Roussi, which, apparently, at least willing to credit him for the document, Mr. Roussi was a potential purchaser of these documents.

Maybe it was a feeler to see if he was interested. When he didn't rise to the bait, Mr. Koubriti let him go.

141

## Mr. Richard Helfrick

On the other hand, Mr. Hmimssa, I have no doubt, snapped at the bait like a hungry trout.  I'm not all sure it cuts in favor.

MR. HELFRICK:  I'm not so sure Roussi doesn't corroborate Sidi as to Hmimssa being the one creating all these things and making these documents as well.

THE COURT:  You think anybody seriously doubts that?

MR. HELFRICK:  Well, you know, Hmimssa denied it. Hmimssa was claiming he's working for El Mardoudi, not the other way around.

THE COURT:  They're not exclusive of each other.

MR. HELFRICK:  So we were never given the opportunity.

THE COURT:  Mr. Thomas, what do you know about Mr. Jones and the letter, first?

MR. THOMAS:  I do recall that we had a conversation with Mr. Amberg on the phone on a Saturday or Sunday when we were working, regarding Mr. Amberg's client who I was not familiar with, but who was not considered to be a witness in this case.

There was a mention, in passing, of Mr. Jones.  But in my recollection, it was that there was nothing in particular.  And it didn't strike me as something that I was going to follow up with.

142

**Mr. James Thomas**

THE COURT:  Did you have any knowledge of the letter?

MR. THOMAS:  No, I did not get the letter.  I had no knowledge that anyone had that letter before it was disclosed to us after the trial.

THE COURT:  Why did you not want to follow up? You were tenacious about following up.

You would not have Mr. Amberg told you Mr. Butch Jones may have the same kind of knowledge Robertson had, why did you not to follow up?

MR. THOMAS:  We didn't ascribe to any particular knowledge that was going to help us.

I considered --

THE COURT:  If Amberg is telling you my client is saying that Hmimssa is telling him that he's lying, you don't ascribe that as --

MR. THOMAS:  Judge, we had gotten --

THE COURT:  I'm not questioning -- I'm not questioning your decision not to pursue Mr. Robertson.

I have enough experience with Robertson to know that he was certainly a lead not worth pursuing.

MR. THOMAS:  At that time, we were in mid trial. We were working seven days a week.  We probably were working eight or nine hours, maybe 10 hours not on trial days.

We're working during the trial days, I have to tell

## Mr. James Thomas

you that.  Maybe there was a cost benefit analysis that was done at the time.  Certainly nothing I could have done --

THE COURT:  Was part of the analysis Butch Jones are we really going to call Butch Jones?  We can't be too serious about this.

MR. THOMAS:  Judge, I can honestly tell you Butch Jones comes with baggage.  I read his book.  I knew who was representing him.

I have to also tell you that I didn't have the benefit of that letter.

Had I had the benefit of that letter, we would have pursued it and pursued the areas that I fell very, very strongly about, inspite of what the opinion of the now in hindsight, the office who didn't give us the materials at the time.

I would have pursued it as vigorously as I pursued anything else.

THE COURT:  What about Roussi?  I don't want to take a long time on this.

MR. THOMAS:  I think that, in my view, Roussi is probably a witness that would have cut both ways.

Again, I would have liked to have the opportunity to interview Roussi to see if we can develop anything positive that he said.

But, you know, in my view -- you know.

144

**Mr. James Thomas**

THE COURT:  I would have think you would have been given what he has to say, apparently, about Mr. Hannan you would have been circumspect about pursuing Mr. Roussi as a witness.

MR. THOMAS:  You have to remember something --

THE COURT:  True or not true?

MR. THOMAS:  I say that I grant you that.

But you have to recognize that this 302 is authored by FBI agents who were involved in this case.  They weren't authored by my investigator or not authored by me.

I would have liked the opportunity to develop whether or not those statements are true and how far they went.

THE COURT:  Look.  I'm not quarreling with any defense lawyer here.  I'm not really quarreling.

The government isn't quarreling with you as to whether or not these documents should have been turned over. They should have been turned over, period.

MR. THOMAS:  Now we get to argue about materiality.

THE COURT:  That's what I'm questioning you about, whether or not it makes a difference.

Whether or not there's a reasonable probability that the failure to turn over these documents would have made a difference in the verdict in this case.

145

**Mr. James Thomas**

**MR. THOMAS:** Well, you know, I heard the government's analysis of what they thought was material and whether or not it was material. And I think that that's the standard.

Now was there a likelihood that the verdict would be overturned? That's *Brady*.

I think that the Court, also, has a *Kyles versus Whitley* standard in order to analyze --

**THE COURT:** *Giglio*, also.

**MR. THOMAS:** -- analyze, too, which is something I want to say. But --

**THE COURT:** Let's not get into argument on -- legal argument. Let me ask you this.

Do you have any more information beyond what Mr. Helfrick has said about Roussi?

My recollection is that there was a 302 turned over which mentioned Mr. Roussi as having been a roommate of three defendants.

**MR. THOMAS:** There was mention --

**THE COURT:** I'm sorry. Mr. Helfrick?

**MR. HELFRICK:** The gentleman by the name of Sayed.

**THE COURT:** Sayed.

**MR. HELFRICK:** S-a-y-e-d.

**THE COURT:** That's a 302 on Sayed.

**MR. HELFRICK:** There's a 302.

## Mr. James Thomas

He talks to the agents, says, you maybe want to talk to this Roussi guy. He used to live with these guys, too.

THE COURT: Isn't that a lead you should follow?

MR. HELFRICK: But, again, Your Honor --

MR. THOMAS: When was he given to us?

MR. HELFRICK: He was deported by then.

MR. THOMAS: He's gone, judge. I want to -- also want to address something.

We have made a very specific request for *Brady* material. Mr. Convertino stood up in open court and said there is no *Brady* material. He said that before the trial occurred and he said it throughout the trial.

Now, interestingly, Mr. Corbett now thinks that it would have been, in hindsight, a better idea to give that material to us before the two issues that we're talking about.

He was the one that jumped up and objected to giving 302's to us before the witness testified.

That was a position that the government took at the time that this trial began.

In addition, Mr. Convertino, in the face of the Court saying you were to give -- he was to give us witness lists in advance, stood up in front of the Court --

THE COURT: It wasn't all witnesses, only those

## Mr. James Thomas

witnesses about whom they had security concerns, Mr. Thomas.

MR. THOMAS: Judge, he stood up and told the Court that he wasn't going to do it.

THE COURT: He was asserting *Jencks Act* issues.

MR. THOMAS: Well, he told the Court he wouldn't do it.

The Court says I'm going to order you to do it. This is the lawyer who now tells us we're supposed to rely on him for disclosure of *Brady* materials.

THE COURT: Thank you, Mr. Thomas.

Ms. Raben.

MS. RABEN: I first saw the Jones letter after it had been faxed to me by Mr. Swor, who had received it from.

THE COURT: Let's start with something more basic. Your a partner of Mr. Gurewitz.

MS. RABEN: I am.

THE COURT: You stood in for Mr. Gurewitz with Mr. Jones, correct?

MS. RABEN: An Arraignment on a Superseding Indictment of Mr. Jones.

THE COURT: You've also visited Mr. Jones in jail on a number of occasions, correct?

MS. RABEN: One occasion, Your Honor.

THE COURT: Just one occasion?

MS. RABEN: Yes.

## Ms. Margaret Raben

**THE COURT:** Not talked to him on any other occasions?

**MS. RABEN:** He has called me, occasionally, on the phone. He hadn't called me personally. I have answered the office phone.

And Mr. Jones has been on the phone and he has asked me to -- after some social chit chat, he has asked me to communicate a message to Mr. Gurewitz. I have done that. That has been the total of my contact.

**THE COURT:** Have you ever discussed with Mr. Jones anything about Mr. Hmimssa or any of the issues in this case?

**MS. RABEN:** No. Not ever.

**THE COURT:** Didn't Mr. Jones know that you were working on the Hmimssa -- Koubriti case and with Mr. Hmimssa?

Mr. Jones is certainly a purveyor of the news.

**MS. RABEN:** I have no way of knowing what Mr. Jones --

**THE COURT:** Consumer and purveyor of the news.

**MS. RABEN:** I do not know what he knew or did not know.

I have never discussed anything related to Mr. Jones's own case with him. He is represented by Harold Gurewitz under the Criminal Justice Act.

## Ms. Margaret Raben

And that is --

THE COURT:  Did Mr. Gurewitz, having had this letter in February of 2002, and knowing that you were a lawyer on this case representing Mr. El Mardoudi, did Mr. Gurewitz ever say anything to you about this letter?

MS. RABEN:  Not until after I took the copy I received.

MR. SWOR:  Ms. Raben didn't come into this case until March of 2003, not 2002.

THE COURT:  We're in trial.  We're still in trial, Mr. Swor.

MS. RABEN:  Your Honor, the answer to your question is, I never saw this letter.

THE COURT:  That wasn't my question, Ms. Raben.

My question was, did Mr. Gurewitz not say anything to you about, hey, you know, you may want to talk to Butch Jones?

MS. RABEN:  That is correct.

THE COURT:  What is correct?  He did not?

MS. RABEN:  I would like to explain this.

When I received the copy of the letter from Mr. Swor, a day or two later, I showed it to Mr. Gurewitz.

I didn't show it to him immediately.  He was not in the office.

I was -- probably the next time we were both in the

USA V Koubriti, et al 01-80778

## Ms. Margaret Raben

office at the same time, I showed it to him.

And he told me that he had not only seen the letter, but that he had a copy of it. And he thought it was somewhere in the file.

And, in fact, he thought that there had been a separate letter sent by Mr. Jones to Mr. Convertino, but he wasn't sure where that was.

I became very concerned about a number of things.

THE COURT: I'm sure you did.

MS. RABEN: And one of them was the implication that I, somehow, would have had constructive possession, for lack of a better term, of that letter.

I did not go through the Butch Jones files in our office looking for the letter.

And a day or two later, Mr. Gurewitz came into my office with his copy of the Jones letter, and stapled to it was a cover sheet from Mr. Convertino to Mr. Gurewitz.

The letter and the cover sheet was dated -- the fax cover sheet dated February 22, 2002.

THE COURT: Well, let me see if I can fairly understand the state of your knowledge from the time you came into this case; in March of 2003, came into the case.

Is it fair to say or accurate to say that you knew nothing about Butch Jones's alleged knowledge about Youssef Hmimssa?