UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA**

Government.


v.

Case No. **01-80778**
**Volume 22**


**AHMED HANNAN,**
**KARIM KOUBRITI,**
**ABDEL ILAH EL MARDOUDI,**
**FAROUK ALI-HAIMOUD,**

Defendants.

_____/


JURY TRIAL PROCEEDINGS

**BEFORE THE HONORABLE GERALD E. ROSEN**
United States District Judge
860 US Courthouse & Federal Building
231 Lafayette Boulevard West
Detroit, Michigan
**Tuesday, April 22, 2003**


**APPEARANCES:**


RICHARD CONVERTINO
KEITH CORBETT
Assistant United States Attorneys
211 West Fort Street
Detroit, MI 48226
        On behalf of the Government.
- - -


Stenographically reported by:  Carol S. Sapala, RMR-FCRR
                               Linda Dona, RMR-CRR


USA V Koubriti, et al 01-80778

APPEARANCES:    (continuing)

RICHARD HELFRICK
LEROY SOLES
JAMES GEROMETTA
Federal Defender Office
645 Griswold Street, Ste. 2255
Detroit, MI 48226
            On behalf of Defendant Koubriti.


JAMES C. THOMAS
JOSEPH NISKAR
2632 Buhl Building
Detroit, Michigan 48226
            On behalf of Mr. Hannan.


ROBERT MORGAN
645 Griswold, Ste. 4100
Detroit, Michigan 48226
            On behalf of Defendant Ali-Haimoud.


WILLIAM S. SWOR
645 Griswold, Ste. 3060
Detroit, MI 48226
            On behalf of Defendant El Mardoudi.


MARGARET SIND RABEN
GUREWITZ & RABEN, PLC
333 West Fort Street
Detroit, MI 48226
            On behalf of Defendant El Mardoudi.


THE INTERPRETERS:  David Habboo, El Sayed Mostafa


USA V Koubriti, et al 01-80778

# C O N T E N T S

IDENTIFICATION                                          PAGE

**WITNESSES**

**CAROLYN SADOWSKI**

Cross Examination by Mr. Soles                          3951

Redirect Examination by Mr. Convertino                 3973

Recross Examination by Mr. Soles                       3980


**TRACY KING**

Direct Examination by Mr. Corbett                      3982

Cross Examination by Mr. Swor                          3986


**RICHARD TRACY**

Direct Examination by Mr. Corbett                      3987


**CAROLYN BREDEMUS**

Direct Examination by Mr. Corbett                      3994

Cross Examination by Mr. Swor                          4001

Redirect Examination by Mr. Corbett                    4003

Recross Examination by Mr. Swor                        4004

# C O N T E N T S (continuing)

**IDENTIFICATION**                                    **PAGE**

**EDWARD SEITZ**

Direct Examination by Mr. Corbett          4004

Cross Examination by Mr. Helfrick          4008

Cross Examination by Mr. Thomas            4020

Cross Examination by Mr. Morgan            4022

Redirect Examination by Mr. Corbett        4034

Recross Examination by Mr. Morgan          4036

Certification of Court Reporter            4056

# E X H I B I T S

| IDENTIFICATION | MARKED | RECEIVED |
|---|---|---|
| Government's Exhibit Number 36A2-16 | | 3996 |
| Government's Exhibit Number 3636A2 | | 3996 |
| Government's Exhibit Number 36A21-68 | | 4001 |
| Government's Exhibit Number 36A69 | | 4001 |
| Government's Exhibit Number 42 | | 3991 |
| Government's Exhibit Number 63 | | 3975 |
| Government's Exhibit Number 65 | | 4007 |

## In Camera Hearing

Detroit, Michigan

Tuesday, April 22, 2003

9:35 a.m.

(The following was held *In Camera*)

THE COURT:  Go on the record.

The record should reflect that the government has requested an *in camera* proceeding concerning a witness that it may call, El-Salam Ebed Makalka.

There are a couple of issues related to Mr. Makalka's testimony, including two potential issues of *Brady* material and a number of issues related to his substantive testimony as well.

Mr. Corbett is here on behalf of the government, to address those issues.

Mr. Corbett?

MR. CORBETT:  Your Honor, the two potential issues of *Brady* material would be, one, an FBI Report indicating an investigation into an allegation that Mr. Makalka made a threat against Assistant United States Attorney, specifically, Bill Sauget, who was the prosecutor who handled the case on which Mr. Makalka was sentenced in January of this year.

Investigation was conducted and it was determined that the investigation should be closed because of insufficient evidence to merit further proceeding.

**USA V Koubriti, et al 01-80778**

3939

### In Camera Hearing

I have given the Court all the reports in question. It is my opinion and I have discussed this with Mr. Gershel from the United States Attorneys Office, that this does not constitute *Brady* material, since it did not give rise to any sort of Indictment or charge against Mr. Makalka and the decision as to whether or not to proceed was in no way related to his testimony or anticipated testimony was made entirely independent of the possibility that he would testify in this case.

THE COURT: When was the decision not to prosecute?

MR. CORBETT: It was the last page in there, Your Honor. I'm going to guess -- I've got my own copy. See exactly when.

Okay. On 6-13-02, interview failed to substantiate Makalka's claims and the matter was terminated.

THE COURT: I'm sorry. Makalka's claims?

MR. CORBETT: No. The claims of the witness.

Apparently, if you read the report, there was an allegation that his co-defendant -- he had threatened his co-defendants, burned his co-defendant's home down.

He said he never threaten me, never burned down my home.

The Dearborn Police were contacted. They had no

## In Camera Hearing

record of the home being burned down since all that information came from the threat to Mr. Sauget which was, apparently, exactly, in quotes, "the bitch-ass prosecutor's going to get his."

A determination was made back in June of 2002, before he was sentenced or before he --

THE COURT:  When did the Government decide to use or potentially use Mr. Makalka as a witness in this case?

MR. CORBETT:  The first discussions with Mr. Makalka would have been in -- I'll have to be 100 percent sure.  I'm going say, at the earliest, the Fall of 2002 after --

THE COURT:  After the decision was made.

MR. CORBETT:  Yes.

The first formal discussions were handicapped by Mr. Sauget's refusal to consider any sort of downward departure or Rule 35 Motion in connection with the witness.

THE COURT:  Let me see that.

Beyond the *Brady* aspect in this that there was a decision not to prosecute, which, from the recitation we've given, I agree is attenuated, at best, there is an issue; and that is, the potential instability of the witness.

Somebody who is allegedly making threats against a prosecutor is probably not the most stable person, so the

## In Camera Hearing

potential instability.  That doesn't make it *Brady* material, but it may be grounds for or it may be a basis for the defendants to explore his general reliability as a witness.

MR. CORBETT:  Your Honor, that may be true. But -- and I urge the Court to read the report.

But I believe you'll find, also, that the person who attributed that statement to Mr. Makalka, attributed other statements to Mr. Makalka; specifically, a threat to his co-defendant which the co-defendant denied and, specifically, the statement --

THE COURT:  That can all be brought out on cross and redirect.  It's up to the defendants whether they want to go into that.

My concern here, frankly, is that there -- apparently, the source of this information was a confidential informant.

MR. CORBETT:  Right.  And that is a problem.

THE COURT:  So I think what I will do on this is, I will turn this over to the defense on the condition that they not get into or discuss that source.

MR. CORBETT:  Could we just redact the material and indicate the one sentence -- let me do this, if it's agreeable to the Court.

The person who initially proffered the statement,

## In Camera Hearing

apparently, is a witness in Mr. Hurley's -- I'd like to take the 302 as it's recorded in there, give it to Mr. Hurley, ask him if he feels it can be redacted, make his suggested redactions, give them to the Court.

And then if the Court finds that agreeable and the Court still believes it should be turned over, we can do that.

THE COURT: I think that procedure's fine, except we'd have to tell defense counsel that the reason why they're being given a redacted version of the report is to protect the confidentiality of the source.

THE COURT: I guess we can deal with that.

I would assume, Your Honor, if he denies making the statement, that ends pursuit of the matter entirely. I mean, there's no other way to go beyond it.

THE COURT: Well, on redirect, I suppose, you could ask him whether or not any charges were brought.

MR. CORBETT: Yeah. I mean, I could.

THE COURT: But at any rate, I want to put the key in this door in the defendant's hands, give them the opportunitY

MR. CORBETT: Again, I will meet with Mr --

THE COURT: That includes the threat of the co-defendant as well.

MR. CORBETT: Which the co-defendant, himself,

USA V Koubriti, et al 01-80778

### In Camera Hearing

personally denied.

THE COURT:  Both.

MR. CORBETT:  Saying he hated Mr. Makalka and he still says it didn't happen.  His 302 is in there, too.

THE COURT:  I can't judge the credibility of that.

MR. CORBETT:  Cigarette smuggling.

THE COURT:  The second issue is the cigarette smuggling which I think is actually the closer issue on the *Brady* side, because it goes to, potentially, to the honesty of the witness under 608.

Potentially, if he was involved in the smuggling of cigarettes --

MR. CORBETT:  Tobacco.

THE COURT:  If he was involved in the smuggling of tobacco into a prison, especially using it.  Looks like he was -- using his son, I think.

MR. CORBETT:  Yeah.  His kids.  That's right.

THE COURT:  That that may go to the 608(b) purposes.  All right.

It may go to the issue of his character for truthfulness and honesty.  I don't see anything in here that has to be redacted.

MR. CORBETT:  No, I'm not concerned about

## In Camera Hearing

that.  That report --

THE COURT:  All right.  With respect to his testimony, would you outline for me, please the three areas.

MR. CORBETT:  Again, in broad terms.  The witness -- and I understand the Court's previous ruling.

He would indicate that he sold dope and smoked dope with the defendants.

I understand the Court to have indicated that the potential prejudicial value of that testimony, at least on direct examination, that outweighs the potential probative value -- and I will not -- I will caution the witness before we offer him as a witness, to avoid bringing out that matter, unless he's confronted with a question and answer from the defendants which affords him no opportunity.

The main areas of his focus would be, one, he purchased firearms from the defendants, small firearms .22 caliber handguns, that he acted as a middleman for the sale of at least three semi-automatic weapons, two AK-47's.

As I sit here, I don't recall the exact description of the third.

THE COURT:  He acted as a middleman for the purchase of two AK-47's.

MR. CORBETT:  By Karim Koubriti and Ahmed

## In Camera Hearing

Hannan.

He had a friend in the drug business who wanted to unload the weapons.

He had been advised by the defendants previously, that they wished to purchase weapons and he put the two parties together.

THE COURT:  When was this?

MR. CORBETT:  This would have been in 2001 and Summer-Fall 2001, to the best of his recollection.

THE COURT:  Potential 404(b) evidence?

MR. CORBETT:  Well, Your Honor, our argument would be that the material supported is part of -- it's arguable it will be part of the material supported firearms.

They had up to $50,000 to make additional purchases.

THE COURT:  You think your argument is it's intrinsic to the conspiracy charge and charge of support to terrorism?

MR. CORBETT:  Especially, Mr. Hmimssa looking for weapons, especially, additional information.

THE COURT:  Without committing, I think that's a at least a plausible argument.  To be on the safe side, do you have this in a 302?

MR. CORBETT:  I don't have the 302 with me,

### In Camera Hearing

but I believe, certainly communicate to the defendants if it's not in the 302, I will communicate it to the defendants.

THE COURT:  I don't know that it's 404(b).  It sounds much like the other type of evidence that I ruled was intrinsic to the conspiracy.

But in an abundance of caution, I think you should make it available.

MR. CORBETT:  I will make it known to them if it is not in the 302.

I know from the brief conversation I had with them, that he, personally, had advised me of that.

I believe it is not a 302.  If it is not, I will advise the defendants.

THE COURT:  There was one other, I think, piece of evidence.

MR. CORBETT:  Yeah.

The third evidence major area would be his statement to us.

There was a discussion, again, of the defendants trying to encourage him to -- actually, they played some of the tapes in question for him, some of the tapes that have been mentioned before.

They believed he was Muslim and encouraged him to get back in touch with his Muslim faith.  He did not

## In Camera Hearing

disabuse of that belief he was a Muslim.

And the other matter is, their inquiry of him as to whether or not they were -- he knew mentally slow people, because they wanted to use them for business purposes.

And he said he didn't know any or he didn't put them in contact with anybody.  He does recall that conversation.

THE COURT:  Again, I want that made available.

MR. CORBETT:  I'm sure that's in the 302.  If it's not, I will advise them before he takes the stands.

And as I said, I will -- I'm going to debrief him today.  And if any additional information comes out that is not recorded in a 302, I'll be making notes, although I don't think they're discoverable.

As we've previously indicated, if it's a new matter or something that's flushed out, I will advise the Court and the defendants before he takes the witness stand.

THE COURT:  When are you going to make a decision as to whether or not to call him?

MR. CORBETT:  Your Honor, if we can work out an arrangement with Mr. Mullkoff this afternoon, I would -- I'll make the decision today.

I'll give the defendants the materials today.  If I make -- the decision will be made today whether to call

## In Camera Hearing

him or not.

The defendants will be advised of that decision, as will the Court.

If it is to call him, then I will provide the materials.

If it is not, then, obviously, we're not going to provide any materials.  But if it is, we'll provide the materials to the defendants today.

And I guess we can even address at the close of the day, the timing issue.  And if it's really a problem for the defendants and on the Court.

THE COURT:  I was going to say we may call him on Friday.

MR. CORBETT:  We may be able to.

THE COURT:  Give them time.

MR. CORBETT:  I'm not trying to sand bag anybody.  If they need until Friday, they can have it.  So we'll go from there.

THE COURT:  Assuming there's a Rule 35 that can be agreed upon, you'll give that to the defense.  You'll give them the Rule 11 he originally --

MR. CORBETT:  I'll get the Rule 11.  I have the transcript of the sentencing.  I'll get a copy of the Indictment.

And I'll, also, to the extent that he feels

## In Camera Hearing

comfortable, Mr. Mullkoff is available to them to discuss at least parameters of our discussions, the Rule 11 Plea Agreement.  Obviously, not anything he talked about with his client.

I'll give him permission to the extent it's necessary to discuss our conversation with Mr. Mullkoff.

THE COURT:  Very good.

(The following was held in open court, but out of the presence of the jury)

MR. SOLES:  Okay.  I don't plan to spend a lot of time with this witness today.

The question -- but I do want to ask the witness about the photo spread.  I don't want to put the photo spread on the Elmo, because it's got this picture, Number Two, Nabil Almarbh.

And we've agreed that this picture's supposed to be -- not to be considered by the jury.  And if we put the picture up, it will draw attention.

I do want to ask her questions, though, about the six people in the photo spread and I want to ask that question, these questions, about the amount of hair showed and the difference between these people.

THE COURT:  Why don't you show her the photo spread rather than show it to the jury?

MR. SOLES: That's what I want to do.

My only question is, I don't want to open the door and I don't believe I am opening the door by asking her particular questions how much hair these people had.

THE COURT: That's not opening the door to putting the photo spread up on the Elmo.

MR. SOLES: You're saying it is not. With that, I'm ready to go.

(Whereupon the jury was brought out into the courtroom at 9:55 a.m.)

THE COURT: Counsel satisfied the jurors are in place?

MR. SWOR: Yes.

MR. NISKAR: Yes, Your Honor.

MR. CONVERTINO: Yes.

THE COURT: Court is in session. You may be seated.

All right. Recall the witness Ms. Sadowski from yesterday, please.

THE COURT: Ms. Sadowski, resume the stand and remember you're still under oath.

Mr. Soles, you may proceed.

MR. SOLES: Thank you, Your Honor.

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

CROSS EXAMINATION

BY MR. SOLES:

Q   How are you, ma'am?

A   Good.

Q   January 27, 2001, right?

A   Yes.

Q   And it was a Saturday night?

A   Uh-huh.

Q   And you were at work that night, correct?

A   That's correct.

Q   And earlier that day, or earlier -- and you met two gentlemen that night, correct?

A   That's correct.

Q   Okay.  And, earlier, before you dealt with these two gentlemen, you had seen a person, Ali Ahmed, applying for a membership?

A   That's correct.

Q   And he had to fill out a membership application, is that correct, before his picture was taken?

A   I didn't see that portion, but that would be the proper procedure.

Q   The person would have to fill out the membership application, then the photo is taken?

A   That's correct.

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

Q      They open it up and that gives him the right to --

A      To purchase.

Q      The items.

A      Correct.

Q      Okay.  Then after you see Mr. Ahmed earlier, then the two gentlemen come in, Mr. Ahmed and another gentleman, correct?

A      Later that evening.  Correct.

Q      Right.  And then you have this, this meeting with Mr. Ahmed and the other gentleman, right?

A      They approached me up on the front line registers.

Q      Right.

And there's a discussion about cigarettes, correct?

A      They wanted to purchase cigarettes.

Q      And there is a check presented; this check, correct?

A      Well, we went to the cigarette cage first. But then when the transaction was going on, yes, they did present this check.

Q      And then as part of your being a manager or were you an assistant manager?  I'm sorry.

A      An assistant manager.

**USA V Koubriti, et al 01-80778**

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

Q    As part of being an Assistant Manager, you checked the identification of both gentlemen?

A    Yes.  Because of what I had seen and occur in front of me.

Q    I understand.

You checked the identification of -- may I approach, Your Honor?

THE COURT:  You may.

BY MR. SOLES:

Q    -- Ali Ahmed.  Correct?

A    Yes that's correct.

Q    You looked at a Michigan I.D. number?

A    Yes.

Q    You looked at this card?

A    That's correct.

Q    You then looked at the identification of the second individual, correct?

A    That's correct.

Q    And you wrote down the identifying information of both individuals on the top of the check?

A    That's correct.

Q    And, so, you see Mr. Ahmed's name up here?

A    It's the first one on the top, on the left.

Q    You wrote down his Michigan I.D. number?

A    That's correct.

**USA V Koubriti, et al 01-80778**

## Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti

Q    Then you wrote down the identifying information of the second individual, correct?

A    That's correct.

Q    And you wrote down -- and that is --

A    ZZ9274300.

Q    Then you wrote down the name of the second individual?

A    That's correct.

Q    T-h-a-m-i-r, Ziad, z-a-i-d; is that correct?

A    That's correct.

Q    Let me ask you this.

When you're dealing with these people, is there a camera present?

Is there a camera recording this transaction?

A    We have surveillance cameras throughout the building, yes.

Q    Is there a surveillance camera in this area?

A    Yes.  There's -- there are cameras on the front line registers, yes.

Q    Have you retrieved the film?

A    No.

Q    Okay.  Have you ever viewed the film?

A    Well, not that particular day.  But I have viewed films in the past, for different reasons.

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

Q    Okay.  Is there a film to review?

A    No.  They, they -- unfortunately, they record over the top of it.

Like Monday, Monday will be rerecorded over on Monday the following week.

But I can't tell you what they're doing now.  I can only tell you what we were doing at the time we were employed at Sam's Club.

Q    Once there was a film recording of this, but there's no longer a film recording of this transaction?

A    At one time there would be a film that was recorded, correct?

THE COURT:  I'm not clear.  How long, when you were working there during the time of this transaction in January of 2001, how long would that surveillance film have been preserved before it was recorded over?

THE WITNESS:  One week.  One week.

THE COURT:  One week?

BY MR. SOLES:

Q    Okay.  And let me ask you this.

Were prints -- do they have thumb prints taken of the individuals who present checks such as this?

A    No, we do not.

Q    Okay.  Yesterday, you testified that the

**USA V Koubriti, et al 01-80778**

**Carolyn Sadowski–Cross Exam/Mr. Soles–Koubriti**

amount in question here, the $3336 was not an huge amount, correct?

A    No.  It's not a huge amount.

Q    As assistant director (sic) you have occasion to check a number of checks and identification of people, correct?

A    Occasionally, yes.

When there's a large check that's purchased, you just verify the name.

Q    You verify I.D. and cigarette cases, cases involving cigarettes, where there's a large amount of money, correct?

A    Depending on if you are member.

Because part of my job was to greet the member try to get them to, you know, keep coming back.

And this is the first time I've ever been acquainted with these two gentleman.

So I talked to them, asked them some questions.

And after I saw what occurred in front of me, one person writing the check --

Q    Excuse me.  I don't want to cut you off.  My question is, you verified checks in a number of circumstances, correct?

A    I have in the past, correct.

**USA V Koubriti, et al 01-80778**

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

Q    Okay.  And you've verified checks in circumstances where there's -- you don't know the people.

And there's a large amount of money, correct?

A    That's correct.

Q    You verified checks, checks and identification when people are making cigarette purchases?

A    Yes.

Q    Because you want to make sure that the person isn't under age, correct?

A    Yes.  The register automatically prompts the cashier to check that.

Q    So you verify identification when somebody's purchasing alcohol, correct?

A    That's correct.

Q    And you verify identification when checks -- when checks, in general, are being presented, if you don't know that person, correct?

A    Not all the time.

You look at their membership card, see how long they've been a member.

Their membership card has there picture on it, but to double verify, you may ask for the driver's license.  Let's say it's a thousand dollars.

**USA V Koubriti, et al 01-80778**

3958

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

It's a person buying patio furniture or, you know, versus someone that's coming in. They're buying all electronic items and more than one t.v. or you ask for more identification.

You just use your discretion.

Q Okay. So what's coming out now is that the identification you check is both driver's license, correct?

A Correct.

Q Michigan identification cards for people who don't have a driver's license, correct?

A That's correct.

Q And the Sam's card photo I.D. which has a picture on it, correct?

A That's correct.

Q And, sometimes, you look at other identification.

If they don't have any, well, if they don't have any of the Michigan I.D. or the Michigan driver's license, you ask for other picture I.D correct?

A If they have other photo identification.

Q Yes.

A Somebody that works in the military may have a different --

Q Right. You worked there for 14 years,

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

correct?

A    13.

Q    13 years.

And in the -- and you started out as a cashier, did you?

A    A caller.

Q    A caller.  In the course of your 13 years, you must have checked thousands of identification documents. Correct?

A    I couldn't be specific, but quite a few.

Q    Quite a few.

And now this case happened on January -- not this case, but this interaction that you had occurred January 27, 2001, correct?

A    That's correct.

Q    And you were not shown any photographs of anybody until -- what month was it?

A    Photographs?

Q    Photographs by law enforcement officers.  What months were you first shown a photograph?

A    When Farmington Police Department came and showed me Ali Ahmed's picture.

Q    Okay.  But the line up, the photographic line up that we were talking about yesterday, that occurred in March of 2003, correct?

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

A    For the gentlemen -- that's here or for the first gentleman?

Q    You've only seen one photo spread, correct?

A    Correct.

Q    And that was shown --

A    As far as for that gentleman.

Q    Yes.

That was shown to you in March of 2003, correct?

A    February 18 2003.

Q    Okay.  I'm sorry.  February 18, 2003.

So the event occurred January 27th 2001.

And then February two years later, 2003, that's when you saw the photo spread?

A    That's correct.

Q    And in between those -- that time, between January 27 2001 and February 2003, you were working as the Assistant Manager at Sam's, correct?

A    That's correct.

Q    You were continuing to check identification?

A    That's correct.

Q    Is it fair to say that there's a lot of -- this Sam's store that you're at was in Farmington?

A    That's correct.

Q    And is it fair to say that there's a lot of

## Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti

cigarette -- large cigarette purchases made by party stores and smoke shops?

A     Yes.

Q     And is it fair to say that a lot of people who own the party stores and smoke shops who come to the Sam's in that area, are of Arabic dissent?

A     There's all different nationalities.

Q     Okay.

But you're familiar, are you not, with a large Chaldean population in Farmington Hills and Southfield?

A     I'm terrible with different nationalities I'm just going to be --

Q     You don't know that?

A     I'm terrible with it.

Q     Okay.  Now you were eventually shown an identification, a photo spread, correct?

A     That's correct.

MR. SOLES:  May I approach, Your Honor?

BY MR. SOLES:

Q     I'm going to hand you this photo spread and you just keep that up there for yourself right there, okay?

Now, Your Honor, may I stand here and talk to the witness.

USA V Koubriti. et al 01-80778

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

THE COURT: Yes.

MR. SOLES: Well, can you turn that off? Thanks. Thanks a lot.

BY MR. SOLES:

Q  Ma'am, let me ask you a question.

If we look at this, this photo spread, this is six people?

A  That's correct.

Q  And the first person is the one above the first person correct?

A  That's correct.

Q  Number one, would you not describe this person as -- this person has a significant amount of hair, correct?

A  Yes.

Q  How would you describe this hair?

A  Curley.

Q  Thick?

A  Thick, black.

Q  Black. Curley or coarse hair, correct?

A  Yes.

Q  If you even -- may I assist you here?

If you measure from the top of the hairline right here the forehead to the amount of hair

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

that this person has sitting on top of his head.

Approximately, how much is that?

A    Well, it says half an inch, but you're looking at a photo.

Q    It's flat, until it's kind of deceptive.  It looks like half an inch of hair on top of his head?

A    Right.

Q    It almost looks like the Bart Simpson character?

It's about half an inch of hair, thick, coarse hair, right; is that correct?

A    Yes.  That's correct.

Q    If we look -- and may I ask you this.

If you look at the individual in photograph number one, could you tell us does he, does that person have bushy eyebrows?

A    They're -- not as bushy as the guy next to him.

Q    They're kind of bushy?

A    He has the eyebrow going.

Q    Let's move to the second guy.

The second guy has oh what do you describe an eyebrow?

A    Yes.

Q    Think heavy?

**USA V Koubriti, et al 01-80778**

## Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti

A     One eyebrow that goes across.

Q     And the second individual in the -- what exhibit was this?  I'm sorry.

Government's Exhibit 64.  That's what wire talking about, right?  64?

A     Yes.

Q     Okay.

The second individual in Government's Exhibit 64 from the top of --

THE COURT:  Actually, it's not been admitted.

MR. SOLES:  We're not admitting it.  I think it's for --

THE COURT:  I don't think.  I haven't been notified it's been marked.

MR. CONVERTINO:  It was marked for identification, but I didn't use it.

THE COURT:  So if you want to, are you going to move to admit it?

MR. SOLES:  No, I don't want to admit it.  I want to use it for demonstrative purposes only.

THE COURT:  All right.

MR. SOLES:  And so --

THE COURT:  My only point is, referring to it as Government's Exhibit 64 will confuse the record as not being identified.

USA V Koubriti, et al 01-80778

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

MR. SOLES:  You're right.

What does Your Honor suggest I do in terms of marking this as an exhibit?

THE COURT:  Well, the copy that I have said Defendant's II.

MR. SOLES:  Okay.

THE COURT:  As Mr. Helfrick indicated, capital I, capital I.

MR. SOLES:  I'm going to remark this, ma'am, Defendant's Exhibit II.  Okay?  This is for demonstrative purposes only.

THE COURT:  Okay.

MR. SOLES:  I'm going to mark here II.  I'm going to put that over.

BY MR. SOLES:

Q    So, again, ma'am, just for the record, I'm showing you what's been marked governments --
Defendant's Exhibit II.

You recognize defense Exhibit II?

A    Yes.

Q    That's the photo spread you were shown by Agent Thomas; is that correct?

A    I believe so.

Q    Okay.  Are you having some difficulty remembering that?

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

A   Well, it wasn't numbered II or anything like that when I saw it.

Q   Let me ask you this.

What I've marked as Defendant's Exhibit II, do you recognize -- if you turn it around and don't look at II, you look at six photographs?

A   Right, right.

Q   Are these the six photographs that Agent Thomas showed you?

A   Yes.

Q   And that you, later, used to identify a person in this case.  Correct?

A   That's correct.

Q   You said you identified person number six; is that correct?

A   That's correct.

Q   Now looking at Defendant's Exhibit II, we already went through number one in Defendant's Exhibit II, correct?

A   That's correct.

Q   That person has -- we've determined 6 inches of hair from his the top of the -- what would you?

A   Forehead.

Q   Forehead to the top, correct?

THE COURT:  6 inches.

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

MR. SOLES:  I'm sorry.  Half an inch half --
half inch.  Is that right?

THE COURT:  I don't think even Elvis had
6 inches of hair.

MR. SOLES:  Bart Simpson.

MR. CORBETT:  Could be Don King.

BY MR. SOLES:

Q   So from where the hairline begins to the top
of the hair, it's half inch in picture number one?

A   Yes.

Q   Okay.  And then and it's dark, coarse hair.

And the person -- now look at picture
number two and picture number two, again, does this
person have hair?

A   Yes.

Q   And how would you describe the hair in terms
of color?

A   Black spiked.

Q   Dark what?

A   Spiked hair.

Q   Spiked hair.

And does it looked like course, curly
hair?

A   No.

Q   It doesn't.  Okay.

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

And if you take that ruler again and you measure from where the hairline begins to the top, you want to do that?  How much?

A    I didn't have a ruler when they showed me the line up.

Q    I know.  I know.  I'm going through one right now.  I know you didn't.  That wasn't even important at that point.

How much?

A    I don't know.  You have to tell me.

Q    Okay.  Well, is it fair to say --

A    Less than half an inch.

Q    Little less than half an inch, right?  Okay.

Now if we look at the third person portrayed in Defendant's Exhibit II?

Can you describe what kind of hair this person has?

A    It looks like it's kind of matted to their head.

Q    Okay.  And it looks thick?

A    No, not necessarily.

I mean it's thick, because there's not a lot of balding or something going on as far as spots.

But, to me, I would not consider, based on the front that I'm seeing, he doesn't have very thick

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

hair.

Q    It's covering his forehead, correct?

A    Right.

Q    He's not bald, is he?

A    No.  He's not bald.

Q    It's black hair, correct?

A    That's correct.

Q    It looks coarse or curly, doesn't it?

A    That's correct.

Q    If you take this ruler and you measure from where the hairline begins to the top, as you see it on this picture, which isn't fair, is it a little over half inch?

A    That would be correct.  It was half inch, according to what I can see.

Q    Half an inch, correct?  Let's go to picture number four on Defendant's Exhibit II.

What do you see there?

A    Again, someone with a receding hairline on both sides here and goes in the front, dips down.

Q    Is it --

A    Thing hair.

Q    -- dark hair?

A    Dark hair.

Q    Is it?

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

And if you take this ruler and you measure from the where the hairline begins, approximately, how much do we have?

A   Again, half an inch.

Q   Half inch.  Let's look at Mr -- number five here.

How would you describe the person portrayed in picture number five?

A   He has facial hair.  He has an oval to round face.

Again, the two receding areas, again.

Q   In terms of hair from the top of where the hairline begins to the top?

A   You want me to measure again?

Q   Would you please tell us how much hair do you see there?

A   About an inch.

Q   About an inch.

So now let's look at number six.  And this is the person that you identified, correct?

A   Correct.

Q   For the record, describe this person's hair.

A   He has a very big receding hairline.  He's balding, very thin hair.

Q   Take that ruler from where the hairline

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

begins, tell us how much hair this person had.

A    I don't know the numbers.

Q    It's a little number, isn't it?

Would you guess it's like -- what are they cent --

A    I told you, you, you got the wrong person.

Q    One-sixteenth of an inch?

A    I don't know.  You're asking me?  It's the first dot.

Q    The first dot?

A    The first line.

Q    The person is bald in number six, correct?

A    I wouldn't say he's bald, because I can see peach fuzzy hair.

Q    Fuzzy hair.

Are you looking at me now?

A    If you want me to give you my opinion.

Q    I have a little fuzz right here, correct?

A    Right.

Q    But the little fuzz that I have is not the little fuzz that you see in picture number one, correct?

A    That's correct.

Q    Or the picture in number two, correct?  Now look at me.  I'm not proud of it or picture number three.

**Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti**

Do I have as much hair as picture number three?

A    You have as much hair as number six.

Q    Not as number four, correct?

A    No.  Right.

Q    I don't have as much as number five, correct?

A    Correct.

Q    I have about as number six.  I have little fuzz on top of my, head right?

A    According to what this looks like, you have a little bit more then he might, but I've got a different view, because you're in person.

Q    Thank you.  So the person that you looked at in this photograph, number six, the person you identified, has significantly less hair then all of the other people, correct?

A    That's correct.

MR. SOLES:  I don't have any further questions.

THE COURT:  Any other cross examination by any defense counsel?

MR. THOMAS:  No, thank you, judge.

MR. SWOR:  No, sir.

THE COURT:  Any redirect?

MR. CONVERTINO:  Just a little bit, judge.

## Carolyn Sadowski-Cross Exam/Mr. Soles-Koubriti

Can I borrow your ruler?

MR. SOLES: Sure, you can.

MR. CONVERTINO: I'm just kidding?

MR. SOLES: Can I get your hair?

THE COURT: He may want to borrow your hair.

MR. CONVERTINO: Mr. Corbett tells me I'm losing my hair, judge.

THE COURT: It depends on the angle.

MR. CONVERTINO: The angle? I'll stay at this angle then, for now.

THE COURT: As with the rest of us.

### REDIRECT EXAMINATION

BY MR. CONVERTINO:

Q I have just a few questions for you.

Yesterday on cross examination, Mr. Soles asked you about one of the times you were in the office.

And I think he said that you said that in confirmed the identification of one of the defendants.

MR. SOLES: Excuse me, Your Honor. I'm sorry to interrupt. It's not what I said. It was the answer that came out.

THE COURT: That's what he just said, Mr. Soles. He just said you said that I confirmed.

MR. CONVERTINO: In response to a question that was what --

**Carolyn Sadowski-Redirect Exam/Mr. Convertino-Govt.**

THE COURT:  That's what he just said.

THE WITNESS:  That's correct.

BY MR. CONVERTINO:

Q    Can you tell us, how, how in your mind, did icon firm that you had chosen the right person?

A    I was issued a subpoena that day it was dated February 18th.

And if I had picked the wrong person I would think that.  I wouldn't be here right now.

Q    Is that what you base your statement that in confirmed that you picked the right person?

A    That, to me, was confirmation enough.

Q    At any time during any contact you had including Farmington Hills Police Department, so including the Farmington Hills Police Department any representative of the FBI, any federal agency including United States Attorney's Office, did anyone suggest to you in anyway, which person you should pick?

A    Absolutely not.

Q    Did anyone tell you explicitly, implicitly, in any in direct way, that you had picked, as you said, the right person?

A    No.  I was just issued a subpoena and then I knew that I had to go to court.

Q    I want to show you what's been marked as

**USA V Koubriti, et al 01-80778**

**Carolyn Sadowski-Redirect Exam/Mr. Convertino-Govt.**

Government Exhibit 63. I think I moved for the admission of this?

THE COURT: Actually, I don't have it as admitted.

MR. CONVERTINO: You do not. I would move for the admission of --

THE COURT: Any objection to the admission of 63?

MR. SOLES: No, Your Honor.

THE COURT: Without objection. We'll admit 63.

BY MR. CONVERTINO:

Q    You had testified about the photo array that was shown to you and people who -- I don't have any clue about the amount of hair on the ruler.

But that people had hair except for one who was, who was more balding then the others or had more receding hairline?

A    That's correct.

Q    You remember the name of the person -- whoops.

The second person here I'm pointing to. The name for the record of Government Exhibit 39, is Famir Gheorghi.

Do you remember that?

A    That's correct. I do.

Carolyn Sadowski-Redirect Exam/Mr. Convertino-Govt.

Q     You were showing shown a picture of the person who, by all indication, was the person who was with Ali Mohammed Ali Ahmed?

A     That's correct.

Q     I'm going to put up on the screen what's been marked as exhibit -- admitted as Government Exhibit 63.

That's the person who's name is on the license that you were presented, do you know?

A     Yes.  No.  That's the driver's license that Special Agent Thomas introduced to me in 2002.

Q     Now if you were looking at a --

THE COURT:  Can I ask when in 2002 to the best of your recollection?

THE WITNESS:  I really couldn't specify a date.  I know, I wasn't working at Sam's Club at the time.

THE COURT:  When did you stop working at Sam's Club.

THE WITNESS:  In February.

THE COURT:  In February.  Was it soon after you left or.

THE WITNESS:  I couldn't be certain.

THE COURT:  Sorry.  Go ahead.

BY MR. CONVERTINO:

Q     I'm sorry.

USA V Koubriti, et al 01-80778

**Carolyn Sadowski-Redirect Exam/Mr. Convertino-Govt.**

Do you recall the date that the first date you were shown this photograph?

A    After February of 2002 sometime.

Q    All right.

Now the name -- was this the person that came into Sam's Club with Ali Mohammed Ali Ahmed January 27, 2001 to purchase those cigarettes?

A    No, it was not.

Q    How does this person appear, as far as the hair and the inches off the forehead and all that stuff to the other people you saw on the photo array?

A    This gentleman has curly hair, definite mustache.  It's thicker hair.  Definitely, thicker hair.

Q    Any doubt in your mind as you sit here today, that the defendant you picked out in court yesterday is the man who came in with Ali Mohammed Ali Ahmed, January 27, 2001, and purchased those cigarettes?

A    That's the gentleman I remember who's in court today.

Q    Do you know if there is -- were you able to find out, if a place by the name of Highland Smokers, 604 West McNichols, Highland Park, Michigan, even existed?

A    I have no idea whether it existed.

Q    You said that this check, Government Exhibit

**USA V Koubriti, et al 01-80778**

**Carolyn Sadowski-Redirect Exam/Mr. Convertino-Govt.**

39 came back to Sam's Club?

A     Account closed account closed.

Do you recall seeing any information from the bank when it was open and when it was closed.

MR. NISKAR:  Objection, Your Honor.

MR. SOLES:  Calls for hearsay.

MR. NISKAR:  Best evidence.

THE COURT:  I'm not sure, it does.

Rephrase your question.

BY MR. CONVERTINO:

Q     This check came through you as the manager or assistant manager at the time?

A     At the time of the purchase, it came through to me.

Q     Okay.

Do you recall whether or not -- you said it says right here a clandestine closed?

A     Account closed.

Q     On the check.

Do you recall when the account for Highland smokers was open and closed, based upon your position at Sam's Club?

A     No.

MR. NISKAR:  Objection, Your Honor.

THE COURT:  Just a moment.

## Carolyn Sadowski-Redirect Exam/Mr. Convertino-Govt.

It's hearsay.  If it was offered for the truth of when it was open or closed.  I don't know what other relevant purpose.

MR. CONVERTINO:  I'm asking her based upon positioning of the bank account, whether or not she took any independent action in the course of the what she would consider to be a fraud.

THE COURT:  You can get to that.  You can simply ask her.

BY MR. CONVERTINO:

Q    As a result of having the check come back, did you take any action, yourself, regarding contacting of any police agencies?

A    I sent an employee down to the Police Department with the check to make a police report, because I knew something was wrong and I my gut instinct was correct.

Because I wrote both.  I never write full names on the driver's license for anyone.

I wrote two people's full names, because two people were passing me that check.

Q    That's reflected in that corner there?

A    I wrote down everything I saw.

MR. CONVERTINO:  Thank you.  Thank you very much.  Thank you, Judge.

**Carolyn Sadowski-Redirect Exam/Mr. Convertino-Govt.**

THE COURT: Any recross?

MR. SOLES: Yeah. One.

RECROSS EXAMINATION

BY MR. SOLES::

Q Couple questions, ma'am.

When's this photograph dated on Government's Exhibit 63? When's that dated?

A Is it down at the very bottom.

Q July 26, 2001.

A Okay. I'm not familiar with looking at that kind of stuff.

Q Look at the date right underneath that man's photograph, would you, please?

A Right. I see that.

Q What day appears?

A 7-26-01.

Q The date that this transcript occurred was January 27, 2001, correct?

A January 27th 2001.

Q Seven, six months before this photograph was taken, correct?

A I'm sorry.

Q The transaction occurred six months before --

A Yes.

**USA V Koubriti, et al 01-80778**

Carolyn Sadowski
Recross Exam/Mr. Soles-Defense

Q    --- this photograph was taken?

A    That's correct.

Q    Let me ask you this.

You said you wrote these names up here because you had a funny feeling that something wasn't right?

A    That's correct.  The whole bit about Highland and Highland Park.

Q    I understand.

But you didn't preserve the tape, did you, the videotape?

A    No.  I didn't think that far ahead.

MR. SOLES:  Thank you.  No further questions.

MR. CONVERTINO:  No, thank you, judge.

THE COURT:  Any questions from any of our jurors beyond the question that was submitted at close of proofs yesterday, which I think has been asked by the lawyers?  Any other questions?

All right.  Thank you, ma'am.  You may step down.

(The witness was excused at 10:40 a.m.)

MR. CORBETT:  Government calls Tracy King.

THE WITNESS:  My name is Tracy, t-r-a-c-y.  Middle initial J. John, King, K-i-n-g.

Carolyn Sadowski
Recross Exam/Mr. Soles-Defense

**DIRECT EXAMINATION**

BY MR. CORBETT::

Q    Sir, would you please tell the ladies and gentlemen where you live?

A    I live?

Q    In what state?

A    New Jersey.

Q    And how long have you lived in New Jersey?

A    All my life.

Q    And by whom are you employed?

A    American Express.

Q    And how long have you been employed by American Express?

A    About five years.

Q    And in what capacity are you employed by American Express?

A    I'm a managing consultant for corporate purchasing card transactions for companies, large market companies.

Q    And, sir, do you have occasion to come to Detroit on a regular basis?

A    Yes.  I have family in the Detroit area that I often visit.

And there are situations where I have clients in this area that I would fly into.

**USA V Koubriti, et al 01-80778**