**Edward Seitz-Cross Exam/Mr. Morgan-El Mardoudi**

Farouk Ali-Haimoud with his personal information, correct?

A    I don't quite recall the application sir, but I do know that I've talked to a representative of that company and they stated that, yes, he was an employee.

Q    All right.

And in order to obtain that position, he had to be approved by a government agency, correct?

A    I beg your pardon, sir?

Q    Did he have to be -- in order to have that position, did he have to be approved by a government agency?

A    I'm sorry.  I can't speculate on that at this time, either.  I don't know exactly what you mean by "government agency"

And, sir, could you be more specific?

Q    Some kind of agency connected with Wayne County operates that the airport.

A    I don't believe so, sir.

I know that from his badging, he would have.  But for employment with the company, I could not say.

MR. MORGAN:  I have nothing further.  Thank you.

THE WITNESS:  Thank you, sir.

## Edward Seitz-Cross Exam/Mr. Morgan-El Mardoudi

THE COURT:  Anything?

MR. SWOR:  No, sir.

THE COURT:  Any redirect?

MR. CORBETT:  Just one or two questions, Your Honor.

### REDIRECT EXAMINATION

BY MR. CORBETT::

Q    Sir, in response to a series of questions by Mr. Morgan, we're talking about the visa and the high quality of the visa, is that correct?

Do you recall that?

A    Yes, I do, sir.

Q    He even showed you a portion of previous testimony to refresh your recollection.

Do you recall that?

A    That is correct, sir.

Q    Sir, is it -- is it your testimony here that the visa was high quality, but you were able to identify it as false, because of the fact that it was with a passport that you knew to be invalid?

A    That is correct.

When he asked me the question, I thought he meant at this moment.

Looking at the visa quickly, the one thing I do know for a fact is, we would never have

USA V Koubriti, et al 01-80778

**Edward Seitz-Redirect Exam/Mr. Corbett-Govt.**

issued a visa to World Authority Passport.  It is not recognized by the United States Government.

Q    Sir, do you know whether or not you can use a World Authority Passport to get a Michigan driver's license, if you know?

A    I don't believe so, but I do not know.

Q    And, sir, on the evening -- recalling back to the evening of September 17th at the time of the arrest, were you ever presented with Green Cards for any of the individuals to review and/or passports of anyone, other than Mr. Koubriti, and the passport of Mr. Saisa's name on that evening to review?

A    That is the only passport I recall at this time seeing.

I don't recall looking at any other Green Cards or passports.

MR. CORBETT:  I have no further questions. Oh, I'm sorry.  One last question.

BY MR. CORBETT::

Q    The Edy's Ice Cream.  How close is that to the airport -- how close is that to the airport gate?

A    It's within 20, 20 feet of the gate.  It's right next to the gate, basically.

MR. CORBETT:  No further questions.

MR. HELFRICK:  No questions, Your Honor.

**Edward Seitz-Redirect Exam/Mr. Corbett-Govt.**

MR. MORGAN: Very briefly.

**RECROSS EXAMINATION**

BY MR. MORGAN::

Q Are you familiar with ACCESS? ACCESS, the community organization?

A You mean the organization, sir?

Q Uh-huh.

A Yes, sir.

Q And do they assist Middle Eastern people with seeking employment?

A From what I know, sir, yes. They help them fill out applications and that, yes.

Q From what you know, do you know whether or not ---

MR. CORBETT: I'm going to object. This is beyond the scope of redirect.

THE COURT: I'm going to permit it.

MR. MORGAN: It goes to the area in the airport.

THE COURT: Goes to the issue at the airport. It's close enough.

BY MR. MORGAN::

Q Do you know whether or not ACCESS has assisted people, employers and prospective employees with applications for jobs at the airport?

**Edward Seitz-Redirect Exam/Mr. Corbett-Govt.**

A     That I can't answer, sir.  I'm not a member of ACCESS.

MR. MORGAN:  Okay.  Thank you.

THE COURT:  Any questions from any of our jurors?

All right.  Thank you, Mr. Seitz.  You can step down.

(The witness was excused at 11:50 a.m.)

THE COURT:  All right.  Why don't we break for lunch.

MR. CORBETT:  Your Honor, can we have a brief side bar on scheduling?

THE COURT:  On scheduling?

MR. CORBETT:  Right.

THE COURT:  Before we let the jury go?

MR. CORBETT:  I'd like to do that.

The following was held at the bench, outside the hearing of the jury)

THE COURT:  Well folks, I've got good news and maybe more good news, or bad news, depending on how it goes.

The good news first is, that we are proceeding faster then we anticipated.

JURORS:  That's good news.

THE COURT:  The bad news is, that we don't

have any witnesses for this afternoon.  Now I don't know if that's bad news or good news.

A JUROR:  Good news for me.

THE COURT:  However, we will be back in session tomorrow morning.

And after talking to the lawyers, I anticipate that the government will finish its proofs either by the close of business on Friday or sometime on Monday.  Okay? And then we will have further instructions for you at that time.

All right?  Until tomorrow then, don't discuss the case, don't let anybody discuss it with you.  Keep your notebooks closed.  Leave them on your chairs.

Do not read anything in the media, do not watch anything on television, listen to anything on radio.  Thank you.

(Whereupon the jury was excused at 11:52 a.m.)

MR. CORBETT:  Judge, one housekeeping matter.

THE COURT:  All right.

MR. CORBETT:  When I had Tracy on the witness stand, I showed him a document I indicated was marked as Government Exhibit 42.

THE COURT:  Yes.

MR. CORBETT:  I didn't realize --

THE COURT:  There was 42A.

MR. CORBETT:  I didn't realize in our obsession to number everything, 42A.

THE COURT:  Wondered about that.

MR. CORBETT:  I discussed it with counsel. I don't think they have objection to 42A as well.

THE COURT:  I'll admit 42a as well.

Let's clear away some underbrush here as well.

Mr. Corbett, we had an *in camera* hearing this morning regarding a potential witness.

Good afternoon, Mr. Mullkoff, just about to address something that may involve you.

We had an *in camera* discussion this morning regarding a potential witness and a number of issues arising out of the potential testimony of that witness.

I see Mr. Mullkoff here in court.  I take it you've not had an opportunity to make a determination, yet, as to whether you're going to be calling that witness?

MR. CORBETT:  Well, Your Honor, as I've indicated previously, and as I spoke to Mr. Mullkoff.

We have an agreement in principle, but I don't think Mr. Mullkoff has had an opportunity to talk to his client since we reached an agreement in principal.

His client is available today.  I anticipate the resolution of that within the next hour.

THE COURT:  Okay.  As I indicated, in our *in*

*camera* proceeding, as soon as you have made a decision on calling this witness, I want you to advise defense counsel and turn over to defense counsel all of the material that I ordered you to do in connection with this testimony.

Mr. Helfrick indicated the other day, that he wanted 48 hours. I don't know that 48 hours is necessary.

I've reviewed all the material. I don't know that it's necessary, but out of an abundance of caution, out of an abundance of caution, Mr. Helfrick, I'm going to order the Government, if they're able to reach an agreement with Mr. Mullkoff and his client, I'm going to order the government not to call this witness until Friday.

MR. HELFRICK: Thank you.

THE COURT: All right. The Court has made a complete record regarding the issues.

After defense counsel have received the material that I've ordered to be turned over, I want defense counsel to advise the Court immediately, meaning by close of business tomorrow, if they're any issues before this witness takes the stand. Okay?

MR. HELFRICK: Do you anticipate there's going to be some issues based on what you've seen?

THE COURT: Well, let me say this.

I have erred on the side of prudence in providing

defense counsel with virtually every document that was presented to me.  Because I don't know -- I'm not privy to everything that you folks have, in terms of your proofs I couldn't anticipate fully all defense issues.

So I erred on the side of caution or, perhaps, generosity, I suppose is a better word.

MS. RABEN:  We'll take that.

THE COURT:  And ordered the Government to produce everything.  There may or may not be issues in there.  However, the only thing I do want to say.  If I could have defense counsel's complete attention?

There are some sensitive issues involved in these materials, issues that the government's concerned about.

So before defense counsel conducts its cross examination, it should discuss it with the court.

In the first instance, discuss it with the prosecution, perhaps.

And in the second instance, at least, discuss it with the Court.

Issues in particular, there is a report of an incident that will be part of the material that you receive.

MR. HELFRICK:  Your Honor?

THE COURT:  Before going into that incident, you should at least meet with the Court.

USA V Koubriti. et al 01-80778

MR. HELFRICK:  I don't know if there is anything that's being held back.

But we had asked --

THE COURT:  There's nothing being held back.

MR. HELFRICK:  It be sealed.

THE COURT:  Yeah all right that's probably a good way to do it, at least in until the witness is put on the stand, we can seal it.  Okay.

MR. THOMAS:  Judge?  There has been a subpoena that was served on the Federal Detention.

THE COURT:  Just to be -- I've been accused of being overly precise.  I've found that that's, particularly in this case, not a bad thing.

You asked if there was anything withheld.  There have been those documents withheld.  There will be one document which you will receive a redacted version of.  Okay.

I can tell you that the material that is redacted is not relevant to the case.

MR. HELFRICK:  Can you tell us what that is?

MR. CORBETT:  When you read it, you'll see.

THE COURT:  It will be obvious, okay.  I want to be absolutely clear.

No documents are being withheld that relatively small -- a relatively small portion of one of the documents

**USA V Koubriti, et al 01-80778**

4043

is being redacted.

Go ahead.

MR. THOMAS:  There was a subpoena that was served on the Bureau of Prisons Federal Detention Center, Milan, regarding Hmimssa's visitors.  That subpoena was not answered.  It was -- we were deferred to the U.S. Attorney's Office.  We'd like to have at least that addressed, so that we can get those materials before we start our case.

THE COURT:  Well, either the government can remedy that or I can order the Warden to produce the Visitors List.

MR. THOMAS:  It doesn't take a quantum leap here.

I came in at 6 this morning, saw the Hmimssa Mobile coming in.  I assume he's not in the building, that this person may be a federal prisoner.

I see Mr. Mullkoff here who I'm very familiar with having been appointed in federal cases.

If this person is, in fact, at the Milan Detention Center and if, in fact, he has visitors records, we would want to have those produced, especially if they were in the same section, either the East or West Section of the Detention Center.  And so I want to address this issue.

**USA V Koubriti, et al 01-80778**

I expect there's going to be argument that the government might object. It may be relevant as to the second person, but, certainly, as relates to Mr. Hmimssa.

THE COURT: I'm aware of no information whatsoever that connects Mr. Hmimssa to this next witness.

I will instruct the government that, Mr. Corbett, since this is going to being to be your witness, you've advised me.

MR. CORBETT: Yes, Your Honor.

THE COURT: Would you please consult with Mr. Mullkoff and determine whether his client has had any contact with Mr. Hmimssa.

MR. CORBETT: Yes, I will.

THE COURT: All right. Let me while, we're clearing the way, I have another loose end here from yesterday.

Defense counsel were exercised over the identification procedures used with respect to the photo lineup in which Ms. Sadowski, the witness who was on the stand yesterday and this morning, identified Mr. Koubriti.

There were a number of issues that were raised and I want to address those issues.

Mr. Soles, I believe, made the motion, precise motion, in that he moved Ms. Sadowski's identification,

USA V Koubriti. et al 01-80778

both in court and, I believe any reference to her identification in the photo lineup, be stricken.

Mr. Soles, do you wish to renew that motion now or after your further cross examination, are you satisfied that the procedures used were not unduly suggestive?

MR. SOLES:  No.  I wish to renew it and I don't need to need to make anymore statements about it.

THE COURT:  I've had an opportunity to go back and review the law involving Post Indictment photographical arrays by a witness and I'm going to deal with it.

They're a number of different issues or layers of issues.  I'm going to deal with those in order.

First, with respect to the issue of whether any Sixth Amendment right to counsel or right of confrontation arise in the context of a photographic display.

The law's clear that there are no Sixth Amendment right to counsel or right of confrontation issues that arise.

They're numerous appellate decisions.  The Seminole decision in the area is *United States versus Ash,* 413 United States 300 and the appellate decision all flow from that.

They well establish that there is no right to counsel and no confrontation issue that is implicated in

USA V Koubriti, et al 01-80778

the showing of a witness even just prior to trial or even during trial.  They're number of decisions that have held that by a photographic line up.

I'm not going to review all of the case law in that area.

And I don't think, frankly, defendants contest that having now had an opportunity to review the law.

That leaves Fifth Amendment due process issues which I think, candidly, are the issues that defense counsel are most concerned about, in that as I apprehend defense counsel's argument and infer from the line of questioning followed by Mr. Soles, it is defense counsel's contention that the showing to Ms. Sadowski of a photographic line up which included Mr. Koubriti, in that he was the only bald or balding man in the line up, was unduly suggestive.

Fairly stating or distilling the law in this area, the courts instruct that the Court is to make a determination of suggestively, based on total Terry -- I'm sorry, totality of the circumstances involved both in the line up in the photographic display and in the in-court identification, as to whether or not the photographic line up was both unduly suggestive at the time and whether or not the photographic display tainted the in-court identification.

I'm going to do that now. I'm going to look at the totality of the circumstances.

The primary indicia of suggestiveness brought out on cross examination is the fact that Mr. Koubriti was the only person among six in the photographic line up, who did not have a full head of hair.

Mr. Soles graphically brought that out with his measuring stick this morning.

However, that, in and of itself, does not establish suggestivity. And courts have counseled that photographic identifications should not be so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

That's the *Simmons versus United States* decision by the United States Supreme Court, 390 United States 377 at page 384.

However, in that case, the Supreme Court also established the standard for determining suggestivity. And said that:

Identification in a photographic lineup would only be set aside if the procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

Since then, Court's have identified a

number of different factors that trial courts should consider and weigh in determining whether the lineup, itself, was suggestive and whether or not it impermissibly tainted the in-court identification

Among these factors are the witness's opportunity to view the subject at the time of the crime, the witness's degree of attention upon that subject at the time of the identification.

The secrecy of and prior discretion of the subject.

The level of certainty demonstrated at the confrontation in court, as well as at the line up initially.

Finally, the time between the crime and confrontation

As I said, there have been number of cases that have added flesh to the bones, primarily, *Neil Versus Biggers*, Supreme Court 409 United States 188.

I want to go through each of these factors, both as to the photo lineup itself and then as to the in-court identification, some of which I alluded to yesterday.

I was caught unaware by the defense concern about the lineup. Indeed, I was caught and unaware by the

USA V Koubriti, et al 01-80778

4049

identification, in general, of the witness.  I had some idea of what the body of law in this area was, but now that I've managed to go back, confirm my initial views, I feel more confident in ruling and putting it in the context of these factors.

The first factor with regard to the witness's opportunity to view the subject at the time.

Ms. Sadowski testified that her attention was focused very clearly on Mr. Koubriti.  There were only two people there.

She said she spent at least 15 minutes with them. There was no question of lighting.

She said had some suspicions at the time which heightened her -- heightened her attention to Mr. Koubriti.

And, all in all, I think that this factor weighs in favor of the government and against any suggestiveness, either in the photo lineup or the in-court identification.

The second factor is the witness's degree of attention that is a further refinement of the first factor the opportunity to view Mr. Koubriti as I indicated in my analysis of the opportunity.  Her attention was clearly focused on Mr. Koubriti and Mr. Ali Mohammed Ali Ahmed.

And, in particular, when she asked for Mr. Koubriti's identification, she looked at the photo -- she looked at the identification, rather, and looked at

Mr. Koubriti as well.

At any rate, with respect to Ms. Sadowski's opportunity to view Mr. Koubriti and the amount of attention that she was able to pay at the time, I find that this negates any degree of suggestivity.

With respect to the accuracy of any prior descriptions that she made, it is unclear to the Court as to exactly what those prior descriptions were.

It was suggested during cross examination that she had, at one point, indicated that he was heavy set. However, she explained that by saying that he was heavy set in relation to the other person, Mr. Ali Mohammed Ali Ahmed, who, clearly, was a very slight person.

There was also a prior description of hers that was brought out. I don't remember if it was on direct, redirect or cross. That the person in the photo was of medium built.

I find that this factor does not point towards any suggestivity, but neither does it really -- neither does it really negate suggestivity. At best, it's a neutral factor.

However, I believe the fourth factor, is, perhaps, most determinative here as well as some additional factors that I'm going to add; and that is, the level of certainty demonstrated at the confrontation.

USA V Koubriti, et al 01-80778

Ms. Sadowski's testimony with respect to the photo lineup was that she immediately picked out Mr. Koubriti after looking at the photo display. She demonstrated no uncertainty at all.

I would note that the photo display, although Mr. Koubriti is the only one there who does not have any hair, includes six Middle Eastern males, all of whom are dark complected, and four of whom have facial hair very similar to Mr. Koubriti.

Three others, in addition to Mr. Koubriti, have mustaches and goatees very, very similar to Mr. Koubriti.

Her ability to identify him in the photo display and the certainty as she related it in her testimony, clearly weighs in favor of a finding of no suggestivity.

In addition, as I did point out yesterday when she came into court and identified Mr. Koubriti, she demonstrated no hesitancy whatsoever in picking Mr. Koubriti out of 12 males sitting in the vicinity of Mr. Koubriti, seven of whom, as I pointed out yesterday, were balding.

It may not have been a perfect photo display, but it was not overly suggestive. Balding is only one physical characteristic.

There were other physical characteristics that, indeed, all of the subjects in the photo display displayed,

such that they were dark, they had heavy eyebrows, they were if not Middle Eastern, of some Semitic or Middle Eastern derivation.

And, taken in context, I don't believe the fact that Mr. Koubriti was the only one who had a thin or balding hair, makes out a difference -- makes out a case of overwhelming suggestivity in the photo line up, such as -- such that the photo lineup identification should be thrown out, nor do I believe that it tainted the in-court identification.

They're other factors, however, that persuade the Court that the photo lineup is not overly suggestive and that it did not taint any in-court identification.

First and foremost I would note that when presented with a photograph of the person who's name was on the check and that she had actually written the name of that person, she categorically said that that was not the person.

If anything would have been suggestive of an identification, it would have been being presented with a driver's license with the name of the person that she wrote down that would have suggested that that, indeed, was the person who was at The Sam's Club at the time.

However, she categorically denied that or categorically rejected that suggest. And, in fact, that

4053

was much closer in time than the photographic identification of Mr. Koubriti in the display of six people.

In addition to that, her testimony under cross examination never wavered as to her certainty of Mr. Koubriti.

Defense counsel ably broke down her identification, questioned, clearly, on whether or not she'd been influenced, whether or not she had in any way been led into this identification.

And I think fairly stated in its totality, she didn't waiver, she wasn't uncertain.

And to conclude her testimony she, again, indicated that she was certain of the man.

This leaves only two questions raised in cross examination. The first was, the witness originally testified on cross examination yesterday that Mr. Convertino had confirmed her choice of Mr. Koubriti on redirect, that confirmation turns out to have been an inference that Ms. Sadowski, herself, drew, not anything that Mr. Convertino did.

Specifically, Ms. Sadowski said when asked what she meant by her testimony, that Mr. Convertino had confirmed the choice.

She said, well, after identifying him, I got a

subpoena. And that confirmed in my mind that I had identified somebody important, because I would have to testify. That, of course, is a pretty good deduction, particularly from a lay witness.

And in her mind, I could see, certainly, how that would confirm her choice -- her view that she had picked, quote, the right person.

Which leaves only one other issue; and that is, her testimony that Mr. Convertino indicated that the person would be in the room. That was not inquired into further by either defense counsel or by the government on redirect.

However, I would only indicate that it would not be a complete surprise to anybody brought into a courtroom who had identified a person in a photo lineup that the person is going to be in the courtroom and that she may be asked to identify that person.

The question then is, were the circumstances in the courtroom overly suggestive such that the subject of the photo would be unduly suggested. And as I've indicated I don't find that.

Specifically, the defendants weren't singled out, they weren't asked to stand. She was not told where.

There's nothing in her testimony that indicates that she was told where Mr. Koubriti would be standing where he would be seated, rather.

And as I indicated, he was amongst 12 males, seven of whom had at least similar hairline characteristics to Mr. Koubriti, and at least three of whom had -- four of whom five of whom, perhaps, had facial hair similar to Mr. Koubriti.

So the fact that her in-court identification was rock solid absolutely certain, and was not in any way led by the prosecutor, confirms my view that neither the photographic line up that she was shown was overly suggestive, nor that it did it taint her in court identification.

So for all of those reasons, I'm going to deny the defense motion. All right.

Anything else that we need to clean up before tomorrow? You want to come back this afternoon to put something on the record?

MR. HELFRICK: We're thinking maybe we'll meet with the Assistant United States Attorneys today see if we can work out some stipulations.

THE COURT: If you need me, I'll be here.

MR. CORBETT: Thank you.

(Whereupon court was in recess for the day at 12:18 p.m.)

USA V Koubriti, et al 01-80778

CERTIFICATE OF COURT REPORTER

I certify that the foregoing is a correct transcript from reported proceedings in the above-entitled matter.

CAROL S. SAPALA, CSR, RPR, CM                    Date

USA V Koubriti, et al 01-80778