UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

Government.

v.                                    Case No. **01-80778**
                                      **Volume 32**

**AHMED HANNAN,
KARIM KOUBRITI,
ABDEL ILAH EL MARDOUDI,
FAROUK ALI-HAIMOUD,**

Defendants.

_____/

**JURY TRIAL PROCEEDINGS**

BEFORE THE HONORABLE **GERALD E. ROSEN**
United States District Judge
860 US Courthouse & Federal Building
231 Lafayette Boulevard West
Detroit, Michigan
**Wednesday, May 14, 2003**

**APPEARANCES:**

**RICHARD CONVERTINO
KEITH CORBETT**
Assistant United States Attorneys
211 West Fort Street
Detroit, MI 48226
        On behalf of the Government.
                    - - -

Stenographically reported by:  Carol S. Sapala, RMR, FCRR

**USA V Koubriti, et al 01-80778**

APPEARANCES: (continuing)


      **RICHARD HELFRICK**
      **LEROY SOLES**
      **JAMES GEROMETTA**
      Federal Defender Office
      645 Griswold Street, Ste. 2255
      Detroit, MI 48226
            On behalf of Defendant Koubriti.


      **JAMES C. THOMAS**
      **JOSEPH NISKAR**
      2632 Buhl Building
      Detroit, Michigan 48226
            On behalf of Mr. Hannan.


      **ROBERT MORGAN**
      645 Griswold, Ste. 4100
      Detroit, Michigan 48226
            On behalf of Defendant Ali-Haimoud.


      **WILLIAM S. SWOR**
      645 Griswold, Ste. 3060
      Detroit, MI 48226
            On behalf of Defendant El Mardoudi.


      **MARGARET SIND RABEN**
      GUREWITZ & RABEN, PLC
      333 West Fort Street
      Detroit, MI 48226
            On behalf of Defendant El Mardoudi.


**THE INTERPRETERS:** David Habboo, El Sayed Mostafa


USA V Koubriti, et al 01-80778

# C O N T E N T S

IDENTIFICATION      **PAGE**

**WITNESSES**

**BRAHIM SIDI**

Direct Examination by Mr. Swor    5878

Cross Examination by Mr. Helfrick    5902

Cross Examination by Mr. Thomas    5904

Examination by The Court    5912

**MATTHEW MEYER** (recalled)

Redirect Examination by Mr. Convertino    5946

Cross Examination by Mr. Helfrick    5954

**KHALED ABOU EL FADL**

Direct Examination by Mr. Convertino    5956

Cross Examination by Mr. Swor    5977

Cross Examination by Mr. Helfrick    5997

Cross Examination by Mr. Thomas    5999

Cross Examination by Mr. Morgan    6001

Redirect Examination by Mr. Convertino    6006

Certification of Court Reporter    6018

USA V Koubriti, et al 01-80778

5875

# E X H I B I T S

**IDENTIFICATION**                                        **RECEIVED**

Government's Exhibit Number 78                              5950

Government's Exhibit Number 78A, C, E                       5950

Government's Exhibit Number 82                              5958

Government's Exhibit Number 83                              6011


Defendant's Exhibit FFF                                     5944

Defendant's Exhibit GGG                                     5944

Defendant's Exhibit HHH                                     5945

**USA V Koubriti, et al 01-80778**

Detroit, Michigan

Wednesday, May 14, 2003

9:30 a.m.

(The following proceedings were held

outside the presence of the jury)

THE COURT: We're going to bring the jury right down because I understand we have a call waiting. I'm prepared to rule on the reverse 404(b) issue.

I found a very interesting case just before I went home last night, did a little bed time reading. I'm sure we'll all find it instructive, written by Judge Ed Beck who is well known evidence expert.

(Whereupon the jury was brought out

into the courtroom)

THE COURT: Counsel satisfied the jurors are in place?

MR. SWOR: Yes.

MR. CONVERTINO: Yes.

THE COURT: Morning, ladies and gentlemen. All right. I believe the defendants have another witness for you.

Who's going to call this witness?

MR. SWOR: Your Honor --

THE COURT: Mr. Swor.

MR. SWOR: If it please the Court, I will.

USA V Koubriti, et al 01-80778

Your Honor, at this time, the defense would call Mr. Brahim Sidi.

**THE COURT:** All right.

Ladies and gentlemen, Mr. Sidi is going to be testifying, as did Ms. Koubriti yesterday, is going to be testifying by telephone on an open line from -- live from Morocco and we'll follow the same procedure we followed yesterday.

Could the people on the line in Morocco please identify themselves for the record. Go ahead.

I don't understand how, after spending all this time putting this together --

**MR. SWOR:** 10 minutes ago, this was working just great.

**THE COURT:** Very frustrating. Try again, okay.

**MR. SWOR:** Try it again.

**A VOICE:** Yes. This is Lauren Anderson from the FBI in Paris, France. Responsibility in Morocco.

**THE COURT:** It's breaking up still.

All right. Let's try that now. Go ahead. Who else?

**MR. ALLISON:** My name is Doug Allison. I'm a Special Agent at the Diplomatic Security Service serving as the Regional Security Officer at American Embassy in Rabat, Morocco.

**USA V Koubriti, et al 01-80778**

THE COURT:  Okay.  Anybody else there?

THE WITNESS:  Brahim Sidi.

THE COURT:  Mr. Sidi, this is Judge Rosen.

Do you have any need to have an interpreter assist you?

THE WITNESS:  No.  There is no interpreter.

THE COURT:  Okay.  Do you need an interpreter?

THE WITNESS:  I don't.

THE COURT:  Okay.  If at any time you do not understand a question, please indicate that.  We will have the attorney repeat it, okay?

Can you hear me, sir?

THE WITNESS:  Yes.

THE COURT:  Okay.  Would you raise your right hand, please.

(Whereupon the witness was then sworn)

THE WITNESS:  I do, sir.

THE COURT:  Okay.  Thank you.

Mr. Swor, you may proceed.

MR. SWOR:  Thank you, Your Honor.

### DIRECT EXAMINATION

Q    Would you state your name?

A    Brahim Sidi.

Q    Mr. Sidi, how old are you?

A    31, sir.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    Okay.  Have you ever been in the United States?

A    Yes, I have.

Q    And when did you come to the United States?

A    August 2000.

Q    Everybody hear?

     For what purpose did you come to the United States?

A    (unintelligible)

Q    Would you repeat that?

A    Study.  Study.

Q    Did you say study?

A    Yes.

Q    Where were you going to study?

A    Oklahoma.

Q    Okay.

     Where did you arrive in the United States?

A    New York.

Q    Where did you go from New York?

A    Orlando, Florida.

Q    What did you do when you go to Orlando, Florida?

A    I tried to get my transfer to Florida.

Q    You try to get your transfer to Florida?

A    From Oklahoma State University.

Q    Were you able to do that?

A    No, sir.

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    When you couldn't get your transfer, what did you do?

A    I went to Chicago.

Q    Why did you go to Chicago?

A    To get Social Security Number.

Q    Why did you need a Social Security Number?

A    Work.

Q    Did you say work?

A    Yes.

Q    Why did you go to Chicago to get a Social Security Number?

A    I was told to go there.

Q    Okay.  When you went there, did you meet someone?

A    Yes.

Q    And who did you meet?

A    For the purpose of social security number?

Q    Yes.  The first time, yes.

A    A Palestinian guy.

Q    Was his name Nasser Kwash?

A    Yes, sir.

Q    Where did you meet him?

A    Where did I meet him?

Q    Yes.

A    A guy who work for him, pick me up from the airport.

Q    Okay.  So was this his business?

A    Yes.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    Okay.  What did you obtain while you were in Chicago?

A    What did I obtain?

Q    Yes, sir.

A    Obtained a social security number after three months, I guess.

Q    Did you stay in Chicago for three months?

A    Yes, yes, to obtain my social security, yes.

Q    What did you do while you were in Chicago?

A    My money -- wasn't enough money with me, so that guy got me a job.

Q    So you worked with Kwash?

A    Yes.

Q    What did you do for him?

A    Worked in a store.

          Then I worked, you know, picking up people with his car from the airport, train station, whatever.

Q    Why was he picking up people?

A    Because they came for the same purpose, to get a social security.

Q    Okay.  Were these regular people?

A    What?

Q    Were these just ordinary people?

A    Yes, just people with their Visas.

          And they went to get a Social Security Number. So they go to Chicago because that's the only state, my

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

understanding, that issue social security or driver's license was that easy to do.

Yeah, I mean, you submit application and sent it to the office to give you one or not.

Q    Were there a lot of people doing it?

A    A lot of people, yes.

Q    Were there people other than Kwash doing it?

A    Yes, we did.

Q    Did you meet anyone that first time that you were in Chicago that was doing that?

A    I wasn't familiar with the city, but I heard a lot of people doing it from different nationalities.

Q    Okay.  Did you leave Chicago?

A    No.  I stayed there.

Q    Okay.  Did there come a time when you met a person named Jillali?

A    Yes.

Q    Okay.  When did you meet him?

A    I don't remember the exact date, but it was the year 2000.

Q    And how did you meet him?

A    Met him in a cafe room.

Q    Where?

A    Cafe.  Yes.

Q    Did you talk to him?

### Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi

A    Yes.

Q    What did you talk to him about?

A    He said he could obtain social security, too, for people.  That's what he said.

Q    Did he offer you a job working with him?

A    No.  He offered me to make one for me.

Q    How much did he say he would charge you for that?

A    He didn't talk about the price, but he said it's going to cost me around 1500, something like that.

Q    Did you pay 1500 and get a Social Security Number from him?

A    Yes.  That's what he said.

Q    Okay.  Did you ever do that?

A    No, sir.

Q    Okay.  Were you working for Kwash at the time?

A    Yes, sir.

Q    How long did you stay in Chicago?

A    Whole time, sir.

Q    Okay.  You never went back to Orlando?

A    No.

Q    Did you ever live in any other city in the United States?

A    No.

Q    Okay.  Did there come a time when you asked Jillali to make false documents for you?

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

A     I didn't ask him to make false documents, what the deal was he was making social security for me for work, yes.

The way he was going to do it, I didn't know how he was going to do it.

Q     How were you going to pay him?

A     Well, he said I told him that amount was about 2,000.

I said I couldn't pay that amount.  So he said, but I would do it for free for you.

Q     Okay.  Would you repeat that, sir.  I was moving the volume.

A     I said, if I bring some people, some customers to him, he would do my social security for free.  The cost is 2,000.

MR. CORBETT:  Could we have a time frame when this took place?

THE COURT:  If you could lay a time frame.

MR. SWOR:  I was going to.

BY MR. SWOR:

Q     When, roughly, was this?

A     Sometime around 2000 maybe March, February.  I couldn't recall the exact date, sir.

Q     Was it the beginning of 2000?

A     No 2001.

Q     Beginning of 2001?

A     Maybe the middle.  I can't remember, sir.

Q     Okay.  You were to bring him customers?

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

A    Yes.

Q    And he would do your social security card for free?

A    Yes.

Q    Is that what you said?

A    Yes.

Q    Okay.  Would he charge these customers?

A    Say that again, sir?

Q    Would he charge these customers?

A    Yes.

Q    How much did he charge them?

A    15, 1800, depends.

Q    Did you get money out of that?

A    He said he would give me 200, because I would make the trip with this guy.

Q    Okay.  Did he -- did you, in fact, bring him customers?

A    Yes, I did.

Q    Did he, in fact, charge these people?

A    Yes, he did.

Q    Did he, in fact, pay you?

A    Yes.

Q    Okay.  Did you work for anyone other than Jillali?

A    No.

Q    Did there come a time when you knew a person named Abdel or Abdella?

A    What, sir?

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    Did you meet someone named Abdella?

A    Yes.

Q    Okay. How did you meet him?

A    I was moving out of an apartment and he was moving in. That's how I met him.

Q    Okay. Did you ever do any work for Abdella?

A    No, sir.

Q    Did Abdella work with Jillali?

A    I don't know, sir.

Q    Did Jillali require the people to pay for the social security cards before they were delivered?

A    It depends. No, after they got their social security card.

Q    Okay.

Do you remember the first person that -- the first customer you obtained for Jillali?

A    I don't remember. It was some Indian guy.

Q    Okay. Do you remember a person by the name of Mena Sager? (phonetically)

A    Yes, sir.

Q    What did you provide to Jillali?

A    What do you mean, sir?

Q    Okay. Let me back up a second.

Was Jillali still living in Chicago when you brought the first customer to him?

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

A    No.  He was in Detroit.

Q    Okay.  Then how did you get together with Jillali for that customer?

A    I give him the passport and he put the top on it.

Then I went to the customer -- to the Social Security Office.

Q    Let me stop you.

Did you drive to Detroit --

A    Yes.

Q    -- to give him the papers on Sager?

A    No, no, no.  He came to Chicago.  I gave him the passport.

Q    Okay.  Did -- other than the passport, did you give him any other papers?

A    No, sir.

Q    Did you give him an I 94?

A    No, sir.

Q    When the passport came back, did it have an I 94 on it?

A    Yes, sir.

Q    Okay.  Was it your understanding that he had made that I 94?

A    Yes, sir.

Q    Okay.  Then when he came back, you said that the passport had a different -- had different paperwork on it?

A    Yes, sir.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    Okay.  What paperwork did it have on it?

A    I know it was a type of Visa.  I don't know, can't remember what type of Visa was it.

He said he would get social security for work. That's what he said.

Q    Okay.  Did you take this person somewhere?

A    Yes.

Q    Where did you take them?

A    Debuke, Iowa.

Q    Who told you to go to Debuke, Iowa?

A    Jillali.

Q    Say that again?

A    Jillali, sir.

Q    Jillali?

A    Yes.

Q    By the way, did you learn Jillali had another name?

A    No, sir.

Q    Did you ever hear the name Youssef Hmimssa?

A    No, sir.

Q    Okay.

A    Not until, you know, the other guy told me about it.

Q    What guy told you about it?

A    The FBI, when they interrogated me in Iowa.

Q    Okay.  Did they show you a picture?

A    Yes.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    And was the person that they called "Hmimssa" the same person you called Jillali?

A    Yes, sir.

Q    Did you ever do any work for Abdella?

A    No, sir.

Q    Okay.  Were you aware that Abdel what was doing work with Jillali?

A    I don't know it was visiting him in Iowa.  I don't know what they were doing together.

Q    They were doing something together, right?

A    I don't know, sir.

Q    Okay.  Did you learn what Abdella did for a living?

A    Yes.

Q    What did he do?

A    He goes to the airport, goes to pick up phone numbers from the airport.

Q    Did he sell those phone numbers?

A    That's what he said, but I don't know, sir.

Q    You didn't see it?

A    What?

Q    You didn't see him selling any phone numbers?

A    No.

Q    What airports did he go to?

A    Chicago airport.  I don't know.

Q    Chicago airport?

**USA V Koubriti, et al 01-80778**

5890

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Now did, did Jillali ever fix up your passport and get you a Social Security Card?

A    Yeah, eventually sir.  Yes, he did.

Q    Okay.  How did he get your passport?

A    I give him my passport first time.

Q    Where?

A    Where?  When he was still in Detroit.

Q    Okay.  You drove to Detroit and gave him your passport?

A    Yes, sir.

Q    Did you give him anyone else's passport?

A    Yes.

Q    Who else's passport did you give him?

A    My girl friend's passport.

Q    Your girl friend?

A    Yes.

Q    What was her name?

A    Theresa.

Q    Theresa is Theresa Bachova?(phonetically)

A    Yes, sir.

Q    When you gave Jilalli your passports at that time, did he return them with documents?

A    No, sir.

Q    Did something happen to their passports?

A    He told me they got stolen.

Q    He told you they got stolen?

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

A    Yes.

Q    Okay.  Did he say by whom they were stolen?

A    No, sir.

Q    Did you eventually go to Detroit?

A    Yes, sir.

Q    Did you get your passports back?

A    Yes, sir.

Q    Did you pay to get your passports back?

A    Yes, sir.

Q    Who made the arrangements?

A    Abdella.

Q    Okay.  Did Abdella tell you that these people that had your passport worked for him?

        MR. CORBETT:  I'm going to object to the leading nature of the question.

        THE COURT:  If you could -- if you could -- I understand the technical difficulties presented by the way we're presenting the testimony here, over the telephone.

        But that doesn't give you free license to suggest testimony.

        MR. SWOR:  I'm trying to be expedient.  All right.

BY MR. SWOR:

Q    Do you remember who you gave the check to?

A    Yes.

Q    And who did you give the check to?

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

A    Somebody call Karim.

Q    And how much was the check?

A    1,000.

Q    Okay.  Did you did someone tell you why Karim had your passport?

A    No, sir.

Q    Did you tell Jillali that you got your passports back?

A    Yes, I did.

Q    And did Jillali say anything to you when you got the passports back?

A    Something like what, sir?

Q    I can't lead you.  You have to tell me.

        Did he say anything?

A    I can't remember, sir.

Q    Okay.

        (A discussion was held off the record)

Q    Did Jillali seem surprised you got the passports back?

A    I assume so.

Q    Okay.  Was he angry?

A    Yes.

Q    Did he say anything when he was angry?

        **MR. CORBETT:**  I thought he said the answer was no.  I --

        **THE COURT:**  Just a moment.  Apparently, the answer was yes.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Is that what you have Carol?

Go ahead, reask the question, Mr. Swor.

**BY MR. SWOR:**

Q    Sir, was Jalali angry when you told him you got the passports back?

A    I think so.

Q    Did he say anything to you when you told him that you got the passports back?

A    Something like what, sir?

Q    Did he say he was going to do anything?

MR. CORBETT:  Now I'm going to object.

THE COURT:  Come on, Mr. Swor, anything that the witness remembers?

BY MR. SWOR:

Q    Anything.

A    I don't remember.

Q    Okay.  Let's go back to Detroit, if we can.

When you went with Abdella, where did you go in Detroit?

A    Where?

Q    Yes.

A    Dearborn.

Q    Okay.  Did you go to a house?  Did you go to a store?  Did you go to a gas station?

A    I mean the first time I went with Abdella?

USA V Koubriti, et al 01-80778

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    Yes, sir.

A    I went to his apartment Jillali's apartment.

Q    Okay.  And that was to drop off the passports?

A    Yes.

Q    Okay.

When the passports were stolen, you went back with Abdella, right?

A    Yes.

Q    When you went back that second time, where did you go?

A    I was with my girl friend.  I spent the night in a hotel.

Q    Okay.  How did you get your passports back?

A    I paid for it.

Q    Okay.  Where were you when you paid for it?

A    In a restaurant.

Q    Okay.  Did somebody at the restaurant have your passports?

A    Yes.

Q    Okay.  Was it somebody working in the restaurant?

A    No, sir.

Q    Okay.  Did someone come to the restaurant?

A    I thought it was Karim and another guy.

He brought my passports and I paid them for that.

Q    So they came to you, correct?

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

A    Yes.

Q    Did Abdella tell you anything about Karim and the other guy?

A    No, sir.

Q    Did you observe how he talked to them?

A    Normal to me, sir.

Q    It was normal?

A    Yeah.

Q    Did you negotiate the price for the return of your passports?

A    A little bit.

Q    A little bit.

        Did Abdella tell you how much to pay to get the passports back?

A    No, he didn't.

Q    Was it Abdella's money that was being used to get the passports back?

A    My money.

Q    Your money?

A    Yes.

Q    Once you got the passports back and went back to Chicago and you told Jillali, what did you do then?

A    He said, I'm going to do it.

        I ask him to do it for me as quick as possible.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    You asked who to do it for you as quick as possible?

A    Jilalli.

Q    And what did Jillali tell you?

A    He will do it.

Q    Okay.  Did you give him your passports back?

A    Yes.

Q    Okay.  Where did you do that?

A    I was in Iowa.

Q    Okay.  How did you get to Iowa?

A    I drove to Iowa.

Q    Who did you drive to Iowa with?

A    The first time?

Q    When, when you gave him your passports?

A    By myself.

Q    By yourself.

         Was Jillali living in Iowa?

A    Yes, sir.

Q    How did you Jillali get to Iowa?

A    I help him move from Detroit, but then he stayed in a motel in Cedar Rapids, Iowa.

         Then I came the next day with Abdella when he paid the rent for an apartment.

Q    Whose idea was it for Jillali to move to Cedar Rapids?

A    I think it was his idea, sir.

Q    Okay.  Did he have any information about Cedar Rapids

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

when he went there?

A    I don't know, sir.

Q    Did he make any phone calls in your presence?

A    I don't remember, sir.

Q    Did you continue to take customers to Jillali in Cedar Rapids?

A    Yes.

Q    When you took those customers to Jillali, were you working with Abdella?

A    No.

Q    Were you working for Abdella?

A    No.

Q    Did you help -- when Jillali moved to Cedar Rapids, were you there when he moved into his apartment?

A    Yes.

Q    What name did he give the landlord when he moved into the apartment?

A    He said his name is Michael.

Q    Did you have a discussion with him about that?

A    I was kind of surprised about that.

Q    Okay.  Did Jillali pay the first month's rent and the deposit on that apartment?

A    I did.

Q    Why did you do it?

A    He said he didn't have money, so asked me to pay and he

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

would reimburse me for it.

Q    Did he do that?

A    Yes.

Q    Do you remember taking an individual.  I'm sorry.  Let me rephrase this.

Do you remember taking an Algerian individual to Cedar Rapids?

A    What's his name, sir?

Q    Do you remember the name Benaouicha?

A    What's the first name?

Q    Mohammed Tahar?

A    Yes, sir.

Q    Who was this person?

A    A regular customer, sir.

Q    Did you ask Jillali to change this person's Visa to an airline pilot training visa?

A    No, sir.

Q    What kind of visa did you ask him to change it to?

A    I don't know Visa.  He knows that stuff.

Q    What was the purpose of taking the passport and Visa to Jillali?

A    Persons are interested in getting a social security to work.

They don't know means or how he going to do at this time.  He just want a social security to work.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q     Did Abdella have anything to do with that passport or visa?

A     I don't think so, sir.

Q     Did you see him?

A     Who?

Q     Abdella.

A     What do you mean, did I see him?

Q     When you took Bemaouica's papers to Cedar Rapids.

A     Yes.

Q     Did you say yes or no?

A     I mean yes to your question.

But I thought you haven't finished your question.

Q     All right.  Did you see him when you took the papers?

A     I don't remember, sir.

Q     Okay.  Do you ever see Abdella help Jillali create any passports or visas or any other documents?

A     I mean, it was spending some, some time with him in his apartment in Cedar Rapids.  I don't know what they were doing together.

Q     Did you ever talk politics with Abdella?

A     No, sir.

Q     Did you ever talk religion with Abdella?

A     No, sir.

Q     When you went to Cedar Rapids, you opened a number of

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Post Office Boxes, correct?

A    Yes.

Q    Who told you to open those Post Office Boxes?

A    Jilalli did.

Q    Who told you where to open the Post Office Boxes?

A    Jillali did.

Q    When you brought people to Iowa to get social security cards, what kind of addresses did they use?

A    Mailbox addresses.

Q    Whose idea was to use the mailbox addresses?

A    Jillali.

Q    Who told you which mailbox addresses to use?

A    Jillali.

Q    Mr. Sidi, when were you arrested?

A    Ha?

Q    When were you arrested?

       Did you leave the United States voluntarily?

A    No.  I was deported.

Q    Okay.  When were you arrested?

A    I believe January 7, 2002.

Q    2002?

A    Yes.

Q    Okay.  Were you kept in Government custody until you were deported?

A    Yes.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

Q    While you were in custody, were you interviewed by federal police agents?

A    Yes.

Q    Do you remember how many times?

A    I think twice, maybe three times.

Q    Were you charged with a crime?

A    Yes, sir.

Q    Do you remember what crime you were charged with?

A    Conspiracy to obtain social security cards.

Q    Were you charged with terrorism?

A    No, sir.

Q    Were you charged with aiding terrorism?

A    No, sir.

Q    Did you plead guilty?

A    Yes, I did.

Q    After you plead guilty, did you stay in Government custody?

A    I was transferred to INS custody after that.

Q    When did you plead guilty?

A    June -- I don't remember the exact -- maybe June, yeah.

Q    And where -- did you go to court and get sentenced?

A    Yes.

Q    And when were you sentenced?

A    I don't remember, sir.

Q    Okay.

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Direct Exam/Mr. Swor-El Mardoudi**

A    I think it was First of July.

Q    After you were sentenced you, were you transferred to INS custody?

A    I was transferred at the time, sir.

Q    Did you stay in the United States -- when were you deported, let's put it that way.

A    Somewhere the end of December.

Q    December of what year?

A    2002.

Q    Mr. Sidi, were you ever interviewed by any agents from Detroit, Michigan?

A    No, sir.

Q    Do you know -- you had an attorney in Iowa, did you not?

A    Yes, I did.

Q    Okay.  Do you know whether your attorney spoke with the government officials in Detroit, Michigan about your case?

A    Remember they sent a letter saying they want to talk to me, but they never did.

        THE COURT:  Any other defense counsel wish to question Mr. Sidi?

        MR. HELFRICK:  Yes, Your Honor.

                    CROSS  EXAMINATION

BY MR. HELFRICK:

Q    Mr. Sidi, this is Richard Helfrick.  I represent

**Brahim Sidi-Cross Exam/Mr. Helfrick-Koubriti**

Mr. Koubriti in this case.

A    Yes, sir.

Q    I just have a couple of questions.

When the pass -- your passport and your girl friend's passport was stolen, was Jillali upset about that?

A    Yes.

Q    Was he angry?

A    I believe so.

Q    And did he indicate what he --

MR. CORBETT:  I'll object.  Just ask him what he indicated, let's not suggest.

THE COURT:  Yes.  Don't lead.

BY MR. HELFRICK:

Q    You were interviewed by the FBI on January 11th of 2002, correct, Mr. Sidi?

A    I think so, yes.

Q    Do you recall telling the FBI --

MR. CORBETT:  I'll object, Your Honor.

THE COURT:  Nonleading, please.  Nonleading.  Nonleading.

MR. HELFRICK:  Can we fax something to him so he can review it?

THE COURT:  Nonleading.  Ask him if he remembers.  Go ahead.

BY MR. HELFRICK:

**USA V Koubriti, et al 01-80778**

**Brahim Sidi-Cross Exam/Mr. Helfrick-Koubriti**

Q    Did Jalali indicate what, if anything, he was going to do about that?

THE COURT:  That's okay.

THE WITNESS:  I don't remember the exact words. He was mad about it.

MR. HELFRICK:  Okay.  Thank you, sir.

## CROSS   EXAMINATION

BY MR. THOMAS:

Q    Mr. Sidi, my name is Jim Thomas.  I represent Ahmed Hannan who's in this case, also.

I want to ask you a question about your passport.

You had a passport to come into this country legally.

Is that correct?

A    Yes, sir.

Q    And what about Ms. Bukva? (phonetically)

A    Yes.

Q    When those passports were originally given to Jalali, were they in any way altered or changed?

A    No, sir.

Q    They were legal passports?

A    Yes.

Q    When the passports were -- did you become aware that something happened to those passports?

**USA V Koubriti, et al 01-80778**

Brahim Sidi-Cross Exam/Mr. Thomas-Hannan

A    When I got them?

Q    No, after you gave them to Jillali.

A    I don't know what he was going to do with them, but I told me he was going to put something -- put an I 94 to allow us to get a social security.

Q    Right.

You have testified that you learned that something happened to those passports.

Is that correct?

A    Yeah, but not in the first time.

I'm not talking about the first time I got the passport, because they got stolen.

Q    When they got stolen, you went to go get them again, right?

A    Yes.

Q    When you went to get them, had there been any changes made to the passports?

A    No, sir.

Q    They were still in the original form and they had not been altered or changed?

A    Yes, sir.

Q    It was then that you received them.

Did you then give them back to Jillali?

A    I give him my girl friend's passport at first.

        MR. THOMAS:  All right.  I have nothing further.

USA V Koubriti, et al 01-80778

**Brahim Sidi-Cross Exam/Mr. Thomas-Hannan**

THE COURT: Mr. Morgan, anything?

MR. MORGAN: No, Your Honor.

THE COURT: Mr. Corbett?

MR. CORBETT: Just one moment, Your Honor. I'm trying to decide if I will ask him any questions.

(After a short delay, the

proceedings continued)

MR. THOMAS: Judge, can I? I think what I want to do in a nonleading fashion, is ask questions to establish something. If I cannot, we'll go -- I won't go further.

THE COURT: All right.

BY MR. THOMAS:

Q   Sir, this is Jim Thomas, again. I'm sorry. I think I want to ask you a couple more questions in a different area, okay? Okay?

That is, that when you learned that the passports were stolen, did you have contact with Jilalli?

A   Yes, sir.

Q   And how did you feel about the fact that they were stolen?

A   I was so mad about it, too.

Q   Yes. Did you tell that to Jillali?

A   Yes. I tell him that.

Q   Then what was his response?

A   I mean, he was just --(unintelligible)

**USA V Koubriti, et al 01-80778**

5907

**Brahim Sidi-Cross Exam/Mr. Thomas-Hannan**

THE COURT: We didn't get that.

BY MR. THOMAS:

Q     Did you say he was kind of scared?

A     Yes, because he didn't know what happened.

So it was just -- not answering my phone.

Q     But did he have -- he was scared of you?

A     No. I don't know scared of me, scared of the police or something. I don't know.

Q     But in any event, as a result of that, you talked to him again. Right?

A     Yes.

Q     And what was his explanation for what happened to those passports?

A     Explanation?

Q     His explanation.

A     For the fact that they got stolen?

Q     Yes.

A     Before he knew about the fact.

Q     What did he tell you about what happened to the passports?

A     He didn't say anything.

He said somebody broke into his apartment. He doesn't know who, took a bunch of stuff from his apartment.

Q     Did you later have discussions with him where he thought he might have known who did break into his

**USA V Koubriti, et al 01-80778**

Brahim Sidi-Cross Exam/Mr. Thomas-Hannan

apartment?

A    He didn't know.

Q    He didn't know.

You were familiar with the fact or were you familiar with who it was that he lived with in Detroit?

A    I was aware of that fact later on, sir.

Q    Later on, did you become aware of the fact that Jillali thought that these two people were the ones that stole his passports?

A    Yes, they're the ones.

Q    Stole your passports.  Right.

Did he express to you how he felt about those guys when he found out that they were the ones that stole the passports?

MR. CORBETT:  This questions been asked and answered three times.

THE COURT:  He's doing it in a nonleading way. I'll permit it.  Go ahead.

MR. CORBETT:  You're going to have to repeat it.

THE COURT:  Repeat the question, if you would.

BY MR. THOMAS:

Q    Sir, did you then come to know how he felt about those passports being stolen?

A    I think --

Q    Let me do it again.

USA V Koubriti, et al 01-80778

### Brahim Sidi-Cross Exam/Mr. Thomas-Hannan

A     I said it he was mad about it.  A natural reflection.

Q     But you said a natural something.  I didn't hear what you meant.

A     I mean reflection.

Q     Natural reflection, is that what you said?

A     Yes, sir.

Q     And he was mad about it?

A     Yes.

Q     And he was made at the two guys that did it to him?

**MR. CORBETT:**  This is a leading question, Your Honor.

**THE WITNESS:**  Yes.

**MR. CORBETT:**  He's mad at the two guys that did it to him.

**THE COURT:**  I'll permit it.  It's obvious from the context who he's referring to.

BY MR. THOMAS:

Q     Did he say he was going to do anything to those persons?

A     I wasn't paying attention to what he was saying.

I was happy I got my passports back, but he was mad about it after they stole the passports.

Q     Okay.

**THE COURT:**  Let me see the 302.

**THE WITNESS:**  I mean, I wasn't paying attention to

USA V Koubriti, et al. 01-80778

**Brahim Sidi-Cross Exam/Mr. Thomas-Hannan**

what he was saying.

MR. THOMAS: Hold on one second, please.

(After a short delay, the

proceedings continued)

THE COURT: Mr. Sidi, can you hear me?

THE WITNESS: Yes, sir.

MR. CORBETT: Your Honor, can I make a suggestion about this point?

THE COURT: Yes.

MR. CORBETT: Can we do it at side bar very briefly?

THE COURT: All right.

(The following was held at the bench,

outside the hearing of the jury)

THE COURT: Just a moment, please.

MR. CORBETT: What was the Court going to ask him was the first question.

THE COURT: I am going to first ask him to remember all of the conversations -- to try to remember all of the conversations that he had with Jillali concerning the theft of these passports.

MR. CORBETT: I've no objection to that.

THE COURT: I'm then going to ask him if at any time Jillali indicated who he was angry at.

MR. CORBETT: No objection to that.

**USA V Koubriti, et al 01-80778**

## Brahim Sidi-Cross Exam/Mr. Thomas-Hannan

THE COURT: I'm then going to ask him if at any time, assuming he says he was angry at Koubriti.

MR. CORBETT: I think so. He's already said that.

THE COURT: Assuming he said he was angry at Koubriti, I'm then going to ask him if at any time Jillali indicated that he was going to act upon his anger in any way.

MR. CORBETT: Your Honor if --

THE COURT: The problem, Mr. Corbett, this is --

MR. CORBETT: I have a suggestion.

MR. CONVERTINO: Now wait. We've no objection to that.

THE COURT: The problem, Mr. Corbett, is, if Mr. Sidi was here, they'd be able to show him this.

MR. CORBETT: My suggestion is that we do this inquiry out of the jury's presence. If he said it doesn't refresh his recollection --

THE COURT: The embassy in Morocco is closed today. There's nobody there, other than these people.

And I don't know whether we can get it there in time or anything else. Let me try.

MR. THOMAS: You're right, if he was here -- let me do that.

THE COURT: Let me try it this way. This is what you were trying to get to.

USA V Koubriti, et al 01-80778

5912

**Brahim Sidi-Cross Exam/Mr. Thomas-Hannan**

MR. HELFRICK: Yeah.

THE COURT: I assumed that.

MR. CORBETT: All right.

THE COURT: My only point to you was that you jumped right into it without trying to get to it the way Mr. Thomas got to it.

MR. HELFRICK: As long as we get to it.

MR. SOLES: If there's a way to him that would protect our confrontation rights --

THE COURT: Your confrontation rights are more than protected. Let me see if I can get to it.

(The following was held in open court)

Can I ask everybody to stop talking, please, so the witness can hear.

Mr. Sidi, this is Judge Rosen. Can you hear me?

THE WITNESS: Yes, sir.

**EXAMINATION**

THE COURT: All right. I want to you listen very carefully to my questions and answer only the questions that I ask you, okay?

THE WITNESS: Yes.

THE COURT: All right.

Mr. Sidi, concerning the theft of these passports.

Did Mr. Jillali ever indicate to you who he believed was responsible for the theft of these passports?

**USA V Koubriti, et al 01-80778**

### Brahim Sidi-Examination-The Court

THE WITNESS:  Say that again, sir. I missed a part of your question.

THE COURT:  Did Mr. Jillali ever -- did Mr. Jillali ever indicate to you who he believed was responsible for stealing the passports?

THE WITNESS:  No.

THE COURT:  Did he indicate to you in any way whether he believed that the people who you met in the restaurant were responsible for stealing the passports?

THE WITNESS:  He didn't know who did it, so he didn't indicate anything of that kind.

THE COURT:  At any point, did he believe that the man referred to as "Karim" may have been responsible for the theft of the passports.

THE WITNESS:  Say it again, sir.

THE COURT:  At any point, did Jillali indicate to you that Jillali believed that Karim was responsible for stealing the passports?

THE WITNESS:  Mr. Koubriti?

THE COURT:  Yes.

THE WITNESS:  No.

THE COURT:  Do you know -- do you have any idea, who Jillali thought stole the passports at any time?

THE WITNESS:  No, sir.

THE COURT:  Jillali never told you that he

### USA V Koubriti, et al 01-80778

**Brahim Sidi-Examination-The Court**

believed that the people he lived with in Detroit, stole the passports?

THE WITNESS: He was living by himself, sir. So I don't know. That was before.

THE COURT: Did he ever tell you that he knew who stole the passports?

THE WITNESS: He never did, sir.

THE COURT: Did he ever suggest to you in any way that people who he had been associated with in the past, stole the passports?

THE WITNESS: No, sir.

THE COURT: Counsel can follow up. Thank you. This is why we take it step by step.

MR. THOMAS: I've no further questions.

Thank you, Judge.

THE COURT: Mr. Helfrick, do you wish to reexamine based on the Court's questions?

MR. HELFRICK: No, thank you.

THE COURT: Mr. Swor? Mr. Corbett?

MR. CORBETT: The government has no questions, Your Honor.

THE COURT: Any questions from any of our jurors?

All right. Thank you very much, Mr. Sidi.

I want to thank all of you in the embassy in Morocco. I know that you've been working on this very, very

**USA V Koubriti, et al 01-80778**

hard to make this testimony possible, and all of us here deeply appreciate it.

I know it's a Holiday in Morocco. We understand that the embassy is closed and you had to really go out of your way to make this possible. And I just want to let you know how much all of us appreciate it.

All right. Anything else? Thank you. All right.

(Whereupon the telephone conference concluded at 10:30 a.m.)

THE COURT: Does the defense have anymore witnesses?

First, anymore witnesses from the defense?

MR. HELFRICK: Your Honor, I think we need a moment.

THE COURT: Regarding witnesses or?

MR. THOMAS: Yes.

MR. HELFRICK: Yes, regarding witnesses.

THE COURT: All right.

(A discussion was held off the record)

(After a short delay, the proceedings continued)

MR. ALLISON: We don't have any other witnesses.

THE COURT: No more witnesses for the defense, but I know we have a number of evidentiary matters that we have to resolve before the defense rests and stipulations.

USA V Koubriti, et al 01-80778

Are you ready to do the stipulations?  Why don't we do this.

Why don't we take up, outside the hearing of the jury, the additional evidentiary matters, then we can do the stipulations when we come back.  And then I assume the government will be prepared with any rebuttal.

MR. CORBETT:  Yes, Your Honor.

THE COURT:  Okay.  All right.

Ladies and gentlemen of the jury, we'll take a break.  Hopefully, it won't be very long, but I've a number of legal matters to discuss with the lawyers.

Don't discuss the case, don't let anybody discuss the case with you.  Keep an open mind.  Leave your notebooks on your chairs.  All right.

(Whereupon the jury was excused 10:30 a.m. and the following was held outside the presence of the jury)

THE COURT:  All right.  Okay.  You can all be seated.

First of all, there is the open matter of the judgment of conviction of Mr. Zaia for avoiding payment of cigarette taxes.

Yesterday evening after -- yes?

MR. HELFRICK:  Your Honor.

THE COURT:  You've reached a stipulation on it?

USA V Koubriti, et al 01-80778

**MR. HELFRICK:** The government -- it doesn't say anything about taxes, it says it's unlawful transportation and possession of contraband cigarettes.

I assume they're contraband because the taxes weren't paid on it. The actual official charge doesn't mention taxes. Just so --

**THE COURT:** Okay. Maybe I should have the judgment up here as I address this issue.

**MR. CORBETT:** What's the statute say?

**MR. HELFRICK:** I don't have the statute.

It says 18 U.S.C. 2342(a). Then it gives the title of the statute. You can keep that.

**THE COURT:** Last night, I took to heart Mr. Corbett's motion for reconsideration regarding the judgment against Mr. Zaia entered by one of my colleagues in this Court.

This is a judgment that was entered October 29th of 2002, approximately, two years after the incident at Sam's Club.

**MR. CORBETT:** Before you mean?

**THE COURT:** I'm sorry? No. The judgment was two years after the incident at Sam's Club.

**MR. CORBETT:** The incident at Sam's Club's was in 2000. The judgment was 1998. I'm sorry. The offense -- that's correct. I'm sorry.

**USA V Koubriti, et al 01-80778**

**THE COURT:** Okay.

**MR. CORBETT:** I'm looking at the date of the conduct.

**THE COURT:** The judgment, the judgment.

The conduct, itself, the underlying conduct, itself, was in '98. That's correct.

I went back and I reviewed a number of cases, the most compelling of which, because it is very thorough and I think documents -- all the issues that the Court has to consider here is *United States versus Stevens*, 935 F.2d. 1380, a 1991 decision.

The decision is written by Judge Ed Becker, Ed Becker was -- obviously, doesn't play into whether or not I adopt it, but I think it's well known in the judiciary, at least probably among practicing lawyers, he's one of the foremost experts on evidence law among sitting judges certainly.

He chaired the Evidence Rules Committee for a period and is well versed and is certainly well known for his thorough, careful, well analyzed opinions on the Rules of Evidence.

This is a case which presented a similar issue of alleged misidentification of the defendant.

And in order to support the defendant's theory of misidentification, the defendant wished to call to the stand

**USA V Koubriti, et al 01-80778**

the defendant was on trial for assault and sexual assault related charges.

And the defendant wished to call to the stand to give testimony, another man who had been a victim of the assault in the same place, roughly the same place, roughly around the same period of time. There were a number of indicia of similarities.

The defendant in this case, Mr. Stevens, wanted to call the other victim, another victim of a similar assault, and the government originally had suspected Mr. Stevens of perpetrating that assault.

The victim of that assault, a Mr. Mitchell, testified positively or was prepared to testify positively, I should say, that Mr. Stevens did not commit that other assault. And, indeed, had identified another person.

The trial court excluded that evidence. Apparently, the basis for excluding it was not completely clear from the trial court's record, but it appears to have been both relevance grounds and under 403, that it would have been misleading to the jury and confusing on the issues.

Obviously, Mr. Stevens was presenting this witness for purposes of showing a misidentification of himself and providing -- substantiating his theory that there was another assailant out there who may have looked like him but who -- another person had identified as the assailant in a similar

5920

crime.

The parallels aren't identical here, they're very similar, particularly in one respect and that respect is on the issue of identity.

One difference, obviously is, that the identity issue went to the crime charged here.

The identity issue doesn't go specifically to the crime charged, but is only under the government's theory corroborative of the crime charged. I.e., that Mr. Koubriti was involved in a conspiracy and that part of this conspiracy was in getting Mr. Ahmed to buy him cigarettes for illegal purposes. However, in most other respects, the analytical paradigm is identical.

What Judge Becker did was, he went back and he traced virtually every case, both state and federal, that had been decided on the issue of reverse 404(b) evidence.

**MS. RABEN:** What was the cite? We need that.

**THE COURT:** It's a wonderful opinion. I see they're other interested people here in bedroom reading, so I can give the cite again. 935 F.2d.1380.

I'm not going to read the entire opinion, it's quite lengthy, but I will quote parts of it.

The analytical basis for Steven's proffer

of Mitchell's testimony -- Mitchell is the

other person who was assaulted, who

**USA V Koubriti, et al 01-80778**

positively indicated that Stevens was not the assailant, that it had been somebody else, was a rarely used variant of Rule 404(b) known as reverse 404(b). In contrast to ordinary other crimes, evidence which is used to incriminate criminal defendants, reverse 404(b) evidence is used to exonerate defendants. As Wigmore's treatise points out, it should be noted that other crimes evidence may also be available to negative the accused's guilt.

If A is charged with forgery and denies it, and if B can be shown to have done a series of similar forgeries connected by a plan, this plan of B is some evidence that B and not A committed the forgery charged. This mode of reasoning may become the most important when A alleges that he is a victim of mistaken identification.

Obviously, if we substitute the name Zaia for B and the name Koubriti for A, we have a very, very similar analytical paradigm here.

Judge Becker goes on. He says -- goes through a number of state cases which I won't go through, all of which

**USA V Koubriti, et al 01-80778**