are to the affect that where reverse 404(b) has the effect of negativing the guilt of the defendant on trial, the threshold relevant standard is lower.

Because the similarity of crimes between the defendant and the other identified person, that threshold is lower because there is, in that instance when it is offered by the defendant, no risk of prejudice to the defendant.

And I just want to read one case that Judge Becker relies on, because I think it speaks to very closely the issue that we have here.

This is a case *State versus Garfole*, in which the defendant was charged with sexually molesting two children. And he sought to introduce evidence that he had been indicted on charges arising out of five similar episodes and that the charges arising out of four of those episodes had been dismissed, and that he had an alibi for all but two of the episodes.

The trial court rejected this proffer, stating that it was irrelevant to the specific crime charged against Mr. Garfole in that case. The New Jersey Supreme Court over reversed.

The New Jersey Supreme Court, after noting that this evidence clearly had some relevance to the case *Garfole* was charged in, then said that:

Where other crimes were sufficiently

**USA V Koubriti, et al 01-80778**

relevant or similar to outweigh the countervailing consideration, such as confusion of the issues, they should be -- that evidence should be considered.

The New Jersey Supreme Court then went on to say that:

The trial court had imposed upon the defendant, the same standard of similarity that would have applied if the government had offered the evidence which is, parenthetically, the basis of discussion yesterday.

I'd note, Mr. Corbett, that you even acknowledged if we were applying the same standards, you would have attempted to introduce this evidence under 404(b).

**MR. CORBETT:** And probably fail.

**THE COURT:** But that was a judgment you made.

**MR. CORBETT:** That's experience.

**THE COURT:** In essence, requiring that the other crimes evidence be so distinctive as to constitute signature crimes, just as it would have, because it would have been introduced by the government against the defendant.

The Court held that this was error, saying:

We're of the view that a lower standard of degree of similarities of offenses may

**USA V Koubriti, et al 01-80778**

justly be required of a defendant using other crime evidence defensively then that which is exacted from the State when such evidence is used incriminatorily.

Other crimes evidence submitted by the prosecution has the distinct capacity of prejudicing the accused.

so you may have been right here.

Therefore, the fairly rigid standard of similarities that may be required of the State if its effort is to establish the existence of a common offender by the mere similarity of offenses.

But, when the defendant is offering that kind of proof exculpatorily, prejudice to the defendant is no longer a factor.  And simple relevance to guilt or innocence should suffice as the standard of admissibility, since, ordinarily, and subject to the rules of competency, an accused is entitled to advance in his defense, any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made.

The court -- this is Judge Becker, again.

**USA V Koubriti, et al 01-80778**

The court thus instructed the trial court to rebalance the probative value of the evidence against the countervailing considerations, keeping in mind that prejudice to the defendant is not a factor when the defendant offers the other crimes evidence.

Interestingly, Judge Becker notes in a footnote that:

A lower standard of similarity to the defendant's proffer is additionally justified by consideration that the defendant need only engendered reasonable doubt of his guilt whereas the State must prove guilt beyond a reasonable doubt.

The Court, Judge Becker, then goes on and he hashes through a number of other cases all to the same point, particularly, on the point of the lower standard of similarity required when it is the defendant who is offering this reverse 404(b) evidence defensively as opposed to the government offering it offense civil.

I'm not going to read -- Judge Becker goes on at great length about the government's theories, some of which are similar to Mr. Corbett's theory, particularly, the dissimilarity between the charge and the instant -- and the

issues in the instant identification issue.

However, Judge Becker finishes up by saying:

Based on our survey of the case law, we believe that the district court imposed too stringent a standard of similarity upon Stevens and that the government has unnecessarily compartmentalized the permissible uses of 404(b) evidence. It is well-established that the defendant may use similar other crimes evidence defensively if, in reason, it tends, alone or with other evidence, to negate his guilt of the crime charged against him. Citation omitted.

In our view, the most persuasive treatment of the reverse 404(b) evidence issue is found in car fellow where in the New Jersey Supreme Court observed a lower standard of similarity should given reverse 404(b) evidence because prejudice to the defendant is not a factor.

We agree with the reasoning of *Garfole* and with its holding that the admissibility of reverse 404(b) evidence depends upon a straightforward balancing of the evidence,

**USA V Koubriti, et al 01-80778**

probative value against considerations such as undue waste of time and confusion of the issues.

Recasting this standard in terms of the Federal Rules of Evidence, we, therefore, conclude that a defendant may introduce reverse 404(b) evidence, so long as it's probative value under 401 is not substantially outweighed by 403 considerations.

The court when went on to apply that test to the facts presented to it in Stevens and found that Mr. Stevens should have been permitted to present Mr. Mitchell's identity testimony.

This case has much of the issues that we have here. Although the underlying identification issues may not be identical, there are certainly logical inferences that are raised by a person who, two years previously, had been involved in the illegal trafficking of cigarettes without a precise charge, and two years later when he shows up with a mentally deficient person at Sam's Club for the purpose of buying $3,000 worth of cigarettes.

Although the issues may not be identical, given the low threshold of Rule 401 and 402, and the relevance standard, I believe that the logical inference is sufficient

**USA V Koubriti, et al 01-80778**

to support a finding of relevance.

The only question then remaining to the defendants' proffer of the judgment of conviction, is whether the judgment, itself, is reliable and trustworthy.

I believe that both under 803(22) and under any other principles of permitting extrinsic evidence, be it a judgment or a statement or anything else, a charge that has been reduced to a judgment of conviction, probably bears amongst the highest degree of trustworthiness and reliability, because you have a defendant coming in and either having been convicted beyond a reasonable doubt of the underlying charge or having confessed to it, as in the case of Mr. Zaia, who confessed to it by plea.

I also note that there is extrinsic corroborative evidence of Mr. Zaia's activities in the evidence that Officer Stasch gave.

Although that Officer Stasch's testimony of Mr. Zaias' conversation was not completely inculpatory, as I indicated in my analysis of the 804(b)(3) statement against interest requirements and Officer Stasch's testimony, it certainly puts Mr. Zaia at a place at which a substantial amount of cigarettes was being purchased illegally.

And I believe that the judgment against Mr. Zaia is sufficient evidence -- sufficiently reliable evidence that Mr. Zaia, himself, was involved in the illegal trafficking of

cigarette products.

So for all of these reasons, I am going to permit the defendants to introduce the judgment of conviction of Mr. Zaia.

Mr. Corbett, have you been able to craft a limiting instruction that you would like?

MR. CORBETT: No, Your Honor. I want to address two things on that.

One, I understand the Court's ruling. I'm not going to belabor it.

THE COURT: That always means that you are.

MR. CORBETT: I'd like the opportunity to introduce the count to which he plead guilty, so this jury knows exactly what he admitted doing as opposed to some vague --

THE COURT: I think that can be part of the limiting instruction that I give.

So if you could --

MR. CORBETT: I will.

THE COURT: -- craft.

MR. CORBETT: Find the count he plead guilty to. Now I'll look for probably something along the lines of standard.

THE COURT: He plead guilty to Count One.

MR. CORBETT: I'll get a copy of that before the

USA V Koubriti, et al 01-80778

Court. We'll bring that in.

As I said, in terms of a limiting instruction, I'll -- since it's now coming in under 404, I'll look to *Devitt & Blackmar* 404 instructions try to come up with something pretty much a pattern jury instruction.

I would ask that be given in regular jury instructions, not separately at the time that the motion is made to offer the --

THE COURT: You don't want it given contemporaneously with the introduction of the judgment?

MR. CORBETT: No.

THE COURT: All right.

MR. CORBETT: I will, also, look to mark as an exhibit, the count of -- the actual count to which he plead guilty from the Indictment, as part of the government's rebuttal case.

THE COURT: It depends how long it is. If we can summarize it.

MR. CORBETT: We may be able to.

THE COURT: All right. Mr. Helfrick?

MR. HELFRICK: Okay. So we're going to introduce this exhibit.

We'd like to -- I don't know if there's an objection to the introduction of these maps or not. We got a map of Amman, Jordan, yes, Your Honor.

And we have a map, basically, of take your pick either the Middle East or a harden bunker.

THE COURT:  Or Michigan.

MR. HELFRICK:  I don't know if there's objection to these two exhibits or not.

THE COURT:  I must say that notation on the bottom looked as much to me like it could be Michigan as it could be the Middle East, but.

MR. HELFRICK:  So, I mean, I don't know if they want to object to these.  I would rather prefer they just be introduced.

MR. CORBETT:  I was going to ask the expert from *Rand McNally* to verify that.

THE COURT:  I could take judicial notice of it.

MR. HELFRICK:  We can introduce these without objection.

Then we have, I think lastly, is a stipulation regarding the Sky Chef records.

The Government has some objections to the language of the stipulation which we have agreed to change.

But I can I think read it and then when it goes to the jury, while have a clean copy with the change that they requested.

THE COURT:  Then you're done.

MR. HELFRICK:  Then we're done.

USA V Koubriti, et al 01-80778

**THE COURT:** Okay. The government will be prepared to call it's first rebuttal witness?

**MR. CORBETT:** As soon as -- I take it Mr. Swor wanted to take up a witness issue which we'll deal with that the first witness won't be the one, but it will be the second witness.

**MR. THOMAS:** Can we know who it is?

**MR. CORBETT:** Who the first witness is we're going to call? He's not here. Matt Meyers to the stand about some photographs he took.

**THE COURT:** Matt Meyers?

**MR. CORBETT:** The FBI agent's already testified. He took some photos of pay phones outside the Arabian Village.

**THE COURT:** Okay.

**MR. CORBETT:** That will be five minutes.

**THE COURT:** Okay.

**MR. CORBETT:** The second witness is a government expert.

Now I believe that's Mr. Swor's.

**MR. SWOR:** We've had more than a passing interest as to whether or not the government was going to attempt to call an expert in rebuttal.

And I have been asking for several days. Today's Wednesday, at least Monday and Tuesday, whether the

USA V Koubriti, et al 01-80778

government was going to call an expert witness.

THE COURT:  More whining, Mr. Swor?

EUFPLT 5:  No, it's not whining.

MR. THOMAS:  Do you have the sign?

THE COURT:  Are you simply going to say you haven't had enough notice?

MR. SWOR:  We have asked --

THE COURT:  I understand it this is a witness who has been on the government's witness list from the beginning.

MR. SWOR:  Actually, he's not on the Government's Witness List.  I checked.  He was -- we were told originally that he might be an expert.

We have received no summary from this person when I asked yesterday the Government told me they didn't know at 4:30.

MR. THOMAS:  We should know who it is first.

MR. SWOR:  I assume it's k-a-l-e-d-a-b-l-u-b, e-l-f-a-d-u.

THE COURT:  From California?

MR. CORBETT:  Yes.  UCLA.

MR. SWOR:  At 4:30, I called Mr. Corbett's office, was told the government still didn't know if they were going to call an expert.  I left my cellphone number to be called in case and I left it on until 9:00.

**USA V Koubriti, et al 01-80778**

**THE COURT:** What I want to know is, what is this witness going to rebut that could not possibly have been foreseen in the testimony of the other witnesses?

**MR. CORBETT:** Well, Your Honor, actually, I wish Mr. Convertino were here, since he's the one proffering him. I think I'll be able to suggest some things to the Court.

One of the issues, it seems to me, that has developed in connection with the experts, both in terms of presentation and cross examination has been who listened to what tapes, who listened to how many tapes, who sampled how many tapes.

This witness has listened to every single tape, all 105 entirely. And this witness is prepared to rebut some of the assertions made on the basis of sampling and other statistics taken by the defendants in their case.

The decision as to ultimately whether or not we were going to call him, I will tell the Court this morning, there is a, perhaps, a potential disagreement in the prosecution team as to that. But the matter has been resolved and it is now anticipated he will be called.

**THE COURT:** I think the jury will be overjoyed to hear another expert on Islamic fundamentalism.

**MR. CORBETT:** I understand he's going to be focused, in large measure, on the 105 tapes and his evaluation of the tapes and the tapes alone.

USA V Koubriti, et al 01-80778

THE COURT:  Is he going to testify about the politics of Mr. Kousi?

MR. CORBETT:  That's the main trust of his testimony, Your Honor.

MR. SWOR:  That was brought out in their case in chief.  That was the sampling issue that was addressed with their expert who said it was a valid method of proceeding.  This is, in essence, impeaching their own case.

Rebuttal evidence is evidence presented to rebut new evidence if it's new under all the facts and circumstances.

The evidence was not fairly and adequately presented to the trier of fact before defendant's case in chief.

The only thing we did with our experts was respond and we were very circumscribed about it.  That was to respond to the questions posed to Mr. Fadl and responded to by Dr. Phares.

Dr. Hallaq -- we absolutely went there with Dr. Haykel.  We went a little bit more in terms of history.  But simply because of his background, but it was still that --

THE COURT:  Haykel.  You said Hallaq said one thing that probably would open up rebuttal, which may be the critical issue and the only critical issue arising out of

USA V Koubriti, et al 01-80778

these tapes; and that is, he testified that Mr. Kousi was the ultimate pacifist. Now Hallaq didn't necessarily agree with that. But he did put a different gloss on Mr. Kousi then did the government's expert.

My view is all of this is fairly inconsequential in the long run to the jury's consideration of the case.

Because Mr. Haykel testified -- and I found him a very credible witness, testified, ultimately, that radical fundamentalists who were so inclined to take and distort some of the preaching, for lack of a better word, in these tapes, could, in fact, use those for their own means and for whatever purpose they wanted. I think, fairly stated, that's the bottom line on Dr. Haykel's testimony.

If I were the government, I'd be satisfied to leave it there, but I'm not trying the case.

**MR. SWOR:** Well, I think under 403, the Court could make --

**THE COURT:** It still leaves open the question of some other expert's view of Mr. Kousi.

Frankly, Mr. Swor, in case anybody hadn't noticed, my -- with a few exceptions, my policy in this case has to err on the side of admitting evidence, rather than not admitting evidence and let the jury work it all out.

The issues presented by the tapes are, at best, corroborative, at the very best, and I'm not even sure

raising it to that level of dignity is appropriate.

But at the very best, the issue of the tapes are, at best, corroborative of the government's underlying theories, at best.  Yes?

MR. HELFRICK:  Your Honor, the only point I was going to add about this is, that, you know, my recollection anyway of the testimony is, there's yet to be any testimony that any defendant has listened to these tapes.

THE COURT:  There is one piece of evidence that negates that, Mr. Helfrick, and that is the fact that Mr. Hannan's -- I believe it was Mr. Hannan's -- I'm sorry, it wasn't Mr. Hannan's name, it was Mr. Al Farouk's (sic) name was on the box in which the tapes were contained.

MR. HELFRICK:  Which may show possession of ownership, Your Honor.  But there's still yet --

THE COURT:  You would admit that there is a logical inference between possession, ownership and use?

MR. HELFRICK:  It's conceivable, but I think there's still yet to be a witness who has said that any defendant in this case listened to the tapes.

THE COURT:  Let me ask you a question, Mr. Helfrick.

MR. HELFRICK:  Yes, sir.

THE COURT:  Do you have a collection of tapes or CD's?

**USA V Koubriti, et al 01-80778**

MR. HELFRICK:  Yes, I do so does --

THE COURT:  If they were found in your car, would it be fair a fair inference at some point you may have listened to that tape or CD?

MR. HELFRICK:  But I think a better analogy is --

THE COURT:  Wouldn't you?

MR. HELFRICK:  I have children.  And my children have CD's and tapes.  They have them in their room.

And would you infer that I listened to their CD's?

THE COURT:  The difference between that and this case, the name of one of the defendants is on there, that's the difference.

MR. HELFRICK:  I understand it.

My only point with allowing yet another expert to come in --

THE COURT:  I think it's good argument to the jury, but it's not legally sufficient to keep the evidence out.

I'm, obviously, not trying this case.  This is the government's decision to try the case, it's the government's strategy.

I told you all the other day what I thought about this jury hearing one more word of evidence about some expert's view of Islamic fundamentalism and the speakers on the tape.

USA V Koubriti, et al 01-80778

However, counsel are free to disagree with me.  And I'm not going to preclude counsel from presenting its case.  My own view of whether it's helpful or not, I suppose, is irrelevant.

MR. HELFRICK:  Just one final point on this; that is, as the Court knows, there was some point at which you indicated that Professor Phares had to stop listening to the tapes.  He was going to be limited to those tapes.

Now the Government has someone else who now they're saying has listened to all 105 tapes.

And, you know, we are then now put in the position --

THE COURT:  The problem is that for whatever reason and for whatever weight it's worth, Mr. Kousi, himself, and his politics, have become an issue.

MR. SWOR:  I'm sorry, Your Honor, that came in only in the government's case when they put in that expert tape.

THE COURT:  No, no, Mr. Swor.  It came in most recently in Mr. Hallaq's testimony.

MR. SWOR:  I understand that was in response to the comment.

THE COURT:  Enough.  I've ruled.

Anything else we need to sort out?

MR. CORBETT:  No, Your Honor.

USA V Koubriti, et al 01-80778

The one thing we're not sure yet whether it will be Agent Brennan or Agent Meyers about the photographs.

**THE COURT:**  As long as one of them can lay a foundation.  As long as one of them can lay a foundation.

**MR. CORBETT:**  I can't imagine.

**THE COURT:**  Is this a photograph --

**MR. CORBETT:**  We haven't developed that technology yet.  We're working on it.

**THE COURT:**  Just wanted to know what probative value this photograph was going to have.  But.

All right.  Can we bring the jury back and go through the issues?

**MS. RABEN:**  Can we have five minutes?

**THE COURT:**  Let's take a break.  I didn't ask the question and I guess experience in this case has taught me that I should ask every question.

Will the government have additional evidence?

**MR. CORBETT:**  Other than the two witnesses?

**THE COURT:**  Other than those two witness.

**MR. CORBETT:**  No, Your Honor.

**THE COURT:**  Okay.

(Whereupon at 11:08 a.m. court was in recess)

Mr. Convertino or Corbett, tell defense counsel what this professor from UCLA is going to testify to.

**MR. CONVERTINO:**  Judge, just, just -- I will do

**USA V Koubriti, et al 01-80778**

that.

But -- this is the -- this professor has a CV and his information about what he would testify to has been turned over, I think it was December of 2000.

THE COURT:  Is this the fellow who was sick you weren't sure you were going to be able to have him?

MR. CONVERTINO:  Yes.

THE COURT:  We've talked about this.  We talked about him.

MR. THOMAS:  We have a CV?

THE COURT:  Not only do we have a CV, I remember conferences in which we talked about him.

I remember Mr. Convertino specifically telling us they didn't know whether he was going to be well enough to come to travel here.  I remember that specifically, so --

MR. HELFRICK:  They were still cut off on the number of tapes we'd have to be prepared for.

THE COURT:  He's going to be testifying?  You weren't in the courtroom, Mr. Convertino.

MR. CONVERTINO:  No, sir.

THE COURT:  I indicated he would only be permitted to testify on a very limited range of issues.

MR. CONVERTINO:  Yes, sir.

THE COURT:  That range of issues being Mr. Kousi, the preacher's policy -- politics, rather, and whether or

**USA V Koubriti, et al 01-80778**

not the excerpts presented by the government, and for that matter, by the defense, misrepresented the entirety of the tapes.

I think that for, those reasons only, that would be helpful to the jury. I'm not sure any of this is going to be helpful to the jury.

But to the extent anything could be helpful to the jury only on those two issues, okay?

(Whereupon court was in recess at 11:03 a.m.

The Court was back in session at 11:35 a.m.

and the following was held outside the

presence of the jury)

**THE COURT:** When are you going to get the proposed jury instructions? I thought that was going to happen on Monday.

**MR. CORBETT:** We went over them internally, revised a number of them. We'll have it to them today.

**THE COURT:** When are we going to have our charging conference? I'm out of the box on Friday, so --

**MR. THOMAS:** I have a funeral Thursday.

**THE COURT:** Mr. Thomas has a funeral on Thursday.

**MR. HELFRICK:** I have a sentencing tomorrow morning.

We don't have any jury instructions yet, do we, proposed?

**USA V Koubriti, et al 01-80778**

THE COURT:  Nope.

MR. CORBETT:  As I said, we'll have ours today. We'll give copies to the Court and defense counsel today.

THE COURT:  Well, I'd like to think there would be few disagreements, but I somehow doubt that would be the case.

MR. THOMAS:  Could use Judge Duggan's rule, you will agree.

MR. CONVERTINO:  Judge --

THE COURT:  Not a bad idea.

MR. CONVERTINO:  -- I'd like to ask permission under Rule 611 to ask more leading questions to foundational questions.

THE COURT:  To limit the scope?

MR. CONVERTINO:  Yes, and in particular, the background of the professor, so we're not --

THE COURT:  That will expedite it.  All right. Let's not spend a half-hour on his background either.

(Whereupon the jury was brought into the courtroom)

THE COURT:  Counsel satisfied the jurors are in place?

MR. SWOR:  Yes, Your Honor.

MR. HELFRICK:  Yes.

THE COURT:  All right.  Mr. Helfrick.

MR. HELFRICK:  Yes, Your Honor.

USA V Koubriti, et al 01-80778

At this time, we would ask the Court to admit Defendant's Exhibit double R, which is a judgment of conviction of Thamir Zaia on October 28, 2002, reflecting his conviction for unlawful transportation and possession of contraband cigarettes in 1998.

THE COURT: Okay. For the reasons I've indicated, earlier, I'll admit that.

MR. HELFRICK: And, Your Honor, at this time, we would move, I understand without objection, Defendant's Exhibit triple capital F, which is a map of Amman, Jordan.

THE COURT: Without objection, triple capital F is admitted.

MR. HELFRICK: Without objection, Defendant's Exhibit triple capital G, which is a map of the Middle East.

THE COURT: Triple G. Map of the Middle East is admitted.

MR. HELFRICK: And we have a stipulation as to the LSG Sky Chef records.

THE COURT: Okay.

MR. HELFRICK: If I could, we've agreed and stipulated that in the keeper of the records of LSG Sky Chef Detroit facility were called to testify, he or she would say that as the keeper of records, a search was conducted for all records relating to the employment of Ahmed Hannan and Karim Koubriti, as they were employed at Sky Chef Detroit

USA V Koubriti, et al 01-80778

facility from May 16, 2001 through July 5, 2001.

That on July 6th 2001, they were discharged.

And that these records were made and kept in the ordinary course of doing business and those records are reflected in exhibit triple capital H.

THE COURT: Okay. And the records are stipulated to as well?

MR. HELFRICK: Yes, Your Honor. Triple capital H.

Yes, Your Honor. With that, the defense rests.

THE COURT: All defense counsel rest as well?

MR. THOMAS: That's right, Your Honor.

MR. SWOR: Yes, sir.

THE COURT: Mr. Morgan?

MR. MORGAN: Yes, sir. I think Rule 26 might require renewal of the motion, but just for the record, that's done.

THE COURT: Okay.

MR. THOMAS: So join.

MS. RABEN: So join.

THE COURT: Record will indicate defendants have preserved Rule 29. All right.

Back to the government. Any rebuttal?

MR. CONVERTINO: Yes, sir. Judge, the government calls Special Agent Matthew Meyer.

Mr. Meyer, you've testified previously. You are a

USA V Koubriti, et al 01-80778

resident photographer; is that right?

THE WITNESS:  Yes, sir.

THE COURT:  I'll readminister the oath.

(Whereupon the witness was then sworn)

**REDIRECT EXAMINATION**

BY MR. CONVERTINO:

Q    Morning, sir.

A    Morning.

Q    Tell us your name, please.

A    Matthew R. Meyer.

Q    Are you a Special Agent with the FBI?

A    Yes, ma'am.

Q    Sir, during the course of this trial, have you had an occasion to go to the Arabian Village, the area in front of the Arabian Village and take photographs?

A    I have.

Q    Could you tell us, specifically, where you took photographs and of what?

A    Proximate area was on Dix Avenue.

MR. MORGAN:  Judge, was there a date to that?

THE COURT:  Yes.  If you could provide the date that you did this.

THE WITNESS:  It was Saturday, May 10th.

MR. SOLES:  Of what year?

THE WITNESS:  Of 2003.

**USA V Koubriti, et al 01-80778**

**Matthew Meyer-Redirect Exam/Mr. Convertino-Govt.**

BY MR. CONVERTINO:

Q    I'm sorry, sir.

A    The area it was on Dix Avenue, between Salinas and Wyoming.

Basically, that area's considered the Arabian Village center.

Q    What did you take photographs of?

A    I took photographs of that block, specifically, looking at that area, to determine whether there were any other paid telephones located in that block.

Q    May I approach the witness, Judge?

Sir, I've handed you four copies of photographs, the first one marked Government Exhibit 78, second is 78A, third is 78C and 78D.

Do you have those in front of you, sir?

A    Yes, I do.

Q    Starting with 78A, who took that photograph?

A    I took the photos.

Q    And where is the photograph taken from?

A    The photograph is taken across the street, across Dix Avenue from the Arabian Village.

Q    And is that --

A    A restaurant.

Q    And is that Government Exhibit 78, for identification, a fair and accurate representation of the scene the day you

**Matthew Meyer-Redirect Exam/Mr. Convertino-Govt.**

took the photograph?

A    Yes, it is.

Q    Taking in front of you what's been marked for identification 78A.

Do you see the 78A for identification?

A    Yes, I do.

Q    Can you tell us what that is a photograph of?

A    That 78A, is, again, a photo looking across Dix Avenue at the Arabian Village Restaurant.

Q    Is that a copy of the photograph depicted in 78A, a fair and accurate depiction of the scene the day you took the photograph?

A    Yes, it is.

Q    Take in front of you what's been marked for identification 78C.

A    Yes, sir.

Q    Could you tell us what that is?

A    It's a photo of the corner of Dix Avenue and Salinas. There's a telephone, public pay telephone, located on that corner.

Q    Is that a copy of the photograph depicted in 78C, a fair and accurate representation of the photograph you took of the scene as it was on the day you took it?

A    Yes, it is.

Q    I'd like you to take before you what's been marked for

**USA V Koubriti, et al 01-80778**

**Matthew Meyer-Redirect Exam/Mr. Convertino-Govt.**

identification Government's Exhibit 78E.

Do you have that in front of you, sir?

A    Yes, I do.

Q    On top of the photograph, on the top portion of the photograph, there are appears to be copies of Post-It Notes with handwriting.

Do you see that?

A    Yes, I do.

Q    Whose handwriting is that?

A    It's my handwriting.

Q    Why did you put Post-It Notes and handwritten notes on it?

A    It's a bit unclear in looking at the picture to determine where the areas are located.

For instance, it was difficult to see from the photo that I took where the telephone was located, approximately, four stores down from the Arabian Village Restaurant.

Also, pointing out what location the Arabian Village Restaurant was in the picture.

In addition to pointing out the location of the pay telephone located on the corner of Salinas and Dix.

MR. CONVERTINO:  Judge, move into evidence previously marked for identification Government Exhibits 78, 78A, a, as in Alpha, 78C, as in Charlie, 78E, as in echo.

**USA V Koubriti, et al 01-80778**

Matthew Meyer-Redirect Exam/Mr. Convertino-Govt.

THE COURT: Any objections?

MR. THOMAS: No.

MS. RABEN: No, Judge.

THE COURT: Without objections, we'll admit those photographs.

BY MR. CONVERTINO:

Q    I'd like to put up 78A on the overhead.  See if you can identify this, sir.

MS. RABEN: I'm sorry, Mr. Convertino.  Which one is this?

MR. CONVERTINO: 78A.

BY MR. CONVERTINO:

Q    Is that right, sir?  Is that 78A?

A    Yes, it is.

Q    This is looking at the Arabian Village from across the street.

Is that right, sir?

A    That's correct.

Q    You have up on the Elmo 78C.

Is that accurate, sir?

A    Yes, it is.

Q    Tell us what that is.

A    That's a photo of the public pay phone at the intersection of Salinas and Dix.

Q    Is that the public phone that I'm pointing to with the

USA V Koubriti, et al 01-80778

**Matthew Meyer-Redirect Exam/Mr. Convertino-Govt.**

laser, sir?

A    Yes, it is.

           And it is -- you can see it's sitting just on this side on the east side of Salinas.

Q    And where is the Arabian Village; down in this area or to the left or to the right of the pay phone?

A    If you're looking at the photo, it's to the right.

           It's the second awning over is the Arabian Village.

Q    I'm going to put up on the screen what's admitted as 78A.  I'm sorry.  78.

           Do you see 78 on the Elmo, sir?

A    Yes, sir.

Q    Could you tell us -- I'm pointing to the laser to the center of the screen right in front of the minivan.

           Is that the pay phone you were taking a photograph of?

A    Yes, it is.

Q    Could you tell us, looking from my vantage point directly in front of this photograph, is the Arabian Village to the left or to the right of that pay phone?

A    Looking at the photo, the Arabian Village would be to the left, approximately, I think it's four stores, not exactly sure.

Q    I'm going to put up on the Elmo what's been admitted as

**USA V Koubriti, et al 01-80778**

Matthew Meyer-Redirect Exam/Mr. Convertino-Govt.

Government's Exhibit 78E.  That's the photograph with your handwritten notes on it.

Sir, is that -- do your handwritten notes reflect the telephones as you -- from the vantage point that you took the picture?

A    Yes, it does.

Q    Are you aware, base upon a check, whether or not those pay phones, the phone on Salinas and Dix and the phone four stores down from the Arabian Village, West of Dix, were those pay phones in operation in that location --

MR. SOLES:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. CONVERTINO:

Q    -- in 1991?

A    In?

Q    I'm sorry.  2001?

A    Yes, they were.

THE COURT:  Can you lay a foundation for this, how you came to know that, sir?

THE WITNESS:  We had spoken to individuals at the phone company to determine whether those telephones were activated.

MR. HELFRICK:  Judge, we're going to object to this hearsay.

THE COURT:  Keep going.

USA V Koubriti, et al 01-80778

Matthew Meyer-Redirect Exam/Mr. Convertino-Govt.

THE WITNESS:  We -- it was determined that the one phone was activated 1992, the other one was activated 1998.

MR. CONVERTINO:  Thank you, sir.

I've no further questions.

THE COURT:  Did you attempt to lay a foundation -- purposes of laying a foundation, did you ask the phone company to provide any records for you to produce --

THE WITNESS:  It's my understanding --

THE COURT:  -- to review --

THE WITNESS:  No.

THE COURT:  -- as to the installation of these phones?

THE WITNESS:  No, sir.  We just spoke to them on the phone.

THE COURT:  I'm afraid it is hearsay.  I'm going to order the jury to disregard as to the activation dates. I don't know it's offered to prove when they were activated, that's the only possible relevance it would have.  He didn't review any records.

Order the jury to disregard when these phones were activated.

Anything, Mr. Helfrick?

MR. HELFRICK:  Yes, Your Honor.

USA V Koubriti, et al 01-80778

**Matthew Meyer-Recross Exam/Mr. Helfrick-Koubriti**

### RECROSS EXAMINATION

BY MR. HELFRICK:

Q   Agent, when you went out there on -- last week Saturday, right?

A   Yes, sir.

Q   Okay.  And you saw these three phone calls (sic) did you call anybody on these them and ask them to call you back there?

A   I saw three phones in those areas as they are marked. I did make calls from those phones.

The one at the time I had to return, make the call again on Monday.

But I was able to make calls from those phones, yes.

Q   Were you able to receive calls at those phones?

A   Sir, when I made calls to those telephone numbers, first one I made a call to was the phone located at the Arabian Village.

When I called attempted to contact that number, I heard what sounded like a fax noise.  I understand the testimony of the individual who said he installed that phone previously to allow incoming calls.

I then called the other numbers.  I got a ring and a similar sound when I contacted those phones.

The phones that's located on Dix, as well as

**USA V Koubriti, et al 01-80778**

**Matthew Meyer-Recross Exam/Mr. Helfrick-Koubriti**

the phone located on Salinas and Dix.

Q    When you contacted the phone companies, did you ask them for records indicating when, if ever, these phones had been, if ever, switched over to receive incoming calls?

A    The contact with the phone company -- we were told that they were not able to determine whether the phones were set up to receive incoming calls or not.

MR. HELFRICK:  Okay.  I've no further questions.

THE COURT:  Any redirect?

MR. CONVERTINO:  No, thank you.

THE COURT:  All right.  Any questions from our jurors?

Thank you.

(The witness was then excused at 11:50 a.m.)

THE COURT:  Next witness, please.

MR. CONVERTINO:  Governments calls Dr. Khaled Abou El Fadl.

THE COURT:  Step up here, sir, please.

(Whereupon the witness was then sworn)

THE COURT:  You would be seated.  Please, give and spell your full name.

THE WITNESS:  My first name is Khaled, spelled K-h-a-l-e-d.

Last name is El Fadl.  Spelled a-b-o-u, space, capital E l, space, capital F-a-d-l.

**USA V Koubriti, et al 01-80778**

Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.

THE COURT: Okay, thank you.

**DIRECT EXAMINATION**

BY MR. CONVERTINO:

Q    Morning, sir.

A    Morning.

Q    Sir, could you tell us what you do?

A    I'm a professor of law at UCLA School of Law.

Q    How long have you been at UCLA School of Law?

A    Five years.

Q    What is your area of specialty, sir?

A    Islamic law, Middle Eastern law, as well as other areas.

Q    Sir, did you previously have 13 years of systematic instruction in Islamic law in Egypt?

A    Yes, I did.

Q    Are you a graduate of American School of Kuwait, receiving a diploma in 1982?

A    Yes, I am.

Q    Did you receive a baccalaureate of arts degree in political science in May of 1986 from Yale University?

A    Yes, I did.

Q    Did you receive a J.D. or law degree from the University of Pennsylvania Law School in May of 1989?

A    Yes, I did.

Q    Professor, did you receive a Master of Arts in Islamic

USA V Koubriti, et al 01-80778

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

law in June of 1992 from Princeton University?

A    Yes, I did.

Q    Sir, did you receive your Ph.D. in near eastern studies doing a dissertation on *Islamic Law Of Rebellion* in 1999, April 1999 from Princeton University?

A    Yes, I did.

Q    Next year, sir, did you accept a position for the next academic year as a full professor at Yale University School of Law?

A    Yes, I did.

Q    Could you tell us, sir, do you have an area of expertise within your area of studies?

A    I specialize both in research, research and writing and lecturing in Islamic law and Islamic movements.

Q    When you say "Islamic movements"  Could you tell us what you mean by that?

A    Particularly Islamic intellectual history, the ideas and movement of ideas and various groups that have different ideas and substantively what these ideas are.

Q    Can you tell us, sir, based upon your personal experience and your academic experience, how much of your life has been devoted to that area of study?

A    Pretty much all of my life, except for the years where I was too young to comprehend anything.

MR. CONVERTINO:  May I approach, judge?

**USA V Koubriti, et al 01-80778**

Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.

THE COURT:  You may.

BY MR. CONVERTINO:

Q    Sir, I've hand you what's been marked for identification Government Exhibit 82.

Do you have a document marked for identification Government Exhibit 82 in front of you?

A    Yes, I do.

Q    Could you tell us what that document is?

A    It's my CV.  It lists of degrees, degrees, publications and partial list of employment and lecturing.

Q    It's roughly 15 pages long; is that right?

MR. CONVERTINO:  Judge, move into evidence what's been previously marked for identification Government's Exhibit 82.

THE COURT:  Without objection.

MR. SWOR:  I assume I've no objection.  I'd just like to see it.

MR. CONVERTINO:  Sorry.  This is his previous CV.

MR. SWOR:  Same one?

MR. CONVERTINO:  It's the same one.

THE COURT:  Okay.

BY MR. CONVERTINO:

Q    Sir, have you ever consulted with the United States Government regarding terrorism or radical fundamentalist groups?

USA V Koubriti, et al 01-80778

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

A    I have.

Q    Have you ever testified before or spoken before regarding radical or fundamentalist groups?

A    I have.

Q    Have you ever testified in court before, sir?

A    Yes, I did.

Q    Have you ever testified as an expert witness in court?

A    Yes, on many occasions.

Q    Could you tell us, sir, have you ever testified as an expert witness on behalf of the defense before?

A    On behalf of defendants, yes.

Q    Can you tell, sir, are you getting paid for your testimony here today where your work involved in reviewing things in this case?

Are you getting paid for that?

A    No, I'm not.

Q    Sir, I want to draw your attention to a series of tapes that you were provided, 105 tapes that you were provided.

Could you tell us, sir, of the 105 tapes --

MR. MORGAN:  Could we have a date, judge?

THE COURT:  Date, please.

BY MR. CONVERTINO:

Q    When were you provided the tapes?

A    I think I was provided the tapes -- I think it was sometime in February.

USA V Koubriti, et al 01-80778

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

THE COURT: Of which year?

THE WITNESS: Of -- sorry. 1993 (sic).

MR. MORGAN: 1993?

MR. CONVERTINO: You said 1993. You didn't mean that.

THE WITNESS: Oh we're -- we're in 1993, right?

MR. CONVERTINO: Yes, we are. I'm sorry. 2003. Yes.

THE COURT: You've been studying ancient history too long.

THE WITNESS: Yes. I'm just off by a decade, that's all. No. 2003. February 2003.

BY MR. CONVERTINO:

Q    I thought we were in 1991 one witness ago.

2003 February, thereabouts, you received 105 tapes?

A    Yes.

Q    Could you tell us, sir, of the 105 tapes, did you receive transcripts that went along with the tapes?

A    Yes, I did.

Q    Did you read all the transcripts?

A    No, I didn't.

Q    Why didn't you read all the transcripts that you were provided?

A    I started skimming some of the transcripts and then was

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

not satisfied with how much I was gaining from them. Providing partial picture.

Q    What did you do as a result of not receiving or only receiving a partial picture, as you said, from the transcripts?

A    I listened to the tapes.

Q    Of the 105 tapes, how many tapes did you listen to?

A    I listened to all the tapes that were provided to me.

Q    Could you tell us, sir, did you listen to the tapes more than one time?

A    I went through them once.

I started listening to some of the tapes that I thought were particularly interesting again.

Q    Could you tell us, sir, when it was that you became aware that you would be called as a witness in the rebuttal case?

A    When I knew that, in fact, I -- I guess, really, just yesterday.

Q    You came in from California for the purposes of your testimony?

A    Yes, I did.

Q    I want to ask you, sir, about the -- do you recall who the speaker on the tapes was?

A    A fellow by the last name of Al Kousi.

Q    Kousi?

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

A    Kousi.

MR. MORGAN:  What was the first name?

BY MR. CONVERTINO:

Q    What was his first name, please?

A    I think his first name is Mohammed.  He's rather -- I just know him as Al Kousi.

Q    The person who we're speaking, Kousi, you heard of him before you had received the tapes?

A    In the field, I've heard his name.  But didn't acquire any substantive information about him.

Q    Did you, did you go back and attempt to acquire more information about him?

A    Right.

After that, after receiving the tapes I was interested in knowing a bit more about who this speaker who speaks in the majority of the tapes not all the tapes.

Q    What did you find out about the person who was speaking on the tapes, Al Kousi.

A    What I was able to find out is he is normally thought of as Wahhabi, Wahhabi.  Wahhabi.

Q    What is a Wahhabi, sir?

A    Wahhabi is belonging to the school of Mohammed Abdel Ahab.

A Puritan, in my view, extremist Puritan quite fanatic school that emerged in the 18th Century in Saudi

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

Arabia.

And Al Kousi is known as the follower, as a follower of this school.

Apparently, he had lived for some years in Yemen, some years in Saudi Arabia, known among Islam's in Arabia as one of the primary Wahhabi advocates, is the way I put it.

Q    Is there a relationship between Wahabis and Salafis?

A    The Wahabis are keen -- well, Wahabis don't refer to themself as Wahabis.  They consider that demeaning to them.

They refer to themselves as Salafis as in fact the true Salafis.

Q    Are you able to draw an opinion as to whether this person, Al Kousi, would you consider -- well let me ask you. Would you consider him based upon what you've heard what you know, the ultimate pacifist?

A    No.

Q    Would you consider him a moderate?

A    Not by a long shot.

Q    How would you characterize Al Kousi, sir?

A    Al Kousi falls squarely within the Wahhabi school, as I mentioned.

He is -- he reflects classic reflection of Wahhabi fanaticism Puritanism, literalism, what I consider to be quiet an extremist theological position in Islam.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

Q    Can you tell us, sir, based upon your review of the tapes -- of all of the tapes, how would you characterize the tapes?

A    They are squarely within what I would expect from a -- within a Wahhabi discourse.

In other words, they're really vintage Wahhabi type of indoctrination and theological -- theological discourse.

Now the -- as part of that, I'll describe the tapes in substance, that the doctrines advocated are Puritanical, extremist ill tolerant.  And quite, in my view, fanatic.

Q    Sir, have you had an opportunity to review the government's exhibits of portions of the tapes that were admitted into evidence in this case?

A    Which exhibits are you referring to?  I'm sorry.

Q    I'm going to hand you what's been admitted into evidence as 51, 51A, 51 B, 51 C, D, E, G, H, I, J, K, L, M, N, and O.

A    Yes, I reviewed these documents before.

Q    They're familiar to you?

A    Yes, they are.

Q    Have you had an opportunity, sir, to listen each of those tapes and listen to them in context with the excerpts that were taken?

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

A    I listened to the tapes before I reviewed these documents.

So I have to think about these documents in the context of the tapes that I had listened to already.

Q    Well, could you tell us, based upon your review of the tapes, are any of those exhibits that were taken from the larger body of the tape, sir, are they reflective or not reflective of the content of the tape?

A    They are pretty much -- they exemplify what is in the tape.

The tapes are long quite, often rambling and repetitive, but that's pretty much representative of what I found.

Q    Would you characterize those or could you characterize those as being taken out of context as unreflective of the position of the speaker?

A    Not in my opinion.

Q    Sir, I want to ask you about a person by the name of Mukbel Al Wadae a Sheikh by that name?

A    I'm sorry.  What?

Q    Mukbel Al Wadae?

Have you ever heard of a person by that name?

A    I don't believe so.

Q    Okay.  Let me I -- may I approach, judge?

THE COURT:  You may.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

MR. SWOR: Your Honor, this is beyond the scope.

THE COURT: This is beyond the scope that I permitted. I believe.

MR. CONVERTINO: Judge. This is referring to the document 21T.

THE COURT: 21T?

MR. CONVERTINO: Yes, that was covered on your case in chief.

I'm rebutting evidence that I believe was incorrect.

MR. SWOR: That's not rebuttal.

THE COURT: Just a moment. Let's have a side bar on this. Excuse me, sir.

(The following was held at the bench, outside the hearing of the jury)

THE COURT: This is Exhibit 21T.

MR. CONVERTINO: This was the exhibit that came from --

THE COURT: What is that he's going to testify about?

MR. CONVERTINO: The person --

THE COURT: One of the signatories?

MR. CONVERTINO: Yes. One of the signatories is mentioned in the tape as well.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

Mr. Swor brought out testimony that this is nothing but innocent political discourse regarding an election, I think he said took place in 1992.  Haykel said that.

THE COURT:  That's right.

MR. CONVERTINO:  He's going to say that that's not what it is.

I'm not going to ask him many questions about it, just, that's not what it is.

MR. SWOR:  Except --

THE COURT:  But you put it into play.

MR. SWOR:  He put it into his play on direct.

THE COURT:  You responded.  He can buttress it, I'll permit it, limited to -- I don't want lot of testimony about this entire thing.

MR. CONVERTINO:  No.

THE COURT:  Just limited to that.

MR. MORGAN:  I presume we don't get surrebuttal, an opportunity?

THE COURT:  Nobody's asked me that.

MR. MORGAN:  We could have a continuation of a week or so?

THE COURT:  No, you can't have a continuance.

But why would you presume you don't get surrebuttal?

MR. HELFRICK:  How would we know about a witness

USA V Koubriti, et al 01-80778

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

who listened to 105 tapes when they tell them they can't listen to anymore tapes.

Did you hear the tape he's talking about here when he got these tapes in February, Your Honor?

I think that's after you told him to have -- stop having Phares listen to them.

**MR. CONVERTINO:** It is not.

**MR. HELFRICK:** I believe it is.

**THE COURT:** The issue of whether or not it was a reasonable sampling of the tape was put into question by the defense and that's the purpose for which this testimony is offered.

**MR. HELFRICK:** Another thing, Your Honor, is this guy's testifying, apparently, that he had transcripts of all the tapes.

You know, where did that come from?

**THE COURT:** He didn't say he had transcripts of all the tapes.

**MR. HELFRICK:** He quit relying on the transcripts.

**THE COURT:** He didn't say he had transcripts of all the tapes. He said he was sent transcripts. He stopped reading them.

You can ask him that.

(The following was held in open court)

BY MR. CONVERNTINO:

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

Q     You have before you what's been marked as Government's Exhibit 21T.

Is that right, sir?

A     That's right.

Q     Could you tell us, sir, have you had an opportunity to review that document prior to your testimony?

A     I have.

Q     Is there a signature by Sheikh by the name of El-Bani attached to that?

A     Right.  That's the well known Sheikh El-Bani.

Q     Is there a signature by a Sheikh by the name of Al Wadae?

A     Yes.  That's right.

Q     Do you know of that person Al Wadae is it Mukbel Al Wadae?

A     Mukbel bin Hadi Al Wadae.  He's, he's, I know that he is -- Wahhabi jurist, basically.

Q     Could you tell us, in summary fashion, what that document is.

A     Well the document, at the end, designates itself as a fatwa, meaning a legal response, a legal opinion issued by the undersigned jurists.

And it says that it this response on this fatwa was issued by ad so jama (Mark) (Mark) (Mark) this is the Sal soon jama is commonly how the Wahabis refer to

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

themselves Wahabis often call themselves Ahlul Bayt.

And it says this fatwa, this response was issued, which means it was issued to Muslims at large, all Muslims.

Q    Tell us what that document means.

A    Basically, it's the jurists who -- for those who consider these jurists to be authoritative, Sheikh Mohammed El-Bani is an influential jurist, he dead now.

For people who consider these jurists to be authoritative, their opinions about what God forbids or allows and matters, it matters a lot.  Because they're supposed to have a better understanding of God's will and God's desires.

And so, basically, the fatwa is about democracies, about elections, political elections, about political activism, about secularism, about pluralism and the electoral process and the import.

The bottom line of the fatwa is that these institutions are an innovation in Islam, meaning, in this context, something evil, and something that a good Muslim should not follow or accept.

Q    Sir, are you aware of whether or not in the tapes you've reviewed, Sheikh Al Wadae -- I'm pronouncing his name wrong but the Sheikh who signed or affixed to that document, discusses whether or not is discussed you in the tapes?

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

A     He's -- if I recall correctly, he is mentioned on several occasions.

Q     Could you tell us?

A     Al Wadae.

Q     Could you tell us in what context he's mentioned in the tapes?

A     What I recall is that is that he is mentioned favorably.  A lot of the tapes -- this is an important point of clarification.

A lot of the tapes mention jurists or scholars and either say that they're mistaken or that they are heretical what they call (in Arabic)

Or they say they're good jurists, we should listen to them or learn from them because they're the real scholars.

And that's a very important theme throughout these tapes, who are the real people that you should listen to and who are the real scholars you should listen to and the people that are pretend scholars, not real scholars.

Q     Sheikh Al Wadae is one that is a real scholar, should be listened to?

A     Sheikh Al Wadae is mentioned as one of Mukbel El-Bani Al Wadae is mentioned one that should be listened to.

Q     Does Kousi discuss a relationship between Sheikh Al Wadae and Osama bin Laden in the tapes?

**USA V Koubriti, et al 01-80778**