**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

A    What I recall is, that at one point, he mentions Sheikh Mack bell receiving a sum of money.

Of course, if I recall correctly, he's referring to ream Saudi the cursory in Saudi Arabia.

I don't know exactly how much it translates. He says he received some money and its -- its I don't -- I do not believe that he explained what the purpose of this money was or what was done with this money.

Q    Who received the money and from whom?

A    The money was received, according to the tape, Osama bin Laden.

THE COURT:  I'm going to stop this here.  This is far beyond the scope that I've permitted.

It's also about triple hearsay and instruct the witness not to continue this far beyond the scope.

BY MR. CONVERTINO:

Q    Let me ask you, sir.

Could you tell us, have you conducted any research on The Internet about Salafist groups or Wahhabi groups?

A    The Internet is often -- let me put it this way.

Often, Wahhabi groups, in particular, use Internet extensively to post a lot of their response, a lot of their opinions.

And, so, you go to the Internet to sort of see

USA V Koubriti, et al 01-80778

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

what is the latest -- what are the latest issues they are focusing on, what are they think is hot and current and important.

MR. SOLES:  Your Honor, I'm going to object to testimony that comes from the Internet, because I think Your Honor has criticized The Internet and criticized --

THE COURT:  We've had testimony from, I think virtually every expert that's testified, they've relied on research from the Internet.  This isn't being offered, so far at least, to prove the truth.

MR. SOLES:  I don't understand the relevance and we don't know what any, any facts can be derived.

THE COURT:  Under 703, if this contributes to his opinion about the Wahhabi philosophy, it will be permissible as the type of material that an expert would rely upon.

But I want to move this along, Mr. Convertino.

MR. CONVERTINO:  That was my question.

BY MR. CONVERTINO:

Q    Is it the type of area that a professional or expert in your field would rely upon research into?

A    As I said, it's important that an expert reviews that venue because of the fact that Wahabis use it to express themselves.

So besides books, lectures, you also for a scholar, ought to research books, lectures and Internet.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

Q    Sir, how would you characterize these tapes?

A    The way I characterize these tapes are intolerant, in my opinion, quite fanatic and extreme.  And --

THE COURT:  Fanatic and extreme in a religious sense, sir?

THE WITNESS:  In a religious sense, in the sense that the theology that, that it advocates although the, the people -- the tapes -- the speaker on the -- the people talking on these tapes, especially Al Kousi, insists that they represent Orthodox Islam, the only one and true Islam.

In fact, in my opinion it is an extreme and intolerant and a fanatic form of Islam.

BY MR. CONVERTINO:

Q    How are people, according to the tapes and Kousi, how are people outside of this group to be treated?

A    Well, the discourse going on in these tapes or what these tapes say, is multi layered.  It says several things at the same time.

So, for instance, it talks about the Shiite Muslims, that's the second major sect of Islam.  It talks about them as complete heretics.

MR. SOLES:  It calls them mass Jews (Mark) (Mark) (Mark) which is, basically, basically very -- unacceptable group within Islam.

It says that the Shiits have their own *Koran*.  So

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

it advocates the complete unacceptance of anything Shiite.

Then it goes on to talk about what they refer to as (in Arabic) which pretty much encompasses everyone who does not agree with their logical paradigm.

And they are, again, portrayed as utterly in error and they must confess their error or they are at risk of becoming non Muslims with attendant consequences.

And then it talks about non Muslims, Jews and Christians. And basically says there are three choices; accept Islam or be subjugated by Muslim forces and pay the pole tax or (in Arabic) die or go to war, basically, they say.

So when you put together, despite the rhetoric of we are the orthodox Islamic group, when you put together the ultimate result, there is only one group that is saved, only one group that is -- could possibly be on the right path, and most -- more -- most important of all is that it dehumanizes in my view, dehumanizes the other, because it is -- it is constantly creating a tie, a nexus, a connection, between how the other so misguided and the workings and the deceptions of the devil.

So, for instance, in one of the tapes he's talking -- Al Kousi is talking about someone who disagreed with him, who wrote a book criticizing Sheikh, one of the Wahhabi sheikhs.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.**

Then he makes this rather surprising remark.  He says, well, number one, we don't know who this person is.

So it's quite possible that this person is a human being, but it's also quite possible this person is a devilish gin.

Gin is metaphysical entity that exists that could be devilish.

So rendering the opponent, rendering the other as possibly even nonhuman and he says, well, we don't know whether he's human or not, this is something to be established. That's pretty much typical of the theology that you and the rhetoric you hear on these tapes.

Q    What is his position regarding the people who he believes, in your words, are nonhuman?

A    Well, on the one hand, he says that I am opposed to Takfir.

Takfir is the practice of calling a Muslim an infidel and then declaring that they either repent or die.

But, on the other hand, he is consistently talking about Muslim -- Muslim who, for a whole range of beliefs and actions, that if they are of the belief X, Y or Z and they insist upon it, and they refuse to repent or apologize, they become infidels and must be treated as such.

So its --

Q    How does he suggest treating infidels, sir?

**USA V Koubriti, et al 01-80778**

Khaled El Fadl-Direct Exam/Mr. Convertino-Govt.

A    That's death.

Q    Are you Muslim, sir?

A    I am.

MR. CONVERTINO:  I have no further questions.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. SWOR:

Q    Are you saying that he actively advocates death right now?

A    He does, but he hinges it on it being functionally practical.

So when Muslims are in power and they're strong enough to do what they need to do, they should do it.

Q    When the Caliphate is reinstated, correct?

A    Well, actually, no.

He -- and, in fact, at one point in the tapes, he's respond to another group that calls for the establishment of the Caliphate and says we don't need to have a full fledged Calif.

What we need is to have a good ruler and to be in a position of power.

Q    He also speaks on the tape about making piece with Israel, doesn't he?

A    He does.

Q    And he's in favor of it, right?

USA V Koubriti, et al 01-80778

### Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi

A    He says it's a necessary evil right now.

Q    He also condemns suicide bombings as being not Muslim, doesn't he?

A    No, he doesn't.

He condemns suicide bombings that are undertaken without the leadership of the duly authorized leaders.

So he says that if the leader commands it, then that's different.  But he doesn't say you shouldn't do it.

Q    The duly authorized leader being the leader of the Muslim community, right?

A    That's a point of vagueness in his thinking, who is the duly authorized leader in his thinking.

Q    He also criticizes The Muslim Brotherhood in the tape?

A    Yes, he does.

Q    Okay.  That's a radical Islamic group or was?

A    Muslim Brotherhood compared to Wahabis is not radical.

Q    He criticizes Said Kateb(phonetically), doesn't he?

A    Yes, he does.

Q    Said Kateb has been described as the ideology of Al Qaeda, right?

A    It's the ideology of many extremist groups.

Q    Now you're a professor of law, correct?

A    Yes, I am.

## Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi

Q    Okay.  And you have been for a number of years.

A    Right.

Q    Okay.  Do you know someone by the name of Walid Phares?

A    Yes, I -- I've heard of him.

Q    Do you know him professionally?

A    I've heard of him.

Q    Do you know Wael Hallaq?

A    Yes, I do.

Q    Do you know him professionally?

A    We're colleagues.

Q    Is he a respected colleague?

A    I respect him.

Q    Do you respect his opinions?

A    I respect him as a scholar.

Q    Do you know Bernard Haykel?

A    Yes, I do.

Q    You do respect his opinions, don't you?

A    He's a good scholar.

Q    You testified that you've served as an expert witness in many cases, correct?

A    Yes, I have.

Q    In your CV, on Page 3, you indicate you are or were you, an expert consultant for the animated film Mohammed The Last Prophet, produced by Rich Kress Animation Studios, sir? Is that what it says?

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

A    That's right.

Q    Can you explain why there's no record of you being a consultant for that movie?

A    Actually, if you sat through the credits, you'll see my name. It flashes at the end of the movie.

Q    Then why would there be no record of you then?

A    I don't know. It's in the movie. I've seen it myself.

Q    You say that you are legal consultant and expert witness for David J. Cowan from -- who's an attorney in an employment discrimination case, from April 2000 to August 2001.

Do you have an explanation why he has no record of you?

A    He has no record of me?

Q    Yes.

A    I have no explanation. I have his files at home, if you want them.

Q    You testified -- your CV says that you are a legal consultant -- legal consultant and expert witness for Joseph Conrad Smith and Associates, Southfield, Michigan, in a case involving employment discrimination, February 2000 to April 2001.

Isn't that what that says?

A    Right.

Q    Okay. In fact, sir, you spoke with Mr. Smith once on

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

the telephone.

That you never, you never reviewed any records, you never had a retainer agreement with him, and you never billed him.

There, in fact, never was a case, was there?

A    Well, according to my assistant, I wrote an affidavit for Mr. Conrad.

And I work in so many of these cases that -- and at a point in my career, that this is minutiae.

Q    You don't you have an assistant to do these things for you?

A    Sure.

Q    So you have an assistant who is your consultant?

A    I have an assistant that keeps record of who I worked for and takes their billing as well.

And if I talked to him, apparently, without billing him -- maybe I should send a bill.  Apparently, I forgot to do that.

Q    And you're here for free?  Just for what reason?

A    I thought that this case involves public interest issues.

Q    Well, actually, you view this case as a battle for the definition of Islam, don't you?

A    No.

Q    In fact, you are politically opposed to all Salafists,

**USA V Koubriti, et al 01-80778**

Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi

aren't you?

A    That's not right.

Q    There are Salafists that you don't oppose?

A    That's right.

Q    Okay. What Salafists are those?

A    Salafists like Krasha Rada (phonetically), like Mohammed Abdou Rahmman, who I admire.

In fact, a lot of my research, I did prove that the Wahabis are not Salafists; they claim to be, but they're not.

Q    Sir, you're not exactly a disinterested observer in this debate, are you?

A    What does that mean?

Q    Well, in fact, you believe that you are in a -- you are personally in a battle for the soul of Islam.

For who gets to define what Islam is going to stand for, don't you?

A    I believe that.

Q    So that gives you a stake in what these positions are, doesn't it?

A    I don't think anything that happens in this is case will help define the soul of Islam.

Q    It will establish your authority, perhaps?

A    I'm already a prominent scholar. I hardly need a case to establish my authority.

USA V Koubriti, et al 01-80778

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

Q    You recently published -- well, not recently, amazing how things get -- you published a piece called *The Place Of Tolerance In islam*, didn't you?

A    Yes, I did.

Q    And in that piece, you said that Salafism was founded in the early 20th Century as a liberal theological orientation.  Correct?

A    That's right.

Q    Okay.

You said in that same piece, despite it's intellectual rigidity, however, Wahabism itself, does not bear primary responsibility for the existence of terrorist groups in Islam; isn't that true?

A    That's right.

Q    Okay.  You said that Wahabism, is distinctively inward looking.

Although focused on power, it primarily asserts power over other Muslims.

This is consistent with its obsession with orthodoxism and correct ritualistic practice.  Puritan groups are both introverted and extroverted.

Is that correct?

A    That's correct.

Q    Would you agree with the statement that Salafist reject anything that is not explicitly recognized by *The Koran* and

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

the *Sunna*?

A    I challenge that.

Q    Would you agree that innovation is the one thing that Salafi reject?

A    If I agreed with that I would be -- I would join the ranks of Wahabis today.

Q    What, again, was the name of the speaker on the tape? The primary speaker on the tape?

A    Al Kousi.

Q    What's his first name?

A    Mohammed.

Q    Is his name Osama abuse Hatem Abou Latife Al Kousi?

A    Sorry.

         As I said, I know him primarily as Al Kousi.

Q    When did you listen to these tapes?

A    I finished listening to them in beginning of April.

Q    Did you make any notes while you were listening to these tapes?

A    No, I didn't.

Q    Did you record anything about these tapes -- about listening to these tapes?

A    No, I didn't.

Q    Maybe I only half asked this, maybe you only half answered this.

         But Khaled Abou El Fadl, you are in a battle for

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

the soul of Islam?

A    I already answered that, yes.  Has nothing to do with this case, though.

Q    Do you believe that the present state of radicalism in Islam, was brought out as a result of European colonization and colonialism of the Middle East?

A    I believe that that contributed to it, but I put a considerable amount of blame on Wahabism as a Puritan and intolerant theology.

Q    Now these tapes.

You do agree, however, that they are theological statements, correct?

A    No, I don't agree.

Q    You do not believe that these are theological preachings?

A    No, I don't I think that I do believe.  They pretend to be; that's a big difference.

Q    Well, how do you know?

Were you there when any of these tapes were recorded?

Were you there when any of these tapes were recorded?

A    Obviously, not.

Q    Do you know when these tapes were recorded?

A    According to the tapes themselves, they say they were

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

recorded in '98 and '99.

Q    Have you ever met with Al Kousi?

A    No, I haven't.

Q    Did you ever meet with El-Bani?

A    No, I haven't.

Q    You've heard of El-Bani, right?

A    Right.

Q    El-Bani gave a fatwa approving of the stationing of U.S. troops in Saudi Arabia, did he not?

A    I have not read the fatwa.

Q    I'm sorry?

A    I have not read the fatwa.

Q    El-Bani gave a fatwa saying that suicide bombing even inside of Israel is wrong.  Did he not?

A    El-Bani gave a fatwa saying it's wrong because of suicide, not because it's illegal to kill innocent Israelis. There's a big difference.

Q    The fatwa did not say --

A    Oh, yes.

Q    -- it's legal to kill innocent Israelis?

A    The fatwa, in fact, did.

Q    A fatwa is a legal opinion, correct?

A    That's right.

Q    Okay.  It is not an order, is it?

A    No, it's not.

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

Q    Okay.  It is not even binding on anyone, is it?

A    According to the Wahhabi school of thought, if you accept the authority of the jurist who issues a fatwa, you must obey.

Q    There's, there's, there's a couple layers here.

First of all, you have to accept the authority, correct?

A    Right.

Q    And if someone says I don't accept the authority, then the fatwa is not binding?

A    Right.

Q    Now did the government send you the tapes that are in that box or copies of the tapes?

A    You'd have to ask the government.

Q    Do you still have the set at home?

A    Not here, in Los Angeles.

Q    That's what I meant.  You don't live here?

A    No.

Q    So if those are the original tapes over there, then you got copies, right?

A    I presume.

Q    Anything ordinary -- extraordinary about these tapes, physically?

A    They have -- they're labeled on one side only.

They're what should be on side, which should

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

be Side A, is actually Side B.

Q     Were these tapes cued up to any sections?

A     What do you mean?

Q     They started at the beginning, didn't they?

A     Yeah.  There's someone voice that comes on and says this is mata, which means material.  This is material in such-and-such lesson.

And, sometimes, you've got to continue between five chunks of material on a single lesson and, sometimes, you've got what appears to be selections from speeches or lectures here and there.

Q     All right.

Sometime -- actually, in the very first tape that you listened to, the speaker cautions about how to go about the study, correct?

The true path?

The speaker says that if you have a conclusion first and work backwards, that's wrong, isn't it?

A     The, the speaker says so many things in these tapes that are inconsistent with each other.

In other words, a speaker says a million things.  Quite a few of them are inconsistent, back and forth.

Q     But The Koran is inconsistent, isn't it?

A     I don't believe so, that's why I believe in The Koran.

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

Q     Have you ever read The Bible?

A     I've read The Bible.

Q     They're inconsistencies in The Bible, aren't there, where it goes back and forth.  Right?

A     That's, that's your conclusion.

Q     You don't think it is?

A     I -- I'm not an expert on The Bible, I'm an expert on The Koran.

Q     I just asked you what you thought.

This is Government Exhibit 51A.  Now this is Counter 102 through 133.

Now is -- how do you get to Counter 102 through 133?

You have to listen to the whole tape?

A     I don't understand the question.  What's counter?

Q     You see where it says tape number seven, Bates 475, Side A, Counter 102 to 133.

Do you see that part?

A     Yeah.

Q     Okay.  So presumably, you got to listen to 102, whatever or a 101 before you get to this point, don't you?

A     I really can't answer the question, because I don't know what the government, whoever the counter is referring to.

Q     You don't know where this is on the tape?

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

A    No.

Q    Do you recognize this on the tape?

A    I recognize this because it was repeated several times throughout the tape.

Q    Is this classic theology?

A    This is classic hadith.

Q    And the hadith -- and the hadith are what?

A    Reports attributed to the prophet.

The first paragraph is a report -- is the prophet is often quoted as saying.

Q    That's not -- that's not Al Kousi speaking.

He's saying this is what the prophet is saying, right?

A    Correct.  That's as to the first paragraph.

Q    Yeah.

As a matter of fact, as you earlier said, a lot of these tapes are where something is being repeated or quoted and then either being discussed or supported or contradicted, correct?

A    Right.

Q    Okay.  This is Exhibit 51,E, as in Edward.

Once again, this is -- at least it appears to be some distance away from the other one.  Correct?

A    This particular report?

Q    Just answer my questions, sir.

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

You see the counter there?

A    I can't answer the question.

Q    You don't know what those numbers mean?

A    No.

Q    Did you hear this right after the prophet said --

A    When you say "hear this" here which?

Q    You heard this section here, right?

A    Yeah, right.

Q    Now this section is not something that Al Kousi is saying, is it -- this, in fact, is a hadith, isn't it?

A    It is something he is claiming the prophet said.

Q    This entire quote is a hadith, isn't it?

A    A purported hadith, yes.

Q    Purported --

A    Purported.

Q    -- out of the *Sunna of Abu Daoud.*

A    Out of the *Sunna of Abu Daoud.*

Q    This was not Al Kousi, this was a quotation from something, right?

A    Yes.  He's quoting something.

Q    This section -- now this is on the back of the tape, right?  This is Exhibit 51,P, as in Peter.

Let me scoot this down.  This says Side B, right?

A    Right.

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

Q    Would you presume that that means Side B of the tape?

A    I'm not willing to presume.

Q    Do you remember this at all?

A    Yeah.  This is a supplication.

Q    It's a benediction.  It's a prayer like, right?

A    It's supplication said by Al Kousi at different parts of the tape.

Q    I'm going to show you Government's Exhibit 51H.

You don't have any independent recollection of this, do you?  Or do you?

A    I do.

Q    Okay.  This is from Side B of the tape?

A    I presume.

Q    When was the last time you listened to tape number 37?

A    It would have been in March, sometime.

Q    And you remember this, right?

A    I remember I -- I remember the statement.

Q    You remember the concept?

A    Yeah.

Q    And this particular instance, however, Al Kousi is quoting someone else, isn't he?

A    I don't remember if he's saying it as his own conclusion or if he's quoting something.

Q    Do you agree that what you describe as main stream Salafists or moderate Salafists are A political.

**USA V Koubriti, et al 01-80778**

### Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi

A     I didn't describe -- I didn't use that expression means moderate Salafists.

Q     Well, do you believe they're moderate Salafists?

A     They are, but not represented what I heard on the tape.

Q     I didn't ask you --

A     Well, I'm answering what I think is an accurate response.

          I'm not going to give you the answer you want.

Q     Obviously.

          **THE COURT:**  How much longer, Mr. Swor?

          **MR. SWOR:**  Couple more minutes, judge.

BY MR. SWOR:

Q     You know -- how much do you respect Wael Hallaq?

A     Too broad.

          The way you ask the question is too broad, so I have to get into some detail.

Q     As an academic, do you have -- you said you respect him, correct?

A     As to what specific topic?

Q     You said you respect him, correct?

A     I respect him overall.

Q     Okay.  You respect him as a scholar on Islamic law, correct?

A     Yes.

Q     Okay.  You respect him as a scholar on Islamic

### USA V Koubriti, et al 01-80778

## Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi

theology, correct?

A    No, I don't.

Q    Do you respect him as a scholar on Islamic movements?

A    No, I don't.  He's not an expert in that.

Q    Do you respect Bernard Haykel?

A    Again, do you want to specify a field?

Q    Do you respect him as a scholar on Salafism?

A    Yemeni Salafism.

Q    Is there a difference between Yemeni Salafism and other Salafism?

A    Bernard Haykel's training is primarily doing field work in Yemen, so his prospective is quite narrow.  But what he does, he does well.

Q    And if he asserted a position, you would consider it, would you not?

A    If -- I mean, if he asserted not any position, I would take it seriously.

Q    If he asserted a position on Salafism, you would hesitate, you would consider it and you would give it serious reflection, would you not?

A    Again, if you push me for a yes or no, the answer would have to be -- the question is too broad, so I would have to say no.

           But, for instance, if he tells me these tapes are mainstream Islam, that's not right.

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

Q    You have never published on Salafism, have you?

A    Oh, I have.

Q    What book?

A    *Speaking God's name, In God Go Us As Soldiers, Rebellion of Islamic Laws.* Specifically, the last part of the book --

Q    These are general texts.

MR. CONVERTINO:  Judge, I'm going to object. Objection, Judge.

He was not finished listing off the publications regarding Salafism.

THE COURT:  Let him finish all of his publications, then you can ask your question.

THE WITNESS:  Then just recently, I published a very long article, about 40 pages typed, specifically on the history of the Salafi movement.

BY MR. SWOR:

Q    Where?

A    In the *Journal of Islamic* -- *UCLA Journal of Islamic and Near Eastern Law.*

Q    By whom is that?

A    What?

Q    That's a journal?

A    Yeah.  UCLA.

Q    That's your employer?

**USA V Koubriti, et al 01-80778**

**Khaled Fadl-Cross Exam/Mr. Swor-El Mardoudi**

A    Okay.  I have another.

Q    Yes or no.  That is your employer?

A    UCLA is my only employer.

I have another article, also, on the history of Salafism that appeared in *Progressive Muslims* edited by Omar Saffee, (phonetically) who I have never met in my life.

Q    You consider yourself a progressive Muslim, yes?

A    No, I don't I consider myself a Muslim.

Q    But, apparently, this author considers you a progressive Muslim.

A    He's free to consider whatever he wants.

Q    Did you submit this article to him?

A    No.

Q    Where'd he get it?

A    At the beginning of the article, I make clear that I am not a progressive Muslim, I'm not a liberal Muslim.  I'm Muslim.

So -- and with all due respect for his opinion for the title of this book.

**MR. SWOR:**  Nothing further, Your Honor.

**THE COURT:**  Anything else, Mr. Convertino?

**MR. HELFRICK:**  I have a question or two, Your, Honor, just for the heck of it.

We're missing lunch anyway.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Cross Exam/Mr. Helfrick-Koubriti**

### CROSS EXAMINATION

BY MR. HELFRICK:

Q    What does this Al Kousi guy say about Budweiser? Anything to say about Budweiser?

MR. CONVERTINO: Objection, Judge.

BY MR. HELFRICK:

Q    What's he say about drinking liquor? Does he have a position on that?

A    Are you are you still maintaining it to the specific label of Budweiser?

Q    Well, yeah.

Say anything specifically about Budweiser?

A    No, he doesn't say.

Q    Anything at all about drinking alcohol?

A    I don't recall if in the tapes he talks about drinking alcohol.

But he talks about drinking alcohol is one of the major sins.

Q    What about smoking marijuana?

Does he have a position on smoking marijuana?

A    I don't remember if he mentions marijuana specifically.

But he does talk about what intoxicates the mind.

And says that intoxicants to the mind are prohibited in Islam.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Cross Exam/Mr. Helfrick-Koubriti**

Q    Would that include hashish as well?

A    You'd have to ask him if he considered hashish.

As far as I consider it an intoxicant and prohibited, yes.

Q    What about sex?  He say anything about sex?

A    He talks at length about what is known as sin and the meaning to have sex outside the bounds of marriage.  And he says that it is prohibited.

However, he says you may have a thousand slave girls, if you wish.  And there are no restrictions with sex with slave girls.

Q    Oh, really?  Is this the --

A    It's in your tape.

Q    This is the Wahhabi, is that right?

The last three guys -- experts, said are Salafists on the tape.

You're the first one says he's Wahhabi.

A    They're Wahabis.

Q    Nobody else said they're Wahhabi.

A    Well, they're wrong.

Q    And you're right?

A    I'm right, because I'm only involved in this case for -- to render a professional opinion about tapes that were submitted to me.

There is no question who there allegiance is

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Cross Exam/Mr. Helfrick-Koubriti**

to.

The conflict recites the battle.  These are Wahhabi beacons.

Q    You're not — not because of your years and of study and articles, things like that.

You're right because you're here to testify in the case; is that it?

A    What I'm saying, in case you just didn't get it, is that they, apparently, had the financial interest.  I have none.

Q    Oh — okay.

So you think if a person has a financial interest in a case, they might color their testimony, right?

A    It's possible.

Q    Okay.

If they have, perhaps, any kind of an interest in a case, whether it be money financial gain or, perhaps, gaining their liberty, that might color their testimony, correct?

A    Theoretically, it's possible.

MR. HELFRICK:  Thank you.  I have no further questions.

## CROSS EXAMINATION

BY MR. THOMAS:

Q    Can I talk to you about something a little bit

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Cross Exam/Mr. Thomas-Hannan**

different and off these other subjects?

A    You want to talk about Budweiser?

Q    Maybe after we're done here today.

I don't want to take too much of your time.

You're a Professor of Law, are you not?

A    Yes.

Q    That's a yes.

American law, right?

A    I teach Islamic law and Middle Eastern law.

Q    You graduated from Law School, have you not?

A    Law school, yes.

Q    You believe in the concept of freedom of speech, do you not?

A    Yes, I do.

Q    Do you believe that speech, whether you agree with it or not, is protected?

A    Absolutely.

MR. CONVERTINO:    Judge, I'm going to object to this line of questioning.

THE COURT:    Overruled.

BY MR. THOMAS:

Q    There freedom of religion?

A    Absolutely.

Q    People have a right to practice religion, even if you do not agree with them?

**USA V Koubriti, et al 01-80778**

Khaled El Fadl-Cross Exam/Mr. Thomas-Hannan

A    Yes.

Q    Do you believe that after having listened to these tapes, that the speech that is contained within those tapes are protected speech?

A    Yes.

MR. THOMAS:  Nothing further.

MR. MORGAN:  I have.

THE COURT:  Don't feel obligated, Mr. Morgan, to prolong this.

MR. MORGAN:  I'm still grappling with puritanical and the slave girls, how that meshes is something.

THE COURT:  I could make a remark about many husbands having similar views.

MR. THOMAS:  Did you mumble?  I didn't hear that.

MS. RABEN:  You're mumbling, judge.

CROSS EXAMINATION

BY MR. MORGAN:

Q    Good afternoon, sir.

A    Hello.

Q    You indicated at one point, there were -- I don't know if I heard the word million or so, many inconsistent statements within the tapes themselves, correct?

A    Right.

Q    Would you characterize the tapes as an intellectual show?

USA V Koubriti, et al 01-80778

6002

**Khaled El Fadl-Cross Exam/Mr. Morgan-Ali-Haimoud**

A    The tapes -- the tapes are by someone who is consistently saying, don't listen to ignorant, listen to the true scholars.

Strongly intimating in every way that he is among the true scholars.

In order to achieve that objective, he throws out a lot of concept -- a lot of technical jargon that he misuses and misunderstands.

In other words, prudentially, he really doesn't know what he's talking about.

Q    Juris prudentially?

I guess -- is that a yes or no?  Is that an intellectual show?

A    I can't be limited to that expression.

If you insist on that, I would have say I don't know.  I haven't thought about it in those terms.

Q    Anyone who used that expression, do you think would be dead out wrong?

A    No.  I just haven't thought about it in those terms.

If you give me 10 minutes, I could reason it out, come back with a judgment.  But --

Q    We don't have 10 minutes.

Within the tapes, is the speaker posing questions and issues and answering those questions?

Is there a debate, so-to-speak, within the

**Khaled El Fadl-Cross Exam/Mr. Morgan-Ali-Haimoud**

tapes?

A    The speaker is -- they're, they're parts he says.

For instance, I received this question from this person and through this question.

Then he answers those questions.

But he also talks at length about such a person, said this such a person published this book, such a person printed this book.

And, most often, saying that all of these individuals are ignorant.  They don't know what they're talking about, *et cetera*, *et cetera*.

Q    Okay.  In any event, one thing's clear.

You received the tapes February of 2003, correct?

A    I think that's correct.

Q    And you didn't have the tapes before that time, right?

A    Frankly, I mean, to be entirely precise, I don't frankly remember if it was January or February, but it was one of these.

Q    But it's in 2003 and you didn't have them in 2002.

A    No, I think it was 2003.

Q    You didn't listen to them in 2002, correct?

A    No, I didn't have them.

Q    You didn't issue an opinion in 2002, did you?

A    I didn't have them.

**Khaled El Fadl-Cross Exam/Mr. Morgan-Ali-Haimoud**

Q     You didn't have an opinion in 2002?

A     No.

Q     So you don't have any idea how the government could represent in a pleading that you had?

MR. CONVERTINO:  That's nonsense.  I object to that.  It's not accurate.  It's not true.  And I object to it.

THE COURT:  Just a moment.  We'll take this up outside of the jury, outside of the hearing of the jury.

MR. CONVERTINO:  I'd like the jury to be instructed to disregard that question.

THE COURT:  We'll take this up outside the hearing of the jury.

Mr. Morgan, go ahead.

MR. MORGAN:  Did the Court sustain the question -- objection or overrule it?

THE COURT:  First of all, it's a rhetorical question.  The question for this witness is meaningless.

All you're doing is providing foundation for an argument.

If he says he did not get the tapes until January of 2003, you have everything you want, if you can support it. Move on.

MR. MORGAN:  Okay.

**Khaled El Fadl-Cross Exam/Mr. Morgan-Ali-Haimoud**

BY MR. MORGAN:

Q    Thank you.  Do you know whether the --

THE COURT:  Anything beyond that is an intellectual show.

MR. MORGAN:  Intellectual what?

THE COURT:  Show.

MR. MORGAN:  Show.

MR. CORBETT:  If you think about it in those terms.

MR. MORGAN:  I don't want to do that.  Just a couple questions.

BY MR. MORGAN:

Q    These speakings, were they -- did they take place in Egypt, as far as you could discern?

A    Quite often, the speaker refers to -- makes references to where we are.

In other words, makes references that lead me to believe he's in Egypt.

But, other times, it's more confusing because he makes references that lead me to believe he's in Yemen or Saudi Arabia.

And I'm not -- the tapes are not contextualized by the person doing the introductions, so that you know exactly whether it's Egypt, Yemen or Saudi Arabia, I believe these are three main countries.

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Cross Exam/Mr. Morgan-Ali-Haimoud**

Q    How long did it take you to listen to the tapes?

A    It took quite a few hours.  It must have been about 50, 70 hours, something like that.

Q    Maybe 50?  Maybe as much as 70?

A    Right.

Q    But that would be a fair and accurate range, 50 to 70 hours?

A    I think so.

I mean, I was listening to them -- what seemed like every day for several weeks, until I got done.

Q    And as far as any of the speakings in Egypt, would you -- did it -- the tapes lead you to believe that these speakings were in public?

A    He seems to have been talking to a group of people.

Because a couple of times he makes -- he says things like okay, you understand, don't you agree.

So -- but, although in the tapes that I have, you don't hear the response or the noise from the audience that well.

I mean, I can't talk as to every tape, because some tapes -- you can't get a sense at all of where he is.

Other tapes, I would say it's more likely than not that he has an audience.

Now I don't know.  There's no way that I can -- a couple of times, he refers to a mosque that they're

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Redirect Exam/Mr. Convertino-Govt.**

in.

Other than that, I don't know whether this was a public event or a private lesson or, you know.

MR. MORGAN: I have nothing further.

THE COURT: Anything on redirect?

MR. CONVERTINO: Yes.

**REDIRECT EXAMINATION**

BY MR. CONVERTINO:

Q    I have a couple questions, sir, about Wahabis.

You said you recognize the tapes to be Wahhabi.

On direct examination, you said there was a relationship between Wahabis and Salafists?

A    Right.

Q    Can you explain that?

A    Well, the -- in some ways, I mean, you hear scholars often saying this.

In some ways, all Muslims are Salafists because Salafi comes from the word Salif, which basically means you follow the predecessor.

Now most Muslims say we follow the predecessor. We follow the prophet, and we follow the companions of the prophet.

So that is why the term "Salafi" is ambiguous. It just means you follow those who you should follow, the prophet and companion.

**Khaled El Fadl-Redirect Exam/Mr. Convertino-Govt.**

Q     Doesn't the speaker represent himself to be a Salafist?

A     That is the whole point, is that the speaker refers to himself sometimesas absunnah or jajar and absunnah or hadith. (phonetically)

Or sometimes says that the Salafi is (in Arabic) which is true and correct Salafism.

According to the speaker, all these various groups pretend to follow the predecessor, the prophet and the companions.

It is really only this group, what he calls &&&if a jazz yeah, the saved group, that's the one that follows.

Therefore, according to him, they are the ones most deserving of the, the title Salafist.

But I am saying more accurately describes them is that they are the followers of the theology and thought of Mohammed El Wahhabi theologian, that appeared in Saudi Arabia and it's a more accurate description of who they are is Wahabis.

Salafis is too broad.

Q     And someone who is of the Wahhabi, as you've described them, mind set like the speaker, how would you characterize that person, briefly?

A     Well, if they believe in Wahabism, they -- I would characterize that position as intolerant, puritanical,

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Redirect Exam/Mr. Convertino-Govt.**

fanatic, extremist, literalist.

A strong and unwavering conviction that their way and their way alone, is the right path.

And that everything else is either an outright evil or something that is clearly wrong that must be fixed.

Q    Is that view reflected in these tapes?

A    Absolutely.

Q    All right.

**THE COURT**:   Mr. Convertino, you have three more minutes, then you're finished.  I'm imposing Rule 403 and Rule 611.

**MR. CONVERTINO**:   Yes, Judge.  I need one minute.

BY MR. CONVERTINO:

Q    I'm going to show you what's been shown to you by defense counsel, 51E, referred to as a hadith.

Do you recall seeing this, sir, where the person puts a shovel through a woman's belly, breaks her spine and kills her.

You said this is purported hadith.

What does that mean?

A    It's a tradition attributed to the prophet that appeared in one of the books that an author that said I'm collecting what the prophet said.

The name of the author is Abou Dawood. (phonetically)

**USA V Koubriti, et al 01-80778**

**Khaled El Fadl-Redirect Exam/Mr. Convertino-Govt.**

He put it in there. He said the prophet said this.

Now the reason I said it's purported, is that most jurists agree that this tradition is a fabrication.

Q    Okay. Now, in your opinion, is this quoted by Al Kousi in the tape, if it's not a reputable hadith?

A    Al Kousi treats it as if authenticity, the fact the prophet said it, as if it's taken for granted.

He basically is saying in the context of the word, quotes, those who insult the prophet should be killed. And it's a simple as that.

They should be -- the word is, their blood is allowed.

Q    Today, those who assault the prophet, according to Al Kousi, today, should be killed?

A    That's what he emphasizes.

**MR. CONVERTINO:**  Thank you, sir.

**THE COURT:**  Anything else? Any questions from our jurors?

Thank you, sir. You may step down.

(Whereupon the witness was excused at 1:15 p.m.)

**THE COURT:**  All right. Anything else from the government in rebuttal?

**MR. CORBETT:**  Judge, I just have a proposed exhibit, Government Exhibit 83.

**USA V Koubriti, et al 01-80778**

6011

I've shown a copy of it to Mr. Helfrick.

It is, in fact, the count to which Mr. Zaia plead guilty, so that the jury will understands the exact nature of the offense which he plead.

THE COURT: You want that incorporated as we've discussed?

MR. CORBETT: Yes, Your Honor.

THE COURT: Any objection?

MR. HELFRICK: No objection.

THE COURT: Okay.

MR. THOMAS: None.

MR. CORBETT: The government has no further rebuttal, Your Honor.

THE COURT: All right.

No surrebuttal from defense?

MR. THOMAS: No, Your Honor.

MR. HELFRICK: No, thank you.

THE COURT: Ladies and gentlemen of the jury, that concludes the evidence in this case.

We will be off tomorrow. We will be off on Friday as well.

We will resume on Monday, at which time we will have closing arguments for you and instructions to you.

It's very important that you continue to follow my instructions not to discuss the case, not to let anyone

USA V Koubriti, et al 01-80778

discuss the case with you.  Keep an open mind.  Leave your notebooks here on your chairs.

Don't read anything in the media, don't go on The Internet and consult any of the areas websites all of the experts have referred to or anything else.

And if anybody tries to talk to you about the case, please report it to us, okay?  Have a good rest.  Come back refreshed.

**MR. CORBETT:**  Your Honor, there's one thing the Court might want to address to the jury; that is, if the case goes to them next week.

I assume we will come in on Thursday.

**THE COURT:**  Actually, I wanted to -- I addressed that to the jury before and I received a response indicating that a number of the jurors have made other plans for next Thursday, so they will not be.

In addition, next Friday, I'm going to have to tell the lawyers next Friday is the Friday before a weekend holiday.

I don't know if any of you have plans for the Memorial Day Weekend, but if you wanted to knock off a little early, I'll entertain consideration of that from any of the remaining 12 of you.  Okay.  I also want to discuss it with the lawyers okay.

All right.  Have a good rest.  We'll see you Monday

**USA V Koubriti, et al 01-80778**

morning.

(Whereupon at 1:17 p.m. the jury was excused
and the following was held outside the
presence of the jury)

THE COURT: All right. Let me cover some housekeeping matters.

I want counsel to get together this afternoon about jury instructions.

I want counsel to report back to me tomorrow as to when they will be prepared to discuss with me, tomorrow, any objections to jury instructions.

As I understand it, the government is going to be providing its proposed set of jury instructions to defense immediately. I want counsel to get together and begin going over those.

Do defense counsel have a set as well that they're prepared to discuss with the government?

MR. HELFRICK: No, Your Honor. I'm not sure that the Court's characterization as "immediately" is necessarily accurate.

THE COURT: Immediately. You meant last Monday when I was told that was happening?

MR. HELFRICK: I'm just saying if we're going to get their copy, you might want to ask them when they think they're going to have that copy ready.

USA V Koubriti, et al 01-80778

THE COURT:   When are you going to have it?

MR. CONVERTINO:   I don't know, maybe might be immediately, might be by the end of the day.

THE COURT:   Well, immediately whatever you've got, give it to them immediately, as far as you've gotten.

If you have other things you want to discuss with them, you can discuss it on an ongoing basis.

MR. CORBETT:   On Monday.   I want to get this process moving.   I don't have a lot of time to spend in what I anticipate will be a fairly lengthy charging conference.

Your Honor, the only thing I want to make clear. We have them simply limited to the element of the offense. We haven't done any boiler plate.

THE COURT:   I want -- I want a complete, full, set beginning to end, including the Sixth Circuit pattern instructions and the boiler plate instructions and everything else.

I'm sure that, without very much trouble, Mr. Corbett, you and Mr. Convertino can find those among your colleagues.

MR. CORBETT:   I'm sure we can, Your Honor.   I'm sure the defense can as well.

THE COURT:   Probably no less than a hundred sets of jury instructions I've dealt with the United States Attorney's Office with all the boiler plate --

USA V Koubriti, et al 01-80778

MR. CORBETT: I'm sure the defense has as well.

THE COURT: The defendants can, as well. I hope we won't terry long over the boiler plate.

MR. THOMAS: Trespass terry. You're starting to illiterate, judge.

THE COURT: I'll see if I can think of more in the next few days.

MR. HELFRICK: For the record, Your Honor, I know -- I don't know.

But just for the record, we would renew our motion pursuant to Rule 29.

THE COURT: Yeah. Okay. You've preserved that.

MR. HELFRICK: Thank you, Your Honor.

MR. THOMAS: That is for all of us, right?

THE COURT: Okay. I want to get together with counsel sometime tomorrow afternoon on jury instructions.

MR. THOMAS: Can I suggest, say, after 2:00?

THE COURT: After 2:00.

MR. HELFRICK: I have a sentencing in the morning.

THE COURT: After 2:00, after 2:00 with me.

Are there any other matters preliminary to closing argument that we need to discuss?

MR. HELFRICK: Your Honor, there has been an issue.

I think our position is, we would request that the

**USA V Koubriti, et al 01-80778**

6016

jury instructions be given after the arguments, not prior to.

THE COURT: I'm not sure we're going to have a choice at this point, because I'm not sure I'll be able to resolve all of the issues completely.

But at any rate, as I indicated, I would only give them before closing arguments if everybody had stipulated, so that's not going to happen.

How much time does the government want for closing?

MR. CONVERTINO: Total?

THE COURT: Total.

MR. CONVERTINO: Between both of us?

THE COURT: Well, closing and rebuttal, yeah.

MR. CONVERTINO: Right. We haven't talked about it, judge. Maybe three hours.

THE COURT: Okay. How about the defense? Three hours, three and-a-half hours?

MR. SWOR: Total? If you gave us an hour a piece, that might be longer then we need.

MR. CONVERTINO: We haven't talked about it.

THE COURT: What I'm trying to avoid is a two day closing argument.

I'd like to be able to do closing in one day. Doesn't sound like we'd be able to do it. I'd like to be able to do it, get five trial hours in.

MR. CORBETT: That would be two hours and three.

**USA V Koubriti, et al 01-80778**

We leave one.

THE COURT:  Two to three two and-a-half to three, something like that.  But why don't you talk about it.  I'd like to do it all in one day, if we can.  If we can't, we can't.

MR. HELFRICK:  There's that issue with the one juror about taking time off on Tuesday or Wednesday.

THE COURT:  I've talked to her.

MR. HELFRICK:  And?

THE COURT:  She hadn't gotten back to me.

I told her that it looked unlikely she'd be able to have any time off on Tuesday morning.

I told her that was unlikely I told her possibly Wednesday afternoon, but it would depend on whether she was selected out as an alternate.

She -- her concern is, it's not a mandatory obligation, it's something she would very much like to do.  It's not a mandatory obligation.  Okay?

When we talk tomorrow, I'd like both sides to be prepared to give me requests for the amounts of time necessary.

(Whereupon court was in recess at 1:25 p.m.)

USA V Koubriti, et al 01-80778

CERTIFICATE OF COURT REPORTER

I certify that the foregoing is a correct transcript from reported proceedings in the above-entitled matter.

CAROL S. SAPALA,   CSR, RPR, CM

Nov 20, 2003
Date

USA V Koubriti, et al 01-80778