91
01-80778
510

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

v.

**AHMED HANNAN**
**KARIM KOUBRITI,**
**YOUSSEF HMIMSSA**,

        defendants.

_____/

## EVIDENTIARY HEARING

**BEFORE THE HONORABLE GERALD E. ROSEN**
United States District Judge
860 US Courthouse & Federal Building
231 Lafayette Boulevard West
Detroit, Michigan
**Monday, February 7, 2002**

**APPEARANCES:**

    **RICHARD CONVERTINO, ESQ.,**
    Assistant United States Attorney
    211 West Fort Street
    Detroit, MI 48226
      On behalf of the Government.

    **JAMES THOMAS, ESQ.,**
    535 Griswold Street, Ste. 2632
    Detroit, MI 48226
      On behalf of Defendant Hannan.

    **LEROY SOLES, ESQ.,**
    **RICHARD HELFRICK,** ESQ.,
    Federal Defender Office
    2255 Griswold Street
    Detroit, MI 48226
      **On behalf of Defendant Koubriti.**



ALSO APPEARING:

> **STEPHEN RABAUT**, ESQ.,
> 19900 E. 10 Mile Road
> St. Clair Shores, MI 48080
>     On behalf of Defendant Hmimssa.

- - -

# C O N T E N T S

IDENTIFICATION                                        PAGE


WITNESSES


**MICHAEL  THOMAS** (continuing)

Cross Examination by Mr. Soles (continuing)      5

Cross Examination by Mr. Thomas                30

Redirect Examination by Mr. Convertino          41

Recross Examination by Mr. Soles                49

Recross Examination by Mr. Thomas               52


**MARK PILAT**

Cross Examination by Mr. Helfrick               64

Direct Examination by Mr. Convertino            72

Cross Examinaton by Mr. Thomas                  76



DEFENDANT HMIMSSA'S MOTION

FOR SEVERENCE                                   80

Certification of Court Reporter                 91

E X H I B I T S

| IDENTIFICATION | MARKED | ADMITTED |
|---|---|---|
| **Defendant's Exhibit Number 1** Photograph | 29 | 76 |

USA V HANNAN  ET AL. 01-80778

Detroit, Michigan

Thursday February 7, 2002

2:20 p.m.

THE LAW CLERK:   Calling case number 018-0778, United States of America verdict Karim Koubriti, Ahmed Hannan and Youssef Hmimssa.

THE COURT:   Okay.  I think this is the continuation of the suppression hearing in this matter.

Agent Thomas, you were on the stand.  If you'd resume the stand, please.  I'm not going to readminister the oath to you, but I would remind you you are testifying under oath.

THE WITNESS:   Yes, Your Honor.

**CROSS EXAMINATION** (continuing )

BY MR. SOLES:

Q   Agent Thomas, I just have a few more questions for you.

When we were last in court, we were why you were -- why you cuffed the three gentlemen, Mr. Hannan Mr. Koubriti and you were telling the Court you were cuffing them -- you were telling the Court why you cuffed them.

Mr. Koubriti, I think you established earlier, he hadn't committed any crime that you saw, right, while you were there, before you cuffed them?

A   With the exception of the -- unable to explain the

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

airport badges.  No, there was no crime.

Q    Okay.

Let me -- oh, well, I wasn't going to ask you that.

But, is his inability to explain the airport badges a crime?

A    No, sir.  It's not.

Q    And --

THE COURT:   I neglected.  I don't think I have to reswear the interpreters, but I should remind the interpreters that they -- you were here before.  I know you were here.

Were you here before?

THE WITNESS:   Yes, I was.  I'm just swearing my specs.

THE COURT:   You look a little different -- I just wanted to remind all attorneys, both interpreters, they are also under oath, sworn to faithfully, accurately translate these proceedings.

Thank you.

BY MR. SOLES:

Q    And so they hadn't committed -- so Mr. Koubriti hadn't committed any crime?

A    That's correct, sir.

Q    And said it was in the inability to explain the badges.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

A      As I mentioned to the -- to the judge or to the Court, it was numerous reasons.

One being the inability to explain the I.D. badges when questioned about it, the condition of the apartment, the name on the mailbox.

In addition to -- I still wasn't clearly under the understanding that Mr. Almarbh didn't reside there.

Again, the facts I had at the time, the name on this mailbox, his information that came out of our database indicated he did live there.

I still wasn't convinced that he did not live there.

THE COURT:   That he didn't or didn't?

THE WITNESS:   He did not.

THE COURT:   Are you saying that you thought one of the three people that were there may have been Mr. Almarbh?

THE WITNESS:   No, sir.  What I'm saying is, that I wasn't certain that the residence that we were at was not Mr. Almarbh's that maybe he was not there, but the residence was still his.

THE COURT:   I see.

BY MR. SOLES:

Q    Okay.  Now, so you questioned them -- when you came in there, you questioned them about the badges, right?

You questioned them about their employment,

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

right?

A    Yes, sir.

Q    You questioned them about their badges, right?

A    After questioning about their employment.  Yes, sir.

Q    You questioned them about whether Mr. Almarbh lived there, right?

A    Before all of that.  Yes, sir.

Q    Before all that when you first came into the house when you first came there, you questioned at the door, at the first when you first met Mr. Koubriti you asked if he knew Nabil, right?

A    That is correct.

Q    He said no?

A    That is correct.

Q    You asked him or you showed him a picture of Nabil, right?

A    Yes, sir.

Q    He said he didn't know Nabil, right?

A    That's correct.

Q    You asked him if he was Nabil, right?

A    It was apparent to me he was not Nabil.  I didn't have to ask that question.

Q    He wasn't Nabil?

A    That's correct.

Q    Got these answers from him and then you came upstairs

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

later on, right?

You came upstairs later on?  Yes or no?

A    After being advised, yes, sir.

Q    No one asked you about all that, but you came upstairs later on, right?

A    That's correct.

Q    And then you, again, then you had all three gentlemen in an area at some point, right?

A    Correct.

Q    And then Mr. Koubriti had already asked him about whether he knew Almarbh, right?

You'd already asked him, right?

A    That's correct, sir.

Q    Then you asked him again, right?

A    I asked the other two gentlemen there, sir.

Q    You asked all three of them, didn't you?

A    Yes, we did.

Q    That's what's written in your report.

And, again, you asked Mr. Koubriti who you already received answers from, you again asked him if he didn't know the person in the picture, right?

A    I don't know if I specifically asked him again or that I encompassed that.

All three said they didn't know, but Mr. Koubriti was present when I did ask the other two.

10

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti
They all acknowledged, no, they did not.

Q    So here you are.  You're this law enforcement officer and you don't -- you just told the Court you don't believe that -- you're not necessarily believing that he doesn't live there, Mr. Almarbh, right?

A    At the point after the discovery at the identification badges and the stories of the defendants not matching, yeah, I was suspicious.

Q    Okay.  And now you're asking him, again, you're asking Mr. Koubriti, again, about whether he knows Almarbh, right?

A    That was before.

Q    You asked him twice, right?

You asked him twice about these questions about his knowledge of this man, right?

A    Again, I can't recall if I asked him specifically twice, but I do know that question was asked at least twice in the presence of Mr. Koubriti.

Q    And when you're questioning the second time, you have some doubt about their story, correct?

A    As to knowing Mr. --

Q    Yeah.

A    -- I always had doubt.

Q    Okay.  And is there any is there any -- you've been through the apartment, right?

A    No, sir.  I hadn't at that point, with the exception of

# MICHAEL THOMAS
## Cross Exam-Mr. Soles/Defd. Koubriti

the protective sweep.

Q    That's what I'm talking about.

You went through the apartment with the protective sweep, right?

A    That's right.

Q    You were look for people, right?

A    That's correct.

Q    You hadn't seen this Nabil Almarbh, had you?

A    No, sir.

Q    You had looked in areas where a person might be, right?

A    That's correct.

Q    You looked to the point where you could find two identification badges where a person wouldn't be hiding?

A    Upon entering the room, right.

Q    You could see he wasn't there, right?

A    That's correct.

Q    You had asked Mr. Koubriti at the door if he knew the man, right?

A    That's correct.

Q    You had confronted him with the fact that his name was on the mailbox, right?

A    Yes, sir.

Q    When he was inside the apartment and he said, no, I didn't know the guy, he told you he gave you an explanation why he wouldn't know the guy, right?

## MICHAEL THOMAS
Cross Exam-Mr. Soles/Defd. Koubriti

A    That's correct, sir.

Q    And then he showed him the fixture at the front door and -- and he says, no. I don't know that guy. Right?

A    Correct.

Q    Then when you had all three of them in there you confronted Mr. Koubriti and Mr. Hannan and Mr. Hammoud, again, about this person. Right?

A    Yes, sir.

Q    Showed him the mail you had at the address, right?

A    I didn't so show him any mail.

Q    But you questioned them, again, about whether or not they know Mr. Nabil Almarbh?

A    I believe they were asked the second time.

Q    This second time now -- you're not advising them of their rights to remain silent at this point?

A    No, sir. They were not in custody.

Q    Okay. Is this before or after they were handcuffed?

A    This was before, sir.

THE COURT:  Let me ask you a question, Agent Thomas.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Is it your belief that once the three men were handcuffed, they were not in custody? I'm asking you now this, not for a legal conclusion which I will have, obviously, have to make, but for your own view as a law

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

enforcement officer.

THE WITNESS:   They were detained, Your Honor.  I mean, custody.

I mean did I have probable cause at that point to arrest them?  No, I did not.

They were being detained until we first --

THE COURT:   Let's not talk about arrest.  Let's talk about whether they were in custody, whether it was a custodial presence in the sense of were they free to leave.

THE WITNESS:   They would not have been.  The only one who would have been free to leave at the time would have been Mr. Koubriti, did he did possess the legal identification to being in the United States legally.

THE COURT:   I'm not talking about leaving the United States, I'm talking about leaving the house, at the time that you had them handcuffed.

THE WITNESS:   Until Immigration established they were in the United States legally, they may have been in violation of law.

So to answer your question, no, they weren't free to leave.

THE COURT:   Okay.  So from the time you put the handcuffs on them, they were not free to leave that situation.

THE WITNESS:   That's correct, Your Honor.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

THE COURT:   Anything further on this area, Mr. Soles?

MR. SOLES:   Yeah, just a few more questions.

BY MR. SOLES:

Q    When you were questioning them, the house was -- we know was with agents in it.

There was an agent outside.  There were how many agents upstairs?

A    At least four upstairs.

Q    These were four armed officers, right?

A    Everyone was armed with the exception of the translator.

Q    We've already -- you've already testified that when you came upstairs, when you followed Mr. Koubriti upstairs, you had your hand on your weapon, right?

Or you were poised, you were poised to draw your weapon, correct?

THE COURT:   It was you who had your hand on your hip.  I don't want to be confused in my own mind.

BY MR. SOLES:

Q    Your testimony was you were poised?

A    It was not until I began a protective sweep was I poised.

Q    Okay.  Now you know you made -- you talked about this, this cuffing of them when you found these, these airports

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

identification badges in plain view.

A    Correct.

Q    What did you find in plain view?

You didn't find airport identification badges, did you?

You found -- where was that you found some -- you gave them to me.

You found Sky Chef badges in plain view, right?

A    Sky Chef badges for Detroit Metropolitan Airport, yes, sir.

Q    But there's a distinction between airport badges and Sky Chef badges right, right?

A    At that time, I didn't know if there was a distinction, sir.

THE COURT:   Did you know if the badges that you found would grant the wearer or could grant the wearer of the badges access to the airport?

THE WITNESS:   At the time I initially discovered them?

THE COURT:   Yes.

THE WITNESS:   No, sir.  I did not know that.

MR. SOLES:   May I approach, Your Honor?

The prosecutor had these badges.  Are these the badges that you found in plain view?

THE WITNESS:   Yes, sir.  They are.

## MICHAEL THOMAS
### Cross Exam-Mr. Soles/Defd. Koubriti

BY MR. SOLES:

Q    They don't say airport badges, do they?

A    I see DTW, but they don't say -- I know what DTW is.  I have an airport badge.

Q    It's Sky Chef?

A    Sky Chef badge for DTW Airport.

Q    On the back of this, this badge -- it's the property of L. G. Sky Chef, right?

A    That's correct.  That's why I was questioning as to why they had them.

Q    On the back -- on the back of this badge, it has here please drop in any U.S. mailbox if somebody finds it.

Right?

A    Can I see it, sir?

That's correct.

Q    I mean, let me see your badge.

A    I don't have one with me, sir.

Q    Who's here -- who's here that would have a badge?

THE COURT:   Anybody want to raise their hands so Mr. Soles can call you up and swear you as a witness?

MR. SOLES:   This badge, in fact, makes note if somebody finds it they want you to drop it in the mailbox.

Okay.  Yeah Your Honor, I'm going to mark -- they gave us the originals, but they gave us copies.  It didn't have this back on here with please just drop in the mailbox.

## MICHAEL THOMAS
### Cross Exam-Mr. Soles/Defd. Koubriti

So I'm going to mark it.

MR. CONVERTINO:   Judge, judge, I'm going to clarify.  The original -- the copies that were provided were front and back are the copies I have today.

THE COURT:   We don't need to have this cat fighting.

I'm going to admit the badges.  You've got the originals.

BY MR. SOLES:

Q     So these -- what you found we're marking as Defense Exhibits 1, I guess, number one.

What you found Defense Exhibit Number 1, it's got a picture of Mr. Koubriti and Mr. Hannan on it, right?

A     Yes, sir.

Q     It says Sky Chef, right?

A     Yes, sir.  It does.

Q     It says LSG Sky Chef.

It has DTW at the bottom, right?

A     Yes, sir, it does.

Q     And at the back -- there's some provision that if you if you find it, just drop it in the mailbox, right?

A     That's correct.

Q     Okay.  Now they're airport badges, aren't there?

A     Yes, sir, there are.

Q     And there's airport badges that grant access to secure

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

areas in the airport, right?

A    There's numerous badges, sir.

Q    They grant -- now listen.  They grant access to secure areas of the airport?

A    Numerous badges that grant access to the airport.

Q    Not just the airport, secure areas of the airport?

A    Sir, I understand your question.

Q    Well then answer it, please.

A    They're numerous badges that grant access to the secure area.

Q    Secured areas.  Sky Chef was what?  What is Sky Chef?

A    Sky Chef is a facility or a accompany which provides service to the aircraft to include the food, silverware, the carts of food coming.

They prepared the food and facility and transport it out to the aircraft.

Q    They employ dishwashers, right?

A    I'm certain they do.

Q    In fact, Mr. Koubriti was a dishwasher there, wasn't he?

A    I didn't know that at the time.

Q    You know what?  I was looking at the transcript.

Didn't he tell you and Manescu he was a dishwasher?  He told you he was a dishwasher?

A    I don't recall if he did or not.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

Q    Well, maybe we'll recall Miss Manescu.

But, Your Honor -- I don't know if Your Honor wants me to.

THE COURT:  My recollection of the testimony, let me confirm it with the agent as to his understanding.

My recollection of the testimony was that Mr. Koubriti had indicated that he had been a dishwasher.

MR. SOLES:  Yeah.

THE COURT:  That they were no longer working there.

MR. SOLES:  Yeah, yeah.

THE WITNESS:  What I remember, sir, was what I recall is that they did -- after being confronted with the badges, they did say they had worked there.

THE COURT:  Yes.

THE WITNESS:  Up until they received an injury or auto accident.  I can't recall if he said specifically dishwasher.

Yes, sir.  He did work there.

BY MR. SOLES:

Q    But, sir -- and that's what Sky Chef, just Sky Chef isn't in the area of where the hangers are at, is it?

A    Absolutely, sir.

Q    You can get from where is Sky Chef at?

A    They're on the airport complex.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

Q  Uh-huh.  But are they in the area?  Are they?

Can you walk out the Sky Chef door and walk into a runway?

A  I don't believe so.

Q  No, you can't.

You can't walk out the Sky Chef door right into a secure area, can you?  You're going to tell us you can?

A  They get into the Sky Chef trucks, drive from their building right up to the aircraft, put food on it.

So they do have access to the airport area.  So, yes, sir.  They do, if that's your question.

But from the facility, I don't think you can walk out the door into a secure area.

Q  There is -- now you know, sir, there is airport I.D. that allowed you into secure areas, right?

A  Absolutely.

Q  The I.D. you have of -- there's kind of I.D. that you can just drop in a mail box if you lost it, right?

A  According to this, yes, sir, so is myself FBI identification.

Q  Let he see your FBI identification.

A  I don't have it.

MR. CONVERTINO:  I'll object to this.

MR. SOLES:  He's throws this out.

THE COURT:  We're getting off on a tangent here,

USA V HANNAN ET AL 01-80778

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

Mr. Soles.  Let's shed a little more light, a little less heat.

We have some serious decisions to make here.  I've got some serious decisions to make.  Sure, I want to focus them on the issues.  I actually have to decide now, not whether he puts his FBI badge in the mail.

BY MR. SOLES:

Q    He was a dishwasher at a place.  He was a dishwasher at Sky Chef, right?

A    What he had told us, correct.

Q    He didn't work in some -- he didn't work in a secured area of the airport, did he?

A    Later investigation learned that he did not.

Q    After you -- after you handcuff them, that's when the consent is given, correct?

A    All during that same time period.

Q    After he's handcuffed?

A    Yes, sir.

Q    You get the consent, right?

A    Yes, sir.

Q    And he's cuffed in the back, right?

A    Yes, sir.

THE COURT:  I want to clarify that.

The way you phrased the question, I'm a little bit ambiguous.  I do want to understand the chronology.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

And so that I'm not leading you, to the best of your recollection, at what point did the consent to the search occur relative -- let me finish, relative to the point at which they were handcuffed?

THE WITNESS:   Again, it all transpired at the same time when the questions -- after they admitted to working at the airport, after we pushed them and showed them the I.D. badges, at that point I said, hey listen, things aren't -- aren't looking right here.

I want to place you in custody -- cuffs for your safety and ours.  And I'd like to do a consent search.

At this time, I'm putting them in cuffs.

I asked who had -- whose residence was it?  And Mr. Koubriti indicated that it was his residence.  He paid -- although he didn't have a lease, he paid a monthly $400 to the landlord.

I did not -- they were cuffed, but I didn't have a consent to search form.  I had verbal consent at that point, but I knew from prior cases not to initiate until I have written consent, because we would run into the language issues and barriers.

They were still in cuffs.  I had an agent who was going to go in throughout the FBI office to retrieve a consent form.

Few minutes later, Agent Manescu found a consent

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

form in her trunk.  We then brought --

THE COURT:  You had one -- you didn't know that you had one on-site, but then you found that you did?

THE WITNESS:  Yes.  That's correct, Your Honor.  I brought up.  It was in English.

I had the translator read it to them in English, also, in Arabic.  Noting I didn't, again, being in a similar circumstance in another case, that this is always an issue, the language.

So I insure they read both English /Arabic and understood it.

And since Mr. Koubriti indicated to me that he, in fact, was the occupant or owner of that residence based on what he told me it was he who signed the Consent Form. Mr. Koubriti was uncuffed he signed the concept form and was, again, recuffed.

THE COURT:  Then the search commenced.

THE WITNESS:  Then the search commenced.

THE COURT:  Then what happened once the search commenced?

THE WITNESS:  Approximately, three to five minutes into the consent search, myself and Agent Manescu were in the room and the linguist George Moaikel came in and said Mr. Koubriti indicated there were fraudulent documents in the room.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

I said bring them in here. It was either -- Mr. Moaikel escorted him in and he indicated that the fake documents were in the drawer of the desk in the room.

THE COURT:  Had you begun searching the desk yet?

THE WITNESS:  I was like on the first drawer on the top. I hadn't made it down to where the documents were.

I opened up the drawer. Mr. Koubriti then told me the documents would be found underneath the videotapes in the drawers.

I removed the videotapes. They were there where they said they would be.

THE COURT:  Did he make any other statement at that time?

THE WITNESS:  Yes. He said he observed my partner looking at or pulling out of the Day Planner that he looked over and said, those items also belong to this Jalali papers.

These are -- we brought them over from the residence in the event that he returned for them. And that was it.

At that point, Mr. Moaikel started looking at the or Mr. Koubriti was removed from the room.

Mr. Moaikel looked at the Day Planner and noticed the items in the Day Planner were of concern.

At that point, we stopped the search, I contacted

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

the AUSA, told him what transpired, the consent concern, what we had found.

We were not going to proceed unless we have a search warrant from them.  And he agreed that that was the proper course of action.

THE COURT:  Why didn't you Mirandise them when you put them in custody when you cuffed them?

THE WITNESS:  In my mind, they weren't under arrest.  They weren't under arrest at that point.  It was just -- it's just -- it didn't -- their stories weren't right, but I didn't have a violation.

THE COURT:  You had a suspicion.

THE WITNESS:  I had a suspicion.

THE COURT:  But not probable cause.

THE WITNESS:  Correct, Your Honor.

THE COURT:  What is your understanding?  I ask this not in a legal sense, not for you to draw any legal conclusion.

But what is your understanding as a law enforcement officer as to when you should administer the Miranda Warnings?

THE WITNESS:  When a defendant is in physical custody, when he's not able to leave, and when I'm going to question him about offenses to which he will be charged.

THE COURT:  You said three things.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

In physical custody --

THE WITNESS:  Correct.

THE COURT:  You've already told me they were in physical custody.

THE WITNESS:  Correct.

THE COURT:  Not free to leave --

THE WITNESS:  Correct.

THE COURT:  -- I think you've told me.  And correct me if I'm wrong, I don't want to lead you here, but I think you've told me that at the point you put the handcuffs on them, they were not free to leave, not free to leave the premises.

THE WITNESS:  Correct.

THE COURT:  And the third is when you were going to begin questioning.

THE WITNESS:  That's correct.

THE COURT:  So why didn't you?

THE WITNESS:  I never questioned them after they were in cuffs regarding any of the fraudulent documents. Everything that he gave was in response -- I never questioned him on that stuff.  I didn't sit down and interview him about where these documents came from.

THE COURT:  What was the nature of the statements then?

THE WITNESS:  Utterances.  He said he told us that

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

those documents don't belong to me, they belong to this guy, Jalali. And we brought them over from the other -- I can't remember.

He said I -- we brought them over from the other residence to hold for him. And he also made the utterance about --

THE COURT:   You did nothing to -- you did nothing to extract those statements from him or to, somehow, motivate him to make those statements or?

THE WITNESS:   Again, sir, it's my recollection, no. Referring back, it was Mr. Koubriti who told us where the documents were.

So, no, I didn't elicit questions from him at that point. To the best of my recollection.

And, again, he was -- after we discovered those things, he was removed from the room.

THE COURT:   Any further questions, Mr. Soles?

BY MR. SOLES:

Q    So you walk up there.

So you do you -- while they're seated in a room, you bring the Sky Chef badges and show it to them and confront them with them, right?

A    That's right.

Q    And so you pick these documents up that you say you found in plain view.

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

You pick them up you look at them and you confront them with it, right?

A     That's correct.

Q     And you make them answer questions about that, right, these documents?

A     That's correct.

Q     That you say you found in plain view.

Not only did you do that, you take it, give it to Agent Gillette and he makes phone calls on these documents, correct?

A     That's correct.

Q     Okay.  And -- and it's there answers to being confronted with these documents which makes it even clearer in your mind that something's not adding up, right?

A     It was their failure to acknowledge the documents prior to being confronted with them that may be suspicious.

Q     Then you confront it with them and, what, do you believe their story?

A     No, sir.  I don't.

Q     No.  So you get more.

You get -- you get more evidence that in your mind they're lying, correct?

A     Well, at least -- I wouldn't say -- I had them acknowledging they worked there.

Now prior to that, they didn't, only when

**MICHAEL THOMAS**
Cross Exam-Mr. Soles/Defd. Koubriti

confronted with the knowledge they were employed there, sir.

Q    After you -- after you cuff them, then you have them, you have Mr. Koubriti give the consent while he's cuffed, then they're arrested.

After do you your search, right, after do you a preliminary search, you call Mr. Convertino.  They're taken downtown, correct?

A    That's correct.

Q    And they're further interrogated?

A    They're interviewed.

Q    And statements are taken?

A    That is correct.

Q    And, later, a search warrant's executed at the house?

A    That's correct.

THE COURT:   At what point were they Mirandised?

THE WITNESS:   They were Mirandised once they got to the FBI office prior to the interviews commencing regarding the items that were found.

THE COURT:   Who administered the Miranda Warning?

THE WITNESS:   I wasn't physically there, Your Honor.

THE COURT:   Then don't answer.

MR. SOLES:   I don't have any further questions.

THE COURT:   Mr. Thomas, any further questions?

USA V HANNAN ET AL 01-80778

**MICHAEL THOMAS**
Cross Exam/Mr. Thomas-Defd. Hannan

## CROSS   EXAMINATION

BY MR. THOMAS:

Q     Special Agent Thomas, I want to ask you some questions in a different area.

A     Sure.

Q     You already talked about being out on the porch before going to the address on Norman Street?

A     That's correct.

Q     Prior to going out on Norman Street, do you know the configuration of the apartment unit you were going to?

A     No, sir.  I did not.

Q     You didn't do a search of public records to determine what the house or what the make up of the house was or how many bedrooms there were?

A     I did not.  No, sir.

Q     Did anybody in your group know they have done a database check, Internet database check, but that it would only describe the residence?

A     But, no.  If you're asking if there was a surveillance or a -- a look at the residence beforehand, no, sir.  There was not.

Q     Well, there's two questions in that.

One is to go out there and look at it firsthand. I think that happened; is that correct?

## MICHAEL THOMAS
### Cross Exam/Mr. Thomas-Defd. Hannan

A   That's correct.

Q   Usually before you execute a search warrant, you want to know what the house looks likes before you go in, so that you can know where to go and what to look for.

A   We were going to execute a search warrant.

Q   Well that's -- yes.  That's probably what you already said.

But I just needed to know whether or not, whether you were going in there to do a search warrant or not.

Whether you knew what the make up of the apartment was.

A   No, sir.  I did not.

Q   So then you're going to look for Almarbh?

A   Correct.

Q   That was the main focus of what it was you were doing?

A   Locate him.

Q   Locate and interview Almarbh.  Not to arrest.

A   Correct.

Q   Because at that point, there was only like a bench warrant on a misdemeanor assault he had in Boston?

A   A felony warrant, but I don't know if it was -- those warrants had been issued.

But I'm not certain it was inputted into NCIC at the time.

THE COURT:  Did you say Mr. Almarbh had been on

**MICHAEL THOMAS**
Cross Exam/Mr. Thomas-Defd. Hannan

the Watch List?

THE WITNESS:   Yes, Your Honor.

THE COURT:   You'd received information he was on the Terrorist Watch List.

THE WITNESS:   He was, in fact.

THE COURT:   But I mean --

THE WITNESS:   He was number 27 on the list.

THE COURT:   At the time you went out there?

THE WITNESS:   That was the purpose of the interview, sir.

BY MR. THOMAS:

Q     Because he was on the Watch List?

A     That is correct.

Q     What is Watch List?  I mean, is that like you must arrest or detain him once you get him or is it just to observe his goings and comings?

          What is the Watch List?

MR. CONVERTINO:   Judge, I'll object on relevance regarding the Watch List purpose.

MR. THOMAS:   The relevance --

THE COURT:   I'm going to take the answer.

THE WITNESS:   Could you please state the question?

BY MR. THOMAS:

Q     Was the Watch List?

A     It's a list that is compiled by, I believe, either the

## MICHAEL THOMAS
### Cross Exam/Mr. Thomas-Defd. Hannan

State Department or the FBI of suspected terrorists and people affiliated with known terrorists to locate, identify their whereabouts prior to September 11th and thereafter.

That was the function of the -- it was an entire set of questions that was to be asked of a person on the Watch List to be interviewed.

Q    Okay.  And on that Watch List, there was probably thousands of names at that time?

A    I don't think there was thousands, sir.  There was certainly hundreds, but I don't know about thousands.  I can't be exactly how many were on the list.

Q    The term "watch", though, implies they're not to be arrested, they're to be asked questions?

A    Again, sir, our mission was to locate, interview.  What watch means, I can't determine.  The lead was to locate interview.

Q    Okay.  So then at least we know as of September 17th when you went out there, that there was -- Almarbh was on a Watch List?

A    Yes, sir.

Q    Now Hannan was not on the list and Koubriti wasn't on the Watch List.

And neither one -- Ali Hammoud, they were not on the Watch List?

A    That is correct, sir.  They were not.

# MICHAEL THOMAS
## Cross Exam/Mr. Thomas-Defd. Hannan

Q    The full set of information you had regarding the address on Norman Street related only to Almarbh and not the other defendants?

A    That is correct, sir.

Q    And so then the question arises, when you get to the door and you -- and you have a discussion with Mr. Koubriti, how long did you talk to him while he was there in his robe or undershorts?

A    Approximately, two to three minutes, sir.

Q    Okay.  He answered all your questions?

A    Yes, he did.

Q    You were still, in your mind, suspicious as to whether or not he was telling you the truth?

A    With Mr. Almarbh name on the mailbox.

Yes, I was very suspicious.

Q    But he had told you at that point he'd only been there for two weeks, correct?

A    Correct.

Q    And you already had another address for Almarbh on Wyoming street, correct?

A    That is correct.

Q    All right.  And then was he at Three Rivers already at the Secretary of State changing his driver's license number on the 17th?

A    Sir, I'm not familiar with that.  I don't know.

**MICHAEL THOMAS**
Cross Exam/Mr. Thomas-Defd. Hannan

Q    Did you know he was there in Three Rivers now trying to get another driver's license issued to him with an address in Three Rivers, Michigan?

Do you know now?

A    At that time?

Q    No.  Now.  Is it true?

THE COURT:   How's that relevant?

THE WITNESS:   I don't know if it's true or not.

MR. THOMAS:   Because I'm asking, because the next question is at that time did you know.

THE WITNESS:   No, I did not.  I don't know if that is true, so I definitely know at that time.

BY MR. THOMAS:

Q    Okay.  Now I don't know whether you have this in your car, but I've seen Detroit Police cars, sometimes, they have little computers they can check somebody's driver's license and his address and his birthdate, all that stuff.

A    We don't have that capability, sir.

Q    Detroit Police was not there with you?

A    No, sir.  They were not.

Q    And before going out, you didn't check with the State of Michigan and their database to determine what current address was with Almarbh prior to going out to the Norman Street address?

A    I personally did not.  I'm certain other agents did.

## MICHAEL THOMAS
### Cross Exam/Mr. Thomas-Defd. Hannan

Q    Okay.

MR. THOMAS:   Your Honor, before the end of the hearing, I'd like production of whatever they did have at the time regarding Almarbh's whereabouts regarding either Wyoming or whether it was Three Rivers or whatever.

It was reported in the press that they identified him to a Three Rivers driver's license application at or about the time of the search.  But that's another thing to do.

THE COURT:   Well, as much as we appreciate our friends in the press, it's not evidence, so --

MR. THOMAS:   No.  I have a good faith reason for asking the question, Judge.

I just need to know if it's true or not.

THE COURT:   Can you answer the question?

THE WITNESS:   I cannot, Your Honor.  I don't know.

BY MR. THOMAS:

Q    So then the next question is, how long then were you at the stoop with him before you went up the stairs?

A    Again, approximately, three to five minutes, if that long.

Q    Okay.  And then you went upstairs with him and he walked up the stairs?

A    Yes.

Q    And you walked up behind him?

**MICHAEL THOMAS**
Cross Exam/Mr. Thomas-Defd. Hannan

A    Yes.

Q    Gillette was behind you?

A    That's correct.

Q    And anybody else going upstairs at that time?

A    No.  I don't believe so.

Q    Before going up to the apartment itself, do you and Gillette have some understanding as to how you're going deal with this when you get into the room itself before going up, either verbal or from past experience?

A    No.

Q    Okay.  But then at some point you fan out and search the premises?

A    Correct.

Q    Okay.  Now how, how did that happen?

     You went, you went through the living room and into the back towards the bedroom where Hannan was?

A    That's correct.

Q    Then Gillette went or stayed in that room with --

A    When we walked in, Mr. Ali Farouk was sleeping in the living room.

     And Mr. Gillette or Agent Gillette stayed there with Koubriti and Mr. Ali-Hammoud, while I did a sweep in the back.  It's a very small apartment, sir.

Q    I know that you didn't see where Hannan was at the time?

# MICHAEL THOMAS
## Cross Exam/Mr. Thomas-Defd. Hannan

A    No, sir.  I did not.

Q    Where were you before you went into the back room?

You couldn't see the Sky Chef badges?

A    No.  The door was closed.

Q    And Farouk Ali Hammoud, did -- you did not in any way cause any resistance or any issue regarding a threat or a feeling that you might be assaulted in some way?

A    No, sir.  I did not.

Q    Okay.  And so then was it immediately then upon getting into the apartment that you then swept through the house for the protective sweep?

A    It was upon entering the residence.

Q    So when I say "immediately," you didn't hesitate.  You went and did the sweep?

A    That's correct, sir.

Q    Okay.  Now --

THE COURT:   I thought we were going to cover some different areas.

MR. THOMAS:   No, judge.  This is a very pertinent area.  If you need to know the relevance, I'll tell you.

THE COURT:   I just -- I think we've covered all of this.

MR. THOMAS:   Not the time.  I looked at the transcript, judge.  It's very important we know what the time is.

## MICHAEL THOMAS
Cross Exam/Mr. Thomas-Defd. Hannan

THE COURT:   Go ahead, Mr. Thomas.  But I thought we got into this fairly detailed, both in the last hearing with Agent Manescu and Agent Thomas, now, again, with Mr. Soles here this afternoon.

I want to give you an opportunity, all of you, to make your case, but not simply repeat all the testimony that we've had.

Go ahead.

MR. THOMAS:   I'm getting close to the end.

THE COURT:   Good.

BY MR. THOMAS:

Q    So the question then is, after you did the prospective sweep, you didn't knock on the door and go into Mr. Hannan's room?

A    No, I did not.

Q    When you went into the room, he was sleeping on the floor in a --

A    That's correct.

Q    -- sleeping bag.

A    I believe it was a sleeping bag or blanket.  There was no mattress or anything to that affect.

Q    Now when you did your prospective sweep, did Koubriti resist at all?

A    No, sir.

Q    Okay.  Did Koubriti say anything to you at all?

**MICHAEL THOMAS**
Cross Exam/Mr. Thomas-Defd. Hannan

A      No, sir.

Q      Okay.  And I'm assuming that Ali-Hammoud was on the ground and that he didn't say anything to you at all?

A      Correct.

MR. THOMAS:   Nothing further, judge.

THE COURT:   The room at the documents were found in, when you first went into that room, who was in the room?

THE WITNESS:   Mr. Hannan was sleeping in that room, sir.

THE COURT:   Mr. Hannan was sleeping in the room.

And Mr. Ali-Hammoud?

THE WITNESS:   Mr. Ali-Hammoud was sleeping in which would be the dining room area.

THE COURT:   Downstairs.

THE WITNESS:   It's all one floor.

THE COURT:   On the same floor.

THE WITNESS:   It's only a flat lower part, upper flat.

THE COURT:   Did Mr. Hannan ever say anything about the documents at any time?

THE WITNESS:   To me?  Personally, I don't believe so.

Again, Mr. Koubriti spoke very good English. Mr. Hannan, his English was -- limited at best.  So most of the transaction was with through the translator.

**MICHAEL THOMAS**
Cross Exam/Mr. Thomas-Defd. Hannan

THE COURT:  You do not -- you don't recall any statements made by Mr. Hannan about the documents or the Daytimer (sic)

THE WITNESS:  I do not.

THE COURT:  Mr. Convertino -- I'm sorry. Mr. Rabaut, any questions?

MR. RABAUT:  No, Your Honor.

THE COURT:  Mr. Convertino?

**REDIRECT EXAMINATION**

BY MR. CONVERTINO:

Q   Afternoon, sir.

Sir, you said that as a result of questioning, I believe, I missed Mr. Thomas, that at one point at least when you began the protective search, that there was no threat of harm or assault to you.

You felt that way; is that right?

A   Correct.

Q   That could have changed at any moment; is that true?

MR. THOMAS:  Objection, speculation.

MR. SOLES:  He's leading.

THE COURT:  Overruled.

MR. CONVERTINO:  I think I can lead on cross examination.

THE COURT:  No, you can't.

**MICHAEL THOMAS**
Redirect Exam/Mr. Convertino-Govt.

MR. CONVERTINO:   Can't lead on cross examination?

THE COURT:   Not of your own witness.

MR. CONVERTINO:   This is not my witness, judge.  I didn't call this witness.

THE COURT:   He's a witness.  Certainly -- he's the case agent.  Certainly a party that you represent.  Rule 611(c) is very clear.  Even if we're not bound by the rules Rule 611(c) is questioning of your witness, a party, must be by direct examination.

BY MR. CONVERTINO:

Q    Okay.  Okay, sir, in your mind at that particular time --

THE COURT:   Mr. Thomas learned this in the last trial that we had.

MR. THOMAS:   Judge, I learned a lot in that trial.

BY MR. CONVERTINO:

Q    At the time, sir, when you were in the room, you said that there was no threat, immediate threat to you at that point in time.

What was your understanding about any future threat?

A    You always go to every incident where things could go bad, that's why you always bring several agents with you and you never go do an interview alone.

At any point, any situation could go bad.

## MICHAEL THOMAS
### Redirect Exam/Mr. Convertino-Govt.

That's why you don't turn your back to someone nor do you have someone watching someone while you're doing a protective sweep.

At any time anything could go bad, regardless of any situation.

Q    And during the time when your you're speaking of, did you at that point have in your mind, a reasonable suspicion in your mind that there may be some criminality in the apartment?

A    At which point?

Q    At that point in time?  Did you have a suspicion?

A    At the protective sweep?

Q    Yes.

A    Yes, I did have a suspicion.  Because, again, coming to a residence with -- on the mailbox Mr. Almarbh's name and I have one person down at the bottom telling me I don't know this guy, never lived there, had databases searches telling me he did reside there.  I didn't believe Mr. Koubriti.

And so, yeah, the potential that Mr. Almarbh was in that apartment was always in my mind.

Q    Well, when you asked Mr. Koubriti where he was employed and he told you where he was employed, but he didn't, he didn't at that point -- well, when you first asked him where he was employed, did you believe him then when he answered?

MR. THOMAS:  Your Honor, is this going to the

**MICHAEL THOMAS**
Redirect Exam/Mr. Convertino-Govt.

question of whether or not he had reasonably articulable suspicion to do the protective sweep?  Because if it is, the relevance has to be guided.  When was this that he decided that?

Because are we talking before he was handcuffed or questioned or are we talking about downstairs before he did the prospective sweep?

THE COURT:  Is your objection, Mr. Thomas, lack of foundation?

MR. THOMAS:  Relevance.  Your Honor.  And it's as to whether or not it goes to what followed after.

THE COURT:  Mr. Convertino, in terms of setting the sequence here, I think it would be a good idea for you to lay a foundation as to each step at which point he believed that he had some level of suspicion.

BY MR. CONVERTINO:

Q    I'll ask you that very question.

When did your suspicion begin?

A    My suspicions began as soon as Mr. Koubriti told me he didn't know Mr. Almarbh, nor did he live there.

Q    Now from the time -- that's very beginning of your contact with Mr. Koubriti?

A    That's correct.

Q    From the time your first contact with Mr. Koubriti, you said you were suspicious?

## MICHAEL THOMAS
Redirect Exam/Mr. Convertino-Govt.

A    That's correct.

Q    From that point in time, how long did this suspicion last, in your mind?

A    In my mind, through the entire -- until I left that place, I didn't feel that I was being told the truth and I was always suspicious.

Q    Okay.  When you -- at that point in time, I think you told Judge Rosen you hadn't Mirandised any of the people in the apartment when you -- by the time you left; is that right?

A    That's correct.

Q    From the time that you questioned Mr. Koubriti, you said you had some initial questions of Mr. Koubriti, initial questions of Mr. Hannan and of Mr. Ali-Hammoud.

After the preliminary questions were asked, did you question them about any of the documents while you were at the house?

A    To my knowledge, no.  I didn't ask them any questions regarding the documents.  Again, Mr. Koubriti identified where the documents were, we didn't ask.

And, again, Mr. Koubriti uttered those -- that those documents belonged to Jalali and that he was holding them in case Mr. Jalali returned for them.

Q    Did you hear anyone ask anybody in the apartment about the documents?  Any questions?

## MICHAEL THOMAS
### Redirect Exam/Mr. Convertino-Govt.

A    No.  The only question that may have been asked would have been -- I think it was asked was, do you know where this Jalali person is now.

Q    Do you recall the answer to that?

A    No, they did not.

Q    Do you recall who was asked that?

A    I believe it was Mr. Koubriti was asked that.

Also, I believe, Mr -- All three -- I believe the question would have been posed to all three of them.

Q    You were asked by one of defense attorneys about, specifically, about the badge and the Sky Chef badges, sir.

What was your concern when you saw the badges?

A    Immediately?

Q    Immediately.

A    That these individuals had access to aircraft at DTW Detroit Metropolitan Airport.

Q    You didn't did you know what Mr. Koubriti did at Sky Chef at the time?

A    Upon noticing the badges, I had no idea.

Q    Did you ask Mr. Koubriti specifically what do you do or what do you do at Sky Chef?

A    I don't know if I specifically asked him, but Agent Manescu may have asked or one of the agents when we were questioning him about, you know, what do you do at Sky Chef.

Yes, I may have asked him that.

# MICHAEL THOMAS
## Redirect Exam/Mr. Convertino-Govt.

Q    What about Mr. Hannan?

A    Yes.

Q    He was asked?

A    I'm certain they were.

Q    Do you recall what Mr. Hannan told you he did at Sky Chef?

A    I don't recall exactly what they said they did.

I do recall they did, in fact, work there up until they received an auto injury.  Both of them were in an auto accident, then they had quit.

Q    When, when Mr. Koubriti told you that Mr. Almarbh didn't live there, did you believe him based just upon that statement?

A    Absolutely not.

Q    When Mr. Koubriti told you that Mr. Almarbh was not present upstairs, did you believe him just upon that statement?

A    Of course not.

Q    When Mr. Hannan told you he didn't know or had never seen Mr. Almarbh, did you believe him based upon that statement?

A    No, I did not.

Q    When Mr. Koubriti told you that he did not know Mr. Almarbh or had not ever seen him, did you believe him on that statement?

## MICHAEL THOMAS
Redirect Exam/Mr. Convertino-Govt.

A    No, sir. I didn't.

Q    When both of the individuals told you, if they did, that they were dishwashers, did you believe them, based upon their statement alone?

A    Again, I didn't believe anything they had told me, unless I could physically verify or see it.

Q    And the green card or the resident -- Legal Resident Alien Card that Mr. Koubriti had, do you remember seeing that?

A    I personally did not do not recall seeing that.

Q    Well, did that mean that he -- the card he had would that have satisfied you, seeing that card alone that?

THE COURT:   Let me interject a. question here.

Were you aware, however, that he did have his Resident Alien Card and had produced it?

THE WITNESS:   Yes, I was aware that he did give it to Agent Pilat and he was checking it. I'm sorry, sir. Your question?

BY MR. CONVERTINO:

Q    Did that mean that the person on that card -- that that card was Mr. Koubriti's card, in your mind?

A    No, sir, it did not.

Q    Did the questions you asked in the apartment of Mr. Hannan, sir, dispel your suspicions?

A    Greatly, yes, sir.

## MICHAEL THOMAS
### Redirect Exam/Mr. Convertino-Govt.

Q    They dispelled them?  They quashed your suspicions?

A    No, sir.  They enhanced what my suspicions were even more.

Q    Did the question you asked Mr. Koubriti in the apartment, sir, did they dispel your suspicions?

A    No, they did not.

MR. CONVERTINO:   Thank you, sir.

MR. SOLES:   Your Honor, just a few.

THE COURT:   Follow up?

### RECROSS  EXAMINATION

BY MR. SOLES:

Q    When you came to the -- when you came there, you asked Mr. Koubriti if he knew Mr. Almarbh, right?  He said no?

A    That's correct.

Q    Okay.  Later -- and you didn't believe him?

A    No, sir.  I didn't not.

Q    You said you didn't believe him about anything he said, ha?

A    I believe what I could see and prove.

Q    Okay.  Well, he, he was a dishwasher there, wasn't he?

A    At the time, I didn't know that, sir.

Q    I'm asking you now.

He was a dishwasher there, wasn't he?  Is it you didn't believe these people because they were Arab?

What is your -- why didn't you believe anything

**MICHAEL THOMAS**
Recross Exam/Mr. Soles-Defd. Koubriti

they said?

A    Sir, I'm an investigator.

Q    Yes.

A    I believe what I can prove.

Q    I know.  But, but, the truth is --

A    People lie.

Q    I know.  But the truth is, he was a dishwasher there, wasn't he?

A    I didn't know that at the time, sir.

Q    I want to know why didn't you believe him.

A    I didn't believe him because he was -- didn't tell me he was a dishwasher until I confronted him with badges or at least identification badges for that place.

Q    You don't even believe that -- I mean the green card that he had, you don't believe that.

You didn't believe that because why he was -- because he was a man of Middle Eastern dissent; was that the problem?

A    Sir, I've seen at least a hundred false green cards on people.

Q    So?

A    Based on my experience, no, I did not believe that was a valid green card until it's checked out.

Q    Okay.  Now you told him you wanted to see his identification when you first came to the house?