## MICHAEL THOMAS
### Recross Exam/Mr. Soles-Defd. Koubriti

A    Correct.

Q    And you walked up behind him?

A    That's correct.

Q    And he got into the house and you're with Agent Gillette?

A    Correct.

Q    And now -- according -- you just run straight through the back and start doing your protective search?

A    No.

Q    You do protective search?

A    We do a protective search.

Q    You leave him Mr. Koubriti with Gillette --

A    That's correct.

Q    -- at this point?

So while he's with her, while Koubriti is left with Gillette and with this Mr. Hammoud, you're doing the protective search?

A    That's correct.

Q    When does he get his license?

A    After the residence is deemed safe, Mr. Hannan is moved out the bedroom.  Then Agent Gillette goes into the bedroom and gets the I.D.

Q    One thing we know, too, also, is that Gillette or some agents always accompanying Mr. Koubriti throughout this house, right?

**MICHAEL THOMAS**
Recross Exam/Mr. Soles-Defd. Koubriti

A    Of course.

MR. SOLES:   Okay.  And I don't have any further questions.

### RECROSS   EXAMINATION

BY MR. THOMAS:

Q    Koubriti, at the door, tells you that Almarbh is not there?

A    Correct.

Q    You're suspicious?

A    Correct.

Q    Find out that that was not that was true, right, that Almarbh wasn't there?

A    Wasn't physically there.

Q    He was not specifically there?

A    Correct.

Q    Said that he moved there two weeks earlier.

You thought that that was suspicious, too?

A    There was no indication that --

Q    No.  This is what he told you then.

A    You asked me if I thought it was suspicious.

Q    Yes.

A    Yes.

Q    You weren't going to believe him about that.

You didn't believe him about that?

A    Again, I had suspicions.

**MICHAEL THOMAS**
Recross Exam/Mr. Thomas-Defd. Hannan

Q    So you had suspicion abouts that, but found out later that that was true, too, right?

You found out later that they'd only been there two weeks?

A    Later in the investigation.

Q    Right.

A    Not at that time.

Q    I'm trying to find out --

A    Of course.

Q    Here's your suspicions back then when you go there to Norman Street, okay.  And now.

Let's gage that against what we know now.

A    Okay.  Today?

Q    Today.

A    Yes, sir.

Q    All right.  So as far as Almarbh being there, he wasn't there at that time?

A    Correct.

Q    Whether Almarbh and that they had been there for two weeks, you were suspicious about that.

But we found they had been there about two weeks?

A    Correct.

Q    Okay.  And that Almarbh wasn't living there?

A    He had lived there.

## MICHAEL THOMAS
### Recross Exam/Mr. Thomas-Defd. Hannan

Q    Yes.  Not at that time?

A    Correct.

Q    Okay.  And that those were the sum totals of your inquiry before you went upstairs?

A    That's correct, sir.

Q    Okay.

A    Looking in hindsight, that's always a good view.  But at the time, if you're going back to the time --

Q    No.  No.

A    -- that's suspicions.

Q    I want to know whether or not your suspicions were founded, okay you say you have suspicions.  Let's find out.

THE COURT:   Mr. Thomas --

MR. THOMAS:   This is part of a. question, Judge.

THE COURT:   -- there's an objection.  You didn't see Mr. Convertino.

MR. CONVERTINO:   Object to relevancy.

THE COURT:   That's my question.

My question to you, how does what we know now reflect upon whether or not he had a reasonable suspicion at the time?

MR. THOMAS:   Articulable and reasonable suspicion at the time.

THE COURT:   How does what we know now tell us that?

## MICHAEL THOMAS
Recross Exam/Mr. Thomas-Defd. Hannan

MR. THOMAS:  With the benefit of hindsight.

THE COURT:  For example --

MR. THOMAS:  Here I go.  I'm going to get a lesson.

THE COURT:  I don't know about a lesson.  I'm just going to ask you a. question.  If this were a drug search.

MR. THOMAS:  Yes.  Like in the case *United States versus Taylor.*

THE COURT:  Like the case *United States versus Taylor* and the officer had a reasonably articulable suspicion at the time, but he didn't know for sure.  But it turned out they had the drugs.

In making my opinion as to my decision as to whether or not he had a reasonably articulable suspicion, you would certainly object, and properly so, if I used the fact if he turned out to have drugs in my analysis of whether at the time he had a reasonably articulable suspicion.  Yes?

MR. THOMAS:  I think the prosecutor would disagree with you.

THE COURT:  Do you?

MR. CONVERTINO:  I think it's a brilliant analogy, judge.

MR. THOMAS:  No reasonable prosecutors would agree with you, judge.

THE COURT:  I'm sure Mr. Convertino would like you

56

## MICHAEL THOMAS
Recross Exam/Mr. Thomas-Defd. Hannan

to do that.  I don't know many judges would reason that way.

The converse I think is probably also true, if his story turned out to be true.

The question is in all seriousness, whether he had a reasonably articulable suspicion at the time.

MR. THOMAS:   All right.

THE COURT:   And what the bases of those decisions were.

Now the fact that he turned out to be right or wrong in making this determination, I don't think is relevant.

MR. THOMAS:   Then let's look then.

THE COURT:   It's virtually every defense lawyer has told me in my 12 years on the bench in doing these hearings, when a prosecutor's attempting to go through the back door, establish a reasonably articulable suspicion by showing the quantity of drugs that were there discovered.

MR. THOMAS:   I had my head beat in so often on that, I'd thought I'd try it this way.

What is relevant then is what it is that you knew at the time.

THE COURT:   You remember Senator Howard Baker in the Watergate Hearings?

MR. THOMAS:   I loved him.

THE COURT:   Do you remember the questions he asked

# MICHAEL THOMAS
Recross Exam/Mr. Thomas-Defd. Hannan

what did he know and when did he know it.

BY MR. THOMAS:

Q     Okay.  So when you went out there, there was an NCIC check, obviously, that you took and did.

A     One of the agents did, I'm certain.

Q     Was the NCIC check something that you relied upon in order to determine whether Almarbh lived there?

A     No, I don't believe so.

Q     And the reason why?

A     The reason was, was our database tends to be more accurate then a Secretary of State database.

Q     But NCIC is that Secretary of State.

A     The driver's license portion of it is.

Q     Right.

A     That's what we would check for a residency requirement. We would pull a driver's license and see where this person listed on his driver's license, he resided.

        MR. THOMAS:   I would like to explore, if I could for purposes of this inquiry, what it is that he knew at the time.

        What specific documents he had in his possession regarding Almarbh's presence at the Norman Street address or where he was at any time.

        THE COURT:   I think that's a fair inquiry.

        If the line of your inquiry is, did he have reason

## MICHAEL THOMAS
### Recross Exam/Mr. Thomas-Defd. Hannan

to believe at the time he went in there, that Almarbh was, in fact, not going to be there.

MR. THOMAS:   That's correct or have some -- I guess more -- can I turn it around and say that what it was that he knew that gave him reason to believe that he was there.

THE COURT:   I think you're supposed to ask the question to the witness.

BY MR. THOMAS:

Q   Okay.  And so the sum total of the information that you had was this secret information I couldn't get into in the last hearing --

A   Correct.

Q   -- which I want to have proffered to the Court so that the Court can review it so we can determine whether or not that is relevant at all.

The second thing is --

THE COURT:   Let's stop there.

Is there any way you can describe the generic terms -- without revealing any sources or methods, intelligent sources or methods what you had that caused you to believe that Mr. Almarbh might be at the address?

THE WITNESS:   Yes, sir.  We had a classified database which is derived intelligence from classified investigations which information is stored in.

**MICHAEL THOMAS**
Recross Exam/Mr. Thomas-Defd. Hannan

BY MR. THOMAS:

Q    Is this classified information that's generated as a result of what happened on September 11 or was this something that was in existence before?

A    In existence before.

Q    When you say --

A    Cumulative.

Q    When you say the word "we" FBI or are you talking about some other agency?

A    I can't get into what the information comes from that's imputed.  I will not.

MR. THOMAS:  Your Honor, then we have that procedure by which things can be proffered to you.

And I ask --

THE COURT:  That's a fair request, Mr. Convertino. You can produce either if there's hard evidence on it, document evidence, or if it requires an affidavit from the agent, if you could prove that to me through protocol discovery, I'm not exactly sure what it is that's being questioned, judge.

MR. THOMAS:  There is a specific document that lists where Almarbh lived or where he had been located or identified to as of the date that you went out there.

THE COURT:  More specifically, what it was.

THE WITNESS:  There's also public information

**MICHAEL THOMAS**
Recross Exam/Mr. Thomas-Defd. Hannan

that's put into that.

MR. THOMAS: Let's not get too far ahead of ourselves.

THE COURT: What it was that -- what I'd like to see is everything upon which you based your belief that there was a likelihood that Mr. Almarbh would be located at that address at the time you went out there.

MR. THOMAS: And then pursuant to *Brady*, anything that rebutted that, that you had at the time that you went out there.

MR. CONVERTINO: Judge, I'd like to know, you know, that seems to be, to be overly broad and not relevant for the purposes --

THE COURT: Your, your position on this seems to be -- at least one of your positions seem to be reasonable articulable suspicion, part of the agent's mind set which I'm sure you would want me to consider is what he was going to -- what he thought he might be facing when he went out there and the basis for his belief. He may be basing --

MR. CONVERTINO: I do, indeed. There's been threat a of evidence already that the NCIC database.

THE COURT: I think it's a fair request.

MR. CONVERTINO: Okay judge. But just so I'm sure and I can comply fully, what is it that I am being asked to provide?

**MICHAEL THOMAS**
Recross Exam/Mr. Thomas-Defd. Hannan

THE COURT:   Any information, classified or unclassified that Agent Thomas based his belief upon -- that Almarbh might be located at the address on Norman Street at the time he went out there.

You, obviously, had a belief he was going to be there or you wouldn't have put this whole thing together to go out there; is that right?

THE WITNESS:   Again, Your Honor, I initially did not put anything together.  I was invited into this because of my specialty.

THE COURT:   No, no, sir.  No, no.

MR. THOMAS:   Searching without a warrant, Your Honor?

THE COURT:   All right, Mr. Thomas.  I mean, when you first went out there.

THE WITNESS:   Correct.  Again, the initial lead went to Agent Manescu and her partner.

THE COURT:   I would include in that Agent Manescu. I'm talking about institutionally, the basis.

THE WITNESS:   As long as it's clear.  I didn't specifically run those checks.

MR. THOMAS:   I want to take it a step further, judge, not just what he knew, but what was available to him at the time.  Because that goes into reasonableness and whether or not there are articulable reasons.

62

**MICHAEL THOMAS**
Recross Exam/Mr. Thomas-Defd. Hannan

THE COURT:   I don't think it does, Mr. Thomas.

We have an old saying bulls get fat, pigs get slaughtered.  You've been a pretty big bull so far.

MR. THOMAS:   At the risk of getting slaughtered, I also want the nonclassified information that he had.

THE COURT:   As to those issues?

MR. TH OMAS:   Yes.

THE COURT:   All right.  I've already indicated you could have that.

MR. THOMAS:   Okay.

BY MR. THOMAS:

Q    As you sit here today and are testifying, do you remember what the nonclassified information is you had?

A    Again, Mr. Thomas, I didn't specifically run the check.

I can tell you I'm certain NCIC was run, driver's license check.

Q    Yes.

A    Also, Choice Point, which is a database, public database that is checked for addresses.  It also -- probably are nonclassified are FBI ACS system was checked in addition to our classified.

I would venture to say all four of those were checked.

BY MR. THOMAS:

Q    So I'm clear, that before you went in there, you did

## MICHAEL THOMAS
Recross Exam/Mr. Thomas-Defd. Hannan

not rely on any of that information in order to determine whether or not Almarbh was at the premises before you did a protective sweep?

A    We did rely on, that's why we were at the residence.

Q    Not we versus I.  Okay.

I think that what you just told me is that you're sure that we had it, but I didn't check it?

A    Let me clarify that.

In conferring with my other agents who had received the --

Q    Conferring with whom?

A    Agent Manescu Agent Paul Heyard, they had told me that these checks had been done.  And the most recent address that we had was the Norman Street address.

In addition to a Wyoming Street address, those or the only two addresses that we had.  And the -- the more recent information we had was at the Norman Street address.

Q    As you sit here today, what was the reason why the Wyoming Street address was ruled out as the most recent versus the Norman Street address?

A    Because I believe that the Norman Street address showed the most recent dates on the database checks, the two dates.

Q    That's information you gleaned from Manescu and maybe the other agents?

A    That's correct.

## MICHAEL THOMAS
### Recross Exam/Mr. Thomas-Defd. Hannan

Q    All right.

A    It was our intention to go to both residences, which we did.

MR. THOMAS:   I'm done, Your Honor.  Thank you.

THE COURT:   All right.  Agent Thomas, I don't have anymore questions.

Thank you.

(Whereupon the witness was

excused at 3:28 p.m.)

THE COURT:   Do the defendants have any further witnesses?

MR. HELFRICK:   We asked Agent Pilat be available. We would like Agent Pilat called.

MR. CONVERTINO:   Can we approach, briefly?

(A discussion was held off the record)

(Whereupon the witness was then sworn)

THE COURT:   Give and spell your full name.  And Mr. Convertino has advised us you're in plain clothes for a goods reason, and we understand.

THE WITNESS:   Thank you.

Mark Pilat, P-i-l-a-t.

### CROSS   EXAMINATION

BY MR. HELFRICK

Q    How are you employed?

A    Special Agent United States Immigration.

**MARK PILAT**
*Cross Exam/Mr. Helfrick-Defd. Koubriti*

Q    How long have you been employed in that capacity?

A    Over 12 years.

Q    On September 17, 2001, it's my understanding that you had occasion to be at 2653 Norman Street in the City of Detroit.

A    Yes.  That is correct.

Q    And when you first went there, were you part of the individuals at the front door who knocked and received the answer?

A    No, I was not.

Q    Okay.  You came up at later time?

A    That is correct.

Q    How was it that you came to be in the flat?

A    I was given a signal by Special Agent &Palm.  I'm sorry.  I don't know the last name.

He nodded, told me that it was okay to proceed.

Q    Okay.  And so you went up to the upper flat on Norman Street, correct?

A    That is correct.

Q    And while you were -- when you first went into the flat, were the three occupants already in a certain location?

A    Yes.

Q    Okay.  And it's my understanding that there was a

**MARK PILAT**
Cross Exam/Mr. Helfrick-Defd. Koubriti

question about their status in this country and that you were there to verify that status or make inquiry.

A     Usually, yes.

Q     Okay.  And on that day, you did that?

A     That is correct, I did.

Q     Okay.  With respect to Mr. Koubriti, it's my understanding that he had a green card that he or someone -- either he or someone gave to you to check out; is that correct?

A     Yes, that's correct.

Q     And it's my understanding that you made phone calls and were able to confirm that it was a valid green card and what his status was in the country?

A     Yes.  That is correct.

Q     And correct me if I'm wrong, but, he was in the country legally at the time of when you were there on Norman Street?

A     I don't know that.

Q     What did you find out about his status?

A     That the card that he presented me did match name, date of birth, and legally authorize code of admission.

Q     So when you say you don't know that he was here illegally.  It sounds like that that checked out?

A     Well.  It didn't.  I didn't do enough checks to verify.

I didn't have the date file which would determine if there was a fraud in obtaining the Immigrant

**MARK PILAT**
Cross Exam/Mr. Helfrick-Defd. Koubriti

Visa whether or not he committed a crime.

THE COURT: Let me ask you a question, Agent Pilat.

From what you're saying, it sounds to me like on its face, the card and the information you had, on its face, indicated validity.

THE WITNESS: That is correct.

BY MR. HELFRICK

Q   Even though the other two individuals didn't have their cards, the numbers that they gave you would you have indicated the same thing as to them, correct?

A   If that's who they were, yes.

Q   Right.

And you relayed that information to the other agent at the time, correct?

A   Yes.

Q   Okay.

THE COURT: Were you able to verify the status of the other two individuals at the time?

THE WITNESS: Yes. I was based on the name and date of birth they provided.

THE COURT: Without -- they had no document -- as Mr. Koubriti had documentation, he had his green card. The other two did not.

THE WITNESS: That's correct.

BY MR. HELFRICK

**MARK PILAT**
Cross Exam/Mr. Helfrick-Defd. Koubriti

Q    As I understand it, you've read your report, I assume, your report?

A    My report, yes.

Q    Okay.  My understanding is at some point the Sky Chef badges were found, correct?

A    Correct.

Q    Okay.  My understanding from your report is that when the Sky Chef badges were found, that's when the defendants were handcuffed?

A    Based upon my report, that's what it does reflect.

Q    Okay.  And you were given these Sky Chef badges as well.

You made some phone calls with respect to them as well.  As I understand it.  Correct?

A    Yes, I did.

Q    And the Sky Chef badge that related to Mr. Koubriti had his picture on it.  Correct?

A    Correct.

Q    Okay.  And you called someone at the airport.  My understanding.  Security or something; is that correct?

A    Right the issuing office.

Q    Okay.  As a result of your inquiry, you found out that the possessor of these badges would not be allowed into secure areas at the airport, right?

A    No, I did not.

**MARK PILAT**
Cross Exam/Mr. Helfrick-Defd. Koubriti

Q    I'm sorry?

A    No, I did not.

Q    What did you find out with respect to these badges?

A    That they were not issued DTW airport I.D. badges.

Q    In connection with those badges.  They weren't issued other identification?

A    Right.  The office contacted was the security office for DTW airport.

Q    Okay.

A    They were not issued Detroit Metropolitan Airport I.D. badges.

Q    If they had been issues those DTW I.D. badges, what would that mean?

A    That they, on their own, by themselves, would have access to the air operation area, the AOA or secured areas.

Q    Without those, they would not be?

A    No.  That is not correct.

Q    Okay.  What's the significance of then finding out if they a had the DTW  I.D. badge, which allows them to access to those areas?

        If they don't have it, what does it mean?

A    Like I say, alone, they would be authorized access to the secure areas.

        By being a mere tenant of the airport, they're issued visitors badges.

**MARK PILAT**
Cross Exam/Mr. Helfrick-Defd. Koubriti

So if they were accompanied by an authorized badge holder, they would have been waived in as an escorted individual.

Q    If they were alone, would the Sky Chef badge that they had there, by itself, allow them access to security?

A    No, it would not.

Q    Okay.

THE COURT:   At what point were you able to determine that exactly?

THE WITNESS:   On the telephone right there in the apartment.

MR. HELFRICK:   With the Sky Chef people?

THE WITNESS:   No.  With the issuing -- with DTW Airport.

THE COURT:   I see.

THE WITNESS:   Yes.

BY MR. HELFRICK

Q    I assume, likewise, like the information about the alien -- the green card, that information you received, likewise, I assume, this information you would have relayed to the other agents as well?

A    Yes.  That's correct.

Q    It's also my understanding from your report that when you left the upper flat, you went downstairs and conducted an interview downstairs, correct?

**MARK PILAT**
Cross Exam/Mr. Helfrick-Defd. Koubriti

A    Correct.

Q    You talked to an occupant downstairs.

You asked him about this Nabil person, correct?

A    Yes, I did.

Q    You were told by that person that Nabil had not lived there since December of 2000; is that correct?

A    I would have to refresh my memory.

MR. HELFRICK:   Approach the witness, Your Honor?

(After a short delay, the proceedings continued)

THE WITNESS:   Yes.  That is correct.  The downstairs occupant of the 2655 Norman Street.

BY MR. HELFRICK

Q    Advised you the Nabil individual had not lived there since December of 2000?

A    Yes.  That is correct.

Q    Okay.  And -- did you, likewise, share that information with the other agents?

A    Yes, I did, after we completed the neighborhood checks, as we call them.

Q    Okay.  Also, you went to this Wyoming address, correct?

A    That is correct.

Q    That you had information that Nabil might be at?

A    Yes.

Q    I assume he was not there either?

**MARK PILAT**
Cross Exam/Mr. Helfrick-Defd. Koubriti

A   That is correct.

      MR. HELFRICK:  No further questions, Your Honor.

      MR. THOMAS:  No, thank you, Your Honor.

      THE COURT:  Mr. Convertino, do you have anything further?

      MR. CONVERTINO:  Just a few questions, judge.

**DIRECT EXAMINATION**

BY MR. CONVERTINO:

Q   Special Agent Pilat, I just have a few questions for you.

      You said that you ran a check of the defendants Mr. Hannan, Mr. Koubriti, through your telephone contact with INS?

A   Yes.

Q   How is that done, typically?

A   A radio or a cell phone, whatever means you have available to you.

Q   What is it specifically that you're checking for?

A   With that limited search, they're just looking at our central database, CIS system which will determine or tell you the person's name, address, country of birth, status, as far as when they entered the country, and where.

Q   Why did you refer to it as a limited search?

A   Because that is not the A file itself which houses the

**MARK PILAT**
Direct Exam/Mr. Convertino-Govt.

bulk.  And, ultimately, the total information available on that individual.

Q    And you didn't have access to the A file at that time?

A    No.

Q    When Mr. Koubriti showed you his card and you called it in, what specific information did you have?

What did you learn about Mr. Koubriti solely based upon your check, your limited search, as you called it?

A    That he was authorized as a immigrant to the United States based on a Diversity Visa, which is a lottery.

Q    What other information would you want to have had, but weren't able to get that night?

THE COURT:   By "wanted"  You mean in order to conform to his satisfaction the identity?

MR. CONVERTINO:   Yes, sir.  Thank you, Judge.

THE WITNESS:   Any other documents contained in the file as far as sponsors, where application was made for that diversity Visa, any other times visited in the United States, whether it was a nonimmigrant or immigrant, maybe under a different name or alien registration number, which shouldn't happen, because each individual should have only one number.

BY MR. CONVERTINO

Q    Why would that have been significant to you?

A    To assure us that that is who I'm speaking with.

**MARK PILAT**
Direct Exam/Mr. Convertino-Govt.

Q    When you left the apartment that night, were you assured in your on own mind that the person to whom you were speaking was the same person who gave you the Resident Alien Card?

A    Yes, I was reasonably sure.

Q    How about Mr. Hannan?

A    No, that wouldn't be correct in this case.

Q    Why not, sir?

A    It provided no other information other than a name and a date of birth, which didn't match an individual who made entry as an immigrant to the United States.

But lacking information of a green card, which you can run a number and kickback that information as long as that individual knew of a person's name and date of birth and their status, it could come back legitimately as that person.

Q    Based upon your experience as in INS agent, sir, could you tell is it a violation of federal law if someone does not able to provide you with the Resident Alien Card at the time you asked?

A    Yes, it is.

Q    Could you tell us do you know what the violation is?

A    Section 8 U.S.C. 1304 and it's a relates to the possessing proof of resident alien age or residency in the United States.

Q    Was Mr. Hannan in violation of federal law?

**MARK PILAT**
Direct Exam/Mr. Convertino-Govt.

A    Yes, he was.

Q    Let me ask you a question about the Sky Chef badges, sir, that you were shown.

What is AOA?

A    Air Operation Area where the jetways, excuse me.  Where the aircraft taxi, take off, anything with the side of the secured fencing of an airport.

Q    Show you -- approach, judge?

May I hand you -- pardon me, the Sky Chef badge of Ahmed Hannan and the Sky Chef badge of Karim Koubriti.

Do you have those in your hand, sir?

A    Yes.

Q    Are these the same badges you saw on September 17th?

A    Yes, they are.

Q    How hard would it be for someone wearing those badges to get to the AOA?

A    Being accompanied by another Sky Chef employee, relatively easily.

THE COURT:   Who had access?

THE WITNESS:   The driver of the vehicles would have sole access.

THE COURT:   I'm not asking who had access.

They would have to be accompanied by another Sky Chef employee who did have access?

THE WITNESS:   That is correct, or any other

**MARK PILAT**
Direct Exam/Mr. Convertino-Govt.

employee that had access.  Anyone possessing a DTW badge.

BY MR. CONVERTINO:

Q     How many of those are there?

A     Oh, couldn't begin to tell you.  Thousands.

MR. CONVERTINO:   Thank you, sir.  Thank you, Judge.

THE COURT:   Mr. Helfrick, any redirect, limited to actually this have be recross limited to the direct?

MR. HELFRICK:   The only thing we marked them as exhibits.  I don't think we moved their admission, the Sky Chef badges.

THE COURT:   I show them as moved.  If the record doesn't show them, I'll admit them.

MR. HELFRICK:   That's all, Your Honor.

MR. THOMAS:   As a result of the question regarding Hannan, may I?

**CROSS EXAMINATION**

BY MR. THOMAS

Q     That badge, in and of itself, can't get access to AOA?

A     That is correct.

Q     And you knew that when you were out at the house; is that correct?

A     That's this badge alone?

Q     Yes.

77

**MARK PILAT**
Cross Exam/Mr. Thomas-Defd. Hannan

A    Yes, I did.

Q    And how long after you got into the house did you find that out?

A    Well, immediately, when it was handed to me.

Q    Okay.  So you knew right by looking at it that they wouldn't be able to have access to the AOA?

A    With this document itself?

Q    Yes.

A    That's correct.

Q    So I'm clear having possession of that is not illegal of that document, that is the Sky Chef badge?

A    Well, I'm not sure of the legality of it, if they didn't work there anymore.

Q    Have you assume a couple facts.  Maybe I'll ask for legal opinion, but threats --

Let's assume that they were injured in an automobile accident and that they were terminated because they didn't come back to work within the three days, okay?

And that is what happened early July about a month earlier.  Okay?

A    Okay.

Q    What's illegal about having that badge?

THE COURT:  If you know the answer.

THE WITNESS:  It's not their property; that's the

only thing I would be able to answer.

MR. THOMAS:   Nothing further.

THE COURT:   You can step down.  Any further witnesses from the defense?

(The witness was  excused at 3:45 p.m.)

MR. THOMAS:   No, Your Honor.

THE COURT:   Mr. Thomas?

MR. THOMAS:   No, judge.  No, thank you.

THE COURT:   Mr. Convertino, do you have anything in rebuttal?

MR. CONVERTINO:   No, sir.  Thank you.

THE COURT:   That closes the proofs.

What I would like, Mr. Convertino --

MR. CONVERTINO:   Yes, sir?

THE COURT:   Defense counsel, what I would like is briefing.

I'm going to take this matter under advisement.  I would like briefing on the Miranda and Fourth Amendment issues that have been raised now that we all have an evidentiary record.

And I'd like briefs in by a week from tomorrow.  Any problems?

MR. CONVERTINO:   No, judge.

MR. THOMAS:   No.

THE COURT:   Okay.

The final issue I want to address today is the *Bruton* issue brought by counsel for Mr. Hmimssa.

MR. HELFRICK:   One thing comes to my --

THE COURT:   Yes.

MR. HELFRICK:   -- about the briefing schedule is that because we had a transcript of everything that's gone on previously, but not for today.  So I don't know how long it might take to have the transcript.

So maybe make it two weeks from tomorrow?

THE COURT:   Well Ms. Sapala's very busy.  When can you get counsel a transcript?  They requested -- you're requesting transcript?

THE COURT REPORTER:   Monday or Tuesday?

THE COURT:   Why don't we say briefs due a week from Monday.  It's a holiday.  I'm sorry.  Tuesday all have a nice break then.

Mr. Rabaut, do you want to address those issues? February 19th, for the record.

MR. RABAUT:   May it please the Court, Your Honor.

On behalf of Mr. Hmimssa, as the Court's aware, I filed a motion to either grant Mr. Hmimssa a separate trial or suppress a statement which had been attributed to Mr. Koubriti, which the Court has heard throughout the course of this Evidentiary Hearing, wherein he suggests that false documents and a Day Planner, which were at the location on

# HMIMSSA'S MOTION FOR SEVERANCE

Norman Street, were the property, in fact, of Mr. Hmimssa.

Clearly, Mr. Hmimssa's in a position where, if a jury is permitted to hear those statements and if Mr. Koubriti does not testify in this trial, Mr. Hmimssa's counsel would not be able to cross examine.

THE COURT:   Let me ask you a question, Mr. Rabaut.

It seems to me that given the tenor of these statements, we have a number of different options here.

One, we can sever the trial and try Mr. Hmimssa's separately as you suggest.

Two, the Government may be in a position to redact the statement with respect to the ownership of the documents by Mr. Hmimssa.

I don't know that.  I haven't seen what's in the 302's and anything else and I've heard the testimony.

And the Government will have to make that decision as to whether they want to exclude the portion -- the what I would call the exculpatory portion of the statement by Mr. Koubriti or the intended exculpatory portion of the statement by Mr. Koubriti.  So the second possibility is redaction.

MR. RABAUT:   Judge, I suppose the third possibility of not utilizing them.

THE COURT:   Well, I suppose that is a third possibility. I'm quite confident the Government may not wish

## HMIMSSA'S MOTION FOR SEVERANCE

to follow that.

The other possibility -- assuming they use it, a third possibility would be separate juries.

MR. RABAUT:   Your Honor, I guess having listened to the testimony, especially more recent testimony today about how any statement given by Mr. Koubriti on that date was suspicious and not trustworthy, then the Government proceeds to argue in their brief that, in fact, the truthfulness so clear from the surrounding circumstances that the test of cross examination is -- has marginal futility.

And so why even redacting the statement does it take us out of our position.

I mean, if there is a suggestion that those documents belong to others and if it's redacted, I mean, I think a jury can still, depending on how it happens which we don't know as we stand here, could still, perhaps, come to some conclusion that it was directed towards --

THE COURT:   You don't think well -- if I -- if we did the redaction, the redacted portion would be any reference to Jalali.  I mean the only portion that would come in would be the statements you know, you'll find fraudulent documents in there.

If any statements come in at all, you'll find fraudulent documents in there and, maybe, to the extent that

# HMIMSSA'S MOTION FOR SEVERANCE

there was some indication that they did not belong to Mr. Koubriti.

Would that, in your view, protect your client's constitutional rights?

MR. RABAUT:  Your Honor, not to test the Court's patience, it depends on how counsel or the Court came to the conclusion how redactions came about.

Certainly, I would want to make sure that there's no indication whatsoever toward my client that in some way those documents should be attributed to his ownership or whatever.  And so I guess it would depend on how it's redacted, judge.

THE COURT:  What about separate juries?  Two juries; one for Mr. Hmimssa, one for the other two?

MR. RABAUT:  Certainly, that is another -- I mean, that's about the same as having the separate trials and saves the Court time, as far as judicial resources.

THE COURT:  Something we can consider.

MR. THOMAS:  Can I interject for a second, judge?

THE COURT:  Yes.

MR. THOMAS:  We've joined in the motion on behalf of Mr. Hannan.

There are items within that statement that point to Mr. Hannan.  If you decide that you'd like to go for two years, we might be a problem because then it would have to be

## HMIMSSA'S MOTION FOR SEVERANCE

three.

THE COURT:  I'll look at the *Bruton* issues concerning your client, Mr. Thomas, but I don't see them.

I'm not nearly as concerned about the *Bruton* issues with respect to your client.

Thank you, Mr. Rabaut.

Mr. Convertino, did you want to briefly respond?

MR. CONVERTINO:  Yes, Judge.

There is a mentioned three possibilities which, I believe there is a fourth possibility; and that is, that the case is tried without a jury and before you, if you decide that --

THE COURT:  I see the defendants all raising their head and nodding that that's what they want to do.

MR. THOMAS:  I saw some rolling their eyes, judge. It might have been me.

MR. CONVERTINO:  Judge, we had briefed the issue and we had brief discussion.

THE COURT:  Do you have any further thoughts after your briefing and after our discussion in chambers?

MR. CONVERTINO:  Well, I would just like to point out the differences between the case at bar and the plurality in *Lilly*, if the Court is willing to consider that.  If not, I had.

THE COURT:  Well, I'll -- let me tell you -- let

84

## HMIMSSA'S MOTION FOR SEVERANCE

me be completely honest with you, Mr. Convertino, here.

MR. CONVERTINO:   Yes, sir.

THE COURT:   I had read *Lilly* before, I reread it when you brought it to my attention.

As I indicated to you, these statements seems to me to be, if anything, more *Williamson* statements then *Lilly* statements.

Looking at the statement from the prospective of Mr. Koubriti, it seems to me that the statement was, at least in part, intended to be an exculpatory statement.  And as to the other part, it was probably neutral.

I mean -- and, therefore, does not fit within 804(b)(3) as a statement against penal interest.

But even if it did fall, arguably, within 804(b)(3) as a statement against penal interest, even if it arguably fell, I think Mr. Rabaut's point about the trustworthiness here for cross examination is well taken.

We just had Mr. Thomas and -- I'm sorry, Agent Thomas and Agent Pilat testify, I think fairly forcibly, that they certainly did not trust the statements at the time they were made.

And given that testimony, how can we say that they -- that is an appropriate substitute for cross examination?

MR. CONVERTINO:   Well, it's a Damoclean sword,

## HMIMSSA'S MOTION FOR SEVERANCE

judge, because what Mr. Rabaut is asking the Court to consider are the trustworthiness of the statements in two separate situations.

The suspicion that was raised in the minds of the agents who were there was -- is a totally separate issue then the hearsay or nonhearsay statement of a defendant that was given without prompting or questioning.  It was not.

THE COURT:   The confrontation aspect is only one aspect of the constitutional analysis -- the confrontation aspect is one hearsay aspect related, but also different.

MR. CONVERTINO:   Once you get past the confrontational aspect, judge, it seems you go to *Roberts*, the second prong in *Roberts*, which is the trust worthiness.

THE COURT:   I agree with it, it's your confrontation that I think you have more problems with.  I think there's problems with *Williamson*, but even if you got past that, you still have a confrontation problem here because the real inquiry then is whether there was an appropriate substitute for substitution -- appropriate substitution for cross examination and whether the statements, themselves, are inherently reliable, such that they're trustworthy and do not require further inquiry.

I think given the entire circumstances here, I don't see how I could possibly find that Mr. Koubriti's statement was inherently reliable.

## HMIMSSA'S MOTION FOR SEVERANCE

MR. CONVERTINO:   Well, I would -- may I just briefly be heard?  I don't want to try the Court's patience.

But the state --

THE COURT:   I appreciate everybody being so solicitous of my patience.  It's been a long week.

MR. CONVERTINO:   I know you've considered this issue.  I know you're good enough to hear me on this issue as you stated earlier you would.

But Mr. Koubriti's statement was not -- was not a result as in little leading of a question placed to him by an agent, it was as an excited utterance, as I put in my brief.

The statement, itself, there are documents in the other room and then Mr. Koubriti going with the agents.

THE COURT:   Let me direct you a little on this.  That's not my problem.

The problem with it as regards to the confrontation aspect and as regards the hearsay aspect of it is this.

*Williamson* teaches us that statements which are made, in essence, in aid of helping one's self, which is the *Williamson* case where Mr. Harris, I believe it was, made some statements about the cocaine which were self exculpatory trying to put it on Mr. *Williamson*, I believe it was.

The Court said those are inherently unreliable because what the declarant is trying to do is trying to either get a better deal for himself bargain with the police

## HMIMSSA'S MOTION FOR SEVERANCE

or get himself off.  Therefore, they are not -- rather than being inculpatory, they're exculpatory and, therefore, inherently unreliable.

I think the operative part of Mr. Koubriti's statement for these purposes is not so much you will find the false documents in the dresser, but the statement which goes to the heart of the Bruton issue here, they belong to Jalali.

And I don't see how you can get around that inherent untrustworthiness without either severance or redaction of that second part of the statement.

MR. CONVERTINO:   Judge.  I believe that the initial statement there are false documents here in a drawer as he pointed out there were.  That, alone, is inculpatory.

THE COURT:   That's inculpatory.

MR. CONVERTINO:   The next part of the statement that they're Jalali's.  If they belong to Jalali, I believe the test is applicable.

THE COURT:   You don't think that's intended as a mitigating or exculpatory statement when a guy comes up and says hey you're going to find some drugs in the drawer, you know, but they're not mine.

I mean, that was the situation in *Harris* -- in *Williamson*, that was exactly the situation.  And you know what the Court said in *Williamson*.

MR. CONVERTINO:   I do.  I just --

## HMIMSSA'S MOTION FOR SEVERANCE

THE COURT:   All right.  Look, I want to look at the issue.  I'll take that under advisement, too.

Where we're headed here is, if the Government can't find an appropriate redaction that I think protects Mr. Hmimssa's rights to confrontation, I think we're headed for either severance of the trials or possibly two juries or redaction, something that -- something that considers the *Bruton* implication raised by Mr. Rabaut.

MR. CONVERTINO:   We will redact the statement, if that's the Court's ruling.

THE COURT:   I haven't -- I haven't issued my opinion yet.  You may want to see my opinion before you make that decision on redaction.

MR. CONVERTINO:   Judge, one last thing.

THE COURT:   Yes?

MR. CONVERTINO:   Regarding the -- what I think is the key difference between the *Williamson* case and the case at bar; and that is this.

They're drugs in the drawer and they're being drugs in the drawer is different from saying they're false documents in the drawer and they're Jalali's and the false documents that are in the drawer include photographs of the person who is the defendant Hmimssa.

THE COURT:   Doesn't that -- yeah.  But, but you want to get -- you want to get the statements in which gave

## HMIMSSA'S MOTION FOR SEVERANCE

rise -- which gave rise to the holding against him, that's sort of a bootstrap.

MR. CONVERTINO: The very document themselves are certainly independently trustworthy of the statement that that is this person's document.

It's the photograph of the driver's license of my brother is in the drawer. You look and there it is. It's the brothers photograph.

It's the same scenario which, I think, adds to the trustworthiness, the inherent trustworthiness.

THE COURT: You think Mr. Rabaut wouldn't want to cross examine Mr. Koubriti, in of itself, would be sufficient.

MR. CONVERTINO: What would the benefit of cross examination on that be? The documents are what they are, the photographs is what it is, which is the defendant Hmimssa who the other defendants said --

THE COURT: I don't know, Mr. Convertino. I don't think you're there on it, but I'll --

MR. CONVERTINO: Thank you, Judge.

THE COURT: -- I'll take it under advisement. Anything further, folks?

MR. THOMAS: Yes, Judge.

May we have a side bar, please?

USA V. HANNAN ET AL. 01-80778

# HMIMSSA'S MOTION FOR SEVERANCE

(Whereupon a discussion was held off the record and this case was then in recess at 4:02 p.m.)

CERTIFICATE OF COURT REPORTER

I certify that the foregoing is a correct transcript from reported proceedings in the above-entitled matter.

_____          _____
CAROL S. SAPALA,  CSR,RPR,CM                         Date

USA V. HANNAN, ET AL. 01-80778