UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Government,

v.                                          Case No. **01-80778**

AHMED HANNAN
KARIM KOUBRITI,
ABDEL ILAH EL MARDOUDI,
FAROUK ALI-HAIMOUD,

Defendants.

_____/

**REDACTED TRANSCRIPT OF IN-CAMERA HEARING**

BEFORE THE HONORABLE GERALD E. ROSEN
United States District Judge
860 US Courthouse & Federal Building
231 Lafayette Boulevard West
Detroit, Michigan
**Tuesday, December 23, 2003**

Linda M. Dona, CSR, CRR, FCRR, RMR, CMRS
Theodore Levin U.S. Courthouse
231 West Lafayette Boulevard, Room 257
Detroit, MI 48226
(313) 962-4573

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

USA V. Koubriti ET AL 01-80778

**APPEARANCES:**

> **MR. HAROLD GUREWITZ**
> Gurewitz & Raben, PLC
> 333 West Fort Street, Floor 11
> Detroit, MI 48226
> > On behalf of Mr. Milton Jones.
> > - - -

I N D E X

**Witness:**                                          **Page**

  MILTON DAVID JONES
      Examination by the Court                      11

E X H I B I T S

**Court Exhibits:**                                   **Admitted**

Court Exhibit 1 - Letter                              32

Court Exhibit 2 - Notes                               32

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Detroit, Michigan.

Tuesday, December 23, 2003.

At 10:49 a.m.

-- -- -- -- -- -- -- --

THE CLERK:  01-80778, United States of America v. Karim Koubriti, et. al.

You may be seated.

THE COURT:  All right.  May I have the appearance, please.

MR. GUREWITZ:  Good morning, Your Honor. Harold Gurewitz, appearing this morning on behalf of Milton Jones, who is standing to my right.

THE COURT:  You may be seated.

This is a -- this is a sealed proceeding. In order to --  It's being held in order to assist the Court in making a determination as to the propriety of Mr. Jones' assertion of the Fifth Amendment privilege with respect to the production of the letter that he wrote to Mr. Allen and to notes that he took that were referenced in that letter.

Um, it is critical to the Court --  Well, the record should reflect that Mr. Gurewitz, at the Court's request, produced the notes to the

USA V Koubriti, ET AL 01-80778

**REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03**

Court, um, last week, and the Court reviewed those notes, and it is critical to the Court's determination of materiality on the Brady issues asserted by the defendants in the Koubriti case to make a determination as to whether or not the letter and the notes are credible, given the matters that are disclosed in the letter and the notes.

With respect to the privilege itself, the Court must make a determination as to the foundation of the letter, foundation of the notes and, um, exactly where and how Mr. Jones, um, kept the notes that were referenced in the letter.

So the Court will focus on those issues today.

The Court will not decide today, um, on the issue of the propriety of the Fifth Amendment assertion, and, Mr. Gurewitz, if following this hearing you wish to file a supplemental brief under seal, you may do so, although it will be on a tight schedule.

MR. GUREWITZ: Could I make a statement?

THE COURT: Sure.

MR. GUREWITZ: Your Honor, I just want to

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

note for the record that I have previously submitted a brief to the Court also under seal which discusses the Fifth Amendment privilege and that the bases on which it has been claimed by Mr. Jones as set forth in these proceedings, and there are two grounds discussed in that brief.

One is in light of the Government's representations to the Court at the hearing here on December 12th, um, there is concern that the Government may view Mr. Jones' representations concerning any conversations with Mr. Hmimssa as being false and, therefore, subject to prosecution based upon 18 U.S.C. 1001.

In addition, there is a basis for concern that the Government may attempt to use his communication with the Government, or any evidence of communication with the Government, as an attempt to curry favor with the Government and offer that of evidence of consciousness of guilt.

Mr. Jones, as has been stated in the brief, and I believe I stated before the Court on December 12th, is a defendant in a case now pending before Judge O'Meara, where the United States has

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

asked for the death penalty.

And there is then concern that because the standards for admissibility of evidence is lower in the -- in the aggravation or penalty phase of a death penalty case that the Government may find an easier basis on which to use that information in that circumstance.

And so it's for those reasons that Mr. Jones has asserted his privilege so far in these proceedings.

It's my understanding that -- that any testimony that Mr. Jones gives this morning in this proceeding will not, in any fashion, constitute a waiver of his privilege.

THE COURT:  That's correct.

MR. GUREWITZ:  And so that the testimony he's giving -- he will give here today cannot be used by the Government at this point for any purpose at all.

The Government will have no access to it.

THE COURT:  At that point.

Now, if I find that there is no privilege, um, whether or not the Government, or the defense for that matter, would be able to use testimony here by way of impeachment, and I'm

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

just thinking this through.  If Mr --  If this were to play out and Mr. Jones were to testify at trial, it seems to me that his then testimony may --  Well, I'm not sure it would be used in impeachment.  It is a sealed proceeding.

I think the Court is entitled to rely upon it in making a determination.  Um, I'll have to consider that as well.

MR. GUREWITZ:  That's all I have.

THE COURT:  My current contemplation is that the purpose of this testimony today is that, um -- it is to assist the Court in making the determination as to whether there's a proper assertion of the Fifth Amendment privilege.

I would also observe that if the Court were to determine that Mr. Jones' letter and his notes and his testimony foundationally and substantively were credible, it seems to me that that would go a long way toward, if not entirely, obviating any concern about exposure to 1001 prosecution for false representation.

I think the Government would be very hard pressed to prosecute Mr. Jones for making false

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

representations in either the letter or the notes or his testimony here if I found him to be credible.  That's number one.

With respect to the consciousness of guilt issue, um, I'll have to address that in the opinion.  I'll --

Now, it does strike me as, Mr. Gurewitz, you and I have discussed the letter itself, the document, is not subject to any privilege, because Mr. Jones wrote that to, um, Joe Allen. It's not a document that was written to his attorney or provided to his attorney for purposes of seeking, at least in the first instance, legal advice.

And the same is true of the notes.  The notes were not written for the purpose of seeking legal advice from his attorney, so I'm not certain of the notes.

The issue is the production of the notes. The letter's already been produced.  The Government has already got the letter. Mr. Jones wrote it to Mr. Allen.

The real crux of the issue here is the production of the notes.

MR. GUREWITZ:  Just to be clear, the

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

privilege assertion has been and is with regard to the subject matter of -- of the letter or the notes, and I -- I understand that there is no -- generally no Fifth Amendment privilege with regard to documents which have already been created, except as to the extent that there is a Fifth Amendment privilege concerning the production.

But the privilege has been asserted with regard to any testimony that might be compelled concerning the subject matter of the letter or the notes.

THE COURT:  Okay.

All right.  Mr. Jones, would you come up, please.

THE WITNESS:  Yes, sir.

**MILTON DAVID JONES**,

called as a witness on behalf of the Court, being first duly sworn, was examined and testified as follows:

THE WITNESS:  Yes, sir.

THE COURT:  Be seated, please.  And if you would spell your full name.

THE WITNESS:  Milton David Jones, M-i-l-t-o-n; Jones, J-o-n-e-s.

THE COURT:  Linda, may I have the letter

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

and notes, please.

I'm sorry, sir?

THE WITNESS:  I would just like to apologize to the Court today.

Um, I didn't get a chance to shave.

THE COURT:  It's okay.

EXAMINATION

BY THE COURT:

Q    Um, are you also known as Butch I believe?

A    Yes, sir.

Q    How old are you, Mr. Jones?

A    I'm forty-eight.

Q    Um, you're currently incarcerated pending trial?

A    That is correct, sir.

Q    Correct?

And facing what charges, sir?

A    Um, I'm facing four counts.

One count of conspiracy, one count of continuing criminal enterprise, and two capital murder counts.

Q    When were you arrested in this charge?

A    Um, July -- excuse me.  June the 29th, of 2001.

Q    And were you, um, incarcerated pending

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

trial then?

A    That is correct.

Q    Where were you initially incarcerated?

A    From the first day I got --

Q    Yeah.

A    -- picked up?

Um, the detention center in Philadelphia.

Q    Okay.

At some point you were brought to Michigan?

A    Yes.

Q    You know a person named Youssef Hmimssa?

A    Yes.

Q    Tell me how you knew him.

A    Um, I was put, um -- I was in the Wayne -- I was housed in the Wayne County Jail, and, um, I was put on 604, which is maximum security in the Wayne County Jail, and he was in the cell right next to me, and, um --

Q    Can you tell me roughly when this was?

A    It was in December of 2001.

Q    Was he already there, or --

A    Yes, he was.

Q    He was already there?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A     Yes.

Q     And then you were brought in --

A     Um, I was brought in and housed right next to him.

Q     What was the first contact you had with him?

A     Um, I guess it was about the TV, how, you know, um -- what channels do they watch on the TV, things of this nature.

Q     Was there a general television that you both watched together?

A     Yes.

Q     And you began talking with him.  Was that almost right away after he was moved down to the ward, or --

A     I -- I was moved.

Q     Oh, I'm sorry.

        After you were moved?

A     I was moved on the ward after him.

Q     Okay.

        So did you begin talking to him right away?

A     Yes.

Q     And tell me what happened after that, with respect to your relationship with him.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A    Um, he -- he was complaining.  Um, at this time he was -- he was complaining about John Ashcroft was talking to the -- talking to the press and wasn't supposed to be talking to the press, and he had, um, a lot of papers that, um -- from the newspaper reports from all over, talking about -- talking about his case.

Q    Had you been aware of that, Mr. Ashcroft was talking about Mr. Hmimssa?

A    Um, no.  Not to -- not to my knowledge.

Q    Was this the first you'd heard about that?

A    Yes.

Q    From Mr. Hmimssa?

A    Yes.

Q    Do you know what Mr. Hmimssa was charged with at the time?

A    Yes.

Q    How did you know that?

A    Um, just from the news.

Q    From the news.

         All right.  What happened then?

         How did your relationship begin to develop?

A    Well, they let you out for an hour every day for -- for, um, rec. and a shower.

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q    For rec.?

A    Recreation, walk.  Take a shower and get out and walk.

And he would come down to my cell, and, um --

Q    You were in your cell?

A    Yes.

You would never be out at the same time.

And, um, we -- we would just talk, and I would -- I would basically, um -- I would basically listen, and he was -- he would be asking me questions about, um, the federal prison system, and, um, I was telling him how -- how the federal prison system was.

And he was -- he was asking me about the fences --  He was basically asking me about a lot of things about the security.

Q    Do you know why he was asking you about security?

A    No.

Q    Did he tell you?

Did he say anything to you?

A    No.

Q    So if I understand your testimony so far

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

is he would initiate these conversations with you --

A    Yes.

Q    -- by coming over to your cell?

A    Yes.

Q    Did you have any social conversation with him?

A    Yeah.

We had a social conversation about chess and books.

Q    Did you play chess with him?

A    Yes.

Q    And what books did you talk about?

A    Um, I don't know the name of the books, but he had some books that he wanted me to read, and, um, I think I may have had a book, and we just like traded books or something like this.

Q    Do you remember what the books were about, the ones that he gave you?

A    No.

Q    Um, so you began developing a relationship?

A    Yes.

Q    What happened then?

A    Um, as -- as he would tell me things, um, pertaining to his case, I was -- I was writing it

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

down, and I was trying to, um, be as accurate as I could.

Q    What was he telling you, if you can recall?

A    Well, the thing that stuck out in my mind, he was telling me about the Secret Service -- the Secret Service agent, that, um, he had lied to him about something and got out on bond.

He was supposed to be coming to see -- see this guy, and he said that the man had left a message on his answering service, and, um, he was just laughing about it, about the -- I believe it was like Patrick, is he coming in, or it was something pertaining to that.  He just kept laughing about it.

Q    Patrick.

That was --  Who was Patrick, as you understand?

A    Um, I don't know if that was the name he was using or not, but, um, I believe that that was the name that he was -- he was telling me that the man had left on his answering service.

Q    So that was the name that Mr. Hmimssa was using at the time?

A    Um, I'm guessing.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q     Okay.

      Did he tell you what the last name was?

A     No.

Q     Okay.

      What else did he tell you about his case or anything else?

A     He was, um, basically telling me that he didn't have nothing to do with the, um -- the Bin Laden, because people -- there was another guy that was teasing him about being Bin Laden.

      And he told me he didn't know Bin Laden, and he was telling the guy, stop calling me that, and he was basically telling me that, um, what he did was, um -- was with ID, that he knows how to make ID, and, um -- and he basically talked about he had went to school for, um -- he knew about computers, and he could -- he could build computers, and he knew everything there was about making false IDs.

Q     Did he tell you whether or not he actually made false ID?

A     Yes.

Q     What did he say?

A     He said that he -- he made documents, um,

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

I don't know what kind of documents, whether they was birth certificates or driving licenses, but he was telling me with the computer, you can make all kinds of false IDs.

Q    Did he tell you what he did with the false ID at any time?

A    Um, not to my knowledge.

Q    Did he tell you whether or not he sold it to anybody or supplied false ID to anybody, if you recall?

A    I can't recall if he said that he had, um, sold anybody any false ID.

Q    Now, I have a -- You said you were keeping notes at the time?

A    I was -- I was keeping notes, yes.

Q    What I'm trying to do is understand what you recall independently from having looked at the notes without having looked at the notes.

        And then in a moment I'm going to show you the notes and see if that refreshes your recollection as to what he was telling you, okay?

A    Okay.

Q    But basically, first I want you to tell me how it was that you came to start keeping those notes.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A   Um, basically, when he -- he was telling me, um -- He started talking about his girlfriend was coming, and, um, his girlfriend's brother, and he was telling me that, um, he wanted to get out and go to Canada.

And he was telling me that he could -- he could bring this country down electronically.

Q   Electronically?

A   Yeah.

And that stands out in my mind, and when I basically asked him what he was talking about, he was just -- he kept referring back to the computers, how he could do anything on the computers, and he was on -- he knew how to get money out of people's accounts, um, like bank accounts, through the computer.

Q   Did he tell you any more about using computers to get identification or -- or money or accessing bank accounts?

A   He just told me that that was the case, that he had got in trouble before.

Um, I -- I don't know if it was Chicago or somewhere, and I guess in that region, and he had got -- he had got in trouble before, and,

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

um, I guess it was -- he was making like credit cards, and he was -- he wanted to purchase these computers or something, and, um, he had to leave his car. They was trying to catch him. He had to leave his car in the parking lot.

Q    And that's how he got caught?

Is that --

A    Um, he got away from -- from what I remember. He got away.

And that, um, he was trying to get his car back, and he sent somebody -- he sent somebody to get his car, and, um, they went and got the car.

And when the person met him to get the car, I believe that's how he got arrested.

Q    Did he tell you how he used to, um, use -- how he used to steal people's identification?

Did he say anything to you about that?

A    Um, to the best of my recollection, I believe he spoke on that.

Q    What did he say, to the best of your recollection?

A    Um, that he -- he was making some kind of way -- he was able to get money out of the accounts,

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

and he was making a lot of money.  He was making a lot of money doing that and getting the money out of the accounts with these credit cards.

Q    Do you remember how he said he would do it?

A    No.

Q    Um, what else do you remember about what he was telling you during this time?

A    I remember he was talking about, um, President Bush.

I happen to like President Bush, and I -- I told Harold that, you know, I felt that he did a good thing, as far as trying to protect us after 9/11.

And that, um, he was speaking out real harshly about him, and, um, that's what really made me start taking the notes, because he was -- he called -- he said that they was, um -- the Bush family was like a drug family.  He was, um -- he was saying things about the Bush family that I would never say.

THE COURT:  Linda, do we have another copy of these notes?

THE CLERK:  I don't have a second copy.

THE COURT:  Harold, do you have another

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

copy?

MR. GUREWITZ: Yeah.

THE COURT: Hand up another copy.

Q    (By the Court)  Mr. Jones, the first thing I'm going to show you is, um, a copy of a letter that is dated December 30, 2001, written to a Mr. Allen, okay.

Could you just look at that, please, for me, and read it through and tell me if you recognize it.

A    (The witness complies.)

Yes.  This is my letter.

Q    Okay.

You recognize that?

A    Yes, sir.

Q    And you wrote that letter to Mr. Allen?

A    Yes, I did.

Q    When did you write that?

A    Um, from this letter, it says 12-30 of 2001.

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

Q    In the letter you say he was telling you things about the attorney general, Mr. Ashcroft?

A    Yes.

Q    Is that what you were telling me before, about how Mr. Ashcroft had been talking in the media about his case?

A    Yeah.

And he was mad about -- he had, um -- He had some papers to prove what he was saying that his lawyer had gave him.

They was like news documents, comments that Mr. Ashcroft has made.

Q    Okay.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Could you turn to page 2, please.

At the top there you say, when Youssef started calling the Bush family drug dealers.

A    Yes, sir; that is correct.

Q    Is that what you were just telling me about?

A    Yes.

Q    And you were taking notes you say and writing everything down?

A    Yes.

Q    Could you look at the next sentence of it. He gets to telling me how he lied to the FBI.

A    That's exactly what he said.

Q    Tell me exactly what he said, as best you can remember it.

A    Um, he was telling me that he -- he had got locked up, and that, um, I believe he used this name, Patrick, and he -- it was like it wasn't his real name, and, um --

Q    Did he tell you where he was locked up?

A    To the best of my knowledge, I believe it was Chicago.

Q    Okay.

A    And, um, he was telling me that I guess he

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

was supposed to go report or something, and the man left a message on the answering service.

You know, he was -- he was laughing about it, how he -- how he had got out of jail, how he had got, you know -- he had tricked them.

Q   Now, was that the FBI or the Secret Service?

A   I believe it was the Secret Service.

Q   Did he say anything to you that you can recall about lies to the FBI?

A   Um, right off -- right offhand I can't. That don't stick out in my mind.

Q   All right.

Now, you say, if you look down at the next line, Youssef gets to telling me about the role he played with the terrorists of September 11th and how he made ID and documents for them to get around in the world.

A   That is correct.

But he -- he also stressed that he didn't have nothing to do with the terrorists of like 9/11.

Q   Well, what did he say?

A   Um, he kept telling me that he didn't know nothing about, um, what was going to happen.  He

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

didn't know nothing about no 9/11 or nothing like that.  All he did was make ID.

Q     For who?

Did he tell you?

A     He said that the guys, that they had got arrested with him, had stole, um, I guess -- they had stole some papers that -- or stole some ID of his or something like that pertaining to him, is what I can remember.

Q     Okay.

But when you wrote it here, he got to telling me the role he played with the terrorists of September 11th.

A     What I was speaking of, the role he played was strictly ID.  It was nothing, um, that he knew, like nothing was going to happen like that.

That was the only role he kept telling me, is all I do is ID.

Q     Did he tell you whether or not he supplied terrorists with ID?

A     No.

Q     He did not say that?

Well, when you say here, he gets to telling me the role he played with the terrorists of September 11, 2001, and how he made IDs and

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

documents for them to get around anywhere in the world, what did you understand he was referring to?

A     I was referring to that I understood he was talking about the three guys or four guys that had got arrested with him, that that's all he was stressing, is that he made IDs and people could go anywhere in the world with the ID that he made, because it was very good.

Q     Did he tell you whether he had made ID for anybody else, besides these guys who he was arrested with?

A     Um, I'm going to answer no, because I can't -- I can't remember.

Q     You don't remember?

A     Right.

Q     And now the next line, you've got how he was going to bring the United States down.  You've written here electorally.

Is that what you meant, electorally?

A     No.  I meant electronically.

Q     And the next line you've got, he went to talking about my president, and I knew I'd better write you and tell you.  You can ask my lawyer and he will tell you I like President Bush.

That's what you told me about

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

already?

A    That's true.

Q    Okay.

Then you say, when Youssef talks about terrorist things, I know that's a matter of national security of the highest priority.

Now, what -- what things were you talking about that he was talking about?

A    It's just as far as about ID, and, um, taking money out of, um, people's accounts,

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

Because he's very knowledgeable about computers and how to get money out of people's accounts.

Q    You say, so could you please let the Assistant U. S. Attorney who is the prosecuting attorney for Youssef Hmimssa know I have notes, verbatim, as it was told to me.

A    That is correct.

Q    And that you were willing to take a polygraph test?

A    That is correct.

Q    Did anybody involved with Mr. Hmimssa's

USA V Koubriti, ET AL 01-80778

**REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03**

case for the Government ever come and talk to you?

A    No.

Q    Mr. Convertino, does that ring a bell?

A    Yes.

Q    Did he ever come and talk to you?

A    No.

He -- he called my attorney

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

And at that time I turned over -- the notes over to my attorney.

Q    You turned your notes over?

A    Yes.

Q    When would that have been?

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

It was whenever he came and visited me about that.

Q    Where were you housed?

A    I was housed in the Wayne County Jail, in the maximum security, 604.

Q    You were still in Wayne County?

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A    I was still in Wayne County, still on 604.

Q    Was it somewhere near the time you took these notes, or was it much, much later?

A    Um, it could have been a month or two after, after I took the notes.

Q    So you took the notes starting in it looks sometime like in 2001, and you kept taking them until 2002 sometime?

A    Yes.

Q    When you were still housed with Mr. Hmimssa?

A    That's correct.

Q    How soon after you finished taking the notes did you turn them over to Mr. Gurewitz?

A    As far as time wise, I don't -- I don't know if it was a month or two months after -- after that.

But whenever he came and visited me, the timing, I turned them right over to him.

Q    Okay.

It was not this year, though?

A    No.

Q    It was before the trial started in this case?

A    Yes.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q    If I told you that the trial started in this case in March of this year, 2003, can you tell me whether it was before the trial started in this case?

A    Yes.  It was before the trial started in this case.

Q    All right.

Let's go into the notes, okay?

A    Okay.

Q    I'm going to show you -- I'm going to mark that -- the letter I'm going to mark as, um, Exhibit -- Court Exhibit No. 1.  And we'll include that as a Court exhibit.

We're going to mark the notes as Court Exhibit No. 2.

(Court's Exhibits 1 and 2 were admitted into evidence.)

Q    (By the Court)  And I want to show you the notes, and we'll go through those much like we went through --

And as you go through them, see if that jogs your memory as to anything.

A    Yes, sir.

Q    But, before we do, I want to know just exactly how it was that you took the notes, okay?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A    Um, I would take the notes after he would go back in his cell.  I didn't want him to, um, see me writing down things that he was telling me when --  After his hour would be up, I would write down.

Um, I tried to write it down word for word, what he said, because I wanted to be -- I wanted it to be accurate.

Q    Why were you keeping the notes?

A    I was -- I was keeping the notes because I couldn't remember everything that he was saying, and it was -- I felt that if I wrote it down that I could remember it [ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

[ REDACTED TESTIMONY ]

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q    So would you write these notes down -- You would have a conversation with Mr. Hmimssa?

A    Yes.

Q    And then you'd go back and be in your cell?

A    I would already be in my cell.

And as soon as they locked him in, I would pull my pad and my pencil out, and I would write down what he told me.

Q    You had a pencil in your cell?

A    Yes.

Q    I thought you weren't allowed to have pencils in the cell?

A    No.

You're not allowed to have ink pens.

Q    No ink pens.

So you used a pencil on these notes?

A    Yes.

Q    I'm going to show you the notes.

The first note is dated 12-21-01.

Do you know is that the first day that you started talking to Mr. Hmimssa?

A    I'm going to say yes.

Or the second day.  It had to be the first or the second day.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q    Okay.

Can you read that first paragraph to yourself and then tell me what you remember about that conversation.

A    (The defendant complies.)

Yes.  I remember this.

Q    Does that help you remember?

A    Yes.

Q    What did he tell you about the conversation?

A    It was some kind of device like, say, if you went to a restaurant or something like that, and you paid -- you paid your bill with a credit card, well, he had made this kind of device that he could swipe -- or they -- he can run your credit card through this device, and it will store and -- store your information, and, um, he would go back, and this is how he was like -- they was able to get money out of people's accounts.

Q    So that was --  That would help him steal the money out of the accounts?

A    Yes.

Q    Do you remember anything else he told you about how he did this?

A    He --

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q    Beyond what's in -- either what's in the notes or -- or beyond what's in the notes?

A    I remember asking him --  He told me he had built this device.  Um, it was some kind of -- it was some kind of device that was like for credit cards.

And he was telling me just like it's a strip on the credit card, stores all people's information, like their account number, whatever.

Q    Did you --  Had you heard about anything having to do with this beforehand?

Did you know anything about this beforehand?

A    Just from what I seen on TV, that they had made a raid and -- and picked these guys up.

Q    No, no, no.

A    Oh.

Q    What I mean is how to actually steal --

A    Um, I don't know nothing about, um, credit cards, um, building computers.  I don't know nothing about that.

Q    Did you know anything about how you could run a device -- you could run a card through this device and -- and take people's information off of the cards?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A      That was -- that was the first I had heard of that.

I was impressed with, um, the -- how knowledgeable he was about it.

Q      Next sentence says, he asks me -- he asked me endless questions about federal prison security.

Is that what you were telling me?

A      Yes.

Q      What did he ask?

A      Um, he was asking me about what prisons had different kinds of fences. I was telling him that if he went to like a -- like a level 1, for instance, it might not be no fences, that it's just like a camp status. And, um, if he, you know -- it wasn't no kind of fences, but I told him like a level 2 or level 3 or 4, something like that, they had two fences, and they had like a guy in a gun tower.

Some people had -- some institutions has gun towers, and I guess some of them, they have like patrols. Like in Milan, they ran around and watched the prison.

And, um, he was -- he's just --  What I can remember, he just kept asking me things, um, about the security, how -- how -- how -- how the

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

prison system was set up.

Q    Can you look at the next page.

Read the first paragraph.  See if that refreshes your recollection as to anything else he told you.

A    (The witness complies.)

Yes.  That is correct.

Q    What is that --  What was he telling you with respect to that first paragraph?

A    He was telling me that, um, if he got to like one of them places, that he was going to escape.

And then, um, he was just telling me he needed -- he needed some money and his credit cards, and he would be all right, and he'd like not come back here.

I remember him telling me he was like from Morocco, or he was -- he wasn't really from the United States, and that, um, he was under the impression that he might have got a lot of time or something like that, and the first chance he got, he was going to escape.

Q    If he got to a minimum security prison?

A    Yes.  Yes.

Q    Can you look down at the next paragraph?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

people -- he like --

When you come into this country, you needed a green card, and, um, he knew how to make it like it was real good -- real good documents, all -- everything he made was real good.

Q    Did he tell you anything about what he did with these documents?

A    Um, to the best of my knowledge, um, I was under the impression that he was like in the business of selling documents and ID to people all over, because he was telling me that, um, some people come in this country and get deported.

Q    Can you look at the next paragraph there?

A    (The witness complies.)

Yeah.  That's when he was bragging about how -- he was like boasting about how he lied to the FBI, and, excuse my language, that they didn't know --

Q    Go ahead.

A    They didn't know -- They didn't know shit.

Q    Did he give you any more detail about how he was -- how he fooled the FBI?

Do you remember if he gave you any more detail, having reviewed this now?

A    No.  I can't recall right offhand.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

First of all, the next paragraph has a different date on it.

A     That's true.

Q     And that, the date is?

A     12-26-2001.

Q     Okay.

Did you not have any conversations between that first day, the 21st, and the 26th, or don't you remember?

A     Um, that is correct.

'Cause each time that I had the conversations pertaining to this, um, I put the date down.

Q     Okay.

So in the five days in between, you were -- were you talking to him at all?

A     Um, I was talking to him, but he wasn't saying nothing about this.

Q     Okay.

What did he say on the 26th, if you would take a moment and review your notes.

A     Yeah.

He was telling me about, um, the passports, they was like fake passports, and, um, fake green cards, and, um, he was telling me that

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q     Could you read the next paragraph.

Is that what you were telling me about him not liking the attorney general?

A     Yes, sir.

Q     Can you turn the page, please.

Now, this has a different date on it; right?

A     Yes.

Q     And the date is what?

A     12-27-2001.

Q     All right.

Can you take just a moment and review what's on that page, and tell me then what you recall about what he told you in that conversation.

A     Yes.

Um, he had had a lawyer with his -- Excuse me.  He had a visit with his attorneys.

Q     Um-hum.

A     With his attorney, and he had came back and told me that, um, they was going to make it -- like make a decision in two weeks if he was going to trial or not.

Q     As part of?

A trial about what?

A     Um, he was going to trial on the

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

terrorist -- the terrorist trial, whatever he was charged with.

Q    Okay.

Can you go -- Look at the next paragraph down and just take a moment and read it all the way through.

You may want to read the next page as well. It seems to continue.

A    (The witness complies.)

Yes. Um, I read that. That is true.

Q    Okay.

Can you tell me with respect to that, what was it he was telling you?

A    He was telling me about, um -- He had -- he had this laptop, um, laptop computer, and that, um, it was -- it was something about when the police tried to -- the police tried to arrest him that he left -- he went in and purchased this laptop, and I guess they was trying -- they was waiting for him at his car, and that he ended up leaving the car, and they ended up getting the car.

And I asked -- He was telling me the car was paid for. He paid $23,000 for the car, and some kind of way, he called them or they called him about the car, and he sent his friend that was

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

living with him to pick this car up.

Q    Do you remember if he told you what his friend's name was?

A    He never, um -- I don't believe he mentioned this, because I would have wrote it down.

Q    Okay.  Go ahead.

A    And I was trying to get the details, like, um, well, I was -- I asked him, I said why did you go back and get the car?

And he told me that the car was paid for.  And I was like, you know, how much was the car?

And he told me it was 23,000.  And he even told me what color the car was.  He said the car was green.

And he was telling me about a safe deposit box, and he had some money in a safe deposit box.

Q    He said he had money in a safe deposit box?

A    Yes.

Q    How much?

Did he say?

A    Um, I can't remember offhand.

Q    What did he do with the safe deposit box?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Did he say?

A     Um, I can't recall.

Q     Well, if you look down on -- and read the letter all the way to the bottom of that page and then the top of the next.

A     (The witness complies.)

Okay.  That's what he was telling me, that, um, he had -- he was acting like he was corroborating -- he was cooperating with the Secret Service agent, and this is the guy that had -- had called him.  I guess he was supposed to go meet him, and he left for -- a message on the answering service.

And the reason that it stands out in my mind, because he was laughing about it when he told me about it.  He was repeating what the agent had left on the answering service, and, um, he was just boasting about how he had -- how he had played like he was cooperating just to get out.  And once he got out, he didn't ever have any real intentions on going through with them, kind of deal or whatever kind of corroboration, and he was just laughing about it.

And on the car, he said the car was a Toyota, that he paid -- that he paid the 23,000 for.

**USA V Koubriti, ET AL 01-80778**

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

Q     And he got another car?

A     Yes.

He had -- he had a -- he had another car, and, um, he said they had both cars.  I guess the FBI got both cars, and all his computers.

Q     Now, in the -- in the, um -- in the notes you also say he also told you that he could bring the country down.  You've got electorally again.

A     Yeah.  I can't spell that good.

I meant to have electronically.

Q     Did he tell you how he was going to bring the country down electronically?

A     Yeah.

'Cause he told me that, um, he wanted to -- he went to telling me how much debt this country was in.  He's real knowledgeable, um, about the banking system that we have, and about computers.  And he was real confident on how he can like, um, steal money.

Q     Using the computer?

A     Using the computer.

Q     You've also got there, he stated President George W. Bush is a drug dealer.

A     That's exactly what he said.

Q     Did he say anything more?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A    Um, he went to --  He was just saying that.  Um, he just kept saying that, that the family, that the Bush family was -- was a drug family.

And I didn't really like the comments that he made.

Q    And the next paragraph, would you look at that, the next two paragraphs.

A    (The witness complies.)

Q    What was that about?

A    He was telling me about his girlfriend's brother.

She had come to see him -- come to visit him one time from Milwaukee, and that, um, he was -- he was teaching the brother, her brother, about computers.

Q    Okay.

And then the next paragraph is what you told me before, about the Secret Service agent and leaving a message?

A    Yeah.

Um --  Yes.  That's -- that's what he was --  The man had -- had left message on the answering service, and, um, he was like and where -- where are you, Patrick?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

And he started laughing when he told me this, and he repeated it again, like, where are you, Patrick?

Q   And then down in the next, um, paragraph, he told me he left Chicago.

A   He say he left Chicago, and he went to Iowa.  And in two weeks he had got a driving license and fake name.

Um, I asked him -- I asked him where did he get the driver's license?  And he told me from the Secretary of State in Iowa.  The same -- You can get the -- you can get it the same date from the Secretary of State, like you can get the driver's license in that state the same day.

Q   Okay.

How about the next paragraph?

A   That's where I --

Q   The next two paragraphs actually.

A   (The witness reviews the document.)

He was just telling me that, um, about the documents.

And I want to stress again that he was telling me he never knew nothing about the 9/11.

Q   Never knew nothing about 9/11?

A   About 9/11.

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

And he had some kind of other friend out there that was still walking around. I believe the guy owed him some money or he owed him some money, but it was something about that, but he told me he could never tell on him.

Q    Did he say who this person was or what he was doing?

A    He -- he didn't tell me nothing about the person.

He just told me there was other people out there still walking around. He could never tell on them.

Q    Did he say about why they were walking around, who they were, what they were doing?

A    No.

My understanding was that, um, like he had got locked up, but whoever else he knew that was doing this document stuff was still out there, and -- and he could never tell on them. That's what was my understanding.

Q    He didn't tell you the person's name?

A    No, sir.

Q    Then you've got another line, him brother live in Canada with wife and two kids.

What's that about?

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

A    The person that he was speaking of, he told me that, um, his brother stayed in Canada, and that his -- with his wife, and they had two kids.

And he -- he said, and I just -- I wrote that down, because it stood out in my mind.

Q    Oh, I see.  It was the person who was out there who had a wife and two kids in Canada?

A    No.

Q    No?

A    His brother, Youssef, has got a brother that stays in Canada.

Q    Oh, I see.

Mr. Hmimssa's brother was in Canada?

A    Yes.

Q    With a wife and two kids?

A    With a wife and two kids.

Q    In what context did he tell you about his brother and wife and two kids?

A    When he was speaking on that he -- he could never, um -- tell on this guy, that he -- whatever guy that he was referring to, that he couldn't tell on this person, because they know he got a brother that stays in Canada with a wife and two kids.

Q    Why would that be related, that he had a

USA V Koubriti, ET AL 01-80778

REDACTED TRANSCRIPT - IN-CAMERA HEARING, 12/23/03

brother in Canada and this guy?

How would that be related?

A    I guess that would be related to if he was to tell on this guy, get this guy in trouble, that they might go get his brother or his brother's two kids or something.

Q    Go after him?

A    Yes.

Q    Go after his brother?

A    Yes.

Q    Did Mr. Hmimssa say whether he was concerned about that or afraid for his brother?

A    He just said that in conversation, and I -- I wrote it down just as he said it.

I never knew he had no brother in Canada or married with kids or nothing.

Q    I see.

Now, you've got the next entry is on December 27, 2001, at 5:14 p.m. Thursday evening?

A    Yes.

Q    And what's that about?

A    I had another, um, conversation with him.

(The witness reviews the document.)

He was complaining about his diet and his whole Koran.  He said he had filed a motion

USA V Koubriti, ET AL 01-80778