UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,                  No. 01-CR-80778

vs.                                  Hon. Gerald E. Rosen

KARIM KOUBRITI,

                  Defendant.
_____/

OPINION AND ORDER REGARDING
DEFENDANT'S MOTIONS TO DISMISS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on       June 21, 2006

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

## I. INTRODUCTION

This matter is presently before the Court on two motions for dismissal of the Fourth Superseding Indictment filed by Defendant Karim Koubriti: (1) Defendant's July 26, 2005 "Motion to Dismiss Fourth Superseding Indictment on Due Process Grounds," and (2) Defendant's July 28, 2005 "Motion to Dismiss for Violation of the Double Jeopardy Clause of the Fifth Amendment." The Government has responded to both Motions.

The Court heard oral argument on this matter on May 1, 2006. At the conclusion

of the May 1 hearing, the Court ordered supplemental briefing from the parties

specifically addressing Defendant's due process argument and his allegations concerning

the "taint" of the evidence giving rise to his prosecution for mail fraud as a result of the

findings of prosecutorial misconduct in connection with the prosecution of the Third

Superseding Indictment.  The parties have complied with the Court's directive for

supplementation of the record.  Having reviewed and considered the parties briefs and the

oral arguments of counsel, the Court is now prepared to rule on this matter.  This Opinion

and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

A.  THE FOURTH SUPERSEDING INDICTMENT

Karim Koubriti is presently charged in a Fourth Superseding Indictment with

Conspiracy to Commit Mail Fraud.  The charges against Mr. Koubriti are predicated

upon a scheme to defraud Titan Insurance Company by filing a false automobile

insurance claim in the summer of 2001.  According to the indictment, Defendant Koubriti

and his co-defendant, Ahmed Hannan, falsely claimed to have been physically injured in

a July 5, 2001 motor vehicle accident in Dearborn, Michigan.[1]  Hannan claimed to have

suffered injury to his "back and left leg," and Koubriti claimed injury to his "back and

neck."  The two men claimed to have sought treatment for their injuries at Oakwood

Hospital in Dearborn, then purportedly treated with Dr. Nabil Metwally, M.D. in

---

[1]  Defendant Hannan pled guilty to the conspiracy charge and has been sentenced and deported.  He is, therefore, no longer part of this case.

Farmington, Michigan and at Rudy Physical Therapy in Dearborn.

The indictment further charges that Koubriti and Hannan submitted to Titan Insurance Company ("Titan") false claims for lost wages and fictitious mileage expenses, and submitted various false and fraudulent invoices and other fraudulent documentation for physical therapy and household replacement services which were never provided.  In particular, the indictment alleges that during the times and dates on the claims for lost wages and on the invoices reflecting physical therapy, Koubriti and Hannan were employed or in driving school.

B.      KOUBRITI'S TRIAL ON THE THIRD SUPERSEDING INDICTMENT

Koubriti was previously charged in a Third Superseding Indictment with Conspiracy to Provide Material Support to Terrorists and various document fraud offenses (the "Terrorist Indictment.").  The allegations in this indictment were very broad and ranged from providing money to terrorist groups overseas to planning attacks on the United States.  One element of the alleged conspiracy was a plan to commit fraud in order to both support terrorist activities and to "to cause economic harm to U.S. businesses."  [Terrorist Indictment, Count One, ¶¶ 9, 10(a)]. The indictment charged as one of the "overt acts" of the conspiracy that Defendants Koubriti and Hannan were involved in a traffic accident in Dearborn, Michigan on July 5, 2001in Dearborn, Michigan. *Id.* ¶ 25.

Evidence of these general allegations was presented at trial in April-May 2003

through the testimony of Youssef Hmimmsa. Hmimmsa testified regarding the Defendants' alleged involvement in "economic jihad." Hmimmsa testified that Hannan, Koubriti, and Farouk Ali-Haimoud met with an unidentified Tunisian regarding how to fake an automobile accident and defraud insurance companies. 4/15/03 Trial Tr. pp. 187, 191-192. The Government later introduced the testimony of Kathleen Gleason, regional claims manager for Titan. Ms. Gleason testified that Hannan and Koubriti submitted insurance claims to Titan arising out of the July 5, 2001 auto accident. Titan, however, denied the claims of both men because the insurer believed that the claims were fraudulent. Titan had discovered that the two men were taking truck driving classes when they claimed to be too injured to work and were attending classes when they were supposed to have been receiving medical treatment. 4/25/03 Trial Tr. pp. 4330-4333.

The Government also introduced Titan's records showing claims were made for payment for physical therapy treatments for Defendants Hannan and Koubriti, and also showed that requests were made for household service payments. According to the household service payment forms, Ahmed El-Kattan performed services for Defendant Hannan, and Farouk Ali-Haimoud performed services for Defendant Koubriti. 4/23/03 Trial Tr. pp. 4073-4074. El-Kattan testified, however, that he had performed no household services for Mr. Hannan after his accident. *Id.* at pp. 4069-72.

In its closing argument, the Government stated that the Defendants had committed insurance fraud, 5/19/03 Trial. Tr. pp. 6030, 6033, and that the July 5, 2001 accident was

part of the "jihad"-- the conspiracy to provide material support to terrorism -- at least implying that the fruits of the fraud would be used to support terrorist activities. *Id*. at pp. 6046-47.

C.      POST-TRIAL PROCEEDINGS

On June 3, 2003, the jury returned a verdict finding Defendant Koubriti guilty on Counts One and Two of the Third Superseding Indictment, i.e., Conspiracy to Provide Material Support or Resources to Terrorists and Conspiracy to Engage in Fraud and Misuse of Visas, Permits or other Documents.  Following the verdict, Defendant filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, for New Trial (referred to herein as "Motion for New Trial").  While Defendant's Motion for New Trial was pending, the Court was made aware of exculpatory evidence which had not been disclosed to the Defendants -- including Defendant Koubriti -- or the Court.   The Court conducted a full hearing on this and related matters on December 12, 2003, and following the hearing, ordered a complete file review by the Government of the case.  The United States Attorney General appointed a special counsel to conduct this review. Following an exhaustive review, spanning more than nine months and thousands of documents, the Government filed a Response concurring in Defendant's Motion for New Trial in which it moved the Court to dismiss Count One of the indictment -- the material support to terrorism charge upon which Koubriti was convicted -- without prejudice.

The Government's Response to the New Trial Motion comprehensively detailed

the results of its review and disclosed numerous instances of nondisclosure of material information to the defense and other instances of prosecutorial failure to comply with its *Brady* and *Giglio* obligations.  Taking only a few instances, the review disclosed that the CIA and Turkish National Police, Intelligence Division had a different opinion of the sketches in a day planner presented as evidence of Defendants' involvement in terrorist activities[2] than that which the Government presented to the jury, exculpatory evidence which was never shared with the defense or the Court.  The review further revealed that some officials within the U.S. Air Force agreed with the defense theory regarding a Hardened Aircraft Shelter, i.e., that it was a map of the Middle East.  This, too, was never disclosed to the defense.

Nor was the fact disclosed that photos were requested and obtained relating to a Day Planner sketch purporting to be a map to, and of, the Queen Alia Hospital in Jordan.[3] It was further not disclosed to the defense that the Las Vegas FBI had a very different opinion regarding a Las Vegas "casing tape" of the MGM Hotel/Casino and that the dialect on the tape -- Tunisian -- was posing problems for government interpreters, both

---

[2]  The Day Planner contained crude sketches which the Government maintained were operational terrorist casing sketches of the American Air Force Base at Incerlik, Turkey and of the Queen Alia Military Hospital in Amman, Jordan.

[3]  In fact, on cross-examination by the defense, witnesses at trial testified -- at least by strong implication -- that no such photos were ever taken.  The review revealed that such photos not only were taken, but were provided to the prosecutor prior to trial.  This, too, was not disclosed to the defense.  The prosecutor and a Government witness have recently been indicted on charges related to this testimony.  The Court, of course, neither expresses nor intends any opinion as to the legal validity of these charges.

of which were significant issues at trial.

The Government's review also revealed that potentially harmful impeachment information relating to the Government's primary witness on the terrorism charges, Youssef Hmimmsa, and his virulent anti-American views had not been disclosed to the defense or the Court.  Finally, the Government never disclosed to the defense or the Court that it had used a convicted felon, Marwan Farhat, to assist in the translation of Arabic audio tapes.  The correct translations of these tapes was also a significant issue at trial.

After considering the Government's Response, on September 2, 2004 the Court ordered that Count One of the Third Superseding Indictment be dismissed without prejudice, and ordered a new trial on Count Two.[4]  However, rather than pursuing a new trial on the remaining charge against Defendant Koubriti in Third Superseding Indictment (the document fraud conspiracy charged in Count Two), on December 15, 2004, the Government obtained from the grand jury the Fourth Superseding Indictment which alleges only one count -- the Mail Fraud conspiracy count discussed above.[5]

Contending that his prosecution on the Fourth Superseding Indictment violates double jeopardy and his due process rights, Defendant now moves to dismiss the indictment.

---

[4]  *See United States v. Koubriti*, 336 F. Supp. 2d 676 (E.D. Mich. 2004).

[5]  The remaining count in the Third Superseding Indictment (Count Two) was dismissed upon the filing of the Fourth Superseding Indictment.

III.  DISCUSSION

A.     DOUBLE JEOPARDY

The Double Jeopardy Clause of the Fifth Amendment provides that no person

shall "be subject for the same offense to be twice put in jeopardy." U.S. Const., amend.

V.  However, the Double Jeopardy Clause's general prohibition against successive

prosecutions is not absolute.  As the Supreme Court noted in *Lockhart v. Nelson*, 488

U.S. 33, 109 S.Ct. 285 (1988), "The Double Jeopardy Clause's general prohibition

against successive prosecutions does not prevent the government from retrying a

defendant who succeeds in getting his first conviction set aside, through direct appeal or

collateral attack, because of some error in the proceedings leading to conviction."  *Id.* 488

US. at 38, 109 S.Ct. at 289.[6]  Similarly, a guilty verdict by a jury which is set aside by the

district court on the defendant's motion for new trial does not trigger the prohibitions of

the Double Jeopardy Clause because original jeopardy is not terminated.[7]  *United States*

*v. Wood,* 958 F.2d 963, 970 (10th Cir. 1992).  As the court explained in *Wood*,

> A guilty verdict by a jury which is set aside by the district court on a
> motion by the defendant does not terminate jeopardy. The Supreme Court
> has indicated that one of the interests underlying the continuing jeopardy

---

[6]  By contrast, where the defendant's conviction is reversed or set aside based on a finding that the evidence was legally insufficient to support the conviction, double jeopardy bars retrial on the same charge.  *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150 (1978); *Hudson v. Louisiana*, 450 U.S. 40, 42, 101 S.Ct. 970, 972 (1981).

[7]  The concept of "continuing jeopardy" has application where criminal proceedings against an accused have not run their full course. *Price v. Georgia*, 398 U.S. 323, 326, 90 S.Ct. 1757, 1759 (1970).

> principle is a "limited waiver," *Price* [*v. Georgia*], 398 U.S.[ 323,] 329 n. 4, 90 S.Ct. [1757,] 1761 n. 4 [(1970)], and this is particularly significant to the present case. Defendant's asserted double jeopardy claim rests on his right not to be tried twice for the same offense, yet Defendant asked for the new trial. Had the district court granted a motion by Defendant for a mistrial prior to the jury returning a verdict, the Double Jeopardy Clause would not bar a retrial. *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion) ("a motion by the defendant for a mistrial is ordinarily assumed to remove any barrier to reprosecution"). *See also* [*United States v.*] *Scott*, 437 U.S. [82,] 93, 98 S.Ct. [2187,] 2194 [(1978)]; *United States v. Dinitz*, 424 U.S. 600, 607, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976); *United States v. Poe*, 713 F.2d 579, 583 (10th Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984). Further, had the District Court declared a mistrial due to a "manifest necessity" prior to the jury returning a verdict, the Double Jeopardy Clause would not bar his retrial. *See Illinois v. Somerville*, 410 U.S. 458, 462-63, 93 S.Ct. 1066, 1069-70, 35 L.Ed.2d 425 (1973); *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). In the latter situation, the Double Jeopardy Clause would not bar a retrial even if legally insufficient evidence was presented at the first trial. *Richardson* [*v. United States*], 468 U.S. [317,] 326, 104 S.Ct. [3081,] 3086 [(1984)]. We see no reason why the result should be any different when the district court grants Defendant's motion for a new trial after the jury returns a verdict.

958 F.2d at 970-71.  *See also*, *United States v. Arache*, 946 F.2d 129 (1st Cir. 1991), *cert. denied*, 503 U.S. 948 (1992) (holding that double jeopardy did not bar retrial after the grant of defendant's motion for new trial where no finding had been made that the evidence was legally insufficient to support his conviction.)

Although this case is somewhat different in that the Court did not grant a new trial on the material support to terrorism conspiracy charged in Count One of the Third Superseding Indictment but rather dismissed that charge, without prejudice, the fact remains that Defendant Koubriti *asked* for a new trial.  Under the foregoing authorities no

double jeopardy principles are implicated under these circumstances.

However, Koubriti contends that his case should be analyzed under the principles of *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083 (1982). In *Oregon v. Kennedy*, the Supreme Court carved out a narrow exception to the rule that where the defendant moves for a mistrial, the Double Jeopardy Clause is not a bar to a retrial. Under this exception, only if the conduct giving rise to the mistrial was prosecutorial or judicial conduct intended to provoke or "goad" the defendant into moving for a mistrial will double jeopardy bar a retrial.

In *Oregon v. Kennedy,* the defendant was charged and tried for the theft of an oriental rug. At trial, the State's expert testified as to the value and identity of the property involved. On cross-examination, the expert acknowledged that he had once filed a criminal complaint against Kennedy but explained that no action had been taken on his complaint. On redirect, the trial court sustained a number of objections to the prosecutor's questions seeking to establish the reasons why the witness had filed a complaint against the defendant. After eliciting from the witness that he had never done business with Kennedy, the prosecutor asked: "Is that because he is a crook?" At which point the court granted Kennedy's motion for a mistrial.

On retrial, the court rejected Kennedy's contention that the Double Jeopardy Clause barred further prosecution of him finding that it was not the intention of the prosecutor in this case to cause a mistrial. Kennedy was convicted but his conviction was

10

reversed by the Oregon Court of Appeals which sustained the double jeopardy claim because it found that the prosecutorial misconduct that had occasioned the mistrial, even if not intended to cause a mistrial, amounted to "overreaching."

The Supreme Court reversed holding that where a defendant in a criminal trial successfully moves for a mistrial, he may invoke the bar of double jeopardy in a second effort to try him only if the conduct giving rise to the successful motion for a mistrial was prosecutorial or judicial conduct *intended* to provoke the defendant into moving for a mistrial. Since both of the courts below agreed that the prosecutor did not intend her conduct to provoke Kennedy into moving for a mistrial, the Court held that that is the end of the matter for purposes of the Double Jeopardy Clause.

Following the Supreme Court's decision, appellate courts, including the Sixth Circuit, have been very reluctant to find the intent necessary to satisfy the *Kennedy* standard. *See, e.g., United States v. Thomas*, 728 F.2d 313, 318 (6th Cir. 1984) (no double jeopardy bar to retrial where the Court's "review of the record leads us to conclude that none of the prosecutor's behavior here will pass the intentional-goading-into-mistrial test of *Oregon*"); *United States v. Curry*, 328 F.3d 970, 973 (8th Cir. 2003) (district court's ruling that retrial was not barred following post-trial grant of defendant's mid-trial motion for mistrial upheld on the basis that, despite the prosecutor's withholding of material impeachment evidence and improper comments during closing argument, these actions were not an attempt to goad defendant into requesting a mistrial);

11

*United States v. Gonzalez*, 248 F.3d 1201, 1204 (10th Cir. 2001) (government's appeal of the district court's grant of defendant's mistrial motion not barred because the government's intent in introducing allegedly prejudicial evidence may have been to obtain a conviction rather than a mistrial); *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001), *cert. denied*, 534 U.S. 894 (2001) (government's concealment of discoverable materials held not intended to provoke mistrial); *Greyson v. Kellam*, 937 F.2d 1409 (9th Cir. 1991) (no double jeopardy bar to retrial where misconduct showed the prosecutor's desire to *convict*, and not an intent to goad defendant into moving for mistrial).

As Judge Posner of the Seventh Circuit explained in discussing *Kennedy* in *United States v. Oseni,* 996 F.2d 186 (7th Cir. 1993):

> The requirement of intent is critical, and easily misunderstood. The fact that the government blunders at trial and the blunder precipitates a successful motion for mistrial does not bar a retrial. Yet the blunder will almost always be intentional -- the product of a deliberate action, not of a mere slip of the tongue. A prosecutor who in closing argument comments improperly on the defendant's failure to have taken the stand, thus precipitating a mistrial or a reversal on appeal, is no doubt speaking deliberately, though his judgment may be fogged by the heat of combat. But **unless he is trying to abort the trial, his misconduct will not bar a retrial. It doesn't even matter that he knows that he is acting improperly, provided that his aim is to get a conviction. The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means**.

996 F.2d at 188 (citations omitted; emphasis added).

Accordingly, even if Koubriti's trial had been aborted on a motion for mistrial --

12

which it was not -- Koubriti cannot establish that the *Brady/Giglio*, and other violations found to have occurred here were undertaken with the intent to provoke a mistrial. Indeed, Koubriti has not established any concern on the prosecutor's part over a potential acquittal. Rather, any fair reading of the course of the trial and post-trial proceedings which occurred in this case evince, if anything, the over-zealousness and overreaching of the prosecutor in an attempt to obtain a conviction of Koubriti and his co-defendants at the trial; certainly there is absolutely no evidence that the prosecutor was attempting to goad Defendant into seeking a mistrial. Although the Court certainly does not countenance the prosecutor's conduct in this case and, in fact, has expressed -- and continues to express -- its abhorrence of this conduct, the facts here simply do not provide a basis for application of double jeopardy principles.

In the final analysis, Koubriti's reliance on *Kennedy* is misplaced because, as noted, *Kennedy*'s narrow exception applies only in cases of motions for mistrial, not to post-verdict motions for new trial. Koubriti cites to *dicta* in the Second Circuit's decision in *United States v. Wallach*, 979 F.2d 912 (2nd Cir. 1992), *cert. denied*, 508 U.S. 939 (1993), for the proposition that "in cases where the misconduct remains hidden until after a verdict is returned and an acquittal is avoided by prosecutorial misconduct, the same rationale [as that underlying *Oregon v. Kennedy*'s mistrial ruling] should prevent retrial." *See* Defendant's Brief in Support, pp. 3-4.

While the Second Circuit may appear to be willing to extend the *Kennedy*

rationale to post-verdict dismissals,[8] the Sixth Circuit -- as well as other circuits that have considered the issue -- has refused to do so.  In *United States v. Davis*, 873 F.2d 900, 906 (6th Cir. 1989), *cert. denied*, 493 U.S. 923 (1989), the Sixth Circuit explained that "*Oregon* is a speciman of what we might call the 'mistrial' branch of double jeopardy law," and concluded that because "no mistrial was declared at Mr. Davis's trial [Davis's conviction had been overturned on appeal], *Oregon* and its relatives do not apply here." *See also United States v. McAleer*, 138 F.3d 852, 855-56 (10th Cir. 1998), *cert. denied*, 425 U.S. 854 (1998); *United States v. Doyle*, 121 F.3d 1078, 1086-87 (7th Cir. 1997).

Because the Sixth Circuit has declined to extend *Kennedy*'s prosecutorial misconduct rule to situations involving *post-conviction* motions, Koubriti's claim for double jeopardy protection fails.

Furthermore, the fact that the Court *dismissed* the conspiracy to provide material support to terrorists charge rather than grant the defendant's motion for new trial on this charge does not change the result.  An analogous situation was presented in *United States v. Davis, supra*.  In that case, the defendant, a real estate developer, was indicted, tried and convicted for mail fraud under the theory that Davis had devised a scheme or artifice to defraud citizens of their rights to honest and faithful services from their public

---

[8]  Even the Second Circuit has applied its extension of *Kennedy* sparingly.  *See, United States v. Pavloyianis*, 996 F.2d 1467, 1474 (2nd Cir. 1993) (retrial after conviction not barred as a result of perjury by prosecution witness because there was no evidence that prosecutorial misconduct in allowing perjury, of which prosecution should have been aware, was perpetrated with the specific objective of avoiding an acquittal that the prosecution viewed as likely at the time.)

officials.  While his appeal of his conviction was pending, the United States Supreme

Court decided *McNally v. United States*, 483 U.S. 350 (1987), holding that the federal

mail fraud statute is limited in scope to the protection of tangible property rights and does

not make it a crime to deprive citizens of their intangible right to honest performance by

public officials.[9]  In an unpublished per curiam opinion, the Sixth Circuit reversed

Davis's conviction on the ground that the indictment against him was defective under

*McNally*.  On remand, the district court dismissed the indictment.  Ten days later, a

superseding indictment was returned against Davis, charging him with four counts of

mail fraud based on the same mailings purported to establish the dismissed charge of the

original indictment.  Davis moved to dismiss the superseding indictment for violation of

the Double Jeopardy Clause.  Both the district court and the Sixth Circuit found not

double jeopardy bar to Davis's prosecution under superseding indictment following

dismissal of the original indictment.

   Among the arguments Davis made in support of his double jeopardy claim was an

argument for application of *Oregon v. Kennedy* to bar reprosecution in his case.  The

Sixth Circuit rejected that argument out of hand explaining:

> [I]n *Oregon v. Kennedy* , . . . jeopardy would have been terminated, and a
> retrial would have been barred by the Double Jeopardy Clause, had it been
> found as a fact that the prosecutor was guilty of misconduct that was
> intended to provoke the defendant into moving, successfully for a mistrial.

---

[9] Following the Supreme Court's *McNally* ruling, Congress amended the mail fraud statute to incorporate the intangible rights theory as part of the Anti-Drug Abuse Act of 1988, 18 U.S.C. § 1346.

> *Oregon* is a specimen of what we might call the "mistrial" branch of double jeopardy law; but no mistrial was declared at Mr. Davis's trial, and *Oregon* and its relatives do not apply here. . . .

873 F.2d at 906 (citations omitted).

*Davis* makes clear that it matters not that a dismissal, as opposed to a new trial on the charge in the original indictment was obtained as a result of the defendant's new trial motion. What matters for purposes of application of *Oregon v. Kennedy* is that there have been a motion for a mistrial made and that the prosecutor have goaded the defendant into moving for the mistrial. Neither of these circumstances is present here.

The Court next evaluates the substantive double jeopardy issues in this case in order to show that even absent an *Oregon v. Kennedy* analysis, Defendant's double jeopardy motion fails on the merits.

B.      EVEN IF KOUBRITI WERE ENTITLED TO RAISE A DOUBLE JEOPARDY CLAIM, ON THE MERITS THAT CLAIM WOULD FAIL

Even if Koubriti had alleged a potentially viable double jeopardy claim, that claim would fail on the merits. The essence of a double jeopardy defense is that a defendant may not twice be put in jeopardy on the same charges. The test to determine whether two offenses are, in fact, the same was enunciated by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 3304, 52 S.Ct. 180, 182 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether these are two offenses or only one is whether each provision requires proof of fact which the other does not. A single act may be an offense against two statutes; and if each statute requires proof of an

additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

*Id.* (citations omitted).

In a conspiracy case, it is the agreement to do a particular, specific act which forms the nucleus of the offense. *See Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101 (1942); *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1984), *cert. denied* 469 U.S. 817 (1984).  Therefore, a determination of whether the government can prosecute on more than one conspiracy must rest upon whether there exists more than one agreement.  *Id.*

To determine whether two conspiracy indictments arise from a single agreement to do a specific act, the Sixth Circuit applies a totality of circumstances test.  *United States v. Sinito, supra*; *United States v. Benton*, 852 F.2d 1456, 1463-1464 (6th Cir. 1988) *cert. denied*, 488 U.S. 993 (1988).[10]  The test requires the trial court to consider the elements of: (1) time; (2) persons acting as co-conspirators; (3) the statutory offenses charged in the indictments; (4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and (5) places where the events alleged as part

_____

[10]  The totality of the circumstances tests has been applied by a number of circuits. *See e.g., United States v. MacDougall*, 790 F.2d 1135, 1143 (4th Cir. 1986); *United States v. Thomas*, 759 F.2d 659, 662 (8th Cir. 1985); *United States v. Castro*, 629 F.2d 456 (7th Cir. 1980); *United States v. Marable*, 578 F.2d 151 (5th Cir. 1978); *United States v. Mallah*, 503 F.2d 971 (2nd Cir. 1974), *cert. denied*, 420 U.S. 995 (1975).

of the conspiracy took place.  *Sinito*, 723 F.2d at 1256.  Where several of these factors

between the conspiracies are different, the conclusion follows that the alleged illegal

conspiracies are separate and distinct offenses.  *Id.* at 1256-57.

Applying this test, the Court finds that the Third and Fourth Superseding

Indictments charge two separate and distinct conspiracies.  First, the Third Superseding

Indictment charged a violation occurring from February 1998 through January 29, 2003,

a period of nearly five years.  By contrast, the mail fraud conspiracy of the Fourth

Superseding indictment spans a period of only 10 weeks, from July 5, 2001 through

September 17, 2001.  Although the mail fraud activities charged in the current indictment

include an overt act which was a part of the larger conspiracy charged and tried under the

Third Superseding Indictment, it is beyond question that these activities represented only

a part of the much more extensive terrorism support activities charged and tried under the

earlier indictment. As the Sixth Circuit observed in *Sinito*, two separate conspiracies can

exist even where the time period in the first indictment completely subsumes the time

period charged in the second indictment.  723 F.2d at 1257.  ("Time frames and

personnel can overlap in separate criminal agreements." *Id*., *quoting United States v.*

*Inmon*, 594 F.2d 352, 354 (3rd Cir.), *cert. denied*, 444 U.S. 859 (1979).)

Further, the number and identities of persons charged as co-conspirators is

different.  The present indictment charges only two defendants -- Karim Koubriti and

Ahmed Hannan.  The material support to terrorists count charged five defendants and

18

other unnamed co-conspirators with engaging in 21 separate overt acts; these overt acts span the time period from October 2000 through November 2002.  The only overt act relating to the currently charged mail fraud conspiracy -- the alleged automobile accident of July 5, 2001 reflected in ¶ 25 of the Third Superseding Indictment -- is not even charged as an overt act in the Fourth Superseding Indictment.  And, to the extent that Defendant alleges that a double jeopardy violation is established based on the fact that evidence relating to the automobile accident, which forms the basis of the present mail fraud conspiracy charge, was also part of the evidence adduced in the prior trial, the "same evidence" test has been explicitly rejected by the Supreme Court.  *See United States v. Dixon*, 509 U.S. 688 (1993); *see also United States v. Sinito*, 723 F.2d at 1256 (noting that "[i]n recent years courts have recognized the inherent infirmities in applying the same evidence test to conspiracy cases.")

Although Koubriti and Hannan were alleged to have been participants in the conspiracy to provide material support to terrorists, it is well settled that "[t]he rule [against double jeopardy] does not apply where there are two distinct conspiracies, even though they may involve some of the same participants."  *Sinito, supra*, 723 F.2d at 1257; *see also United States v. Lurz*, 666 F.2d 69, 74 (4th Cir. 1981), *cert. denied*, 459 U.S. 843 (1982); *United States v. Papa*, 533 F.2d 815, 821-22 (2nd Cir. 1976), *cert. denied*, 429 U.S. 961 (1976).

Next, while the statutory offenses in both indictments are charged as conspiracies,

19

the objects, means, methods, overt acts and, perhaps, more importantly, the elements in each are distinctively different.  The offense of conspiracy to provide material support to terrorists as charged in the Third Superseding Indictment required the Government to prove (1) an agreement between two or more individuals (2) to destroy specific property belonging to a foreign government in violation of 18 U.S.C. § 956(b) or destroy or damage a structure within the United States in violation of 18 U.S.C. § 2332(b); (3) the defendant's knowing participation in the agreement; and (4) an overt act toward the commission of one or more of the dual objects of the conspiracy.  By clear contrast, the mail fraud conspiracy charged in the present indictment requires that the Government prove that Koubriti, in concert with co-defendant Hannan (1) having devised a scheme to defraud; (2) conspired or agreed to execute that scheme; and that (3) as part of the execution of that scheme, one or more mailings utilizing the U.S. Postal Service or a private or commercial interstate carrier occurred.

Additionally, as indicated above, 20 of the 21 overt acts charged in the Third Indictment have nothing whatsoever to do with the mail fraud charged in the Fourth Indictment.  Similarly, seven of the 24 overt acts charged in the current indictment charge fraudulent mailings, none of which are encompassed in the Third Indictment.

Finally, the locations of the two charged conspiracies are different.  The terrorist conspiracy in the Third Superseding Indictment is alleged to have extended to a number of foreign countries including Turkey, Jordan and the Netherlands; and to include a

number of U.S. locations -- Chicago, Illinois; Greensboro, North Carolina; and Dearborn, Detroit and Romulus, Michigan.  In contrast, the acts forming the basis of the mail fraud conspiracy are alleged to have occurred entirely with the cities of Dearborn and Farmington, Michigan.

The foregoing demonstrates that the application of the *Sinito* "totality of the circumstances" factors calls for a finding of separate distinct conspiracies having been charged in the Third and Fourth Superseding Indictments.  In arguing for a finding of a single conspiracy, Defendant Koubriti relies heavily on a case out of the Western District of Michigan, *United States v. Shepard*, 89 F. Supp. 2d 884 (W.D. Mich.1999), in which Judge Quist applied the *Sinito* totality of circumstances test to two drug conspiracies charged in two separate indictments and determined that the conspiracy charges in the two indictments arose out of a single drug conspiracy.  Judge Quist granted the defendant's motion to dismiss on double jeopardy grounds as to one count of the later indictment.  In so doing, however, Judge Quist was particularly persuaded that there was only one conspiracy by the facts that (1) both of the indictments alleged conspiracies that began at roughly the same time and (2) both indictments charged the very same object of the conspiracy -- possession with intent to distribute marijuana.  89 F. Supp. 2d at 888-889.  No such broad similarities exist in this case.

For all of the foregoing reasons, the Court finds that the conspiracies charged in the Third and Fourth Superseding Indictments are sufficiently separate and distinct as to

constitute separate agreements. Accordingly, Koubriti's double jeopardy motion lacks merit.

For all of the reasons stated above, Defendant's motion to dismiss for violation of the double jeopardy clause will be denied.

C.     DEFENDANT'S MOTION TO DISMISS ON DUE PROCESS AND RELATED
       GROUNDS IS SIMILARLY WITHOUT MERIT

Defendant has also filed a separate motion seeking dismissal of the Fourth Superseding Indictment arguing that because of "outrageous government conduct" in connection with the Third Superseding Indictment, the Court should dismiss the Fourth Superseding Indictment on due process grounds or, alternatively, by invoking its inherent supervisory power.

1.     DUE PROCESS

A court may dismiss an indictment on due process grounds when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. . . ." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). Whether outrageous government misconduct justifying dismissal on due process grounds exists also turns on a totality of the circumstances test. *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981), *cert. denied*, 457 U.S. 1108 (1982).

Defendant Koubriti argues that such "outrageous government misconduct" is evidenced in this case by:

A.   the allegations contained in Defendant's Amended Motion for Judgment Notwithstanding the Verdict, or in the alternative for New Trial;

B.   the information contained in the Government's Consolidated Response Concurring in Defendants' Motion for a New Trial and Government's Motion to Dismiss Count One without prejudice, and Memorandum in Support;

C.   the information disclosed on June 29, 2004 on the CD-ROM;

D.   any undisclosed *Brady* and/or *Giglio* evidence or material; and

E.   yet to be disclosed evidence of government misconduct which has been uncovered in any of the collateral investigations being conducted by the Government.

[Defendant's Due Process Motion to Dismiss, p. 2.][11]

However, all of this evidence pertains to the conduct of the former prosecutors and the investigation into the allegations forming the basis of the Third Superseding Indictment which the Government has already stipulated to dismissing. Furthermore, the present prosecutors were not involved in the prosecution of the Third Superseding Indictment. Importantly, there has been no showing that the particular evidence which will be used by the Government in its prosecution of the instant mail fraud charges was in any way "tainted" by misconduct on the part of the prior prosecution team.

At the May 1, 2006 hearing on this matter, defense counsel identified only one

---

[11]   Defendant further contends that the Court should require the Government to disclose the information contained in paragraphs (d) and (e).

23

piece of evidence that was arguably "tainted," that being the FBI 302 documenting the

November 19, 2001 telephonic interview with Attorney Allen Blatinkoff conducted by

Special Agent Cheryl Crockett.  Blatinkoff had been retained by Defendants Koubriti and

Hannan on July 6, 2001 to represent them with regard to the accident claim they filed

with Titan Insurance Company.[12]  Defendant Koubriti's position is that by interviewing

---

[12]  The substance of the interview as memorialized by Agent Crockett in the FBI 302 is as follows:

> On November 19, 2001, Attorney Allen Blatinkoff was interviewed via telephone by Special Agent Cheryl K. Crockett. . . .  After addressing the nature and purpose of the interview, Blatinkoff made [] the following statements:

> On July 6, 2001, Allen Blatinkoff was retained by Karim Koubriti and Ahamad [sic] Hannan to represent them in an accident claim filed with the Titan Insurance Company on July 5, 2001.  Blatinkoff stated that Koubriti[] and Hannan were referred to him by representatives of Rudy's Physical Therapy.  Blatinkoff then stated that he has represented other patients in the past that were patients of Rudy's Physical Therapy.  Blatinkoff further stated that his initial meeting with Koubriti and Hannan was very brief, however, Blatinkoff informed Koubriti and Hannan of the "No Fault" benefits available to them as a result of the accident.  According to Blatinkoff, while awaiting for the initial payment claims from the insurance company, Blatinkoff learned the following facts which caused Blatinkoff to withdraw as counsel for Koubriti and Hannan:

> Blatinkoff learned through the media that his clients, Koubriti and Hannan had been arrested for alleged ties involving the September 11, 2001 incident.  According to Blatinkoff, with his clients in police custody, they could not get the necessary treatment that would enable Blatinkoff to perfect a disability case.  Blatinkoff further stated that both Koubriti and Hannan ha[d] violated their representation agreement with Blatinkoff.  Blatinkoff's agreement calls for his clients to provide Blatinkoff with current or change of address so that Blatinkoff can contact them when necessary.  Blatinkoff stated that Koubriti and Hannan had provided him

Attorney Blatinkoff, the Government invaded Koubriti's attorney-client relationship with Blatinkoff and, as such, Blatinkoff's testimony is "tainted evidence."[13]  Having reviewed the Blatinkoff FBI 302, however, the Court finds no evidence of taint.

As an initial matter, the Court notes that the Sixth Circuit has expressly held that evidence that a defendant consulted with an attorney does not invade the attorney-client relationship.  *See United States v. Tocco*, 200 F.3d 401, 422-23 (6th Cir. 2000).  In *Tocco*, the defendant claimed that prosecutorial misconduct occurred when the prosecution elicited testimony during trial from various witnesses that he had consulted an attorney and that he did so in the company of co-conspirators.  The Sixth Circuit found Tocco's claim to be without merit:

---

> with an address of 1335 Riverside, Detroit, Michigan when they were actually residing at 2653 Norman, Detroit, Michigan.  Blatinkoff concluded that Koubriti and Hannan were claiming not being able to work but according to the media, they were working at Sky Chef during the time frame that they were alleging to have been disabled.  Based on these facts, Blatinkoff closed his file on both Koubriti and Hannan on September 19, 2001.

---

[13]  Defendant's identification of this allegedly "tainted" evidence led the Court to order the parties to supplement the record by explaining what evidence from the trial on the Third Superseding Indictment they anticipate will be used at the trial on the Fourth Superseding Indictment so that the Court could determine whether, in fact, such evidence might be deemed tainted.  Accordingly, the parties filed supplemental briefs addressing this issue.  In addition, the Government has provided the Court and the defense with copies of the FBI 302s of all of the witnesses interviewed in connection with the allegations of insurance fraud during the investigation of leading to the Terrorism Indictment.

> [W]e find that the evidence of Tocco's visit to [Attorney] Bellanca's law office -- or evidence that Tocco sought out or consulted the advice of an attorney generally -- simply does not invade the attorney-client relationship, nor does such evidence impinge on the exercise of Tocco's constitutional right to consult with an attorney.

200 F.3d at 422-23.

Furthermore, as is evident from the FBI 302 interview, no client confidences were disclosed in Blatinkoff's interview.  The bulk of the interview was spent on Blatinkoff informing Agent Crockett of his reasons why he was not going to represent Koubriti and Hannan.  His reasons were not based upon any statements they had given him or any legal advise he had given to them, but rather on information he had gleaned from media reports.

However, even assuming *arguendo* that an invasion of the attorney-client relationship occurred by virtue of this single interview of Mr. Blatinkoff,[14] since the Government has affirmatively stated that it does not intend to call Blatinkoff as a witness, Defendant cannot show that he has been prejudiced by the interview.  In *United States v. Valencia*, 541 F.2d 618  (6th Cir. 1976) -- one of the cases that Defendant Koubriti himself relies upon -- the Sixth Circuit made clear that to obtain a dismissal of an indictment, the defendant must show both an invasion of the attorney-client relationship and that information obtained by virtue of the Government's intrusion into the

---

[14]  The Government has stated in its Supplemental Brief that it has not re-interviewed Blatinkoff in its investigation leading up to the Fourth Superseding Indictment.

relationship is <u>used</u> at trial.  The *Valencia* court explained:

> We agree with the district court that it was improper for the government to have intruded into an attorney-client relationship by paying an attorney's secretary for information about his clients.  If any convictions here were affected by the taint of this highly irregular, and we trust, unusual arrangement, we would not hesitate to set aside the convictions.
>
> However, we believe that no necessary inference of prejudice with respect to appellants can be made on the basis of the government's intrusion into the privileged relationship between attorney and client.  The more recent authority indicates that there must be a showing of prejudice as well as a showing of an intrusion into the privileged relationship. * * *  [To make this showing] appellants must demonstrate that specific evidence used in the government's case against appellants [at trial] was obtained through Miss Reichard [the secretary]. . . .
>
> The only evidence that should have been used to convict appellants was information that the Government obtained independently of and unrelated to Miss Reichard's disclosures. . . .

541 F.3d at 623 (citations omitted).

Since Defendant cannot show that he has been prejudiced by the alleged intrusion upon his relationship with Attorney Blatinkoff, his reliance upon the Blatinkoff interview as support for his due process claim is misplaced.

Turning then to the other evidence from the investigations concerning the Third Superseding Indictment that the Government has proffered, as a threshold matter, the Court notes that Defendant never alleged any prosecutorial misconduct with respect to the evidence concerning the insurance fraud claim in his  Amended Motion for Judgment Notwithstanding the Verdict, or in the alternative for New Trial.  Nor did the Government's extensive post-trial investigation reveal any such misconduct.

The Court has now re-examined all of the Third Superseding Indictment 302s on the insurance fraud claim submitted by the Government and finds no evidence of taint in any of them.  Simply stated, the evidence does not establish that the investigations leading to the present indictment arise out of tainted government transgressions that "infected every part of the investigation and [current] prosecution of the defendant."  *United States v. Marshank*, 777 F. Supp. 1507, 1522 (N.D. Cal. 1991).

Defendant makes a "fruit of the poisonous tree" argument claiming that the present case should be viewed as nothing more than a mere continuation of the previous indictment and prosecution which the Government conceded was so infected that it stipulated to dismissal of the charges.  In the Court's view, however, by having obtained a dismissal of the terrorism indictment, Defendant has received all the process that he is due as a result of the misconduct of the prior prosecutors.  The Court has already expressed -- both in this Opinion and in its previous opinion dismissing the material support charges -- its distress and strong disapproval of the former prosecutors' failure to meet their professional and constitutional obligations to the defense, the Court and the justice system.  Nothing in this Opinion is intended in any way to diminish the Court's condemnation of that conduct.  But, the Court cannot, as a result of that misconduct, simply overlook the serious allegations of Defendant's unlawful activities in the Fourth Superseding Indictment.  Because the Government failed in its prosecutorial obligations to Defendant in one case does not give Defendant a "free pass" as to other allegations of

wrongdoing.

In sum, having failed to show that the evidence in support of the Fourth Superseding Indictment is tainted, Defendant has failed to establish that his due process rights were violated by the latest indictment.

2.      SUPERVISORY POWER

The power of a district court to dismiss a grand jury indictment under the supervisory powers doctrine is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice.  *United States v. Streebing*, 987 F.2d 368 (6th Cir. 1993), *cert. denied*, 508 U.S. 961 (1993).  However, while a court may use its supervisory power to dismiss an indictment, dismissal is, generally speaking, a disfavored remedy.  *United States v. Rogers*, 751 F.2d 1074 (9th Cir. 1985).  In *United States v. Smith*, 687 F.2d 147 (6th Cir. 1982), *cert. denied*, 459 U.S. 1116 (1983), the Sixth Circuit held that "[i]n order for this court to order dismissal of an indictment as part of its supervisory powers, there must be a showing of 'demonstrated and longstanding prosecutorial misconduct' as well as a showing of substantial 'prejudice to the defendant.'" *Id.* at 152-53.  To meet this standard, thus, Defendant Koubriti must show that the earlier misconduct was not remedied, or that there is some identifiable previously-tainted evidence that the Government seeks to use against him in a trial on the new charges.  Koubriti cannot make this showing.

Here, the Third Superseding Indictment was voluntarily dismissed in its entirety by the Government upon discovery of significant failures of the original prosecution team to fulfill its discovery obligations to the Court and to the defense.  A new and different prosecution team acknowledged these failures.  The Government's self-imposed remedy was not merely setting aside the verdicts but involved a complete dismissal of the indictment.  Under these circumstances, the Court does not find that the "integrity of the judicial process" and deterrence of improper conduct would be furthered by dismissal of the current indictment.  This is especially true here where the proximate harm occasioned by the misconduct has already been remedied by the Government's earlier dismissal of the misconduct-tainted charges.

For all of these reasons, the Court does not find that the extraordinary remedy of dismissal under the Court's supervisory power is justified.

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss for Violation of the Double Jeopardy Clause is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Dismiss on Due Process Grounds is DENIED.

IT IS FURTHER ORDERED Defendant's blanket request that the Court order the Government to disclose any "undisclosed classified *Brady* and/or *Giglio* evidence or

30

material" and any "yet to be disclosed evidence of government misconduct which has

been uncovered in any of the collateral investigations being conducted by the

Government" as to the conduct of the former prosecutors is DENIED.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  June 21, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 21, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager